Howard & Howard

One North Main
Suite 300
101 North Main Street
Ann Arbor, MI 48104-1475
734.222.1483
Fax 734.761.5957

Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304-5151
248.645.1483
Fax 248.645.1568

Comerica Building
Suite 300
151 South Rose Street
Kalamazoo, MI 49007-4718
269.382.1483
Fax 269.382.1568

Wells Fargo Tower
Suite 1400
3800 Howard Hughes Parkway
Las Vegas, NV 89169-5914
702.257.1483
Fax 702.567.1568

Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602-1350
309.672.1483
Fax 309.672.1568

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(WESTERN DIVISION)

| | |
|---|---|
| TITAN TIRE CORPORATION OF FREEPORT, ) | CASE NO. _____ |
| Plaintiff, ) | |
| v. ) | MOTION TO VACATE ARBITRATION AWARD |
| UNITED STEELWORKERS OF AMERICA, ) LOCAL 745L, ) | **08 C 50072** |
| Defendant. ) | **JUDGE KAPALA** **MAGISTRATE JUDGE MAHONEY** |

Titan Tire Corporation of Freeport ("Titan Tire"), for its claim against the United Steelworkers of America, Local 745L ("Union"), moves to vacate the arbitration award entered on January 24, 2008, as follows:

1.    Titan Tire is an Illinois corporation with its principal place of business in Freeport, Illinois.  Titan Tire operates a manufacturing facility in Freeport, Illinois for the construction of agricultural and other off-road tires.

2.    The Union is a "labor organization" as defined in the Labor Management Relations Act, 29 U.S.C. § 152(5).  The Union represents employees of Titan Tire's Freeport facility.

3.    Jurisdiction in this court is appropriate under 9 USC § 1 *et seq.*, 28 USC § 1331 and 29 U.S.C. § 185.

4.    Venue is appropriate in that this case is brought in the judicial district within which Defendant resides, pursuant to 28 USC § 1391(b), and within which a substantial part of the events giving rise to the claim occurred.

5.    The parties have entered into a Collective Bargaining Agreement ("CBA") which provides that any controversy between Titan Tire and the Union shall be a grievance.  A copy of the CBA is attached as Exhibit 1.  The parties also negotiated and entered into a Benefits Agreement, a copy of which is attached as Exhibit 2.

6.    Under the CBA grievance procedure, any dispute that is not resolved by the parties is submitted to an arbitrator.  (See Exhibit 1, Article VI, Section 4).

7.    Under the CBA, the arbitrator has limited authority:

> The Impartial Arbitrator shall not have the power to make any award changing, amending, or adding to the provisions of the Agreement.  Specifically, the arbitrator shall not have the power to arbitrate general wage levels.

(Exhibit 1, Article VI, Section 4(e)).

8.    The Benefits Agreement also provides for a grievance procedure, which states in pertinent part:

> If any such grievance shall be taken before the impartial umpire in accordance with such procedure, then the impartial umpire shall have the authority only to decide the question pursuant to the provisions of this Part V, applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions.

(Exhibit 2, Section G (5)).  (P. 22)  (A similar provision is found at Exhibit 2, Exhibit B-1, Section 16) (P. 47).

9.    On December 13, 2007, the parties submitted to arbitration a grievance challenging the Company's rejection of a medical benefits claim by employee Kip Kuhlemeier. Kuhlemeier was injured while working for his own company.  It was Titan Tire's position that the Benefits Agreement excluded from coverage an injury as to which the employee was reimbursed or entitled to reimbursement under, among other things, a worker's compensation

Howard & Howard
the law for business®

One North Main
Suite 300
601 North Main Street
Ann Arbor, MI 48104-1475
734.222.1483
Fax 734.761.5957

The Pinehurst Office Center
Suite 101
39500 Woodward Avenue
Bloomfield Hills, MI 48304-5151
248.645.1483
Fax 248.645.1568

The Comerica Building
Suite 800
151 South Rose Street
Kalamazoo, MI 49007-4718
269.382.1483
Fax 269.382.1568

The Wells Fargo Tower
Suite 1400
3800 Howard Hughes Parkway
Las Vegas, NV 89169-5914
702.257.1483
Fax 702.567.1568

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602-1350
309.672.1483
Fax 309.672.1568

2

law. Titan Tire contended that this exclusion also applied to employees who had failed to elect or secure worker's compensation coverage in their outside employment.

10.    On January 24, 2008, Arbitrator Ellen Alexander entered an Award granting the grievance. The decision of the Arbitrator is attached as Exhibit 3.

11.    Under the terms of the CBA and the Benefits Agreement, the Arbitrator shall not enter an award that in any manner changes, amends, adds to, or subtracts from, the provisions of the agreement.

12.    The Benefits Agreement provides, "[s]pecific coverage and exclusions can be found in the most current Benefits agreement and/or Summary Plan Description for the option elected, and are incorporated herein by reference." (Exhibit 2, Exhibit D, Article IV(2)). (P. 62).

13.    The January 24, 2008 Award changes and amends the Benefits Agreement. The Arbitrator ignored the plan language quoted in paragraph 12 and concluded the Benefits Agreement fails to incorporate exclusion language from the Summary Plan Description. The Arbitrator also found the Summary Plan Description (called the "Plan Document") (attached as Exhibit 4), changes the Benefits Agreement and violates it.

14.    The Arbitrator's Award violates the provisions in the CBA and Benefits Agreement which limit the Arbitrator's power.

Howard■Howard
an for business

One North Main
Suite 300
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483
Fax 734.761.5957

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304.5151
248.645.1483
Fax 248.645.1568

BofAmerica Building
Suite 800
151 South Rose Street
Kalamazoo, MI 49007.4718
269.382.1483
Fax 269.382.1568

The Wells Fargo Tower
Suite 1400
3800 Howard Hughes Parkway
Las Vegas, NV 89169.5914
702.257.1483
Fax 702.567.1568

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483
Fax 309.672.1568

WHEREFORE, Plaintiff, Titan Tire Corporation of Freeport, requests that the Court enter an order vacating the January 24, 2008 Award of Arbitrator Ellen Alexander as exceeding the Arbitrator's power.

/s/ Michael R. Lied
Michael R. Lied
Howard & Howard
One Technology Plaza, Ste. 600
211 Fulton Street
Peoria, IL  61602-1350
Telephone:  (309) 672-1483
Facsimile:  (309) 672-1568
E-mail:  MLied@howardandhoward.com

Howard & Howard
law for business

One North Main
Suite 300
101 North Main Street
Ann Arbor, MI 48104-1475
734.222.1483
Fax 734.761.5957

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304-5151
248.645.1483
Fax 248.645.1568

The Comerica Building
Suite 300
151 South Rose Street
Kalamazoo, MI 49007-4718
269.382.1483
Fax 269.382.1568

The Wells Fargo Tower
Suite 1400
3800 Howard Hughes Parkway
Las Vegas, NV 89169-5914
702.257.1483
Fax 702.567.1568

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602-1350
309.672.1483
Fax 309.672.1568

CERTIFICATE OF SERVICE

The undersigned caused a copy of the foregoing document to be served on all persons on

April 23, 2008 as follows:


United Steel Workers
Local 745 – Freeport, IL
2496 East Maize Road
Freeport, IL   61032 (via facsimile
815-232-7762 and hand delivery)

Stephen A. Yokich
Cornfield and Feldman
Suite 1400
25 East Washington Street
Chicago, IL    60602-1803 (via
facsimile 312-236-6686 and email:
syokich@cornfieldandfeldman.com)


Under penalties as provided by law, the undersigned certifies that the statements set forth in this

Certificate of Serve are true and accurate.

/s/ Michael R. Lied
Michael R. Lied .
Howard & Howard
One Technology Plaza, Ste. 600
211 Fulton Street
Peoria, IL 61602-1350
Telephone:  (309) 672-1482
Facsimile:  (309) 672-1568
E-mail:  MLied@howardandhoward.com

**08 C 50072**

AGREEMENT BETWEEN


TITAN TIRE CORPORATION OF FREEPORT

AND

LOCAL NO. 745L


UNITED STEELWORKERS

AFL-CIO


EFFECTIVE January 1, 2006

#1202779



# TABLE OF CONTENTS

Agreement ................................................................................................................... 1

Article I        —        Recognition And Scope Of Agreement................................. 1

Article II       —        Function And Responsibility ................................................. 2

Article III      —        Union Shop And Check-Off ................................................. 4

Article IV       —        Grievance Procedure ........................................................... 9

Article V        —        Hours Of Work And Reporting Pay .................................. 16

Article VI       —        General Wage Provisions ................................................. 23

Article VII      —        Wage Application ............................................................. 29

Article VIII     —        Seniority ........................................................................... 38

Article IX       —        Vacation ........................................................................... 58

Article X        —        Engineering Maintenance ................................................ 67

Article XI       —        Miscellaneous Clauses .................................................... 75

Article XII      —        Safety And Health............................................................ 86

Article XIII     —        Cooperative Efforts.......................................................... 91

Article XIV      —        Cost Of Living ............................................................... 105

Article XV       —        Effective Date and Termination ..................................... 107

Schedule A - Job Departments, Classifications And Grades ................................ 109

Schedule B - Pay Grades ...................................................................................... 112

Letter #1 .............................................................................................................. 114

Letter #2 .............................................................................................................. 115

Letter #3 .............................................................................................................. 117

Letter #4 ................................................................................................................ 117

Letter #5 ................................................................................................................ 117

Letter #6 ................................................................................................................ 118

Letter #7 ................................................................................................................ 119

Letter #8 ................................................................................................................ 120

Letter #9 ................................................................................................................ 121

# AGREEMENT

THIS AGREEMENT, made this 1st day of January 2006 by and between TITAN TIRE CORPORATION OF FREEPORT (hereinafter referred to as the "Company"), and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION and its LOCAL UNION NO. 745L (hereinafter referred to as the "Union") representing the employees as hereinafter defined.

WITNESSETH, whereas the mutual desire of the Company and the Union is to continue to promote cooperation and harmony and to formulate rules to govern the relations between them, the parties hereto agree as follows:

# ARTICLE I - RECOGNITION AND SCOPE OF AGREEMENT

### Section 1—Recognition
The Company recognizes the Union as the exclusive bargaining agent for the production and maintenance employees of the Freeport Plant or any local expansion or extension thereof. The term "employees" for the purpose of this Agreement includes all hourly production and maintenance employees, but excludes office clerical employees, professional employees, guards, supervisor, management trainees, salaried quality control inspectors and control laboratory operators. Further, the Company will bargain with the Union on all matters pertaining to hours of work, wages, and other conditions of employment.

The automation of jobs in the bargaining unit will not be used as a basis for changing such jobs from bargaining unit status to non-bargaining unit status.

### Section 2—Laws Supersede Contract
In the event that any of the provisions of this contract are found to be in conflict with any valid Federal or State Law now existing or hereinafter enacted, it is agreed that such law shall supersede the conflicting provisions without any way affecting the remainder of these provisions.

# ARTICLE II - FUNCTION AND RESPONSIBILITY

## ARTICLE II - FUNCTION AND RESPONSIBILITY

### Section 1—Management Clause
The management of the business and the operation of the plant and the authority to execute all its various duties, functions and responsibilities incident thereto is vested in the Company, except as such authority is limited by the conditions of this Agreement.

### Section 2—Non-Discrimination
The parties agree to the principal that there will be no discrimination in regard to wage rates and working conditions by reason of sex, color, race, age, religion, nationality, or disabilities as covered under the Americans with Disabilities Act.

Where the masculine pronoun is used in this Agreement, it shall refer to both genders.

### Section 3—Productivity Clause
(a)    The Union recognizes that a high level of wages can be maintained only by a high level of productivity.  Therefore, the Union and its members agree to cooperate in attaining, as high a level of productivity as is consistent with the health and welfare of the employees.

(b)    No employee will be laid off as a result of improvements or suggestions made through the employee involvement process.  Plant improvements, as a result of the E.I. process will not cause employees to be laid off from work.  Instead, the Company will assign them meaningful work until such time as permanent vacancies become available.  The surplus employees will then be used to fill these vacancies per the provision of the labor Agreement.

   Improvement to plant performance through the E.I. process will not result in employees being laid off from work.  It could, however, result in a reduction in total plant manning, but this would be accomplished through attrition and not through a layoff.

### Section 4—No Strike-No Lockout Provision
(a)    The Union agrees that it will not encourage, sanction or approve any strike, stoppage, slowdown, or other interruption of work growing out of any dispute arising under the terms of this Agreement and which is subject to the Grievance Procedure including the Impartial Arbitrator.

(b)    On the contrary, the Union and its officers and members will actively discourage and will take whatever lawful steps are necessary to prevent any strike, stoppage, slowdown or other interruption of work in violation of this Agreement.

# ARTICLE II - FUNCTION AND RESPONSIBILITY

(c)    The Company recognizes the right of the Local Union to strike on any issue not subject to the jurisdiction of the Impartial Arbitrator. On any such issue, however, the Union will not encourage, sanction or approve any strike, stoppage, slowdown or other interruption of work until at least ten (10) days of negotiations have proved unsuccessful, provided that the Company does not refuse to negotiate or provided the Company, upon request of the Local Union to negotiate the subject matter of such issue, does not unnecessarily delay. If the parties are unable to satisfactorily conclude such negotiations, this Agreement may be canceled by either party upon giving a 60-day written notice to the other. All terms and conditions of this Agreement will remain in effect during such 60-day period during which time the parties will attempt to negotiate a satisfactory settlement. But failure to amicably settle the issue concerned shall terminate and cancel this contract upon the expiration of such 60-day period unless there is a mutually agreed upon extension. If the right to strike is exercised by the Union at the expiration of the 60-day period and upon such termination of the Agreement and subsequently the parties have amicably settled the issue in dispute and the strike has ended, this Agreement will be reinstated and will become effective and all its terms and provisions shall continue in full force and effect until the termination date of the Agreement and through any extension period, subject to the termination and reopening provisions of this Agreement.

(d)    The Company agrees that in consideration of the carrying out of the responsibilities placed upon the Union and its officers in paragraphs (a) and (b) of this Section, the Company will institute no action for monetary damages against the International Union or the Local Union or its officers for breach of said paragraphs (a) and (b).

(e)    The Company agrees that neither it nor its representatives will put into effect any lockout during the term of this Agreement.

(f)    Any employee who violates the principles set forth in this Section may be subject to discipline.

## ARTICLE III - UNION SHOP AND CHECK-OFF

## ARTICLE III - UNION SHOP AND CHECK-OFF

**Section 1**

(a)     Any employee who is a member of the Union in good standing on the effective date of this Agreement shall maintain his membership in the Union as a condition of his continued employment for the life of this Agreement to the extent of paying periodic membership dues uniformly required by the Local Union pursuant to the Constitution of the United Steelworkers. Such employee may have his membership dues deducted from his earnings by signing the Dues Authorization and Deduction Form as hereinafter provided, or if no such authorization is in effect, he must pay the periodic membership dues directly to the Union.

(b)     Any employee hired on or after the effective date of this Agreement or transferred into the bargaining unit, shall become a member of the Union not later than thirty (30) days following his hire or transfer into the bargaining unit, and as a condition of his continued employment shall maintain his Union membership as provided in paragraph (a) of this Section.

(c)     On the 30th day following the effective date of this Agreement, all employees in the bargaining unit who are not members of the Union may sign the following form and as a condition of continued employment shall tender or pay to the Union the amount of periodic dues uniformly required as a condition of acquiring or retaining Union Membership:

Company.....................................................

Plant ..........................................................

Date............................................................

MEMBERSHIP APPLICATION UNITED
STEELWORKERS -AFL-CIO

On this ........................................ day of....
20.... I hereby make application for membership
in the United Steelworkers , and I promise to pay
dues uniformly required by the local Union
pursuant to the Constitution of the United
Steelworkers.

Signature of Applicant ...............................

Clock Card No. ..........................................

Dues Deduction..........................................

Authorization ............................................

Signed Yes .........................No ...................

Month's Dues.............................................

First Month's Dues ......................................

Rejoining Member ......................................

.................................................................
Signature of Local or International Representative

4

# ARTICLE III - UNION SHOP AND CHECK-OFF

(d)  The provisions of Paragraph (a), (b), and (c) of this Section shall not apply to any employee in the bargaining unit to whom membership in the Union is denied or whose membership therein has been terminated for reasons other than the failure of such employee to tender the aforesaid payments.

(e)  Any employee who fails to maintain his obligations under the provisions of paragraphs (a) and (c) of this Section, shall not be retained in the employ of the Company, provided that the Union shall have notified the Company and the employee in writing of such default and said employee shall have failed to remedy the same within thirty (30) days after receipt of such notice.

## Section 2

(a)  The Local Union will furnish the Company with the names of all members paying dues direct to the Local Union within thirty (30) days following the effective date of this Union Security Agreement.

(b)  Any dispute arising as to an employee's membership in the Union shall be subject for the Grievance Procedure, including arbitration.

(c)  "Member of the Union" where used herein means any employee who is a member of the Union and is not more than ninety (90) days in arrears in the payment of dues.  "Employee" where used in this Article means an employee of the Company in the bargaining unit represented by the Union.

## Section 3

(a)  For the convenience of the Local Union and its members, the Company, during the life of this Agreement and subject to all the provisions of this Section, shall deduct from the pay of those employees in the bargaining unit who have executed or who shall execute an assignment and authorization in the form hereinafter provided, all Union dues, uniformly required by the Local Union pursuant to the Constitution of the United Steelworkers. Further, if at any time during the life of this Agreement it is finally determined that initiation fees and general assessments may be legally deducted from the pay of those employees in the bargaining unit from whom the Company holds the aforesaid authorization, the Company shall make such deductions for all initiation fees and general assessments levied in accordance with the Constitution of the United Steelworkers and the by-laws of the Local Union.  The Local Union shall indemnify the Company against any claim or loss arising out of the Company's deduction of dues, initiation fees, and general assessments levied in accordance with the Constitution of the United Steelworkers and the by-laws of the Local Union, and the Local Union will make refunds direct to all employees for such wrongful deductions.

(b)  The Local Union shall submit to the Company on or before five (5) days prior to the pay ending from which deductions are made, a list of its new members and the amount of

# ARTICLE III - UNION SHOP AND CHECK-OFF

deductions for dues to be made from the pay of each member for the month. Subject to the provisions of this Section, the Company shall deduct such amount from the pay earned in the first pay period of each month of each of those employees whose name has been furnished by the Local Union as provided above, and from the pay of those employees whose authorization cards are on file with the Company, and remit as directed by the Local Union President. Union dues will be deducted on a weekly basis. This procedure may be modified by mutual agreement.

(c)    The assignment, once executed, shall be irrevocable for a period of one (1) year from the date of execution or until the termination of this Agreement, whichever occurs first. At the end of the original period of irrevocability and each renewal period of irrevocability, the assignment shall be automatically renewed and be irrevocable for a like period of one (1) year or until the termination of the then current agreement between the Union and the Company, whichever occurs first, unless the executing employee gives notice revoking his assignment during the 10-day period immediately following the end of such a period of irrevocability. The assignment shall be in the following form:

## CHECK-OFF AUTHORIZATION
## FOR UNITED STEELWORKERS

Pursuant to this authorization and assignment, please deduct from my pay each month while I am in employment with the collective bargaining unit in the Company, and irrespective of my membership status in the Union, monthly dues, assessments and (if owing to me) an initiation fee each as designated by the International Secretary/Treasurer of the Union.

The aforesaid payment shall be remitted promptly by you to James D. English, or his successor, International Secretary/Treasurer of the United Steelworkers, or its successor, Five Gateway Center, Pittsburgh, Pa. 15222.

This assignment and authorization shall be effective and cannot be canceled for a period of one (1) year from the date appearing above or until the termination date of the current collective bargaining agreement between the Company and the Union, whichever occurs sooner.

I hereby voluntarily authorize you to continue the above authorization and assignment in effect after the expiration of the shorter of the periods above specified, for further successive periods of one (1) year from such date. I agree that this authorization and assignment shall become effective and cannot be cancelled by me during any of such years, but that I may cancel and revoke by giving to the appropriate management representative of the plant in which I am then employed an individual written notice signed by me and which shall be postmarked or received by the Company within fifteen days following the expiration of any such year or within the fifteen days following the termination date of any collective bargaining agreement between the Company and the Union covering my employment if such date shall occur within one of such annual periods. Such notice of revocation shall become effective respecting the dues for the month following the month in which such written notice is given; a copy of any such notice will be given by me to the Financial Secretary of the Local Union.

6

# ARTICLE III - UNION SHOP AND CHECK-OFF

While contributions or gifts to the USW are not tax deductible as charitable contributions for Federal income tax purposes, they may be tax deductible under other provisions of the Internal Revenue Code.

Local Union No. ................................................
United Steelworkers
Signature ............................................................
Clock No. ...........................................................
Witness................................................................
Ledger No. ..........................................................

(d)     At the request of the Local Union and in the absence of a revocation by the individual employee, the Company will continue to deduct Union membership dues for those employees who have heretofore so authorized the Company in writing. The Union shall submit to the Company properly executed assignments on the form herein provided for those employees who in the future may desire to participate in the check-off program.

(e)     The Company agrees to provide forms for the assignment and authorization of dues deduction.

(f)     The Company will not be responsible for dues, initiation fees, rejoining fees, or assessments which are not collected due to clerical errors of the Union or due to the fact that the employee did not have sufficient earnings in the pay period in which deductions are made as herein provided to cover such Union dues, initiation fees, rejoining fees, and assessments after deduction for taxes, or due to the fact that an employee's name for any reason has been removed from the Company's payroll prior to the last complete period of the month.

(g)     Any disagreement arising out of wage deductions as provided in this Section shall be subject to the grievance procedure, including the Impartial Arbitrator, whose decision shall be final and binding upon all the parties, including the Company, the Union, its officers and members, and any employee. In case of any disagreement, no deduction will be made from the pay of the employee in question until after the dispute is settled.

(h)     No deductions under this Section shall be made from the pay of any Union member employee who is not working at an operation which is within the bargaining unit. Should an employee member, by changing work assignments, be permanently transferred to an operation outside the bargaining unit, his name will be stricken from the check-off list until such time as he returns to work within the bargaining unit. Upon his return, such employee's name shall be replaced upon the check-off list.

**Section 4**
The Union shall indemnify and save the Company and/or the Trustee under the Supplemental Unemployment Benefits Plan harmless from any claims, suits, judgments, attachments, and from

## ARTICLE III - UNION SHOP AND CHECK-OFF

any other form of liability as a result of the Company and/or the Trustee making any deductions in accordance with the foregoing authorization and assignments.

# ARTICLE IV - GRIEVANCE PROCEDURE

## Section 1—Representation

(a)  A grievance is defined as any controversy between the Company and the Local Union, or between the Company and its employees or any of them.

(b)  For the purpose of representation and adjustment of grievances, the employees in each department or group of departments under one Area Manager or the equivalent shall be represented by a Department Steward each shift. The employees in all departments shall be represented by one Chief Steward each shift. In the absence of a Department Steward the Chief Steward may serve as Department Steward. The Union Bargaining Committee shall constitute the Union Grievance Committee.

(c)  The President of the Union, the Human Resources Manager, or their duly accredited representative shall be accorded the right at any time to participate in any conferences or negotiations between the Company and the Union.

(d)  The Union agrees to keep on file with the Company at all times an up-to-date list of its accredited representatives and will promptly notify the Company of any changes or additions. No employee will be recognized as a Union representative until and unless the Company has been notified in writing by the Union that such employee has been selected to act in such capacity. Each month the Company will furnish the Union a list of their representatives who are to be recognized as such in the steps provided in the grievance procedure, and will promptly notify the Union of any changes.

(e)  In cases where accredited Union representatives are required to leave their jobs in order to handle grievances, the representatives will be relieved as soon as possible, so that production will not be retarded during the representative's absence. Supervisors will provide representatives with a filled-in pass noting time of departure from job. Representatives will submit all passes to their Supervisor at the end of the shift.

The representative may be required to show this pass at any time as authority to be away from their job. Accredited representatives, when handling grievances, shall notify the Supervisor of any department or section in which it becomes necessary to contact employees before they contact the employees involved.

(f)  The Company will issue an annual pass to the Union President, Vice President, Recording Secretary, Financial Secretary, Treasurer, Local Union Time Study Engineer, and Grievance Committee in order to facilitate the investigation and handling of grievances. When entering the plant for this purpose, the above named shall notify the Human Resource Manager on day shift, and appropriate Supervisor on later shifts, of reason for the visit and the destination, and shall register at the Gatehouse.

# ARTICLE IV - GRIEVANCE PROCEDURE

(g)    The Company, upon request of the Union, will permit an International Union Representative to participate in 3rd step grievance meetings and arbitration.


## Section 2—Responsibility

(a)    The parties of this Agreement recognize that grievances should be settled promptly and as close to the source as possible.  Further, both parties will endeavor to present all the facts relating to the grievance at the first step of the grievance procedure in order that an equitable solution may be achieved.

(b)    A written decision at any step of the grievance procedure shall be considered as final unless the grievance is appealed to the next step within fifteen (15) working days thereafter.

(c)    The parties recognize that any employee who feels he is aggrieved should submit such grievance claim within ten (10) working days of the incident.

(d)    If at any time during the existence of this Agreement there occurs an unauthorized strike, sit down, or other curtailment of work in violation of the No Strike Clause of this Agreement neither party shall negotiate upon the subject of said dispute until such illegal activity has ceased.


## Section 3—Grievance Procedure

(a)    The procedure for presentation of a grievance is as follows:

Step 1:    The employee, or in company with his Department Steward, may discuss the grievance with his immediate Supervisor, who must respond within two (2) working days.

(1)    If not settled at the above verbal discussion, the grievance will be reduced to writing, signed by the grievant and/or Union, and presented in duplicate to the Supervisor by the Department Steward within ten (10) working days.  The Supervisor will provide a written answer to the grievance, based from the discussion held above.

Exceptions:    Grievances pertaining to base and/or hourly rates, manning, workloads, or standards not settled at the above verbal discussion, will be reduced to writing and appealed directly to the 2nd step with the Area Manager and Union Time Study Engineer present at this meeting.  If necessary, a joint time study will be completed before being appealed to the third step. Grievances pertaining to job postings, awards,

## ARTICLE IV - GRIEVANCE PROCEDURE

surplus labor, layoffs, recall and employee benefits will be referred to the Employment Department.

Step 2:    If not settled in Step 1, the grievance may be appealed to the Area Manager in Production departments and Division Maintenance Manager or the equivalent by the Division Committeeman or Chairman of the Grievance Committee. If a meeting is necessary, it will be held within five (5) working days, or as mutually agreed.

Step 3:    If not settled in Step 2, the grievance may be appealed to the Human Resources Manager by the Chairman of the Grievance Committee. The notice of appeal must be in writing and must indicate those grievants, witnesses and Union Representatives requested to appear at the hearing. A meeting will be held within thirty (30) days from the date the notice of appeal is received, or as mutually agreed.

(b)    The Company shall give a written answer to the written grievance, with a copy to the President of the Union, as soon after the meeting or discussion as possible, but not later than three (3) working days, at Step 1, five (5) working days at Step 2, and ten (10) working days at Step 3, unless extended by mutual consent. If the written answer is not given within the time allowed, and in the absence of an extension, the Union may take the grievance to the next step without delay.

(c)    If a controversy arises of a nature so general as to affect a large number of employees, such issues of this nature need not be subject to the entire grievance procedure, but may be initiated at a step prior to the Impartial Arbitrator by agreement of the Local Union President and the Human Resources Manager.

(d)    At the written steps of the grievance procedure, the Company and the Union may call any witnesses whose testimony is necessary to the proper consideration of the grievance, or grievances, to be considered at any particular meeting.

(e)    Henceforth, from the date of this agreement no decision, written or oral, made at the first step of the grievance procedure will be considered to have any precedent setting value.

### Section 4—Impartial Arbitrator

(a)    Should negotiations between the Company and the Union at the final step of the grievance procedure fail to bring about an agreement between the parties with respect to any grievance which properly comes under the jurisdiction of the Arbitrator, as hereinafter defined, either party may, within thirty (30) days, but no longer except by mutual agreement, after the final answer at the last step, as outlined above, submit the issue to the Impartial Arbitrator. It is understood that a copy of the issue submitted will be furnished to the other party at the same time.

## ARTICLE IV - GRIEVANCE PROCEDURE

(b)    On a date set by the Impartial Arbitrator, the parties shall at the time and place appointed by the Impartial Arbitrator, appear and present for his consideration a statement of the issues involved, either in writing or orally, as each party may desire. The Impartial Arbitrator shall schedule hearings of grievances in the order in which such grievances are submitted to him, unless the Company and the Union agree on a different order. The place of hearing shall be restricted to Freeport, Illinois, unless otherwise agreed upon.

(c)    The Impartial Arbitrator shall render a decision on the grievance within thirty (30) days following the hearing date of a grievance. At the close of a hearing, the parties may request an award. The Arbitrator shall make any request for additional time in writing and if the parties agree to the additional time, the Arbitrator will be so notified in writing.

    (1)    For the purpose of this section an award means the disposal of the grievance without a statement of reasoning leading to the conclusion reached. Henceforth, awards will not be regarded as having precedent value.

The decision of the Impartial Arbitrator shall be final and binding upon both parties and shall invoke immediate compliance by the parties. If such decision directs a retroactive wage payment the Company will notify the Union without delay of the date on which payment can be made to the employees affected. The Union will be notified in writing of the amount, to whom paid, and the date paid.

(d)    The expense and compensation of the Impartial Arbitrator shall be borne equally by the Company and the Union.

The parties to this agreement have agreed upon a panel of three arbitrators to be selected as set out in the arbitration protocol.

Within five (5) days following a request made by either party for the submission of an issue or issues to an Impartial Arbitrator, the President of the Local Union or his designated representative shall meet with the representative of the Employer for the purpose of selecting an Arbitrator from the panel listed above. In the event a selection cannot be made at such meeting by mutual agreement, the selection shall then be made by the Employer's representative and the Local Union representative alternately striking one name from the list until one name remains who shall be designated as the Arbitrator to hear the issue or issues to be submitted.

(e)    The Impartial Arbitrator shall not have the power to make any award changing, amending, or adding to the provisions of the Agreement. Specifically, the Arbitrator shall not have the power to arbitrate general wage levels.

# ARTICLE IV - GRIEVANCE PROCEDURE

(f)    In the event one of the Arbitrators named on the panel either dies, becomes incapacitated, or refuses to act, a replacement will be selected in accordance with paragraph 6 of the arbitration protocol.

(g)    By agreement at the local plant, a Board of Arbitration may be substituted for the Impartial Arbitrator herein provided. The Board of Arbitration shall be composed of a person selected by the Employer and a person selected by the Local Union, and the Impartial Arbitrator named herein who shall serve as chairman. The persons selected by the Employer and Local Union shall be permanently assigned and shall have final and complete authority to act for their respective parties. Each party shall name an alternate person to serve in the event the regular appointee is unable to serve. The use of the Board of Arbitration may be terminated at any time upon thirty (30) days written notice by either party in which case the Impartial Arbitrator shall serve alone. The authority of the chairman of the board shall be the same as that provided for the Impartial Arbitrator and his award or decision shall be rendered after deliberations with the Board, unless the representatives of the parties agree on a disposition of the case.

## Section 5—Union Time Study Engineer

(a)    Upon written request of the Local Union to the Human Resources Manager the Company will permit a time study engineer approved by the Local Union or the International Union to enter the plant for the purpose of making studies. A signed secrecy pledge will be required before entry is permitted. The Supervisor will provide a filled-in pass as authority for the time study engineer to be away from the job, as coordinated by the Human Resources Manager. A Company time study engineer shall be present during such studies or observations by the Union time study engineer.

(b)    The Company shall cooperate with the Local Union in the training of a Local Union Time Study Engineer, and at the request of the Local Union shall permit practice studies to be taken on any operation approved by the Company. One Union designated employee will be trained or in the training process at all times. One-half the cost of time lost from his regular shift, up to a maximum of twenty (20) hours per week will be paid by the Company to the employee designated as a time study trainee for the Local Union during his training period. The rate of pay shall be Pay Grade of his classification.

## Section 6—Disciplinary Action

(a)    When an employee is directed by the Supervisor to appear in the office to discuss a matter which might likely result in a suspension or discharge, or when a disciplinary letter or derogatory notation is to be placed on his record, the employee will be reminded of his rights to bring his Union representative into the discussion at that time. If the employee requests Union representation, he may remain silent until the representative is present. The Union representative shall be paid for time

# ARTICLE IV - GRIEVANCE PROCEDURE

lost from his regularly scheduled shift in accordance with Article VII, Section 19 (a) of this Agreement.

(b) In cases involving disciplinary action, the Department Stewards may request Chief Steward assistance. In cases involving a possible suspension, discharge, Loss of Value Letter, Last Chance Letter or initiation of 48 hour investigation period, the appropriate Division Committeeman will be notified prior to the meeting.

(c) The decision to terminate an employee will not be made until a minimum of forty-eight (48) hours has elapsed from the time of the infraction. This time may be extended beyond forty-eight (48) hours by mutual agreement. This time will be used for a thorough investigation of all facts relevant to the matter. Prior to the conclusion of the forty-eight (48) hour period, Company and Union representatives will meet to discuss and share such relevant facts and evidence. An employee shall be informed when the Company is imposing the 48-hour investigation period. At the same time, the employee will be informed of the time to return for case disposition.

In the event a termination decision is not made, concluding the forty-eight (48) hour period, the employee shall be compensated for the time lost, less pay for any penalty time decided upon.

(d) If an employee feels he has been unjustly disciplined; i.e., derogatory notation, letter, suspended, or discharged, he shall have the right to appeal his case through the grievance procedure, including the impartial arbitrator.

In cases of discharge or suspension, the written grievance must be filed with the Area Manager or the equivalent, within ten (10) days from the date of discharge or suspension, excluding Saturdays, Sundays and Holidays. If such discharge or suspension is found to have been unjustified, the employee shall be reinstated to his former job with all rights and privileges restored, and shall be compensated at the Pay Grade of his classification for the time lost, less pay for any penalty time decided upon. In the event a Union representative is not present when the employee is notified that he is discharged, the President of the Union or his authorized representative will be notified of such discharge within twenty-four (24) hours.

## Section 7—Derogatory Write-Ups

(a) Whenever an employee is to receive a derogatory write-up that will be part of his record, a copy of that write-up, including notations, will also be given to the President of the Local Union. If the notation is the result of poor workmanship, the employee shall be shown the poor work or the results of the poor workmanship.

(b) All derogatory write-ups, except those recording suspensions or discharges, will be destroyed one year after issuance if the same offenses have not been committed during the preceding twelve (12) months.

## ARTICLE IV - GRIEVANCE PROCEDURE

Letters recording suspensions will be disregarded and destroyed in the administration of discipline after twenty four (24) months provided the same offense(s) has not been committed during that period.

A suspension letter for absenteeism will be destroyed twelve (12) months after issuance if further disciplinary action has not been taken.

For the purpose of this paragraph 7(b), time will be working months rather than calendar months.  Periods of layoff, employment roll or approved leaves of absence of two (2) weeks or more will extend the time for which the disciplinary action remains on the employee's record by the period of time the employee was off work.

(c)    An employee may review his departmental record at a time other than on his regularly scheduled shift or during his personal time on his regularly scheduled shift, provided he makes such a request to his supervisor in advance.

(d)    In addition, the employee may review his medical file under the same guidelines and may also review his personnel file or worker's compensation file with permission and advance notification of the Human Resource Manager.

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

## Section 1—Standard Work Day And Standard Work Week

(a)　The standard work day shall be eight (8) consecutive hours in a twenty-four (24) hour period.　When practicable, the standard work week shall be five (5) consecutive work days starting on Monday. The work week and the timekeeping week shall begin with the starting hour of third shift (11:00 p.m.) on Sunday night. Exceptions may be made in case of emergency, such as machinery breakdown, fire, or when necessary to fill orders within a specified time or to adjust production schedules.　Whenever possible advance notice shall be given the President of general changes from the current operating schedule.

(b)　The timekeeping day for computation of double-time pay for Sunday and triple-time pay for holiday work shall commence at 11:00 p.m. the day before and end at 11:00 p.m. on Sunday or holiday.

(c)　The standard work week will not apply to the Powerhouse employees.

(d)　Shifts other than those named above may be established if necessary, to meet production requirements. Exceptions necessary will be discussed with the Union before implementation.

## Section 2—Reporting Pay

(a)　If an employee reports for work at the start of his regular shift or at a time appointed by his Supervisor without having previously been notified not to report and no work is made available to him, he shall be paid his rate of pay for his current Pay Grade for the full number of scheduled hours of the shift.　If other work is made available to him, he shall be paid his current hourly rate up to Pay Grade of job assigned, whichever is greater.

If an employee is sent home because of lack of work before he has completed the scheduled hours of the shift, he shall be paid what he earned plus his rate of pay for his current Pay Grade for the remaining scheduled hours of the shift.　If the Company offers the employee the choice of other work or going home and he elects to go home, he forfeits his rate of pay for his current Pay Grade for the remaining scheduled hours of the shift not worked.

Payment under the foregoing conditions will be made at time and a half if after 40 hours in any one pay period, at double time on Sundays, and triple time on holidays.

(b)　Notification not to report for work may be handled as follows:

(1)　Verbal instruction to the employee.

16

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

(2)    A notice posted on the department bulletin board with notification to the Department Steward, at least one hour prior to the end of the last shift scheduled for the employees involved.

(3)    Telephone notification to an employee prior to the time he normally leaves home for work.

(c)    An employee who does not have a current telephone number as required under Article XI, Section 5, listed with the Company will not be eligible for report to work pay. An employee with a telephone number listed but who cannot be reached by telephone will not be eligible for report to work pay.

(d)    Reporting pay will be paid in cases of general emergency shutdown of the plant caused by fire, flood, failure of power supply, or similar conditions beyond the control of the employer unless the employer notifies the employee not to report prior to the start of their scheduled shift. Notification will be made through the following radio stations in Freeport, Galena, Illinois and Monroe, Wisconsin:

> Freeport
> WFPS - 92.1 FM
> WFRL - 1570 AM
> WXXQ - 98.5 FM
>
> Galena
> WJOD - 107.5 FM
>
> Monroe
> WEKZ - 1260 AM/93.7 FM

## Section 3—Working Time

(a)    Employees are not to enter their work area earlier than necessary to report at their regular places at their regular starting time. They shall not remain in their departments, after the close of their regular shift, except for periods of authorized overtime.

(b)    All employees are to work to the end of their shift, and those employees on continuous operations are to remain on their jobs until relieved at the end of their shifts. If an employee working on a continuous operation is not relieved by an employee scheduled to work the following shift, the Company will attempt to secure relief as soon as possible, or at a time mutually satisfactory. Except for short periods of time while relief is being secured on continuous operations, employees in the production departments will not be required to work more than eight (8) hours in a normal day.

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

**Section 4—Distribution of Work**

(a)    Daily vacancies and other work may be filled with available labor on the shift on which the vacancy or other work occurs before employees from other shifts are offered the work on an overtime basis. Preference will be given to available labor in the classification, within the department, on the shift on which the vacancy or other work occurs; then, to other available labor within the department provided they are qualified, on the shift on which the vacancy or other work occurs.

    Thereafter, vacancies and other work may be filled with any available labor on the shift on which the vacancy or other work occurs before employees from other shifts are offered the work on an overtime basis.

(b)    All regular time (less than the standard work week), overtime, double-time and triple-time shall be distributed as follows:

    (1)    When less than a full number of employees are needed in a classification for a portion of a shift and no other work is assigned, the employees whose unit or operation is shut down will be short-shifted.

            Employees will be offered the opportunity to be short-shifted on a seniority basis or forced to be short-shifted in reverse seniority order, provided that it makes no difference from a production standpoint which particular unit or operation is shut down. The result of following this procedure will not require significant reassignment of employees to the remaining operating units or operations.

    (2)    When less than a full number of employees are needed in a classification for a full shift during the standard work week, the work will be offered by seniority in the order of preference listed below:

            1.    In classification on shift
            2.    In classification off shift
            3.    Qualified out of classification on shift
            4.    Qualified out of classification off shift
            5.    Qualified out of department on shift
            6.    Qualified out of department off shift

    If an insufficient number of volunteers is obtained, the remaining need will be filled by scheduling (forcing) employees in reverse seniority in the following order:

            1.    In classification on shift
            2.    Qualified out-of-classification on shift in department
            3.    Qualified out-of-classification on shift out of department

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

Employees may sign Short Work Week Sign-up Sheets in classifications other than their own. Employees must be qualified in the classifications they express desire for work.

(c)  A sign-up system for all daily overtime work will be utilized as follows:

A computerized sign-up system will be utilized in the department for the first three (3) hours of each shift. An employee wishing to work daily overtime may sign up to work any of the three (3) shifts listed. The employee is to indicate willingness to work either four (4) or eight (8) hours of overtime. Supervisor will then schedule the qualified employees who have volunteered to work by seniority in the following order of preference:

(1)  To senior, low-houred employee in classification on retiring shift, four (4) hours or eight (8) hours, as appropriate.

(2)  To senior, low-houred employee in classification on oncoming shift, four (4) hours or eight (8) hours, as appropriate.

(3)  To qualified employees out of classification, on the retiring or oncoming shift, four (4) hours or eight (8) hours, as appropriate.

(d)  A computerized sign-up system for all Saturday work will be utilized as follows: During the first three days of the standard work week, a sign-up system for possible Saturday work in specified classifications shall be available in the departments.

An employee wishing to work Saturday may sign up to work any of the three (3) shifts listed. The employee may also indicate willingness to work four (4), eight (8), twelve (12) or sixteen (16) hour periods.

Supervision will then schedule the qualified employees who have volunteered to work by seniority in the following order of preference:

Qualified employees in classification, on shift.
Qualified employees in classification, off shift.
Qualified employees out of classification, on shift, in department.
Qualified employees out of classification, off shift, in department.
Qualified employees out of classification, on shift, out of department.
Qualified employees out of classification, off shift, out of department.

Employees will not be scheduled off shift or out of classification if their seniority is such that they would be forced to work in their regular classification and on their own shift. If the number of employees who signed up is insufficient to accomplish the necessary work, the least senior employees in the classification will be scheduled to work by shift. Twelve (12) or sixteen (16) hour periods will not be awarded to signers until other signers have been offered work, however in

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

classification employees are still to be awarded work before out of classification employees are awarded work.

Efforts will be made to fully utilize such eligible signees before forcing employees to work on a Saturday, particularly considering work assignments not relating directly to the production process.

When it is previously believed that no Saturday production will be scheduled in a classification and such plan is changed during a Friday work shift, the Company will utilize the Saturday sign-up sheets to obtain necessary labor to perform the scheduled work only if a minimum of four hours of Saturday work is scheduled in the classification, and only if the Company has, by 11:00 a.m. Friday, notification from Production Control that such scheduling is required. In the event of reported absences, more than four hours before the start of the Saturday shift, the next senior employee eligible to work on the sign-up sheet is to be contacted. If the absence becomes known less than four hours before the shift starting time, the work is to be offered to the senior in-classification employee immediately available that is working.

    (1)    In the event it becomes necessary, after the Saturday shift has started to short-shift employees; the offered opportunity will be by classification to the senior employee in the following order:

        (a)    Senior in-classification employee
        (b)    Senior in-department employee working out-of-classification
        (c)    Senior out-of-department employee

(e)    A computerized sign-up system for all Sunday and Holiday work will be utilized as follows: During the first three (3) days of the standard work week, a sign-up system for possible Sunday work in specified classifications shall be available in the departments. Similarly for Holidays, during three (3) days of a standard work week beginning five (5) working days prior to the Holiday, a sign-up system will be available. This system will be by specified classifications within each department. An employee wishing to work Sunday or on a holiday may sign up to work any of the three (3) shifts listed. The employee may also indicate a willingness to work four (4), eight (8), twelve (12) or sixteen (16) hours on the subject Sunday or holiday. Employees requesting work will be scheduled as follows:

    (1)    To low hour employee in classification or if the hours are equal to the senior employee, eight (8) hours.

    (2)    To the senior low hour employee in classification, four (4) hours if a matching four (4) hour signer is available.

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

      (3)     To the senior qualified employees out of classification, except in maintenance, where apprentices of the classification will be offered work opportunities before going to qualified employees out of classification.

In the application of the foregoing paragraph, with reference to the maintenance department only, no in-classification employee will be allowed to work the second eight (8) hours until the apprentice of the classification has had an opportunity to work eight (8) hours. Further, preferred shift assignments will be given to the in-classification employee prior to making assignments to the apprentice.

An employee offered work will not be bumped from his regular shift by an employee from another shift. An employee is not considered to have been offered work until such time as he would have been eligible for the work on the basis of the hours of work chart and seniority.

Hours will be charged to those accepting work and to those who refused work made available to them and hours not able to work because of previous hours worked. If the desired number of employees is not obtained in a classification to complete the work, only those employees who refuse work made available will be charged.

      (1)     In the event it becomes necessary, after the Sunday shift has started to short-shift employees; the offered opportunity will be by classification to the senior employee in the following order:

            (a)     Senior in-classification employee
            (b)     Senior in-department employee working out-of classification
            (c)     Senior out-of-department employee

(f)     Hours of work charts will be maintained in the department or on the computer for all classifications, until such a time that it is no longer viable to maintain charts on the computer. All hours will revert to zero the first Monday of January. When an employee is transferred or hired into a classification or permanently moves to another shift in the same classification, he shall be assigned the number of hours equal to the highest in the classification on the shift to which he is assigned.

(g)     When practicable all out-of-classification overtime hours will be first offered to in-department employees before offering such hours to out-of-department employees.

(h)     Notwithstanding the provisions of sub-paragraphs (d) and (e) of this section 4, shut-down and start-up hours of two (2) hours or less in production and three (3) hours or less in engineering maintenance or the Stores Attendant classification will be offered to the employees within the classification on the adjacent shift.

      (1)     The adjacent shift will be defined as those in-class employees assigned to the adjacent shift.

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

      (2)     If the assignments are not filled, those vacancies will be offered to the senior in-class employees working.

      (3)     Out-of-classification most senior qualified employee assigned on the adjacent shift.

      (4)     Senior in-class employees, off-shift.

The distribution of start-up and shutdown work for in-classification is a rotation by seniority.  The rotation will start over with the most senior employee the first Monday of the year.

(i)     In the event errors occur in the scheduling of work, and the errors are promptly reported and can be corrected, such errors will be corrected at the first opportunity.

(j)     No employee shall work in excess of sixteen (16) hours in a twenty-four (24) hour period, except in an emergency.

## ARTICLE VI - GENERAL WAGE PROVISIONS

### Section 1—Holiday Pay

The following days will be recognized as holidays under this Agreement:

> New Year's Day
> Easter Day
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day
> Day After Thanksgiving
> Christmas Eve
> Christmas Day
> New Year's Eve

Optional Holiday to be determined by local Agreement.

The above holidays may be changed to other days by mutual agreement. Holidays will be scheduled to minimize plant shutdowns. All schedules will be posted, denoting the beginning and ending of each holiday.

The following days shall be considered holidays:

| 2006 | Day | Date |
|---|---|---|
| New Year's Day | Monday | January 2 |
| Good Friday | 1st & 2nd shift  Friday | April 14 |
| Easter | 3rd shift Monday | April 17 |
| Memorial Day | Monday | May 29 |
| Independence Day | 1st & 2nd shift Tuesday | July 4 |
| | 3rd shift Wednesday | July 5 |
| Optional | Friday | September 1 |
| Labor Day | Monday | September 4 |
| Thanksgiving | Thursday | November 23 |
| Day After Thanksgiving | Friday | November 24 |
| Christmas Day | Monday | December 25 |
| Day After Christmas | Tuesday | December 26 |

| 2007 | | |
|---|---|---|
| New Year's Day | Monday | January 1 |
| Day After New Year's | Tuesday | January 2 |
| Good Friday | Friday 1st & 2nd Shifts | April 6 |
| Easter | Monday 3rd Shift | April 9 |
| Memorial Day | Monday | May 28 |
| Independence Day | Wednesday | July 4 |

# ARTICLE VI - GENERAL WAGE PROVISIONS

| | | |
|---|---|---|
| Optional Day | Friday | August 31 |
| Labor Day | Monday | September 3 |
| Thanksgiving Day | Thursday | November 22 |
| Day After Thanksgiving | Friday | November 23 |
| Christmas Eve | Monday | December 24 |
| Christmas Day | Tuesday | December 25 |
| New Year's Eve | Monday | December 31 |

**2008**

| | | |
|---|---|---|
| New Year's Day | Tuesday | January 1 |
| Good Friday | Friday 1st & 2nd Shifts | March 21 |
| Easter | Monday, 3rd Shift | March 24 |
| Memorial Day | Monday | May 26 |
| Independence Day | Friday | July 4 |
| Optional | Friday | August 29 |
| Labor Day | Monday | September 1 |
| Thanksgiving Day | Thursday | November 27 |
| Day After Thanksgiving | Friday | November 28 |
| Christmas Eve | Wednesday 1st & 2nd Shifts | December 24 |
| Christmas Day* | Thursday | December 25 |
| | Friday 3rd Shift | December 26 |
| New Year's Eve* | Wednesday | December 31 |

**2009**

| | | |
|---|---|---|
| New Year's Day | Thursday | January 1 |
| Good Friday | Friday 1st & 2nd Shift | April 10 |
| Easter | Monday 3rd Shift | April 13 |
| Memorial Day | Monday | May 25 |
| Independence Day | Friday | July 3 |
| Optional Day | Friday | September 4 |
| Labor Day | Monday | September 7 |
| Thanksgiving Day | Thursday | November 26 |
| Day After Thanksgiving | Friday | November 27 |
| Christmas Eve | Thursday | December 24 |
| Christmas Day | Friday | December 25 |
| New Year's Eve | Thursday | December 31 |

**2010**

| | | |
|---|---|---|
| New Year's Day | Friday | January 1 |
| Good Friday | Friday 1st & 2nd Shifts | April 2 |
| Easter | Monday 3rd Shift | April 5 |
| Memorial Day | Monday | May 31 |
| Independence Day | Monday | July 5 |
| Optional Holiday | Friday | September 3 |
| Labor Day | Monday | September 6 |

# ARTICLE VI - GENERAL WAGE PROVISIONS

*In the event the Company declares a shutdown for December of 2008 the following changes shall occur. First, there will be no "split" Christmas Holiday and New Year's Eve shall be celebrated on January 2, 2009.

Wage payment for employees reporting early for startup on a split holiday, and only when the work period is in two different pay periods, will be paid consistent with the first sentence of Article VI, Section 3 (a).

The Company will pay at straight time to each hourly employee who does not perform work for the Company on such holiday an amount equivalent to the employee's standard work day multiplied by his current hourly rate, plus the night shift differential to which his scheduled shift of such week would entitle him, subject to the following conditions:

(1)    (a)    When one or more of the above holidays falls within the period an employee is on vacation, and he is absent from work because of such vacation, the employee will be paid for such holidays.

    (b)    An employee who is not actively at work when a holiday occurs, will be paid the difference between holiday pay as stated in this paragraph and any Federal, State, or Company compensation he receives for such day, subject to the following conditions:

    1)    Employees who leave work pursuant to an approved leave of absence during the week in which a holiday falls, or in the week previous to it or return to work after such leave during the week a holiday falls or in the succeeding week, shall be paid for such holiday.

    2)    Employees who leave work pursuant to an approved sick leave or a leave of absence for disability due to pregnancy, or who leave the employment of the Company to enter the Armed Forces up to thirty (30) calendar days prior to a holiday, or who return to work after an approved sick leave, or a leave of absence for disability due to pregnancy, or are reinstated from the Armed Forces within thirty (30) calendar days of a holiday, shall be paid for such holiday.

    3)    Employees who leave-work pursuant to absence because of an occupational injury or an occupational illness up to thirty (30) calendar days prior to a holiday, or who return to work within thirty (30) calendar days of a holiday, shall be paid for such holiday.

    4)    Employees who are laid off within fourteen (14) calendar days prior to a holiday shall be paid for such holiday. Employees who are recalled and return to work in a work week in which a holiday falls, or within fourteen (14) calendar days after the holiday, shall be paid for such holiday.

## ARTICLE VI - GENERAL WAGE PROVISIONS

(2)     An employee shall not be eligible for such payment if on his last regularly scheduled shift prior to or first regularly scheduled shift after such holiday, he is absent from work without being previously excused by his Supervisor or without presenting evidence that his absence was justified and reasonable.  In the event of two consecutive holidays, an employee shall not be eligible for pay for the first of the two holidays if he is absent from work on his last regularly scheduled shift prior to the holidays or shall not be eligible for pay for the second holiday if he is absent on his first regularly scheduled shift after the second holiday without being previously excused by his Supervisor or without presenting evidence that his absence was justified and reasonable.  The restrictions in this paragraph do not apply in respect to Paragraph 1. (a) and (b) above except when the holiday falls on the first or last normal working day of the period during which the vacation falls, or the first day of leave or layoff.  As used in this paragraph, "absent from work" is defined as being absent for all or any part of the shift.

(3)     Employees who would not otherwise be scheduled to work on the day a holiday falls will be paid for such holiday subject to the other provisions contained in this article.

(4)     (a)     Employees who are working on jobs which by the nature thereof must be continued in operation on a seven (7) day basis, and employees who rotate thereon, shall be paid holiday pay if the holiday falls on their regularly scheduled day off.  If such employees are scheduled to work on a holiday and absent themselves from scheduled work, they shall not receive holiday pay unless their absence was justified and reasonable.

        (b)     When maintenance work essential to the continued operation of the plant must be done while the plant is not in operation, and such maintenance work is scheduled for a holiday, then holiday pay will not be paid employees who refuse to work on such holiday when requested to do so, unless the refusal to work is justified and reasonable.

                In application of this paragraph, if such work is necessary, at least three days' notice will be given maintenance employees, except in cases of emergency.  When less than the full number of employees in a classification are needed, qualified employees in the classification will be scheduled for the work utilizing the overtime holiday sign up system.  If this does not produce the number of employees needed, the least senior employee in the classification needed will be required to work.

        (c)     Any employees who accept work assignments on a holiday and/or the day preceding or following the holiday and who absent themselves on any of these days will not be eligible for any payment for the holiday unless the absence was justified and reasonable.

# ARTICLE VI - GENERAL WAGE PROVISIONS

(d)    In no event shall premium or overtime pay apply to holiday hours paid for but not worked.

(e)    An employee who is eligible to receive holiday pay and who is required to serve on a municipal, county or federal jury, or grand jury, on such holiday will not have jury duty pay deducted from his holiday pay.

However, such employee may elect to defer the time off for the holiday(s) until his first scheduled shift(s) immediately following the jury duty provided he notifies his Supervisor of his desire to do so in sufficient time for the Supervisor to secure a replacement.

(f)    When a holiday falls on a Friday, the following Saturday shall not be considered a regularly scheduled work day.  When a holiday falls on a Monday, the preceding Saturday shall not be considered a regularly schedule work day.  This provision does not apply to employees who accept work assignments on a Saturday following a Friday holiday or on a Saturday preceding a Monday holiday.  This provision does not apply to operations which are normally scheduled on a seven-day basis.

(g)    When an employee works overtime on a holiday for the purpose of closing down or starting up an operation, he shall be paid at the rate of triple-time, and such time, up to a maximum of four (4) hours, shall not be deducted from the holiday pay herein provided.  All other time paid for at the rate of triple-time shall be deducted from the hours on which such holiday pay is based.

(5)    Probationary employees will not be eligible for holiday pay for any holiday(s) falling within the first 30 calendar days of their employment.

(6)    Employees participating in the plant's Summer Work Program in Department 057 will not be eligible for holiday pay during their first year of employment.

## Section 2—Premium Pay
All work performed on Sundays shall be compensated at the rate of double time.  All work performed on holidays shall be compensated at the rate of triple time.  In no event shall time and one half be paid in addition to double time or triple time.

## Section 3—Overtime Pay
(a)    Time worked in excess of eight (8) hours in any twenty-four (24) hour period or in excess of forty (40) hours in any one pay period week will be compensated at the rate of time and one half.  Overtime hours paid on a daily basis shall not be included in paying for overtime on a weekly basis.  All time worked (whether at straight time, double time, or at triple time), and time paid for, exclusive of the no-

27

## ARTICLE VI - GENERAL WAGE PROVISIONS

strike clause of this Agreement, shall be credited as hours worked for the purpose of computing overtime pay. The term "all time worked" shall include time paid for in taking a scheduled vacation. Also included in the term "all time worked" for the above purposes:

(1)     Scheduled hours lost by employees while serving on a jury and for which the Company pays in accordance with Article VII, Section 16.

(2)     Scheduled hours lost by employees due to being subpoenaed, except when the employee is a plaintiff or a defendant or in any case involving the Company or the Employer.

(3)     Scheduled hours lost by employee for funeral leave and for which the Company pays in accordance with Article VII, Section 18.

(4)     Paid holiday hours falling within the standard work week, but not worked.

(5)     Scheduled hours lost by employee for which the Union pays. The Union will provide the Company advance notice in writing, the names, plus the dates and hours paid for by the Union as situations arise.

(6)     Scheduled hours lost by employee due to an injury caused in the plant covered by Worker's Compensation.

(7)     Scheduled hours lost as a result of an employee returning from lay-off will be credited toward the computation of weekly overtime payment.

(b)     An employee reporting for work and being required to work a portion of his scheduled shift, if then sent home through no fault of his own, except in case of labor disturbance as provided in Article II, or except conditions beyond the control of the Company such as fire, flood, severe weather conditions, or failure of power supply, shall receive credit for the number of hours scheduled for the shift toward the computation of weekly overtime hours.

(c)     Hours of the regularly scheduled work shift not made available during the first five (5) days of the week shall be considered as hours worked for the purpose of computing weekly overtime payment. Hours not available to employees because of a violation of Article II, Section 4, will not be considered as hours worked for such purpose.

ARTICLE VII - WAGE APPLICATION

# ARTICLE VII - WAGE APPLICATION

## Section 1

(a)     In the establishment of a pay rate for any new or combined job, such pay rate shall be arrived at by the use of standard job evaluation practice. A copy of the job evaluation plan shall be furnished the Local Union by the Company.

(b)     Rates of pay shall be established in accordance with paragraph (a) and shall be calculated on a full work load even though it is known at the time of establishment that a full work load cannot be assigned at that time. In the event it may be necessary to establish a rate of pay before the job is fully developed, the rate of pay shall be established on the proper evaluation of job content or job requirements as contemplated in the permanent job insofar as can be foreseen at the time such rate of pay is being calculated.

(c)     Any items of job content or job requirements considered in the rate of pay calculation shall be fully described in the job evaluation record regardless of whether or not such work is being performed at the time.

(d)     In the event such items are included and given proper weight in the rate of pay calculation before they actually appear in the actual performance of the job, the subsequent appearance of such items in the work requirements of the job shall not form the basis for an increase in the rate of pay.

(e)     When job evaluations have been completed, the representative designated and maintained on file with the Company by the Local Union, shall be advised as to what the rate of pay will be as far in advance as possible, but not less than one day before they are to be come effective, excluding Saturdays, Sundays, or holidays, unless a shorter time is mutually agreed to. The Company will make available to the representative for his inspection, complete data showing the basis upon which the rate of pay was determined.

(f)     The Company will give advance notice of at least three (3) days to the Union of any changes in performance expectations and would review the data supporting such changes with the Union Time Study representative prior to implementation of the proposed change.

(g)     Nothing in this Agreement shall be so interpreted as to require employees to perform work loads that are not fair and reasonable.

## Section 2

(a)     Pay Grade as used in this Agreement refers to the hourly rate established on the standard job evaluation procedure.

# ARTICLE VII - WAGE APPLICATION

(b)      Experienced Employee refers to an employee who is permanently assigned on an operation and is qualified to do the job and has demonstrated ability to perform the work satisfactorily.

(c)      Learning time established for each job classification indicates the maximum number of working days a newly hired employee may require to attain a satisfactory performance on the assigned job.  An employee may be removed from the assignment before the expiration of the maximum learning time if satisfactory progress is not shown. The learning time may be extended by the Area Manager or the equivalent if in his opinion, an extension is justified.

(d)      Learning time is defined as the maximum time period outlined on the Pay Grade sheets.

(e)      Hourly rates, for machine operations and non-equipment operations are established on the basis that employees are required to work to the end of their shift, excluding normal lunch and personal breaks at a fair and reasonable pace.

(f)      Short Work Week Average Hourly Earnings, for calculation of SUB benefits as provided in Article II, Section 1 and 2 of the SUB Agreement, will be Pay Grade for the classifications.

## Section 3

For employees hired before January 1, 2006 who transfer from one classification to another classification, the employee will be paid their current hourly rate up to 90 percent of the Pay Grade of the job transferred to unless the employee has maintained that classification on his qualified list which would allow transfer at the rate of the new Pay Grade.  The employee's rate of pay will be increased up to the Pay Grade of the job at the rate of at least twenty cents per hour per week provided the employee worked at least three (3) days in the preceding week.  The Employee's rate of pay may be advanced more than learners scale provided their proficiency warrants it.

For Employees hired after January 1, 2006 who transfer from one classification to another classification, the employee will be paid the rate of pay of the job transferred to at the rate the employee's seniority entitles him to receive in Schedule B.

For employees hired before January 1, 2006 who are involuntarily transferred to a lower paid classification, the employee will continue to receive the Pay Grade of the higher classification until the employee transfers to a different classification as a result of a voluntary bid.  Once the employee transfers to a different classification as a result of a voluntary bid, the employee will receive the Pay Grade of the classification to which the employee bids.

# ARTICLE VII - WAGE APPLICATION

**Section 4**

(a)    When an experienced employee is temporarily assigned to a job in another classification the employee will be paid the Pay Grade of his regular assigned job, or the Pay Grade of the job to which assigned, whichever is greater.

    (1)    Employees temporarily assigned to another job for the purpose of lunch or personal relief will be paid in accordance with the above.

    (2)    Employees temporarily assigned to write Objective Based Training Programs will be paid the rate of the Training Center Labor Trainer or their hourly Pay Grade, whichever is greater.

**Section 5**

If an employee is given extra work over and above his regular eight-hour day or regular weekly departmental schedule on a job other than his regular job, he shall be paid the Pay Grade of the assigned job.

**Section 6**

(a)    When an employee is assigned to a job for the purpose of taking inventory, he will be paid the Pay Grade of Production Service. Employees assigned to trucking during inventory will be paid the rate of the job assigned.

(b)    When an employee is assigned to paint with a spray gun, he will be paid the Pay Grade of the Painter for the period of time assigned.

(c)    When employees are assigned to work with Squad trainees, they will be paid labor trainer rate if higher than their own.

**Section 7**

(a)    All production employees hired after January 1. 2006 shall receive the rates of pay as described in Schedule B.

    (1)    For Grades 1 & 2, there will be a 30 month progression with $.50 increases at 12 months and 18 months with the final increase of $.50 at 30 months.

    (2)    For Grades 3 & 4, the starting rate will be 70% of the maximum rate and shall be increased over a 5 year progression in accordance with the percentages in Schedule B.

    (3)    For Grade 5 positions (other than electricians and powerhouse employees) the starting rate will be 85% of the maximum rate and will be increased in accordance with the percentages in Schedule B.

# ARTICLE VII - WAGE APPLICATION

If an employee transfers during their first five years on the active payroll, they will be paid the rate of pay their seniority entitles them to receive in the classification to which they transfer.

(b)     The hiring and work rate for summer vacation relief help will be capped at the New Hire Grade 1 Rate for the life of this Agreement.

## Section 8
The probationary period for all new employees shall be 60 days worked.

## Section 9
A night shift differential of $.300 will be paid for all hours worked between 3:00 p.m. and 7:00 am.

## Section 10
(a)     Employees will be allowed twenty (20) minutes for lunch and will be paid their current hourly rate for this time.

    (1)     Employee works less than his scheduled eight (8) hour shift. Allowance or payment for lunch period will be made only if the employee works in excess of four (4) hours on his regularly scheduled shift.

    (2)     Employees working on overtime must work in excess of four (4) hours before being eligible for a lunch payment or allowance.

(b)     Two 10-minute break periods will be scheduled for employees working a scheduled eight (8) hour shift on non-continuous operations, provided such schedule does not hinder production.

(c)     Employees assigned overtime (two hours or more) will be allowed ten minutes personal time immediately prior to the start of the next scheduled shift.

## Section 11
(a)     A carbon black premium wage payment of $2.00 will be paid for each day applicable as provided in this section.

(b)     The premium pay will be paid one time per day to eligible employees, except when employees leave the plant and return in any twenty-four (24) hour period. At no time will premium pay be made for consecutive hours worked on adjacent shifts.

(c)     Employees Eligible:

# ARTICLE VII - WAGE APPLICATION

Department 320 - Banburys
1.      All department 320 employees.

Department 119 - Maintenance
1.      Maintenance employees, assigned by supervision and working:

     (a)      On a breakdown in the black system.
     (b)      On the main body of the Banbury (mezzanine floor).

     (c)      On repairing Banbury automatic oil system on the platform above the mezzanine floor.
     (d)      On replacing or repairing the complete pellet system.
     (e)      On repairing fork trucks assigned to Departments 320 and 200 and floor sweepers used in Departments 320 and 200.
     (f)      On loading, hauling and unloading carbon black at the disposal site behind the plant.
     (g)      On changing bags in Dept. 320 dust collectors.

Department 200 - Receiving
1.      Receiving employees, assigned by supervision, and performing the operation of:

     (a)      Connecting or disconnecting "boots" on carbon black cars.
     (b)      Unloading and transporting bag black from boxcars or trailers.
     (c)      Waste and scrap handling.

## Section 12

(a)      Employees injured in the factory, or who suffer from occupational illness, during their work shift and report the fact at the time of its occurrence and are subsequently treated in the dispensary, doctor's office, or hospital and sent home, shall be paid their current hourly rate for the balance of the shift. However, it is recognized in some instances the employee may not be sent home on the day of the injury, but on a subsequent day to be treated in the dispensary, doctor's office, or hospital and sent home, in which case he shall be paid in the same manner specified above. In no event shall an employee be paid for hours not worked on two (2) different days for the same injury.

If employees return to work on the same shift after being treated in the dispensary, doctor's office, or hospital and are unable to work on their regular operation they shall receive their current hourly rate for the balance of the shift.

The above provisions of this item (a) are likewise applicable to the first day of an employee's return to work from absence of a week or more due to an injury in the factory or to occupational illness.

# ARTICLE VII - WAGE APPLICATION

Employees injured in the factory or who suffer from occupational illness and who are required to spend time receiving medical treatment furnished them by the Company, shall be paid their current hourly rate for the time they must lose from their regular shift for such treatment. If the attending physician certifies that such treatment must be scheduled prior to the employee's regularly scheduled shift and that the treatment caused the employee to lose time from that shift he shall be paid for the time lost from that shift.  The provisions of this paragraph also apply to an employee who must lose time from his regular shift because of a medical examination for purposes of a Worker's Compensation evaluation requested by the Company.  If the employee is eligible for compensation for that day under either State Worker's Compensation law or the Supplemental Worker's Compensation Section of the Current Benefits Agreement such compensation will be deducted from the payment for time lost.

Employees who, at the request of the Company, are required to receive such medical treatment in Chicago, Illinois (or any other location of comparable distance from Freeport) will be compensated for up to eight (8) hours upon presenting adequate certification of the time and date that the treatment was given.  It is understood that this paragraph merely establishes guidelines for wage payment and any exceptions to this guideline will be judged on an individual care basis.

Payment for time under this item (a) will be made at time and one-half when it occurs after forty (40) hours in any one pay period week, at double time on Sundays, and triple time on holidays.

(b)    Employees who are treated in the dispensary, doctor's office, or hospital for an injury in the factory, and return to work, shall be paid their current hourly rate for the time involved.

(c)    Employees who become ill (non-occupational) in the factory and are sent home will be paid their actual earnings for the time worked only.

(d)    An employee temporarily assigned other work as the result of the Medical Department's recommendation following an occupational injury or illness will be paid their current hourly rate for the balance of such assignment.  In making such assignments, consideration will be given to preventing further aggravation of the injury or illness.

(e)    An employee temporarily assigned other work as the result of the Medical Department's recommendation following a non-occupational injury or illness will be paid his current hourly rate up to 90 percent of his Pay Grade for the duration of such assignment.

**Section 13**

## ARTICLE VII - WAGE APPLICATION

Employees who are requested by the Company to attend meetings during working hours will be paid their current hourly rate for the time lost during their regular shift.

## Section 14
An employee called in for work shall be guaranteed four (4) hours of work at his current hourly rate up to his Pay Grade. This provision shall not apply when the work is performed in continuity at either end of employee's regular shift.

## Section 15
In the event of a violation of Article II, Section 4 of this Agreement, which adversely affects the earnings of other employees, the Company will not be required to pay minimum wage guarantees, hourly rate guarantees, and bonus payments.

## Section 16
(a)     An employee with thirty (30) days' service who is required to serve on a municipal, county, or federal jury or grand jury, shall be paid the difference between the amount paid for such service and his current hourly rate for each day lost from his regularly scheduled work shift by reason of such service, subject to the following provisions:

(1)     Employees must notify their Supervisor within twenty-four (24) hours after receipt of notice of selection for jury duty.

(2)     In order to be properly paid for jury duty, employees must obtain a jury duty form from the Human Resources Department and have it completed and signed by the appropriate court official of the days and times of duty, the hours of release, and the amount of pay received. This form must be turned in to the Human Resources Department at the end of each week.

(3)     An employee on vacation who is required to serve on jury duty may extend that vacation period by the number of days he is required to serve during such vacation period provided he notifies his Supervisor in sufficient time for the Supervisor to secure a replacement.

## Section 17
An employee with thirty (30) days' service, who is a member of the National Guard or the reserve component of the Armed Forces, who is required to enter upon active annual training duty, temporary special service, or weekend training shall be paid the difference between the amount of pay he received from the Federal or State Government for such duty and normal weekly earnings calculated on the basis of his current hourly rate multiplied by the number of his regularly scheduled hours per day (based upon not more than six (6) days per week) for the time lost while on such duty, up to a maximum of 160 hours per year.

35

## ARTICLE VII - WAGE APPLICATION

Such items as subsistence, rental, and travel allowance shall not be included in determining pay received from the government. In order to receive military make-up pay, the employee must obtain a form from the Human Resources Department. This form must be properly completed and returned to the Human Resources Department after the employee completes his military training.

## Section 18

(a)    An employee with thirty (30) days' service, who suffers a death in the immediate family shall be entitled to funeral pay in accordance with the following:

If an employee is absent from work because of the death of their spouse, parent, child, dependent residing in household, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother, sister, brother-in-law, sister-in-law, grandchild, grandparent, great-grandchild, great-grandparents, or the grandparents or great-grandparents of the spouse, they shall be paid at their current hourly rate plus night shift differential for the time lost from their regularly scheduled work shift (including accepted shifts of Sunday work which will be paid on a straight-time basis) by reason of such absence during a period of three (3) consecutive working days, one of which is the day of the funeral. The employee may elect to take three (3) consecutive calendar days, for up to a total of twenty-four (24) regularly scheduled hours, one of which is the day of the funeral as their funeral leave. The above categories of relatives include step-relatives, half-relatives, and legally adopted children. In the event of delayed notice of death of a relative named above, the funeral leave will be the next three (3) consecutive work or calendar days from date of notice.

(b)    In the application of this clause with respect to in-laws, payment for any such relationship will be limited to those resulting from the employee's current marital status. Where a marriage has been terminated and there has been no subsequent remarriage, the in-law relationship will be recognized.

(c)    In the event an employee is on vacation and it becomes necessary for them to attend the funeral of a relative as provided under Funeral Leave Pay, their vacation scheduled shall be extended by the number of days they are eligible for payment under said provision, provided they notify their Supervisor promptly of the funeral and in sufficient time for the Supervisor to secure a replacement. In the application of this paragraph an employee will be considered to be on vacation at the completion of their last scheduled shift prior to the beginning of their vacation.

## Section 19

(a)    An employee who is a designated Union representative shall be compensated at his current hourly rate for time lost from his regular shift as a result of attending scheduled grievance meetings with the Company. The maximum number of hours

# ARTICLE VII - WAGE APPLICATION

to be paid by the Company as provided in this paragraph shall be determined for each week on the basis of fifteen (15) hours per week for one hundred (100) employees. The number of employees in the computation shall be the number of employees on the active payroll in the bargaining unit and the number of employees on sick leave or leave of absence not included on the active payroll, in the first full week of the month, rounded to the next even hundred. If the total number of hours paid by the Company in a week is less than the maximum, the remaining hours shall be added to the maximum number of hours computed for the following week.

(b)     The Union President will be furnished a monthly summarization of all hours paid by the Company under this Section.

## Section 20
The Company agrees to pay twenty-five (25) cents per hour to employees for time worked on the carbon black tower, outside oil storage tanks or outside conveyors at a height of twenty-five (25) feet or more above ground or roof level.

## Section 21
Wages shall be paid weekly by check or by direct deposit into the financial institution of the employee's choice. Checks or direct deposit receipts shall be delivered to employees in their respective departments by the end of their shift on pay day. Second shift employees shall be paid on Thursday. First and third shift employees shall be paid on Friday. In the event that a contractual absence falls on payday the check or direct deposit receipt shall be delivered to the employee on the last scheduled workday for that week, if available.

To the extent practical, the final paycheck each year includes year-end totals for all deductions. It is understood that this may not be possible in all cases due to the amount of space on the checks and the number of deductions.

# ARTICLE VIII - SENIORITY

## Section 1—Definition

(a)   Seniority is preference or priority by length of service with definite rights qualifying employees for employment when work is available. The purpose of seniority is to provide a declared policy of work security measured by length of service. Seniority shall be based on continuous service with the Company compiled by time actually spent on the payroll, plus properly approved absences or time laid off as specified in the terms of this article. For the purposes of this provision, "Company" shall mean time with Titan Tire Corporation of Freeport and its predecessor Kelly Springfield Tire Company. Said time with the predecessor shall include any time accrued under the Collective Bargaining Agreement between Kelly Springfield and USW Local 745L dated April 7, 2004.

(b)   Reasons for termination of seniority include the following:

　　　(1)   Resignation for any reason.
　　　(2)   Discharge for cause.
　　　(3)   Overstaying a leave of absence.
　　　(4)   Failure to answer recall within specified time.
　　　(5)   Accepting other employment while on leave of absence.

## Section 2—General Provisions

(a)   A new employee shall have no seniority status until he has completed a probationary period of sixty (60) days worked, after which his seniority dates from the date of hire. The Company will not be obligated to recall employees laid off before completing such probationary period, but if such employee is rehired within ninety (90) days from date of layoff, he shall be credited with service for the actual time spent on the payroll during such period. The date of hire is the date the employee is first scheduled to work. Employees with identical service dates will use their age as the determining factor the older employee being considered the one with the most seniority. Employees with the same service dates and birth dates will be assigned seniority alphabetically according to their last name at date of hire. The Company shall be responsible for all seniority records.

(b)   An employee in a supervisory or other position, outside of the bargaining unit, who was once a member of the bargaining unit as defined, will have until January 1, 1993, to return to their previous bargaining unit position. Employees returning under this provision will have seniority accumulated through September 21, 1985. After January 1, 1993, employees will only be permitted to return to the bargaining unit during periods of salary personnel reductions. Those employees will retain their accumulated seniority through September 21, 1985. If such employee does not have sufficient seniority to return to the last classification held in the bargaining

## ARTICLE VIII - SENIORITY

unit, they will bump into a job for which they can qualify by starting with the least senior employee in the plant.

Such employees will retain their company service for pension rights and vacation allotment purposes.

Restrictions imposed by this provision will not apply to a bargaining unit employee temporarily assigned to positions outside the bargaining unit for periods of ninety (90) cumulative days within a calendar year, effective January, 1999. Employees in salary positions who were members of the bargaining unit as defined may return to the bargaining unit because of a physical or mental condition certified, by a physician and approved by the Company and will exercise no seniority privileges.

In the event the Union challenges the validity of the condition of such an employee, the Company and the Union will select a physician who will examine the employee. The doctor's findings will decide the question.  The expenses of such physician shall be borne jointly by the Company and the Union.

In no event shall a salary employee be permitted to return to the bargaining unit when hourly employees are on layoff; neither shall a salary employee be allowed to return to the bargaining unit as long as a salaried position exists compatible with the final physician's opinion.

(c)    An employee who leaves the employment of the Company to enter the Armed Forces, either by enlistment or draft under any existing Federal Legislation, or which may be passed, shall be reinstated upon application, provided he can qualify under the seniority rules, and further provided his discharge from the Armed Forces was other than dishonorable, and he applies for re-employment within ninety (90) days thereafter, and further provided that the employee is physically capable of performing the work required.  The Company will make every effort to place employees who may become handicapped during such service.  Seniority will accumulate during the full period of the employee's initial enlistment only.

(d)    An employee who leaves the employment of the Company as the result of being elected or appointed to public office shall be reinstated upon application provided he can qualify under the seniority rules, is physically capable of performing the work required, and applies for re-employment within thirty (30) days after the end of his tenure in such office.

The employee shall notify the Company in writing of his intention of accepting such office and shall inform the Company of his status. Such employee shall accumulate service not to exceed a total of two years for any or all such periods.

(e)    An employee who leaves the employment of the Company in order to attend an accredited college or university, or a recognized trade or vocational school shall be reinstated upon application, provided he can qualify under seniority rules, is

## ARTICLE VIII - SENIORITY

physically capable of performing the work required and applies for re-employment within thirty (30) days after leaving the college, university, or school. This eligibility for rehire can be made at any time but is limited to one (1) opportunity per employee unless he has returned to full time employment for a minimum period of two years. In no situation may an employee rehire under this provision more than twice. The only exception is granted for an employee returning as part of the Summer Work Program when this program is offered by the Company.

Trade or vocational school for purpose of this clause is one which provides training or a course of study related to jobs performed in the local plant. The employee, upon reinstatement, shall be given the service he had when he left the Company. The employee shall notify the Company in writing of the name of the school, the date of entry, and the expected length of the course of study. He shall confirm the continuation of his school attendance at annual intervals thereafter.

**Section 3—Leaves Of Absence**
(a)  Employees requesting leaves of absence for more than seven days shall make application in writing to their Area Manager or the equivalent on a form provided for that purpose.

(b)  Leaves of absence may be granted for personal reasons when justified, for a period not to exceed ninety (90) days, upon written application of the employee when the services of the employee are not immediately required, and there are employees available and capable of doing his work. Special consideration shall be given to the granting and duration of leaves occasioned by illness in an employee's immediate family. A copy of approved leaves of absence will be furnished the employee concerned at or before the time the leave is granted or extended.

To comply with the requirements of the Family and Medical Leave Act of 1993 (FMLA), it may be necessary to provide eligible employees up to and including twelve (12) work weeks of leave for the reasons outlined in the FMLA.

(c)  An employee who becomes ill or is injured and whose claim of illness or injury is supported by satisfactory evidence shall be granted a leave of absence to cover the period of such illness. Seniority will accumulate for the first two years of such leave.

In the event there is a disagreement between the Company's physician and the employee's physician regarding the medical evidence presented to support the employee's return to work, the question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician after examination of the employee and consultation with the other two physicians shall decide such question. The expenses of the third physician shall be borne jointly by the Company and the employee.

## ARTICLE VIII - SENIORITY

Employees drawing Worker's Compensation shall accumulate seniority during the period covered by compensation payments. If, at the end of such period, he is physically unable to return to work, he shall accumulate seniority for any additional period during which he shall furnish satisfactory evidence of continuing disability to the Company.

(d)     An employee who becomes disabled because of pregnancy and whose claim of disability is supported by satisfactory evidence shall be granted a leave of absence to cover the period of such disability. Seniority will accumulate for the first two (2) years of such leave.

In the event there is a disagreement between the Company's physician and the employee's physician regarding the medical evidence concerning the disability due to pregnancy, the question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician after examination of the employee and consultation with the other two physicians shall decide such question. The expenses of the third physician shall be borne jointly by the Company and the employee.

An employee returning from such leave shall be granted the same privileges as provided in paragraph (i) of this section.

(e)     An employee elected, selected, or appointed for duty as an officer, representative or employee of the International Union or of the Local Union, or of the AFL-CIO as such, or for any State, County, City or Local Union Council of the AFL-CIO, or to an office in a Local Union cooperative enterprise serving Company employees, which assignment will take him from his employment with the Company, shall upon written request of the International Union or Local Union receive a leave of absence for the period of his service. If such service is for more than three years, the leave of absence must be renewed each three years. Seniority shall accumulate throughout the period of his leave of absence.

(f)     If the reasons and circumstances upon which an employee's leave of absence was granted change substantially while he is on leave, he must immediately report to the Company to be reinstated or to request continuation of his leave based on the changed conditions. If he fails to so report, or falsifies his report, his service with the Company may terminate.

(g)     Leaves of absence may be extended when requested, upon approval of the Company.

(h)     Seniority will accumulate for the duration of approved leaves of absence except as specifically limited in this section.

(i)     An employee returning from sick leave, leave of absence, or light duty shall be reinstated to the classification he had at time leave was granted, provided there are

## ARTICLE VIII - SENIORITY

employees working there with less seniority.  If there are no employees with less seniority on such classification, or if the job has been eliminated, he shall be sent to the employment office and handled as permanent surplus labor.

### Section 4—Absences Without Leave

(a)    It is the duty of employees who are unable to work at their regularly assigned periods to report to the Company in advance.  Such report is to be given to the employee's Supervisor, by telephone when possible, and should include the employee's department, clock card number, name, reason for absence, and probable return to work date. Whenever the employee's department is not working, such report is to be given to the Guard at the Gatehouse.  Employees shall be furnished with cards identifying the number to call in the event they are unable to work their regularly assigned shift.  Said cards shall also be available in the Personnel Department.

(b)    An employee who is absent for a period of five (5) working days or more, without notifying the Company and making arrangements for a sick leave or leave of absence, or who overstays such leave without arranging for an extension thereof, shall be considered as having resigned without notice, and his seniority will terminate.  Such leaves may be arranged for by other means than written application.

An employee whose service is so terminated shall be reinstated only if he supplies evidence that his failure to comply with the terms of this provision was justified by reasonable excuse.

### Section 5—Shift Preference

(a)    The President, Vice-President, Local Union Time Study Engineer, and the Union Bargaining Committee shall hold top seniority rating during their terms of office for shift preference only.

When an employee no longer qualifies for top seniority as provided by this paragraph, he may return to the shift he would have acquired, had he not held top seniority.  The Company will keep records which will indicate such appropriate shift.

An employee removed or withheld from their preferred shift as a result of top seniority will have the first opportunity to return or acquire to that shift once the top seniority individual leaves their union position or transfers to another job classification, provided the affected individual is still in that classification.

(b)    All other employees will remain on the shifts on which they are permanently assigned, subject to paragraph (a) above and (c), (d), (e), (f) below.  As an exception, employees in the same classification may be permitted, with the

# ARTICLE VIII - SENIORITY

supervisor's approval, to temporarily trade shifts for a maximum period of time of two (2) weeks for personal reasons. This period may be extended for not more than 3 months, 1 semester or 1 quarter, whichever is shorter, for educational reasons or for 3 months for medical emergencies in support of immediate family. If the employee withdraws, drops or terminates the class or classes that justified the shift trade or if the medical emergency ends, the shift trade will be discontinued. When such shift trades are permitted, each of the two employees involved in the shift trade will assume the other's overtime hour's record, and continuous service date for scheduling and canvassing purposes only, for the duration of the trade. Shift trades will not be approved which circumvents shift preference.

**08 C 50072**

    (1)    A one day shift trade on Saturday is permissible, provided that the trade does not generate additional cost and that both employees requesting the one day trade are in the same classification and both are scheduled in classification on the sixth day (Saturday).

(c)    An employee shall have shift preference when a permanent vacancy occurs on his next preferred shift within his classification according to his seniority. Each employee shall sign a shift preference card stating their first, second and third choices of shift preference. Such cards will be on file in each department office. Shift preference assignments will be made from these cards. It shall be the employee's responsibility to initiate any changes in his preferences.

When jobs are posted in accordance with Section 6 of this Article, the posting will designate the shift on which the vacancy will occur. Changes in shift preference cards will be honored until the time of posting. If the job is not filled as a result of that posting, or when it is not necessary to post a job, changes in shift preference cards will be recognized and honored for a particular vacancy up to the time that the Employment Department has made a commitment to a person to fill a vacancy, either to a new hire or to an employee being offered a job outside the bidding procedure.

An employee awarded a job and awaiting physical transfer will be considered for shift preference according to his seniority on any subsequent vacancies within the classification based on his shift preference card.

Shift moves will be made on the first scheduled work day in the week following the week in which the replacement has completed his learning time.

(d)    An employee transferring from one classification to another classification shall be placed on the shift vacancy remaining after employees on the job, or employee's physically awaiting transfer as outlined in paragraph (c) of this section, have exercised their rights.

(e)    Learners shall be assigned to the shift on which their training may best be handled for the duration of the learning period only.

# ARTICLE VIII - SENIORITY

(f)      Employees who have gained their preferred shift shall not be removed from their shift by other employees, except when employees with more seniority are transferred to a job due to being surplus labor, or an employee returns to his regular shift from a leave of absence, or when it becomes necessary to balance employees on shifts because of changes in production schedules.

(g)     Surplus labor as described in (f) refers to:
     (1)     An employee removed from their job as a result of a permanent surplus of labor on one operation or group of operations.
     (2)     An employee removed from a job as a result of being displaced by another surplus employee.
     (3)     An employee removed from a job as a result of being displaced by another employee exercising rights under Article VIII, Section 8.

(h)     Permanent shift trades will be allowed provided seniority and shift preference are adhered to and that no employee is displaced from their preferred shift as a result of the trade. The trade will be considered permanent, involve the next most senior employee in line to obtain their preferred shift, and must be approved by Management.

## Section 6—Filling Of Vacancies Other Than Maintenance

(a)     Permanent vacancies or new jobs shall be posted at designated locations throughout the plant and will remain posted for four (4) consecutive working days. Employees who wish to apply for the posted vacancy will complete the job vacancy application form in its entirety within the posting period. The application form must be signed by the employee with the original copy deposited in the locked box provided for this purpose, located at the front entrance of the plant. The employee copy is to be retained by the employee.

     (1)     When it becomes evident that the duration of an employee's sick leave, leave of absence, or light duty will be beyond six months, his job will be filled by the filling of vacancy procedure. Said period may be extended by mutual agreement of the parties.

(b)     Posted vacancies shall be filled by eligible and qualified bidders in the following manner:

     (1)     First preference for the posted vacancy will be given to the senior employee in the plant who has been removed from the job previously because of being surplus labor, and who has not had a previous chance to return to the job. Such employees must have been permanently assigned to the job and satisfactorily completed the learning time to be eligible to return to the job where they were surplus.

## ARTICLE VIII - SENIORITY

       a)      Employees on medical layoff will be considered for recall to jobs for which they retain surplus rights and for which they can still qualify within their current medical restrictions under paragraph 1 above with other employees with surplus rights.

   (2)     Next preference for the posted vacancy will be given to the senior eligible employee in the plant who can meet employment qualifications for the job.

   (3)     Next preference for the posted vacancy will be given to the senior qualified employee that is surplus labor or on layoff from any bargaining unit job, without the requirement to fill out job bid application.

(c)    Employees awarded a position above will be transferred to the new position within thirty (30) days.  Exception to this provision may be made when unusual circumstances arise and the Union will be advised.

     Transfers are to be made effective on the first scheduled workday in the work week.  However, when the first days of a work week are holidays, transfer will not be made effective until the first scheduled work day following.

     Likewise, a transfer will not be made so that it becomes effective while an employee is on vacation.  (This also could effect an employee's holiday pay if a holiday fell during vacation.)

(d)    It is understood that only one vacancy caused by following the procedure outlined in this section will be posted (a maximum of two postings).  After results of the final posting are known, or if there are no successful bidders after following the procedure outlined in paragraph (b), the vacancy remaining will be offered to eligible employees, in the plant or on medical layoff, by seniority, who were previously surplused from the job.  If an employee does not accept such offer to return, the employee's surplus rights are nullified.  If no surplused employee exists in that vacancy, the vacancy remaining will be filled by the senior qualified employee on layoff, or if none on layoff, by hiring from the outside.

(e)    Any given job that has been posted will not be posted again until seven calendar days has elapsed.  Any vacancy arising during this period shall be offered to the next preference employee of the last posting as out-lined in paragraph (b) above.

(f)    Employees will not be eligible to transfer under the bidding procedure as outlined in this section until they have met the following requirements:

   (1)     They have worked twelve (12) months from date of hire or latest award on a job with less than eight (8) weeks learning time.

   (2)     They have worked eighteen (18) months from date of latest award on a job with eight (8) weeks or more learning time.

# ARTICLE VIII - SENIORITY

(3)     They have worked twenty-four (24) months from date of hire on a job with eight (8) weeks or more learning time in order to transfer to another job.

These restrictions do not apply to the following:

(4)     Employees working on a job as a result of being surplus labor.

(5)     An employee removed from a job as a result of being displaced by another surplus employee.

(6)     An employee removed from a job as a result of being displaced by another employee as a medical or disqualified placement.

Employees placed under the above numbers 4, 5, and 6 will have bidding eligibility restored.

(7)     Employees assigned to a temporary job, or a sequence of temporary jobs, if combined time on the temporary assignments and time on previous job is in accordance with this paragraph (f).

(g)     Temporary vacancies will not be posted. This includes vacancies caused by absentees, temporary jobs, leave of absence, sick leave under six (6) months or periods of vacation four (4) weeks or more, and exists until the exit vacancy is filled. Such temporary vacancies may be filled by temporary transfer, or by hire.

When a temporary vacancy exists in a classification for 30 days or more and the vacancy has been filled, one employee in the classification may fill the existing vacancy by exercising his shift preference as provided in Article VIII, Section 5 (c) above. When the temporary vacancy is being filled with a new hire, employees within the classification will be allowed to exercise their shift preference by seniority. When cause of the temporary vacancy ceases to exist any labor hired for such vacancy will be surplus labor.

An employee who has exercised his shift preference will be returned to his permanent shift. It is understood that no department employee will be laid off as long as there is need for coverage for temporary vacancies in that department. The least senior employees in a department retained because of the need to fill temporary vacancies will be considered as on notice of layoff and will be laid off upon the return of regular employees.

Such retention shall be limited to thirty (30) days unless mutually agreed to extend the time.

If a temporary vacancy occurs within a crew operation, a qualified employee may be offered the more highly skilled operation. Preference will be given to members

# ARTICLE VIII - SENIORITY

of the crew involved. Any vacancy left by such move may be filled in like manner or as provided above.

(h)     Prior to establishing a job on a trial basis, the Company will meet with the Local Union. Such trials shall be no more than four (4) months. The Area Manager of the department involved would hold a meeting with the interested representatives of the Local Union to discuss the proposed trial. Follow-up meetings, for updating purposes, would be held each month for the duration of the trials. How the labor for the trial would be supplied would also be discussed at the meetings with the emphasis on the use of balance crew personnel to the extent possible. It is understood that the trial period should impact the normal operation of the department to the minimum level possible.

(i)     Nothing in the seniority provisions shall be so construed as to require the placement of employees on jobs for which they are not qualified.

## Section 7—Exceptions To Bid Procedure
(a)     Production Balance

   (1)     Production Balance employees may be maintained for the purpose of balancing production in cases of absentees, emergencies, temporary vacancies, sick leaves, vacations, experimental work, and assigned when needed to work as regular employees.

   (2)     Production Balance employees will be assigned to shifts in accordance with the applicable provisions of Article VIII, Section 5 of this Agreement with the understanding that they may frequently change shifts in order to balance production as described in (a) above and in consideration of each other's qualifications to perform the required work.

   (3)     Overtime available to Production Balance employees will be distributed as equally as practicable among those on the same shift, considering each other's qualifications to perform the available work.

      i)      Production Balance employees are considered as in-department employees for the department to which they are assigned at the beginning of the shift during which the daily overtime requirement occurs.

      ii)     Production Balance employees will be considered for daily out-of-classification overtime in the job assigned at the beginning of their regular shift prior to the overtime opportunity going to other out-of-classification signers.

   (4)     Production Balance classification will be filled by appointment, and a Production Balance employee may be removed at the Company's option.

47

# ARTICLE VIII - SENIORITY

An employee so removed will be considered disqualified from this classification and shall be placed as outlined in Article VIII, Section 8 (a). The Company will follow the established "Company Appointment" guidelines for selection of employees to the Production Balance classification.

Production Balance employees will be eligible for transfer subject to the Filling of Vacancies provisions in Article VIII, Section 6.

Except for departments where there are recognized job groupings, Production Balance transfers from department to department will be considered as a bid for the purpose of determining subsequent bidding eligibility as outlined in Article VIII, Section 6.

(5)    Temporary shift assignments made to a less preferred shift should be made for the reasons outlined in paragraphs (a) and (b) above. In all cases the subject Production Balance person is to be qualified to perform all aspects of the job.

(b)    Labor Trainer
The Company will follow the established "Company Appointment" guidelines for selection of employees to the Labor Trainer classification.


## Section 8—Disqualification
(a)    Other than medical:

When an employee with seniority rights fails to qualify on his regularly assigned job for reasons other than physical disability, he will be referred to the Employment Department for placement in the following order:

(1)    Fill an available vacancy.
(2)    If there are no vacancies, bump into the first job for which he can qualify in line with his seniority by starting with the least senior employee in the plant.

Insofar as shift preference, an employee placed under this section will be initially assigned to the shift vacancy remaining.

Prior to pursuing a disqualification, a thorough investigation of the case will be completed including evaluation, investigating, and documentation of the facts ensuring proper disposition. In questionable cases, disposition by some other means than disqualification may be required. In cases where the employee has been disqualified for the third time in a one (l) year period, Company and Union officials will meet to discuss possible alternatives for disposition which would include termination of employment.

48

# ARTICLE VIII - SENIORITY

(b)     For medical reasons:

    (1)     An employee who is no longer able to perform his regular job because of physical disabilities, as certified by the Company physician, shall be referred to the Employment Department for placement on a job for which he qualifies and is physically able to perform, in the following order:

        a)     Fill an available vacancy.

        b)     If there are no vacancies within the applicable medical restrictions, bump into the first job for which he can qualify in line with his seniority by starting with the least senior employee in the plant.

    Insofar as shift preference, an employee placed under this section will be initially assigned to the shift vacancy remaining. Under no circumstances will a medically restricted employee be allowed to fill a vacancy or bump into a classification that he is not physically able to perform. These moves shall be made on the recommendation of the medical information and subject to mutual agreement by the Union President and the Human Resources Manager or their designees. This move will be considered a trial and will not be counted in the bumping restrictions if the trial is an unsuccessful placement. Insofar as workstation preference, one workstation preference move will be allowed on-shift before the employee is assigned a workstation following a successful trial.

    (2)     In cases where an employee may be bumped by the medically restricted employee, the medical placement will be given sufficient time to acclimate to the job before the affected employee is bumped.

    An employee removed from their job as a result of a medical placement will be given the option to either:

        a)     Fill an available vacancy, or

        b)     Bump into their previous job classification seniority permitting.

    If the employee is unable to be placed under the above options, they will bump into the first job for which they can qualify in line with their seniority by starting with the least senior employee in the plant.

An employee who is placed under this provision by use of their bumping privilege will not be eligible to bump again under the provisions of this paragraph (b) until a one-(1) year period has elapsed. Employees unable to bump will be treated as medically restricted awaiting suitable placement and will be handled under the appropriate terms of the S.U.B. Agreement in effect at that time.

## ARTICLE VIII - SENIORITY

### Section 9—Medically Restricted Placements

In the event it becomes necessary to make a placement of an employee with permanent medical restrictions, it shall only be into a job classification they are physically able to perform. Such placements will be consistent with the trial language used for placing medically disqualified employees in Section 8 of this Article. If the placement is unsuccessful, the employee will retain all surplus privileges they had prior to the start of the trial. A successful placement of the employee will not change surplus privileges, which were available prior to the new placement.

### Section 10—Surplus Labor And Layoffs

(a)     When there is a permanent surplus of labor on one operation or group of operations, employees shall be removed from such jobs in reverse order of seniority. Employees so removed from their jobs shall be referred to the Employment Office to fill available vacancies. If there are none, or they cannot qualify for the vacancy, employees with at least one (1) year's service will be given the opportunity to bump the least senior employee on the last job on which the surplus employee has been permanently assigned and satisfactorily completed the learning time, providing they have greater seniority than the least senior employee in the classification; or bump into a job for which they can qualify by starting with the least senior employee in the plant. An employee with less than one (1) year's service or any employee with seniority who is removed from his job as a result of being bumped by surplus employees will be given the opportunity to bump into a job for which they can qualify by starting with the least senior employee in the plant. If no vacancies exist and in lieu of bumping, an employee with seniority may take a voluntary layoff. If the surplus employee is unable to bump, he shall be laid off and be subject to recall as provided in Section 12 of this Article.

During the six months following a Company declaration of a surplus condition, if in any 30 day period the Company staffs any one of the surplused positions an average of more than four hours per day worked, that surplus condition will be considered reversed and affected employees will be given the opportunity to return to the classifications and shifts assigned at the time of the transfers due to surplus. Persons who elect to return to their position, will be returned to the position. If a person declines to return to the position, the job will be posted and the person who declines to return will remain in his present position.

After six months, if during any 30 day period the Company staffs any one surplused position an average of more than four hours per day worked, the Company will post the job for bid. The restriction provided by this provision may be waived by mutual agreement between management and the Union.

(b)     When a group of employees are surplused at the same time, the senior employee shall be handled first in the Employment Office.

## ARTICLE VIII - SENIORITY

Notwithstanding the provisions of paragraph (a) above, when there is a permanent surplus of labor on one operation or group of operations (excluding bump situations) which would otherwise result in the layoff of employees with one (1) or more years of seniority, an equivalent number of senior employees on that operation or group of operations will be permitted upon their request to take an optional layoff. The appropriate division committeeman will be notified by the Company of a surplus of labor condition and requests from eligible senior employees who are interested in taking an optional layoff (and thereby waiving any layoff notice) must be received by the Area Manager or the equivalent within forty-eight (48) hours after the Company's notice.

When an employee elects to return from optional lay-off, after having been on layoff for ninety (90) days or more, and a permanent surplus labor condition exists as described above, another senior employee on that operation will be permitted to take an optional layoff.

(c)     When employees with seniority may be subject to layoff due to curtailment of production, the Company will give three (3) days' advance notice to said employees, and provide work for said three (3) working days, or pay in lieu of work for that part of three (3) days for which work is not made available. Any employee who has not been notified during absence from work will not be entitled to notice, provided such employee has been absent for three (3) working days. An employee on an excused absence the day of notification will be notified under the same conditions as Article V, Section 2 (c), reporting pay.

(d)     A written list of the names, department numbers, classifications and seniority dates of employees processed to layoff will be given to the Union President. This list will be provided to the Union President at the time employees are notified of the intention to process them to medical or other layoff.

(e)     If an employee is laid off and at the time of layoff is performing his job in an acceptable manner despite some previous injury or disability, and when recalled to work, a physical examination reveals his condition to be no worse than it was at the time of layoff, the fact that he had been previously disabled shall not in any way prejudice his recall.

(f)     Notwithstanding the provisions of this Agreement, the Company may, without the requirement of making a layoff of employees in accordance with the layoff procedure, reduce the schedule due to production requirements for a classification, department or departments to not less than twenty-four (24) hours per week, or may reduce the scheduled hours below twenty-four (24) for not more than two (2) consecutive weeks, or for not more than two (2) weeks in any six (6) week period. The foregoing shall not be construed to require reducing the number of scheduled hours below the number of hours in the standard work week before laying off employees in accordance with the layoff provisions of this Agreement.

# ARTICLE VIII - SENIORITY

If an employee is ineligible for a Short Work Week Benefit and is serving a State System "waiting week" during one of the weeks of such reduced schedule and such week is not a week of layoff in accordance with the layoff procedure, said week will be deemed to be a temporary layoff out of line of seniority in conformance with Article 1, Section 1 (b) (4) of the Supplemental Unemployment Benefit Agreement.

(g) **Short Term Layoff Alternatives**. To the extent feasible the company will seek to avoid short term layoffs of less than eight (8) weeks. Employees will be entitled to utilize existing optional layoff provisions for all layoff situations, including a short-term layoff. The need for the Company to reduce schedules for inventory adjustment purposes was recognized and is not affected by this provision. Emergency situations caused by unplanned or unexpected events may create exceptions to the obligation of the parties to try to avoid short term layoffs.

In an effort to avoid or minimize a short term layoff the Union and Company may develop work sharing methods not to exceed eight (8) weeks. The parties may agree to such means to avoid or minimize the short term layoff as labor pools, special training or education sessions, inordinate temporary transfers, the performance of meaningful normally unassigned work, adjusting vacation schedules when feasible, shared jobs, etc. These listed examples in no way are intended to restrict the suggestions or ideas of the parties.

## Section 11—Preferential Hire
(a) An employee on regular layoff with recall rights from a tire plant covered by a collective bargaining agreement between the USW and Titan will be given preference in hiring at another tire plant covered by a collective bargaining agreement between the USW and Titan where all eligible laid-off employees have been recalled and new employees are being hired for work on which the laid-off employee has qualifying experience. A laid-off employee desiring to exercise his preferential hiring rights under the conditions of this paragraph shall make written application for employment at other plants covered by a collective bargaining agreement between the USW and Titan during the period of time he continues to accumulate service for recall purposes at the plant from which he was laid off with recall rights.

(b) Any laid-off employee who is hired will be hired as a new employee without service credit for seniority purposes. For all other purposes, he will be credited with the amount of continuous service he had at the time of his layoff and, in addition, will receive credit for the amount of service credit for which he would have been eligible under Article VIII, Section 12(b), as if he were being recalled from layoff.

(c) All such laid-off employees shall be required to satisfactorily complete a physical examination prior to hire. The physical examination will be the same type given to employees being recalled from lay-off except those employees laid-off more

# ARTICLE VIII - SENIORITY

than two (2) years will be required to satisfactorily complete a physical examination of the same type given to new hires. Application of this paragraph does not preclude preferential hire of an employee to a job he was able to perform with a physical disability at his former plant prior to lay-off, provided his disability has not worsened.

(d)    An employee exercising preferential hiring rights will be granted pay-in-lieu of time off for any vacation eligibility after the employee has been continuously employed for thirty (30) days at the new plant.  An employee with residual vacation eligibility will be paid pay-in-lieu of time off by the employee's former plant.  Consistent with production requirements and local plant practices, new preferential hires will, upon their request, be granted 100 hours of time off without pay during the current calendar year.  Application of this paragraph does not affect the application of Article VIII, Section 3 (b).

(e)    Should a laid-off employee who has applied for preferential hire refuse a job for which he is qualified, preferential hiring rights will be terminated. Such refusal will not prejudice the employee's right to benefits under the Supplemental Unemployment Benefits Plan and the Benefits Agreement, provided the employee is eligible for such benefits.

(f)    A laid off employee who preferentially hires will be eligible for recall to the former plant after 12 months have elapsed since the date of preferential hire.  An employee who has retained recall rights to the former plant will be eligible for recall at any time if the recall list has been exhausted and a job is to be filled with a new hire at such former plant.

In the application of Article VIII, Section 11 (b) of the Collective Bargaining Agreement, an employee who accepts recall to his former plant will have neither his former plant seniority date nor his pension service date adversely affected in relation to other employees at that plant as the result of the application of the first paragraph of this Article VIII, Section 11 (f).

An employee who preferentially hires will receive a Relocation Allowance in accordance with Paragraph (k) of this Section each time he preferentially hires to another plant and forfeits all eligible recall rights in writing.    Likewise, a preferentially hired employee who has recall rights to a plant that is later shutdown will receive a Relocation Allowance once per shutdown occurrence in accordance with Paragraph (k) of this Section .

An employee exercising preferential hiring rights who is eligible for recall, may answer or refuse recall to his former plant. If recall is refused, the employee will be bypassed until he notifies the former plant to the contrary. Once the former plant has been notified and recall again is offered, the employee must terminate employment at the new plant and report for work at the former plant or lose recall and seniority rights at that plant. When the recall list at the employee's former

## ARTICLE VIII - SENIORITY

plant is exhausted and recall occurs, the employee must answer the recall or lose any seniority rights held at the former plant.

(g)    An employee who answers recall to work at a former plant may be retained on his current job for a maximum of 45 calendar days. A good faith effort will be made to release the employee as soon as possible. After accepting recall, if retained by the present plant, an employee will not lose bargaining unit rights at his former plant while awaiting release from his job.

Vacancies created by preferentially hired employees accepting recall to their former plant will not be subject to the job posting procedure.

(h)    An employee with recall rights who resigns from the plant in which the employee was preferentially hired, must provide at least two (2) weeks written notice. Failure of such employee to provide notice shall result in loss of recall rights at all other plants and the employee will be terminated.

(i)    Notwithstanding the provisions of Article VIII, Section 11(b), an employee who had two years or less of service at the time of layoff and who is hired under the preferential hiring provisions of this Article VIII, and who retained recall rights will receive service credit, if recalled, at his former plant, provided his total service at such former plant at the time of layoff and any service accumulated at the new plant(s) exceeds two years.

(j)    An employee who is released from employment as the result of the complete and permanent closure of a local tire plant covered by a collective bargaining agreement between the USW and Titan, who makes written application for employment at other tire plants covered by a collective bargaining agreement between the USW and Titan within sixty (60) days of such release from employment, will be given preference in hiring over new employees in such other plants for work on which he is qualified, provided such employee has not assumed the status of a retiree, accepted a Special Distribution. A complete plant closure, for the purpose of this Agreement, the Benefits Agreement and the Supplemental Unemployment Benefits Plan means the complete discontinuance of product manufacturing. Notwithstanding, following the date of complete plant closure, there may be employees continued in non-manufacturing duties at the plant site.

Any such former employee who is hired will be hired as a new employee without service credit for seniority purposes. For all other purposes, he will be credited with the amount of continuous service he had at the time of his release from employment or layoff and, in addition, will receive credit for the amount of service credit for which he would have been eligible under Article VIII, Section 12 (b), as if he were being recalled from layoff.

If such employee refuses a job for which he is qualified, his preferential hiring rights specified above shall be terminated. Such refusal will not prejudice the employee's right to benefits under the Supplemental Unemployment Benefits

## ARTICLE VIII - SENIORITY

Plan and the Benefits Agreement, provided the employee is eligible for such benefits.

At the time of hire, an employee exercising preferential hiring rights under this provision will forfeit his preferential hiring rights at other plants and his rights to benefits under the S.U.B. Plan and the Benefits Agreement due to termination caused by the plant closure, except that such prior rights shall be reinstated if he is laid off due to a reduction in force prior to the completion of thirty (30) calendar days' continuous service.

An employee who is preferentially hired under the terms of this paragraph will receive a Relocation Allowance in accordance with Paragraph (k) of this Section.

(k)    An employee who accepts a job offer after the effective date of this Agreement under the terms of Article VIII, Section 11(f) or Article VIII, Section 11(j) will be eligible for a Relocation Allowance after the completion of forty-five (45) calendar days continuous service at the new location, provided he is employed, or laid off from a plant, or plants, to which he has preferentially hired.

No Employee will be eligible for a Relocation Allowance until application is made in accordance with the procedure established by the Company. Only one Relocation Allowance will be paid to a family living in the same residence.

The amount of the Relocation Allowance shall be $1500.00 and will be paid within two (2) weeks after application for such allowance in accordance with the provisions of first paragraph of this Paragraph (k).

The amount of the Relocation Allowance will be reduced by the amount of any relocation allowance or equivalent to which the Employee may be entitled under any present or future legislation only in the case of a plant closure situation.

(l)    In the event of a complete plant closure the Local Union Benefit Representative, upon written request from the Local Union, will be paid his regular rate up to a maximum of forty (40) hours per week for a maximum of six (6) consecutive weeks immediately following the closure for the purpose of assisting former plant employees on benefit matters.

(m)    When considering an employee requesting preferential hire, in order for consideration of a consistent review of their work records, the process will be as follows:

    (1)    Each applicant for preferential hire should have their work record reviewed at the time of layoff.

    (2)    The "sending" plant is responsible for the determination of whether an applicant is "acceptable" or "not acceptable" for preferential hire.

    (3)    Applicants will be determined "not acceptable" for preferential hire for one of the following reasons:

        a)    Work record contains a current or active Last Chance Letter.

55

# ARTICLE VIII - SENIORITY

b)    Work record contains any suspension for absenteeism, including a waived suspension, within the last twelve months prior to layoff.

In the event an employee loses employment as a result of a permanent plant closure and applies for preferential hire, the restrictions contained in this section 3 above are hereby waived.

(4)    If the applicant has any current disabling restrictions on his or her record, the applicant will be deemed "acceptable" if he or she is capable, with or without reasonable accommodations, of performing the essential functions of the job.

(5)    Disciplinary records of preferential hires will transfer to the new location.

## Section 12—Recalls

(a)    An employee without seniority rights who is laid off will have no recall rights and will not accumulate any seniority while on layoff. A laid-off employee with seniority will be eligible for recall provided he notifies the Company by letter, telegram, telephone, or personal interview of changes in his address.

(b)    A laid-off employee with seniority with two years or less of service at the time of layoff, and who is recalled within five years from the date of his layoff, shall be given his previous service plus service credit for the time laid-off provided such service credit will not exceed his actual service at time of layoff.

A laid-off employee with more than two years of service at the time of layoff, and who is recalled at any time, shall be given his previous service plus service credit for the time laid off provided such service credit will not exceed two years for any single period of layoff.

(c)    Laid-off employees will be considered, for the purpose of recall only, to accumulate service credit as defined by the terms of this provision during their period of layoff rather than having such service credit deferred to such time as they may be recalled.

(d)    Employees shall be recalled by certified mail in accordance with seniority.

An employee who is on an optional layoff will be placed on an optional layoff list and will be recalled in reverse seniority order to the operation or group of operations from which he took an optional layoff, seniority permitting. In the event that a vacancy on the operation or group of operations from which an employee has taken an optional layoff does not become available after all employees on regular layoff status with more than one (1) year of seniority have been recalled and before any employees with less than one (1) year of seniority are recalled and before new employees are hired, such employees on optional layoff shall immediately be recalled to any vacancy in the plant for which he can qualify. The least senior of

## ARTICLE VIII - SENIORITY

such employees will be recalled first, but all employees on optional layoff are subject to recall before employees with less than one (1) years seniority and before new employees are hired. Upon written request, an employee on optional layoff will be placed on the regular recall list and recalled in accordance with regular recall provisions.

After an employee has been on optional layoff for ninety (90) days or more, he may return, seniority permitting, to work by notifying the Employment Department at least two weeks prior to date of return.

Employees returning from optional layoff to the classification from which they exited will be placed on the shift they would have achieved had they not left. When movement occurs within a classification, employees on optional layoff will be moved on paper in accordance with Article VIII, Section 5(c) to their next preferred shift according to their seniority. Temporary moves of active employees will then be allowed in accordance with their shift preference to positions only occupied on paper. Any posting in a classification with employees on optional layoff will reflect the shift that remains open as a result of such movement.

When an employee on optional layoff is recalled to a classification different than the classification the optional layoff occurred, the employee will be afforded the opportunity (seniority permitting) to return to the former classification. The employee may elect the new job position and if so, will not have first preference rights to any subsequent job vacancy. Also, the employee will start a new time period for establishing bidding eligibility.

(e)     An employee so recalled must notify the Company of his intentions within forty-eight (48) hours and report for work within five (5) working days. Should he fail to so notify the Company of his intentions, but reports within thirty (30) days from date of recall, and presents a valid excuse for his failure to report earlier, he shall retain his relative position on the recall list, but must await the next available vacancy.

(f)     Employees recalled who report but are unable to return to work because of illness or injury, or who report and cannot qualify for available jobs, will retain their relative position on the recall list.

(g)     Any employee who is recalled and does not respond in accordance with the provisions of this section, or cannot be reached because of his failure to notify the Company of his change of address, or who responds but refuses to accept an available opening for which he is qualified will be removed from the recall list and his seniority terminated.

ARTICLE IX - VACATION

# ARTICLE IX - VACATION

## Section 1—Eligibility

(a)    Employees will be entitled to two weeks' vacation with pay after completing one year of continuous service. Employees will be entitled to three weeks' vacation with pay after completing five years' continuous service. Employees will be entitled to four weeks' vacation with pay after completing ten years' continuous service. Employees will be entitled to five weeks' vacation with pay after completing twenty years' continuous service. Employees will be entitled to six weeks' vacation with pay after completing twenty-five years' continuous service.

(b)    The vacation period shall be on a calendar basis from January 1 to December 31 inclusive. Employees will become eligible for vacation with pay on the first anniversary date of their employment. Thereafter, employees shall become eligible for vacation on December 31, except that they become eligible for the additional week of vacation on their fifth (5th), tenth (10th), twentieth (20th), and twenty-fifth (25th) anniversary dates.

(c)    Employees must be on the payroll and working during the calendar year in which their vacation is due in order to be eligible for vacation pay. This clause shall not be construed to prevent an employee from taking vacation for two (2) calendar years in one (1) continuous period over the year end in which event his pay for the second vacation shall be withheld until after he resumes work in that calendar year. When approved by the Company, a vacation may be taken before the employee has worked in the calendar year, and the employee may be given an advance against wages due or vacation pay for that calendar year.

(d)    Employees who leave the payroll after having qualified for vacation in that year, and later complete an anniversary date which would otherwise entitle them to an additional week of vacation in that year, and return in that year or in a subsequent year will be paid such additional week of vacation upon their return to work.

(e)    Employees who are returned to the payroll on or after December 1, up to and including December 31 of each calendar year, and who meet the foregoing continuous service requirements, will have their vacation privileges restored during the ensuing calendar year.

(f)    Employees entitled to vacation who resign with or without notice, or are discharged before they have taken their vacation, shall be entitled to vacation pay at time of exit; and employees laid off shall also be entitled to vacation pay at the time of exit. Vacation pay received at time of layoff is in lieu of vacation time off. If the laid off employee is returned to the payroll during the same calendar year, he may be given, upon request, a leave of absence for his vacation time off.

## ARTICLE IX - VACATION

(g)    In the event an employee who is entitled to a vacation dies before he has taken the vacation, only the person designated as beneficiary of his life insurance benefits provided by the Company to such employee shall be entitled to his accrued vacation pay.

(h)    An employee may receive, upon request, vacation pay in lieu of time off for all eligible vacation weeks, except ten (10) days. Such vacation payment will be made to the employee as soon as practicable after the request is made and eligibility established.

(i)    An employee may at the time of the vacation canvass elect to defer two (2) weeks vacation until the following year, but no longer.  The deferred week(s) may not be scheduled during the following years designated thirteen (13) week preferred vacation period.

(j)    An employee who is absent from work due to illness or injury may, upon his request, receive one week's vacation pay for each full week not worked due to such injury or illness up to his maximum number of weeks of vacation eligibility, without taking additional time off.  After the 1st week of disability, the employee may also draw day-at-a-time vacation if all weekly vacation is exhausted.  Vacation payment will be made at such time that the employee produces satisfactory evidence that his absence was for acceptable reasons.

    (1)    A request may also be made within thirty (30) days of the employee's return to work.

(k)    An employee will be entitled to a vacation in the year in which he retires on pension based upon the applicable percentage of the previous calendar years' earnings. The minimum vacation is applicable only to those employees who have been continuously employed for a period of thirty (30) days in the year previous to the year in which he retires.

(l)    In addition to any vacation to which an employee is entitled through the above eligibility provisions, an employee who retires on pension or who is released as the result of a plant closure and who is entitled to a special distribution under, or a separation payment, or the surviving spouse of an employee who dies, provided such surviving spouse is the beneficiary of the life insurance benefit made available by the Company for such employee, will be entitled to vacation pay based upon the applicable percentage of the employee's earnings in the current calendar year. The minimum vacation is not applicable to this additional vacation pay.

### Section 2—Pay For Vacations

(a)    Vacations will be paid at the rate of 2% of the previous calendar year's earnings for each week of vacation to which the employee is entitled.  The minimum pay for a

# ARTICLE IX - VACATION

week of vacation shall be forty (40) hours times the employee's hourly rate at the time the vacation is taken.

(b)     Employees who return to the payroll with seniority after having served in the Armed Forces, and whose vacation pay would be reduced by virtue of that service, shall have as their minimum vacation pay for each week of vacation an amount equivalent to their hourly rate for the week prior to the beginning of their vacation multiplied by the number of their regularly scheduled hours (based on not less than five or more than six days per week.)

(c)     Vacation checks will be distributed before the start of the employee's vacation week.

(d)     Employees who elect pay in lieu of vacation under Article IX, Section 1 (h), shall be paid as soon as practicable after the request is made and eligibility established. Employees who do not take all of their scheduled vacation by December 15, will be paid for all unused vacation.

## Section 3—Scheduling Of Vacations

(a)     If the Company anticipates a shutdown of all or part of the plant for vacations for up to ten days (10), and posts a notice not later than December 1, those employees not scheduled to work during the shutdown who are entitled to a vacation shall consider the shutdown period as vacation.  Each day of the vacation shutdowns shall be considered as day at a time vacation.  Such shutdown period shall be during the months of June, July (adjacent to Independence Day Holiday) and December (between the Christmas and New Year's Day Holidays) when local schools are recessed.  If a vacation shutdown is scheduled for December, it will not carry over into the following vacation year.  The Company may schedule the vacation shutdowns up to, but on no more than ten (10) consecutive days during the summer and no more than three (3) consecutive days in the winter.  In no event shall the total vacation shut down be more than a total of ten (10) days.  In the event of a shutdown in December of 2008, the Company may use one of the summer shut down days for a four (4) day shut down in December of 2008.  Consecutive days shall mean consecutive work days and exclude Saturdays, Sundays and Holidays.

(b)     As an exception to Paragraph (a), employees eligible for vacation may schedule their vacation at a time other than the plant shutdown period, for an acceptable valid reason (commitments made for travel, accommodations, etc.), but will be considered on a leave of absence without pay during the shutdown period, if no work is made available to them.

(c)     Employees who are ineligible for vacations during the shutdown period will be considered on layoff if no work is made available to them.

## ARTICLE IX - VACATION

(d)     Vacation selections will conform to the principle of seniority. Selections are limited, by shift, in a department, classification, and crew for each week in accordance with the Company's decision as to the number of employees they may schedule in a given week. Canvassing of employees for vacation preference by the Company will be conducted during the month of December. Vacations will be scheduled from January 1 through December 31. Employees who are on vacation, or hospital pass, or for other reason not available at the time of canvass, must make their vacation preference known to their department prior to the actual canvass. Any employee not designating an available week when canvassed will be bypassed and the canvass will continue to be made. When an employee who has been bypassed desires to assert his preference, his choice will be limited to the weeks available at the time he asserts his preference.

(e)     A posting will be made annually notifying employees of the date the annual vacation canvass is to begin. This notice will include the names of the canvassers in each area. Efforts will be made to contact employees not at work at the time of canvass who did not previously leave a list of vacation preference with their department.

(f)     The Company will agree to post open vacation weeks that may arise during the vacation period. Once a week of vacation occurs in a week that was previously full, that week's opening will be posted in the department for seven (7) calendar days. The senior eligible employee signing the posting will be awarded the open week.

### Section 4—Vacation Day-At-A-Time
Employees will be offered the opportunity to take any or all of their vacation, one day at a time providing the provisions of Article IX, Section 3 are fulfilled. The scheduling of a vacation one day at a time must be with management's approval, not in conflict with production requirements, and scheduled not more than eleven (11) calendar days or less than forty-eight (48) hours in advance. Requests less than forty-eight (48) hours in advance will be considered, production scheduling requirements permitting, but will not be given preference over timely requests.

(a)     Deferred vacations will not be considered for day-at-a-time vacation.

(b)     A week of vacation, one-day-at-a-time, consists of five (5) days; however, any of the six (6) days, Monday through Saturday (or Sunday for Powerhouse Department 160 only,) may be prescheduled as outlined above as a vacation day.

(c)     The rate of pay per day of vacation will be calculated by dividing two percent of the previous year's earnings by five (5) days per week. The minimum vacation pay provisions as outlined in Article IX, Section 2(a) are applicable to this calculation. The daily rate will also apply in the event Saturday (or Sunday for Powerhouse, Department 160 only) is used as a day of vacation.

# ARTICLE IX - VACATION

(d)     Employees who take a day's vacation during the week will have that day credited for payment of time and one-half for hours worked on the sixth day, as provided under Article VI, Section 3(a).

(e)     The advance scheduling of the vacation day will be handled directly through the employee's immediate Supervisor and must be approved by the Supervisor. Answers to requests will be given the next working day after the request. If a vacation day is granted, the employee will be given a vacation receipt so indicating.

(f)     Vacation, one-day-at-a-time, when granted, will be granted in the order in which the requests are made. If two or more employees make the request on the same shift on the same day for the same vacation day, and a vacation day is granted, it shall be granted in order of seniority. Vacation days once scheduled cannot be canceled.

(g)     It is permissible to request and receive two or more consecutive days of vacation with the understanding that each day must be individually requested and each day is individually approved by the supervisor.

(h)     In determining the timeliness of a request, the beginning of the employee's regularly scheduled shift is to be used as the reference point in time.

    (1)     If an individual makes a request for a day of vacation at a time other than during his regularly scheduled shift, in order to meet the 48-hours-in-advance criterion, such request will be considered with any other requests that were made during his last previous regularly scheduled shift. For example, if a first shift employee makes a request for a Friday day of vacation at 6:45 a.m. on Wednesday (prior to his regularly scheduled Wednesday shift), technically he meets the 48-hour-in-advance criterion. However, that request should be considered with any others that were made for the Friday during the regularly scheduled first shift on Tuesday. By doing this, the language which stipulates "if two or more employees make the request on the same shift on the same day for the same vacation day and a vacation day is granted, it shall be granted in order of seniority," can be accommodated.

    (2)     Employees requesting a day of vacation prior to the start of their Friday shift but after the weekend schedule was posted, the day of vacation will be granted for Saturday provided all other vacation scheduling requirements are met and there is another on-shift, in-classification person that can be scheduled.

(i)     When a day of vacation is granted the employee will be considered on vacation for the full 8 hour period starting with the beginning of their regularly scheduled shift. The employee will not be eligible to work during that 8 hour period. Employees

# ARTICLE IX - VACATION

desiring to work overtime must sign for such work. It is then the employee's responsibility to confirm their schedule.

(j)     The day paid as vacation will be incorporated with the week's earnings during which the partial vacation falls.

(k)     An employee's intent to take vacation, one-day-at-a-time, must be expressed at the time of employee canvass for the current vacation year.  However, in cases of immediate family illness, one week of weekly vacation may be converted to day-at-a-time vacation.  This will be done with the Area Manager's approval.  Calendar year for day-at-a-time vacation will be January 1 through December 31.

(l)     Employees taking day-at-a-time vacation on Thursday and Friday will consider Saturday as a voluntary work day unless the allocation for Saturday is full.  If the allocation is full, then Saturday must be considered a scheduled work day. Employees desiring to work Saturday overtime must sign for such overtime. It is then the employees' responsibility to confirm their schedule for that Saturday.

(m)     For scheduling purposes, employees may schedule, in order of seniority, day-at-a-time vacation as follows:

Day-at-a-time vacation weeks will be totaled by department or groups of departments, following the annual vacation canvass.  Total day-at-a-time weeks will be divided by fifty (50) weeks to determine the number of associates that will be allowed off for any given work day.  In the calculation, fractional days will be rounded up to the next whole day.  A minimum of one (1) per day will be granted to each department or group of departments.  Using the above procedure for day-at-a-time allotments does not preclude the Company from discontinuing daily vacation scheduling during the 13-week summer period if conditions arise to warrant such a discontinuance.

**Section 5—Vacation Weekly**
(a)     One (1) employee per department will be allowed weekly vacation in departments with less than five (5) employees.

(b)     A minimum of two (2) employees per department will be allowed weekly vacation in departments with five (5) or more employees.

(c)     During years when a summer shutdown is scheduled, to determine the number of employees permitted off on vacation for each department the total number of shutdown weeks will be subtracted from the department's total weeks. To determine the shutdown weeks, round to the nearest whole number of week(s) for each of the summer and winter shutdown periods, but never more than a total of two (2) weeks.  Divide the department's remaining weeks to be equally distributed among the weeks of the year

# ARTICLE IX - VACATION

Examples:

(4 DOV's) Summer – One Week Shutdown

| Dept. | Total Weeks | Total Shutdown Weeks | Weeks Remaining | Remainder of Year | Rounded |
|-------|-------------|----------------------|-----------------|-------------------|---------|
| 320 | 417 | 94 | 323 | 51 | 6.33 or<br>7 per week for 17 weeks<br>6 per week for 34 weeks |

(4 DOV's) Summer & (3 DOV's) – Two Week Shutdown

| Dept. | Total Weeks | Total Shutdown Weeks | Weeks Remaining | Remainder of Year | Rounded |
|-------|-------------|----------------------|-----------------|-------------------|---------|
| 320 | 417 | 188 | 229 | 50 | 4.58 or<br>5 per week for 29 weeks<br>4 per week for 21 weeks |

 (1) A minimum of one (1) employee per department will be allowed weekly vacation during weeks other than the designated shutdown periods.

(d) During years when no summer shutdown is scheduled, the prime thirteen (13) week summer vacation period from June through August of each year, a calculation of at least 35% vacation liability for each department will be utilized.

The Company will allow at least 35% of a department's total vacation weeks to be scheduled during the designated thirteen-week preferred vacation period.

| DEPT | TOTAL WEEKS | 35% CALCULATION | | 35% ROUNDED |
|------|-------------|-----------------|---|-------------|
| 320 | 417 | 145.9 | 146 | 11 per week for 10<br>12 per week for 3 |
| 514 | 417 | 145.9 | 146 | 11 per week for 10<br>12 per week for 3 |
| 531 | 346 | 121.1 | 122 | 9 per week for 8<br>10 per week for 5 |

The remaining 65% of the department's vacation weeks will be equally distributed among the thirty-nine remaining weeks of the year. It is understood that day-at-a-time vacation allocations will not be affected by the above method of calculation.

## Section 6—Vacation Shutdown Schedule

(a) If the Company offers work to employees during vacation shutdown periods, the following shall apply:

# ARTICLE IX - VACATION

(1)     When possible, the work shall be offered at least two weeks in advance of the shutdown. In case of emergency or break down of equipment, the notice may be shorter.

(2)     The work shall be offered on the basis of seniority in the following order:

    a)     employees in the classification where the work is sought

    b)     qualified employees who have insufficient vacation to cover the shutdown (this does not include any employee who has elected vacation outside of shutdown under Article IX, Section 3(b))

    c)     any qualified employee

    d)     within each of the above groups (a, b & c), in department before out of department and on shift shall be preferenced before off shift

(3)     The Company will not perform any production work during vacation shutdowns and may only perform maintenance and clean up work.

(4)     The Company may not offer work to more than ten percent (10%) of the bargaining unit without mutual agreement.

(b)     Employees who work any day(s) during the shutdown shall have a day of vacation restored for each day worked.

(c)     If the Company offers work to employees it will be in eight (8) hour increments during vacation shutdown periods. Employees will work on a volunteer basis only.

## Section 7—Half-Day Vacation

Employees may use day-at-a-time vacation in half-day increments for a maximum of ten (10) days allowed for day-at-a-time. The following rules would apply to usage of half-days of vacation:

(a)     Half-days would count the same as full days in the department allocations. Two matching half days would count as one allocation.

(b)     Half-days would be scheduled in same manner as day-at-a-time vacation per Article IX, Section 4.

(c)     Employees would not be allowed to match the half-day request if the two half-days would exceed the department allocation.

## ARTICLE IX - VACATION

(d)     All day-at-a-time vacation scheduling (full or half-day) must be considered in relation to production requirements.

(e)     If requests for the same day at the same time are made, preference would be given to a full day request over a request for half-day vacation.

(f)     Employees taking a half-day vacation may still sign and be scheduled for daily overtime.

ARTICLE X - ENGINEERING MAINTENANCE

# ARTICLE X - ENGINEERING MAINTENANCE

## Section 1—Engineering Maintenance

(a)     Employees in the Engineering Maintenance are placed in classifications as follows: Electrician, Instrument Repair, Millwright, Machinist, Pipefitter Oiler, Painter, Tool Crib Attendant, Truck Mechanic, Utility Person, Heating, Ventilating and Air Conditioning Repair, Powerhouse Operator and Maintenance Labor Trainer.    The principle of maintenance men working within their classification is agreed to, however, work in other classifications will be assigned for efficient utilization of labor.

(b)     Because of the nature of maintenance work, the need to assign individuals to certain jobs because of experience, and situations of emergency, maintenance employees may be assigned accordingly, providing the opportunity for regular work and daily overtime are reasonably in balance by classification at the end of the calendar year.

The preceding paragraph will not be construed so as to allow the Company to move any employee to a shift other than his own, but will conform to Article VIII, Section 5.   However, when training employees for the purpose of operating or maintaining equipment, the Company will provide the training.   Employees may be moved, with their approval, to the shift on which the training is to be done for the duration of such training.

(c)     Maintenance job vacancies will be posted in the same manner as all jobs which are subject to the bidding procedure; however, maintenance job vacancies (excluding Utility Person) will not be subject to the job bid procedure as stipulated in Article VIII, Section 6.   Maintenance job vacancies will first be offered to qualified apprentices in the classification.   If there are no qualified apprentices, other employees in the plant will be considered if they have a URW or USW journeyman card or equivalent, or if they have successfully completed a properly approved apprenticeship program in the appropriate craft, or if they have four or more years of experience in the classification, or if they have qualifications comparable to a new hire applicant.   Qualified employees will be considered by seniority.

Employees desiring to be considered for job openings must submit records of qualifications, experience and/or schooling to the Employment Office, verified and furnished by former employers, agencies, schools, etc.   Such documentation must be on file prior to the job posting withdrawal date before the employee can be considered for the vacancy.

Vacancies in the Oiler classification will be filled in the following order:

## ARTICLE X - ENGINEERING MAINTENANCE

    (1)    The senior active applicant judged to be qualified as the result of an interview.

    (2)    The senior employee on layoff judged to be qualified as a result of an interview who submitted records of qualifications, experience and/or schooling to the Employment Office prior to the posting coming down.

    (3)    New hire of a qualified candidate, if found within 60 days from date of first ad appearing.

    (4)    The senior of the plant candidates. Award of an Oiler position to an unqualified person will not prevent management from seeking qualified candidates under this procedure in the future.

(d)    Employees filing vacancies in the maintenance department will use plant-wide seniority for all items relative to seniority and in obtaining a production job in case of being surplus labor.

(e)    When there are employees from maintenance classifications on layoff, posted vacancies in those classifications will be awarded to the senior of:

    (1)    Senior bidder in the plant with surplus rights to the vacancy classification.

    (2)    Senior employee on regular layoff from the vacancy classification.

    (3)    Senior employee on regular layoff with surplus rights to the vacancy classification.

If the above procedure does not result in the vacancy being filled, the low senior employee on optional layoff from the vacancy classification will be recalled.

The bidding procedure in Article X, Section 1(c) will be used once all employees from layoff have been recalled.

In case of permanent surplus of labor, the least senior employees of each classification where surplus exists will be declared surplus. Such employees will be referred to the Employment Office and be placed in accordance with Article VIII, Section 10.

(f)    Maintenance employees are expected to furnish standard hand tools required to perform their daily tasks. The Company will repair or replace broken tools, or tools worn out as a result of normal work performed for the Company, provided they are not broken due to carelessness and that the employee has been employed as a craftsman for at least one year. Such repair or replacement must be approved by the Area Manager (or person designated) or the equivalent.

# ARTICLE X - ENGINEERING MAINTENANCE

(g)    The Powerhouse must be operated on a seven-day-a-week basis. Powerhouse employees will be scheduled so as to equalize work opportunities as near as practicable. The Powerhouse schedule discussed during negotiations will be put into effect and a copy given to the Union. This schedule may be changed by mutual agreement between the Union President and the Manager of Engineering.

(h)    Employees called in for emergency maintenance work on a holiday shall be guaranteed four (4) hours at their regular rate plus any premium benefits. If he is able to resolve the emergency prior to the four (4) hours, he will be permitted to go home and shall receive the guaranteed four (4) hours pay.

    If the employee works four (4) hours or more, they may within the following week, with management's approval, be allowed to take an optional day off from work without pay.

(i)    Maintenance employees shall be allowed ten (10) minutes at the end of the shift to clean up their tools and the work area assigned.

(j)    When job assignments are changed within the Maintenance Division, the change will be for reasons relating to production or maintenance requirements.

    An employee's ability and seniority will be considered when it is appropriate to recognize an employee's request for a job change.

    Employees that have a preference for a job assignment may place a card on file in the Maintenance Department indicating their preferred job assignment, which will be considered by management in making assignments. On-shift employee's job preference will be considered before the seniority of off-shift employees is recognized.

(k)    Maintenance contracts will not be let for work of a type normally performed by employees of the employer's maintenance department, provided the work can be done with available equipment, within the necessary time and at no greater expense. These provisions do not apply to building expansion programs. When expansion programs involving installations, modernization or relocation of equipment is planned, the Company will review with the Engineering Maintenance Division Committeeman the portion of the work that could be performed by local craft personnel.

    The Engineering Maintenance Division Committeeman will be notified in writing at least five (5) days in advance of letting contracts to utilize outside contractors. The notification will provide an explanation of the decision.

    In case of emergency, the advance written notification will not apply, with the committeeman being notified as soon as possible.

## ARTICLE X - ENGINEERING MAINTENANCE

(l)      The Skilled Trades Committee has compiled a list of work which would not require advanced notification. The work which would still require advanced notification will be described in more detail on the notification form.

(m)      For weekend overtime scheduling, Maintenance employees can cancel up to 11:00 a.m. on Friday without being charged for an absence and Management has until 3:00 p.m. Friday to schedule employees to work.

(n)      The duties of pipe covering and insulation shall be included in the classification of Pipefitter,

### Section 2—Outside Contracting

(a)      Before the decision is made to use an outside contractor the Company will be assured that all skilled trades personnel in the affected classification(s) are not working less than the standard work day or standard work week, provided we have the proper equipment and skilled persons who can accomplish the work within the allotted time at no greater expense. Operating procedures will be generated by the Manager of Engineering to improve adherence to this commitment.

      The Company does not intend to violate or evade any specific provisions of the Agreement, or to violate any spirit, intent, or purpose of the Agreement when using outside contractors. The Company will not alter past practices as far as offering Freeport Plant skilled trades employees Saturday, Sunday and Holiday work opportunities before utilizing outside contractors on those days.

      The intent of this letter is to reaffirm to the Union Negotiating Committee the Company's intent to utilize outside contractors only when necessary and justified.

(b)      The parties established the following parameters for conducting Quarterly and Annual Review of outside contracting work performed in the plant that is specified in this Article:

      (1)      The Quarterly meetings will be held during the second, third and fourth quarters of each calendar year.

      (2)      The Annual meeting(s), which will also serve as the first quarter meeting, will be held before March 1st of each calendar year.

      (3)      Standard information that will be provided by the Company to the Contracting Out Committee for the review meetings is as follows:

            a)      Listing of all contracts that were let in the previous quarter, by date, to perform maintenance work that is traditionally performed by plant bargaining unit employees.

            b)      Name of contracting company awarded each contract.

# ARTICLE X - ENGINEERING MAINTENANCE

    c)      Nature of the work contracted and location, by Area or Department.

    d)      Labor hours worked for each contract, actual hours if available, estimated hours if actual not available, total labor cost of contract if available.

    e)      Total contracts let and total contractor hours worked for the previous calendar quarter and year.

(4)    In addition to discussing outside contracting, during the annual meeting the parties will discuss any events that have contributed to accomplishing the intent of Article X, Section 4, as well as future plans relative to fulfilling the obligations set forth in this Article.

## Section 3

(a)    All maintenance bargaining-unit work will be performed by employees from within the bargaining unit. Such work will be contracted out only when necessary to assure efficient plant operations. Criteria for considering such decisions are availability of manpower with the necessary training, ability and skills, availability of necessary equipment, reasonably competitive cost, and purchase and performance guarantees at no additional cost to the Company.

(b)    Contracting Out Committee

The company agrees to make every reasonable effort to utilize personnel for maintenance work necessary for the plant's manufacturing process. The parties agree to establish person Contracting Out Committee at the local level, half of whom shall be members of the bargaining unit and designated by the Union President, and half will be management. This group should include where applicable the maintenance division chairman, and the appropriate management counterpart. The Committee shall consist of six (6) people and shall meet as required but not less than monthly to attempt to resolve problems in connection with contracting out at the plant.

(c)    Notice and Information

(1)    Prior to the Company entering into any agreement or arrangement to use outside contractors to perform maintenance bargaining unit work, the Company will, upon contemplating the use of an outside contractor, provide written Notice to the Contracting Out Committee. Such Notice to be given not less than five (5) days in advance of letting the contract. In the case of an emergency which prevents such advance Notice, the Union will be notified immediately upon the Company becoming aware of the emergency.

## ARTICLE X - ENGINEERING MAINTENANCE

(2)     Should the Union believe a meeting to be necessary, a written request shall be made within three (3) days (excluding Saturdays, Sundays and holidays) after receipt of such Notice.  The meeting shall be held within two (2) days (excluding Saturdays, Sundays and holidays) thereafter.  At such meeting, the parties shall review in detail the plans for the work to be performed and the reasons for using outside contractors.  The Company will give good faith consideration to any suggestions by the Union members of the committee and to any alternate plan proposed by the Union members for the possible performance of the work by bargaining unit personnel.

(3)     Should the Company fail to give Notice as provided above, then not later than thirty (30) days from the later of the date of the commencement of the work or when the Union becomes aware of the work, a grievance relating to such matter may be filed.

(d)     Mutual Agreement

(1)     In the event the Contracting Out Committee resolves a matter in a fashion which in any way permits the use of outside contractors, such resolution shall be final and binding only as to the matter under consideration and shall not affect future determinations under this provision.

(2)     No agreement, whether or not reached pursuant to this provision, which directly or indirectly permits the use of outside contractors on an ongoing basis shall be valid or enforceable unless it is in writing and signed by the President of the affected Local Union.

(e)     Expedited Procedure

(1)     In the event either party requests an expedited resolution of any dispute arising under this Section, it shall be submitted to the Expedited Procedure in accordance with the following:

a)     In the event the parties cannot reach an agreement regarding the contracting out dispute, the Company may let the contract.  Within three (3) days (excluding Saturdays, Sundays and holidays) either party may advise the other in writing they are invoking this Expedited Procedure.

b)     Procedures for expedited arbitration will be developed by the parties.  At such hearing a Union member and a Company member of the Contracting Out Committee shall represent the respective parties.

# ARTICLE X - ENGINEERING MAINTENANCE

     c)    The arbitrator shall render a decision within forty-eight (48) hours (excluding Saturdays, Sundays and holidays) of the conclusion of the hearing.

     d)    Notwithstanding any other provision of this Agreement, any case heard in the Expedited Procedure before the work in dispute was performed may be reopened by the Union if such work, as actually performed, varied in any substantial respect from the description presented in arbitration.

(f)    Commitment

In addition to the other understandings described herein, the Company agrees that where total hours worked by employees of outside contractors in the plant on bargaining unit work reach or exceed the equivalent of one (1) full time employee, in a particular craft or classification, defined as forty (40) hours per week over a period of time sufficient to indicate that the work is full time, the work performed by outside contractors will be assigned to employees and the number of bargaining unit employees will be appropriately increased if necessary, unless the work cannot be performed by the addition of an employee(s), or that assignment of the work to employees would not be economically feasible.

(g)    Quarterly Review

    (1)    Quarterly reviews will be held based on the provisions of Article X, Section 2(b) as appropriately revised.

    (2)    During the quarterly review, the parties shall review the Company's compliance with the Commitment set forth above, including providing the Union all information necessary to evaluate said compliance. In the event the Union believes that the Company is not in compliance with the Commitment, the Union may enforce the Commitment through the grievance and arbitration provisions of the Agreement, irrespective of the Company's compliance with any other obligation in this provision or any other part of the Agreement. The arbitrator shall remedy the situation, which may include adding labor.

(h)    General Provisions

    (1)    Special Remedies

        a)    Where it is found that the Company (a) engaged in conduct which constitutes willful or repeated violations of this provision or  (b) violated a cease and desist order previously issued by an arbitrator, the arbitrator shall fashion a remedy or penalty specifically designed to deter the Company's behavior.

# ARTICLE X - ENGINEERING MAINTENANCE

b)      With respect to any instance of the use of an outside contractor, where it is found that Notice or information was not provided as required under this provision, and that such failure was willful or repeated or deprived the Union of a reasonable opportunity to suggest and discuss practicable alternatives to the use of an outside contractor, the arbitrator shall fashion a remedy which includes earnings and benefits to bargaining unit employees who otherwise may have performed the work.

(i)      Outside Individuals Testifying in Arbitration

No testimony offered by an individual associated with an outside contractor may be considered in any proceeding unless the party calling the outsider provides the other party with a copy of each outside contractor document to be offered in connection with such testimony at least forty-eight (48) hours (excluding Saturdays, Sundays and holidays) before commencement of that hearing.


**Section 4**

The Skilled Trades Representative at the Freeport plant will take on the role of advisor regarding the development and improvement of the programs and processes implemented to improve our competitive advantage. These activities include, but are not limited to, technical skills enhancement, education of safe work practices and procedures, project review, new employee indoctrination and productivity improvement.

Annually, during interim meetings, a joint review of the plant's plan will be made. Components of this review may include:

(a)      review of management's staffing analysis information including rates of attrition and future needs;

(b)      review entry requirements preferencing current employees who meet defined criteria; and

(c)      address upgrading skills, access for production associates, performance based training and basic skills remediation opportunities.

Whereas it is the desire of the parties to establish additional programs consistent with the above to further the skills and effectiveness of the skilled trades organization, the parties recognize the objectives stated herein are of mutual interest and can be accomplished through a joint cooperative effort.

# ARTICLE XI - MISCELLANEOUS CLAUSES

## Section 1—Copies To Employees

(a)    A copy of this Agreement shall be printed by a union printer and given, by the Company, as soon as they can be printed, to each employee working in and to new employees hiring into the bargaining unit. Sufficient copies shall be furnished to the Union.

(b)    Copies of the Supplemental Unemployment Benefit Agreement and the Benefits Agreement will be given the employees and the Local Union.

## Section 2—Training Groups

(a)    The Company may maintain a production, engineering, and staff training group for the purpose of training and preparing employees for more responsible positions.

(b)    Trainees may be assigned to fill in on temporary vacancies only after all qualified bargaining unit employees have been offered the available work.

(c)    No regular employee will be laid off or transferred because of trainee assignments.

(d)    Trainees will not balance work opportunities with regular employees.

(e)    No time studies will be made on any trainee.

## Section 3—Bulletin Boards

(a)    Space on or adjacent to the factory bulletin boards shall be available to the Union for the purpose of posting notices throughout the plant.

(b)    Notices shall be restricted to the following types:
        (1)    Notices of the Union's recreational, educational, and social affairs.
        (2)    Notices of Union elections, appointments, and results of Union elections.
        (3)    Notices of Union meetings.
        (4)    Other informational notices.

(c)    The Union shall deliver all notices to the Human Resources Office for approval and prompt posting. It will be the responsibility of the Human Resources office to remove such postings on a date mutually agreed to at the time the postings are delivered.

## ARTICLE XI - MISCELLANEOUS CLAUSES

### Section 4—Management Working
No supervisory personnel shall perform any work which would ordinarily be done by employees in the Bargaining Unit except for emergencies, inventory, trouble-shooting, and demonstrating methods or operations.

### Section 5—Address And Telephone
It is each employee's responsibility to keep his current address and telephone number (if any), on record with the Company. Notice of change must be made on proper form available for that purpose and may be made with the employee's Supervisor or at the Human Resources Office. Listed telephone numbers should be in the residence of the employee. When the occasion arises, an attempt will be made to call those who have listed other than a residence number, but the Company will not be responsible for failure to reach such employees.

### Section 6—Employee Payroll And Production Records
Whenever possible employees' payroll or production records will not be changed without first consulting the employee. Employees will be furnished with a copy of any adjustment or correction made by the Company to any payroll document which affects their earnings. When the change affects only the performance reported, the employee will be notified of the change that was made at the earliest practical opportunity.

### Section 7—Effect Of Agreement

The parties have entered into this Collective Bargaining Agreement, a Benefits Agreement and a Supplemental Unemployment Benefits Plan ("Agreements"). Those Agreements shall constitute the sole and entire Agreement between the parties and supersedes all prior Agreements. The language of these Agreements will prevail over any oral agreements, unless specifically adopted by the Company in writing after the effective date of these Agreements.

For any past Freeport arbitration decisions, Goodyear arbitration decisions on relevant Benefits Agreement or Supplemental Unemployment Benefits Plan language or under the SUB agreement, precedent setting grievance settlements, memorandums of agreement, administrative letters or Standard Practice Letters ("Claimed Precedent") to be considered as applicable, they must be presented by either party before the Company issues a final response at Step 3 or they will not be relevant or admissible in any subsequent step, including, but not limited to arbitration. The parties agree that either party has up to ten (10) days after the close of the third step meeting to present to the other side any relevant "Claimed Precedent" for consideration. If any "Claimed Precedent" is presented, the other party will have until the case is certified for arbitration to provide any countervailing "Claimed Precedent" for consideration. Nothing herein will prevent the parties from arguing why the "Claimed Precedent" is not controlling before an arbitrator.

## ARTICLE XI - MISCELLANEOUS CLAUSES

For any past arbitration decision at the facility, not disclosed as set forth above, the decision shall not be controlling, but may be introduced for argument in any subsequent arbitration. Nothing herein shall be deemed to limit submission of arbitration cases as argument in accordance with the arbitration protocol.

No oral modifications to the Agreements or oral representations with Goodyear regarding: (a) the Agreements, (b) grievance settlements or (c) past practices that occurred prior to the effective date of these Agreements will be binding on the Company, nor will they be admissible in arbitration proceedings, unless specifically adopted by the Company in writing after the effective date of these Agreements. By "specifically adopted by the Company in writing" includes items in this Agreement as well as those adopted by the following procedure:

(1)    Within 60 days of the effective date, the Union must present a list of all oral modifications, grievance settlements or past practices to the Company for review.

(2)    Within 30 days of the date of presentation of the list, the Company will investigate all oral modifications, grievance settlements or past practices at the facility. The Company will then meet with the union and either accepts the oral modifications, grievance settlements or past practices or ask that the items disputed be specially set before an arbitrator for resolution. The standard for the arbitrator will be whether the oral agreement existed at least one day prior to the effective date of the this Agreement.

(3)    To the extent either party intends to introduce as evidence, refer to or discuss any oral modifications to the Agreements, oral grievance settlements or past practices that are attributed to Goodyear that are not established by this provision, the following will apply. Written notice of said intent must be given no later than 30 days before the arbitration. With said notice must be given the name of the persons who were parties to the agreement, the terms of the agreement and the approximate date of the agreement. Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

(4)    In no event may either party introduce evidence of either Goodyear's "intent" or the Union's "intent" at the bargaining table prior to the 1997 negotiations. If either party intends to introduce evidence of "intent" the following will apply. Written notice of said intent must be given no later than 30 days before the arbitration. With said notice must be given the name of the person expressing the intent, the approximate date of the statements, copies of all notes regarding the statements. Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

# ARTICLE XI - MISCELLANEOUS CLAUSES

(5)     Nothing in this provision will prohibit either party from introducing either parties' intent or any oral modifications, grievance settlements or past practices attributed to Titan Tire.

## Section 8—Gloves

Gloves will be furnished in the first instance by the Company to employees who are regularly assigned to jobs which require usage of gloves, as determined by departmental management.

Replacements will be given only when the old gloves are unusable and turned in to the Company for exchange. Otherwise, the employees must sign a charge slip and have the price of the gloves deducted from his pay. An employee who has been furnished gloves by the Company and subsequently transfers to another job where gloves are not furnished, or who terminates his employment, must turn in his gloves to the Company or pay the price of the gloves.

## Section 9—Adoption Expenses

It was agreed that an employee who, while accumulating continuous service during the term of this Agreement, wishes to adopt such a child (a child under age 18 not related to the employee by blood or marriage), will, at the time of court finalization of the adoption, be reimbursed for the following covered expenses:

(1)     Expenses for court costs and investigative, counseling and supervision fees charged by a recognized adoption agency which is licensed by appropriate State or County government authorities, not to exceed one thousand five hundred dollars ($1,500.00).

(2)     Legal fees associated with the adoption procedure, not to exceed five hundred dollars ($500.00).

## Section 10—Lubrication

The responsibility for lubrication of all plant non-powered rolling equipment would be placed under the responsibility of production, the clean machinery and equipment classification.

## Section 11—Qualified Guidelines For Overtime And Short Work Week Scheduling

The term "qualified" as it applies to overtime opportunities and Short Work Week scheduling shall be determined by the following guidelines.

(1)     A list will be maintained for each employee of the jobs they are qualified to perform.

# ARTICLE XI - MISCELLANEOUS CLAUSES

(2)     The list will be used for daily, Saturday, Sunday, Holiday overtime and for Short Work Weeks.

(3)     The employee and the Supervisor will be responsible for adding to and removing jobs from the list and recording the proper date of addition or deletion.

(4)     If there is question of "qualified" in a particular classification, the employee must demonstrate to that department their ability to perform the job prior to adding the job to the list.

(5)     Jobs added to the qualified list will be maintained until the employee removes the job from the list, unless removed through job disqualification. An employee removing their name may not reapply for a one (1) year period.

(6)     It is understood that the employee's current job classification will automatically be added to the list once they have satisfactorily completed the learning time.

(7)     In cases of job disqualification, the involved classification will be removed from the employee's list.

(8)     In cases where summer labor is involved, the qualified list for these employees will start over at the beginning of each summer. All jobs trained on will be added to the list. No jobs other than those trained on each summer will be added.

The above guidelines do not restrict the Company's right to use employees as available labor when needed. When making temporary assignments, the low senior employee in the identified available labor classification with the required classification on the qualified list will be moved prior to other qualified labor.

## Section 12—Lead Hands

(a)     Lead Hands:

Lead Hands will be utilized at the Freeport Plant in accordance with the attached Letter 6.

(b)     Implementation Guidelines:

(1)     The selection criteria will be established jointly with minimum standards set for attendance and work history. The application of bargaining unit service will be the determining factor only when all other selection criteria are considered equal.

(2)     In addition to a Lead Hand's regularly assigned job, specific job duties will be determined jointly at the local level and may include but not limited to such duties as the direction of work as required, alignment of labor, canvassing for overtime, various administrative duties including payroll

# ARTICLE XI - MISCELLANEOUS CLAUSES

within their respective work areas, ordering stock and requisitioning items from stores.

    (3)    The rate of the job will be established at the local level and will be no less than an additional ten (10) percent above the rate of the job of their assigned job classification.

    (4)    The lead hand will not be permitted to administer discipline.

(c)    The parties agreed that while ultimate authority for certain tasks and duties reside with departmental management, Lead Hands may perform these tasks administratively without conflict with the following CBA provisions:

Article V, Section 4(c) – daily overtime scheduling
Article VII, Section 16(a) – jury duty notification
Article VII, Section 18(c) – funeral leave pay
Article VIII, Section 4(a) – reporting absences
Article IX, Section 4(e) – day-at-a-time vacation
Article XI, Section 5 – address and telephone change notification
Article XI, Section 11 – Qualified list, with the exception of certifying additions to the list
Article XI, Section 15 – home base assignments
Article XI, Section 16 – job preference

The above list may not cover all areas of potential conflicts and may be modified by the parties with mutual agreement.

(d)    The parties agree that a joint oversight committee will be established to monitor implementation of this concept and periodically discuss any issues that may arise out of this process.

## Section 13—PAC

In accordance with Federal Election Commission guidelines, the Company will agree to weekly PAC deductions from earnings for each active union member, provided they sign a USW/PAC authorization form.

In consideration, the Union agrees to:

    (1)    Provide to the Company a duly executed authorization form signed by the individual employees who wish to have contributions deducted from their earnings.

    (2)    Indemnify, defend and save harmless the Company from any claims, suits, judgments, fines, penalties, attachments and from any other form of liability as a result of implementation of this Agreement.

# ARTICLE XI - MISCELLANEOUS CLAUSES

The pay from which the deduction and the date on which the remittance check is to be delivered to the Union shall be determined by the parties once the deduction system is available.

### Section 14—Combining Jobs For Scheduling

For combining jobs for reduced schedule, daily overtime, Saturday, Sunday, Holiday and startup and shut down, the following is a guideline for all departments to follow.

When the sign-up sheets are posted and there are known jobs that will be combined, the sign-up sheets for the combined jobs will be posted on one sheet.

It is recognized there may be cases where the combined jobs are not known until after the normal posting of sign-up sheets.

In either case above, the most senior qualified employee will be scheduled to perform the work on the combined job.

### Section 15—Home Base Assignments

(a)    In Department 320 for "Home Base machine assignment." Each Banbury Operator will be assigned a home base Banbury. Reassignment will be done only when a vacancy occurs or due to a machine breakdown or production requirement changes. As a vacancy occurs, preference will be given to the most senior operator on the shift which the vacancy occurred.

Only two machine moves per opening will be permitted for each Banbury opening.

Department 320 – Overtime with respect to Home Base Machine

Banbury operators working overtime in Department 320 will be assigned to their home base machine, if open, without regard to seniority. After home base machine assignments were made, further openings would be filled by seniority choice. The intent of this provision is that this principle be applied on-shift before offering the preferred machine assignment to an off-shift employee.

(b)    The following guidelines will be implemented in Departments 511 and 531 for "Home base tire machine assignment." Each builder will be assigned a home base machine and reassignment will be done only as is required by ticket changes. These changes will be made for ticket requirements that are for periods of time of more than one week, and most often will be for a long-range time span.

# ARTICLE XI - MISCELLANEOUS CLAUSES

GUIDELINES TO BE FOLLOWED

Whenever a preferred tire machine is needed on a shift and that machine is not manned, the following guidelines will be used:

(1)    Production Control will identify which machine is least preferred and that builder will be reassigned to the preferred machine.  If there are two or more moves to be made, the offering of preferred machines will be made in seniority order of the individuals to be moved.

(2)    If a builder's former home base again becomes a preferred machine he will be offered the opportunity to return to that machine or retain his current home base.  These moves will be recorded on the "machine assignment" sheet, which will be retained in the builder's personnel folder.  Any errors made in reassignment will be corrected at the earliest opportunity.

(3)    A new employee or an employee coming to a different shift because of a shift preference opening will be assigned to a home base as is described in paragraph No. I. above.  However, builders on the shift where the open machine is located may request to be reassigned to that position.  These requests should be in writing and given to the responsible Supervisor. Requests will be considered on a seniority basis and only two machine moves per opening will be allowed.  Notification of a preferred machine opening will be posted on the department bulletin board one week in advance of the machine assignment being made.  This will allow the on-shift builders to know which machine is being preferred and give them an opportunity to request a machine change, if so desired.

(4)    Requests by two builders on the same shift to trade home base machines will be considered only after both builders have been on their assigned machines for three (3) months.

(5)    If realignment of shifts becomes necessary because of a surplus, the following criteria will be followed:

   a)    A builder reassigned to another shift may retain his/her home base tire machine if his/her seniority is greater than the person already assigned on that shift.

   b)    If a reassigned builder does not have seniority to claim their home base, he/she will be assigned to a new home base using the language in paragraph No. 3 of this provision.

   c)    If there are two or more builders being reassigned at a time, seniority among those involved will be used in allowing a selection of their new home base.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(6)    When multiple units go down, the senior builder will be given the option to build tires or be reassigned.

### Section 16—Openings Or Preferences Within Job Classifications
A preference within a job classification will be filled by one (1) senior employee on the shift where the opening exists prior to allowing an employee to move to that shift from another shift, classification or department.  Only two preferences will be allowed for each vacancy filled within the production organization.  This system would not apply to maintenance vacancies.

### Section 17—New Hire Orientation
Involvement of both management and the Union is of value to the orientation process for new employees. The parties recognize the importance of proper new employee orientation and that it is imperative that new employees receive necessary information about the Company and the Union. The Company will pay up to a maximum of eight (8) hours of time lost during the employee's regular shift for this orientation. The logistics of the meeting(s) will be handled by the parties at each plant.

The parties agreed that employees who are hired as part of the bargaining unit will be allowed to meet with local union leadership during their orientation period.

The Company will reimburse employees, who successfully complete their probationary period, for the cost of prescription safety glasses and a vision exam if required.  This reimbursement will equal the amount(s) stated in the employee's benefit package.

### Section 18—Dental Plan
The current Dental Expense Benefit Plan will continue until notice is issued by the Union to discontinue the Plan.  Any increase in the premium for such Dental Expense Benefit Plan shall be borne out of the Cost-of-Living Allowance adjustments and future general wage increases which arise out of the 2006 labor agreement.   If the increase in contribution rate for the Plan exceeds the amount of Cost-of-Living Allowance adjustment or general wage increase payable at the time of the increase, the amount which exceeds the increase will be borne by a reduction in basis wage rates.

In the event, however, that the Dental Expense Benefits Plan is discontinued at any time, the amount previously deducted from Cost-of-Living Allowances and general wage increases otherwise payable will be restored to all pay rates effective immediately upon discontinuance of the Plan, or in the event of a deficit in the Plan fund, when the deficit has been repaid.  In the event of a surplus in the fund at the time of discontinuance of the Plan, the parties will meet to agree to the method of returning the surplus to the employees.

The roll up on the Cost-of-Living Allowances or general wage increases arising out of the Basic Labor Agreement which is withheld to provide for the Dental Expense Benefit Plan

## ARTICLE XI - MISCELLANEOUS CLAUSES

will be applied as a credit to reduce the Cost-of-Living Allowance or general wage increase that would otherwise be withheld.

The Company also agrees to reduce the amount of the Cost-of-Living Allowances or general wage increases that will be withheld during the term of the Dental Agreement effective November 1, 2004, and any subsequent Dental Agreement, to provide for the Dental Expense Benefit Plan, by the amount of roll up. Roll up for the term of the 2004 dental renewal will be based on roll up for the year of 2003. Roll up for the term of any dental renewal beyond the term of the 2004 Dental Agreement will be based on the actual roll up for the year previous to the beginning of the new Dental Agreement period.

The Company will maintain a record of all hours for which employees receive pay and multiply that number by the credit based on roll up. The resulting number will be accounted for on the Company's books as set forth in the "agreed to" administrative letters concerning the Dental Expense Benefit Plan. A report of this information will be provided to the Union on a monthly basis.

Prior to the scheduled expiration of any implemented Dental Agreement, the Company commits to facilitate the solicitation of interested vendors capable of providing the administrative services necessary to accomplish the objectives of the Plan for the renewal period. Contract discussions will be held with invited firms and appropriate Company and Union representatives for the purpose of negotiating the terms of a renewal agreement. The Company further commits to provide any necessary information and pay the reasonable costs associated with these renewal activities.

### Section 19—Notice On Labor Placements
The Company will give notice to the Union when labor placements are to be made under Article VIII, Sections 8 (Disqualifications), 9 (Medically Restricted Placements) and 10 (Surplus Labor and Layoffs). With such notice, the Union may participate in such placements when they are scheduled to occur.

### Section 20—Temporary Assignments Outside Bargaining Unit
To facilitate communication on such assignments:

(1)    All temporary assignments outside the bargaining unit must receive written pre-approval from the Human Resources Manager.

(2)    The Human Resources Manager will forward a copy of such written pre-approval to the Union President.

(3)    The pre-approval will include the starting time/date and the ending time/date of the assignment. This will be posted in the department as notice.

84

# ARTICLE XI - MISCELLANEOUS CLAUSES

(4)    The Company will make management aware of this requirement.

(5)    The Union will make bargaining unit employees aware of this requirement.

(6)    The Company will notify the Union and the employee when the employee has reached 75 cumulative days outside the bargaining unit.

## ARTICLE XII - SAFETY AND HEALTH

**Section 1**

(a)    The Freeport plant health and safety program will continue to be of equal importance with product quality and production. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment and will provide competent first aid personnel and furnish protective devices and protective equipment where necessary, and protective clothing on work which is recognized to be abnormally hazardous. When needed, the employer shall provide transportation for injured employees to the hospital. The plant medical personnel, plant safety management or their designee shall determine the best available mode of transportation. The Employer shall provide necessary shower baths, lockers and other facilities for maintaining sanitary conditions throughout the plant. Unique personal protective equipment requirements for documented needs beyond standard and customary shall be addressed on a case-by-case basis.

Boots will be made available to employees required to perform assignments that involve standing in water. Rainwear will be made available when employees are assigned to outside work in inclement weather.

(b)    A Joint Safety and Health Committee ("JSHC") shall be appointed consisting of not more than four representatives of the Company and not more than four representatives of the Union to facilitate the promotion of safe working practices, including ergonomic considerations, and the elimination of unsanitary or unhealthful working conditions within the plant. The JSHC shall be furnished passes for the purpose of entering the plant and investigating safety conditions within the plant. Members of the safety committee shall perform a comprehensive safety and health audit of the entire plant not less than annually. The audit is intended to augment the existing health and safety inspections and tours already in place. The audit process shall be developed at the local plant level, and shall include a process by which priorities are set and action plans developed. When entering the plant for this purpose, the Committee shall notify the Safety Manager on day shift, and appropriate Supervisor on later shifts, of reason for the visit and their destination.

Effective January 1, 2006, the employer shall provide the union safety committee with a weekly allocation of hours to be utilized for committee business based on the following. The allocation will not be accumulated from week to week. These representatives shall work with the employer safety and health department, but under the direction of the union co-chair of the safety committee and the local union president. The employer may agree to the appointment of additional full or part-time union safety reps in addition to those provided by the hours below, to be compensated by the employer. These representatives shall be chosen exclusively by the union.

# ARTICLE XII - SAFETY AND HEALTH

|   |   |
|---|---|
| - 1-50 active bargaining unit employees | 10-hours/week |
| - 51-200 active bargaining unit employees | 20-hours/week |
| - 201-750 active bargaining unit employees | 40-hours/week |
| - 751-1500 active bargaining unit employees | 60-hours/week |
| - 1501-2000 active bargaining unit employees | 80-hours/week |
| - 2001+ active bargaining unit employees | 120-hours/week |

The preceding provision is inclusive of the existing hours paid currently at each facility. If a facility is currently exceeding the above allocation it will not be reduced below their current level.

(c)     No employee shall be disciplined or discriminated against in any way for suffering an injury or illness, or for reporting an accident in a timely manner. The employer shall not establish any incentive program that discourages employees from reporting accidents, injuries, or illnesses in the plant. Any existing incentive programs shall be evaluated by the plant safety committee with the assistance of the corporate health and safety department and the international union health, safety and environment department.

(d)     Right to Refuse Unsafe Work:

   (1)     No employee shall be required or permitted to work under conditions which may be or tend to be unsafe or injurious to his health or safety and the safety of others.

   (2)     No employee who in good faith exercises his or her rights under this Article shall be disciplined, or suffer any loss of pay or benefits, even if it is later determined that the alleged unsafe condition did not exist.

   (3)     If an employee is concerned about the safety of a specific job or task, the employee will notify a member of management immediately. The member of management will then request a risk assessment to be conducted utilizing the local plant's existing risk assessment procedures.

   (4)     No employee or group of employees shall be required to work on a job or machine while it is considered unsafe by a representative of the joint labor management safety committee. During such time the employee or group of employees shall receive their normal hourly rate.

(e)     The JSHC shall meet not less than once per month for the purpose of discussing safety problems, and will tour the plant periodically to verify that adopted safety recommendations have been complied with. The JSHC may make investigations following serious accidents to determine causes and to explore preventive measures against recurrence. The members shall secure approval from their Supervisor before leaving their jobs for this purpose.

# ARTICLE XII - SAFETY AND HEALTH

Union members of the JSHC shall be paid in accordance with Article VII, Section 13.

(f)    Data concerning disabling injuries will be made available to the JSHC upon their request. An employee who signs an accident report will be given a copy of the report at that time.

(g)    When an employee supplies satisfactory evidence that he sustained damage to his eye glasses, hearing aid, or artificial limb while performing the duties of his assigned work with due caution and without interference by other employees, the Company will reimburse the employee for the cost of necessary repairs or replacement. The cost of an examination or prescription will be borne by the employee. The employee must supply evidence that the breakage was done on the job and in the line of duty.

(h)    The Company Chairman of the JSHC shall notify the Committee of recommendations resulting from plant inspections by State or Federal Safety Inspectors. A copy of such recommendations will be provided upon request.

An employee who is requested by a safety inspector from the Office of Occupational Safety and Health administration and is designated by the Union President to accompany the inspector on an inspection tour, will be paid his current hourly rate for the time lost from his regular shift as a result of such plant inspection.

(i)    The Company will pay full travel and hotel expenses, within the limits of established Company policy, for four Union members of the JSHC to attend an annual State Safety Conference. If the State does not have a suitable conference, arrangements will be made to attend the National Safety Conference or the parties may mutually agree to an alternate safety conference.

(j)    In any area where raw materials of known toxicity are being used, the Company will make available to qualified professional testing representatives the formulation of the material in question upon the request of a physician. In all such cases, where the Company has caused blood tests or skin tests to be made of employees, the result of such tests will be furnished to the employee upon his request. Upon request of the Joint Safety and Health Committee, the Company will make skin or blood tests on any employee exposed to toxic material, subject to the employee's approval. The employer shall maintain an Industrial Hygiene monitoring program in each plant. Upon request, representatives from the Joint Safety Committee may be present when such monitoring takes place and such representative will be entitled to copies of such test or monitoring results. All Industrial Hygiene samples will be analyzed by a laboratory meeting the standards of the current laboratory to be selected in accordance with Titan's Insurance carriers.

# ARTICLE XII - SAFETY AND HEALTH

(k)    When evidence exists that indicates an employee's illness may have been caused by the materials to which he is exposed while working, the Company will make tests in an effort to determine the cause and nature of the illness. A copy of the results of such tests shall be furnished the employee upon request.

An employee who must lose time from his regular shift because of such tests will be paid his current hourly rate for the time lost from that shift.

(l)    No employee shall be required to work on any job in the plant with which he is unfamiliar until he has received adequate safety instructions in the performance of the operation.

**08 C 50072**

(m)    An employee who is injured in the factory must promptly report each injury that occurs with the facts and one who suffers from an occupational illness must report promptly upon becoming aware of the existence of such illness. Should the employee require surgery or hospital confinement or require treatment over an extended period for the occupational injury or illness, may receive treatment by the Company's physician, or such other physician chosen by the employee. In the event any dispute arises concerning any treatment or disability of the employee, the employee may be examined by a physician designated by the employer. If the dispute is not resolved by this examination such dispute will be resolved through the State Industrial Commission.

(n)    The employer will furnish safety prescription lenses and frames to employees that must wear prescription glasses when such employees are permanently assigned to operations where mandatory eye protection is continuously required. This clause does not apply where special or extra eye protection is required and where regular frame safety glasses are not sufficient to meet protection requirements.

Glasses furnished by the company will have side shields permanently affixed so as to provide adequate protection to the employee.

(o)    It is the intention of the Company to continue every effort to improve the safety performance of the plant and improve the safety environment for each employee.

The Company will continue the practice of having weekly meetings with the JSHC. In addition, hygiene monitoring test data will be reviewed in these meetings.

Training of JSHC members will continue to be an important aspect of enhanced safety performance. The Company will continue to review training opportunities that will expand current safety expertise of JSHC members.

The Company will commit to sending at least 2 members, 1 hourly and 1 salary, to the Union/Management Safety Symposium annually throughout the Agreement.

## ARTICLE XII - SAFETY AND HEALTH

(p)     Two (2) members of the Safety Committee shall be named to the Ergonomics Steering Committee; one hourly and one salary associate. The additional hourly member will be selected by the Union President and approval by the Human Resource Manager. The Human Resource Manager and Union President will be members of the Ergonomics Steering Committee.

(q)     Personal Protective Equipment

    (1)     The Company will provide $65.00 credit for safety shoes purchased as a result the mandatory PPE shoe requirement. Additional $65.00 credit for replacement safety shoes is limited to a minimum 18-month interval between purchases during the life of this Agreement.

    (2)     Employees moved out of classification as available labor would be provided coveralls and shoe coverings, if requested.

# ARTICLE XIII - COOPERATIVE EFFORTS

## Section 1

The parties recognize that the intent of cooperative efforts is to provide value for employees, customers and shareholders.

The parties acknowledge that this Memorandum will evolve throughout the life of the contract as business and competitive conditions change. However, the principles outlined in this memorandum should remain constant into the future.

<u>Principles</u>

This memorandum reflects the mutual commitment of the Company and Union and is based on the following principles:

1. Cooperative efforts are long term processes and require ongoing efforts to maintain

2. The parties recognize that these processes are built on a foundation of trust and respect that must exist between all parties, the Company, the Union and the employees.

3. It is not the intent of these cooperative processes to undermine the strength of either party nor compromise the legal collective bargaining process

4. It is recognized that these cooperative processes are not an end in themselves, but rather a means to increase Company and Union viability by providing heightened value to our customers, and an improved quality of working life for our employees.

5. Employees, the Union and the Company should be provided with appropriate information in a timely manner to support effective decision making.

6. The Company and the Union will work together and participate in various community forums where it is appropriate for both parties.

<u>Cooperative Structure</u>

The parties recognize that a cooperative process requires the establishment of an appropriate organizational structure. Such a structure must include defined roles for the parties at each level of the organization.

The parties recognize that the plant has the flexibility to design a cooperative structure that fits the organization's needs and circumstances. Further, where such a structure currently exists, it may be in the best interest of the Company and Union to retain such a structure so long as it meets the objectives and principles of this Memorandum.

## ARTICLE XIII - COOPERATIVE EFFORTS

The Freeport plant is committed either to maintaining its current cooperative structure or entering into a new cooperative process which promotes the principles of this Memorandum.

The parties will establish a plant steering committee for the purpose of promoting and developing cooperative processes at the plant level. This core group must include top management representatives, as well as top Union officials. This committee will have a minimum of four members. This committee will review the plant's business plan and discuss opportunities under the cooperative process to address business issues and needs and appropriate employee concerns.

The steering committee will meet as often as necessary, but no less than twice a year in order to ensure that this memorandum is effectively implemented and consistently administered.

It is recognized that in order for this committee to function effectively, information must be shared in a timely manner. This information will be focused on the Manufacturing Business Plans for the plant. In conjunction with the business plan review process the parties will discuss staffing requirements for bargaining unit employees. Where a substantial number of layoffs are anticipated, the parties will discuss options that could potentially minimize the impact of layoffs on employees.

The plant cooperative structures will be compatible with the plant's existing or future organizational needs and structure.

Process Components

The parties recognize that the following process components are necessary in order to achieve a successful cooperative process:

Skills Assessment

The parties are committed to developing and maintaining a highly skilled workforce needed to meet the demands of the ever-changing competitive environment. To that end, the local parties will:

1. Identify skills needed to effectively operate the plant;

2. Assess current skills;

3. Develop training programs to close gaps between required skills and current skill levels;

## ARTICLE XIII - COOPERATIVE EFFORTS

4.   Assess future skill level requirements

Education/Training

The parties are committed to upgrading employee training and educational programs with the objectives of enhancing occupational skills, communication skills, and providing opportunities for personal development.

Toward this end, during the term of this Agreement, the steering committee will be charged with the responsibility of developing and determining the resources necessary to meet the cooperative education and training needs of the organization.

It is appropriate for the parties to evaluate and determine the need for, and the structure of, a joint educational process.

A review of the status of the cooperative education and training process will be discussed at the Interim Meetings.

Technological Change

The parties recognize the importance of technological change if the Company is to remain competitive and viable in world markets.

It is further recognized that a competitive and viable manufacturing environment provides meaningful, substantial job opportunities for present and future employees.

For this reason, the local Union will be notified of projected technological changes that will have an impact on employees.  The parties will continue to work together to minimize that impact.

In addition,  the parties will discuss technological change in advance of its implementation at the plant.  It is recognized that the involvement and input of the appropriate management and union personnel can result in more informed decisions, as well as the effective and efficient implementation of technological changes at the plant floor level.

Problem Solving Process

The parties recognize and support the utilization of a systematic problem solving process for the purpose of identifying and resolving issues.  It is understood that in order to effectively utilize this problem solving process employees and management need to receive appropriate education and training.

Interim meetings will be a forum to review and discuss problems arising out of this provision as well as the other Agreements.

Work Redesign

## ARTICLE XIII - COOPERATIVE EFFORTS

The Plant Steering Committee may investigate and implement work redesign consistent with the principles of this Agreement. Work redesign may include the establishment of operating work teams or self-directed work teams and/or the implementation of other new and improved ways of performing work. Additionally, any work redesign will be aimed at increasing employee responsibility, more effective utilization of people, materials and equipment along with a heightened level of job satisfaction and security resulting from increased employee contributions to the decisions and initiatives that have an impact on the workplace.

Safeguards and Resources

(1)    The selection of a consultant, if required, to assist in the development and implementation of the cooperative process will be mutual.

(2)    The cooperative process will not conflict with the traditional role of the Union, such as processing grievances.

(3)    Problems arising out of this provision can be referred to the steering committee for review and are not subject to work interruptions or the grievance procedure, unless they were previously under the jurisdiction of the grievance procedure prior to the effective date of this Agreement.

(4)    The Company and the Union are committed to no employee being laid off as a result of improvements made under this cooperative processes.

(5)    The Company and Union leadership are committed to entering into a cooperative process which promotes the principles outlined in this provision. Employee participation in this process is voluntary and employees will not be disciplined as a result of their decision.

(6)    Information shared under administration of this provision will be provided subject to the execution of an appropriate confidentiality agreement between the parties.

In summary, the Company and the Union are strongly committed to this provision as a means of developing the labor management relationship and union/management leadership necessary for creating a workplace environment that will benefit the employee, the Union and the Company

# ARTICLE XIII - COOPERATIVE EFFORTS

## Section 2—Capital Investments

The extent of the Company's future capital investments in the Freeport plant will depend on the competitive position of the plant in areas such as productivity, quality, company profitability and costs as well as the availability of capital funds.

The Company agrees to meet and discuss with the Union, no less than annually, its allocations for future capital projects.

## Section 3—Workforce Training

(1)     Commitments

The parties are committed to:

(a)     the Company's workforce being sufficiently skilled so that all bargaining unit work can be performed in accordance with this Agreement by employees; and

(b)     Employees receiving sufficient training to allow for all reasonable opportunities to progress within the Bargaining Unit where practical and maximize their skills to the greatest extent possible.

(2)     Plant Training Committees

(a)     Appointment and Composition

The parties shall establish a Plant Training Committee. The Committee shall be composed of not less than four (4) and not more than six (6) representatives, half of whom shall be Union representatives and half of whom shall be Company representatives. The Company members of the Committee shall be selected and serve at the pleasure of the Company. The Union members of the Committee shall be selected and serve at the pleasure of the Local Union President.

(b)     Staff

Effective January 1, 2006, the Plant Training Committee shall have one (1) full time Training Coordinator who will be responsible for coordination and oversight of the Training Program for bargaining unit employees. The Training Coordinator will be an employee selected by and serving at the pleasure of the Chair of the Union Negotiating Committee, in consultation with the Local Union President, subject to the reasonable approval of the Company. The Training Coordinator shall be compensated in accordance with standard local plant understandings his currently hourly rate for all hours.

(3)     Study of Workforce Training Needs

## ARTICLE XIII - COOPERATIVE EFFORTS

Within six (6) months of the Effective Date, the Plant Training Committee shall complete a report (Report) of the expected training needs of the workforce over the term of the Agreement, given the Commitments outlined in Paragraph 1 above.  Such Report shall include Findings and Recommendations as described below.

(a)    Findings

      (1)    an age and service profile and the anticipated attrition rates of the workforce over the short term and long term future, it being understood that the study is performed solely for the purpose of determining attrition rates.

      (2)    an assessment of the current skill requirements (both competencies and force levels) of the plant, the availability of such skill requirements within the existing workforce and any training necessary to bring the competencies and/or force levels of the current workforce into prompt conformity with the plant's current skill requirements;

      (3)    an evaluation of the appropriateness of existing training and the necessity of developing additional training, giving due consideration to emerging and changing patterns and trends in technology and future skill needs;

      (4)    an examination of current overtime levels and an assessment of whether employees in certain positions are working excessive overtime;

      (5)    an examination of methods by which productivity can be improved through additional training of employees;

      (6)    an examination of the plant's business plan, including projected capital spending, planned or potential new technology or technological change and other relevant factors over the term of the Agreement; and

      (7)    an assessment of the work practices and the training practices at the plant.

(b)    Recommendations

Based on its Findings, the Plant Training Committee shall develop a comprehensive training program, including a detailed implementation plan and all necessary resources for administration, implementation, delivery

# ARTICLE XIII - COOPERATIVE EFFORTS

and evaluation (Training Program) designed to, on a practical and timely basis, meet the commitments outlined in Paragraph 1 above.

    (c)    Update

Each year the Plant Training Committee shall prepare an Update that reviews the Findings and modifies them based on changed circumstances, measures the success of the Training Program against its objectives and modifies the Training Program accordingly.

    (d)    Separate Statements

The Report and each Update will include separate statements by the parties with respect to any Finding or Recommendation as to which they disagree.

(4)    Action by the Union President

    (a)    Within thirty (30) days of receipt of the Report or an Update, the Union President and the Plant Manager shall approve a Training Program or Update (including modifications upon which they can agree) or submit those matters on which they do not agree to Arbitration, pursuant to procedures to be agreed upon by the parties.

    (b)    The dispute will be resolved expeditiously on the basis of a final offer submission by the parties at a hearing. The arbitrator will determine which of the submissions best meets the Commitments outlined in Paragraph 1 above, in light of the Findings referred to in Paragraph 3(a) above. The arbitrator shall have the power to determine the procedures pursuant to which the hearing is conducted.

(5)    Administration and Union Role

The Plant Training Committee shall jointly oversee the administration and delivery of its Training Program, the expenditure of training funds necessary for its operation, and an annual audit of such activity.

    (a)    With respect to any aspect of the administration, delivery or implementation of the Plant Training Program, the Union members of the Plant Training Committee shall be free to propose that the Union or its designee take any or all responsibility for such administration, delivery or implementation, subject to the approval of the Company members.

    (b)    In the event the Union does take such approved responsibility, the Company shall fully cooperate with the Union or its designee with the

# ARTICLE XIII - COOPERATIVE EFFORTS

resources required for any administration, implementation or delivery for which the Union receives approved responsibility.

(6)    Safeguards and Resources

    (a)    The Company shall provide the members of the Plant Training Committee and the Training Coordinator with such training as is necessary to enable them to perform their responsibilities under this Section. Employee participation in the Plant Training Committee shall normally occur during normal work hours.  All meeting time and necessary and reasonable expenses of the Plant Training Committee shall be paid for by the Company and Employees attending such meetings shall be compensated in accordance with standard local plant understandings.

    (b)    Union members of the Plant Training Committee shall be entitled to reasonable opportunity on Company time to caucus for purposes of study, preparation, consultation and review, and shall be compensated in the same manner as set forth in Paragraph (a) above.  Requests for caucus time shall be made to the appropriate Company representative and shall be held within two working days of the request, unless mutually agreed otherwise.

    (c)    To the extent that Company facilities are available and appropriate for Training Program activities, they will be made available.

(7)    Dispute Resolution

In addition to the matters covered by the dispute resolution procedure described in Paragraph 4 above, in the event that the Plant Training Committee is unable to reach agreement on any matter involving the Training Program, the Plant Training Committee shall appoint the arbitrator referred to in Paragraph 4(a) to resolve such dispute. Further details of this procedure shall be as agreed to by the Plant Training Committee unless they are unable to reach such agreement, in which case they shall be determined by the arbitrator.

## Section 4—Employment Security

(1)    Layoff Minimization Plan

The Company agrees that, prior to implementing any layoffs, it shall review and discuss with the Union:

    (a)    documentation of the business need for the layoffs (Need);

## ARTICLE XIII - COOPERATIVE EFFORTS

    (b)    the impact of the layoffs on the bargaining unit, including the number of employees to be laid off and the duration of the layoffs (Impact); and ,

    (c)    a plan designed to reduce the need for and level of layoffs in the affected classifications (a Layoff Minimization Plan) which shall contain at least the following elements:

        (1)    a substantial reduction in the use of outside contractors in the affected classifications;

        (2)    the absolute minimal use of daily overtime in the affected classifications;

        (3)    any strategy to purchase products or services that would normally be provided by bargaining unit employees;

        (4)    a program of optional layoffs as provided in Article VIII, Section 10(b);

        (5)    the use of alternate work assignments for affected individuals;

        (6)    a meaningful program of shared sacrifice by management.

(2)    Employee Protections

Reference to the elements of a Layoff Minimization Plan in Paragraph 1 above shall not be construed to impair in any way any protection afforded to Employees under other provisions of this Agreement.

(3)    Union Response

The Union shall be provided with sufficient information to reach its own judgment on whether there is a Need, the appropriate Impact and to develop its own proposed Layoff Minimization Plan.

(4)    Dispute Resolution

    (a)    In the event the Parties cannot reach agreement on whether there is a Need, the appropriate Impact and the terms of a Layoff Minimization Plan, the Company may implement its plan and the Union may submit their dispute to an expedited final offer arbitration under the procedures to be developed by the Parties. If the Company lays off Employees in violation of this Article, such Employees shall be made whole.

    (b)    The arbitrator's ruling shall address whether the Company demonstrated a Need, and if it did, whose proposed Impact and Layoff Minimization Plan

# ARTICLE XIII - COOPERATIVE EFFORTS

was more reasonable, given all the circumstances and the objectives of the Parties.

## Section 5—Plant Closing

In the event a full plant closure occurs during the life of this Agreement:

(1)    The Company will notify the Local and International Union at least six months prior to the cessation of production operations.

(2)    Following such notification, the Local and International Union will have the right to discuss and explore with the Company any possible means of averting the closure.

(3)    If attempts to avert the plant closure are not successful, Company and Union representatives will meet to negotiate the manner in which the closure is carried out.

## Section 6—Executive Compensation

The Company agrees that:

(1)    The average base salaries of the executive officers as a group will not exceed the average salaries of similarly situated executives at comparably sized industrial companies.

(2)    All future (including the amendment of existing plans) stock purchase, stock option, stock appreciation or other similar programs (Stock Programs) shall:

    (a)    reward only long-term appreciation in the value of the Company's stock and

    (b)    not, once granted, directly or indirectly be "re-priced" or similarly adjusted, subject to the New York Stock Exchange definition of "re-pricing".

## Section 7—Wellness

A cooperative Titan Tire/Local USW Wellness Program will be maintained at the Freeport plant.

This voluntary program will consist of periodic health screening examinations, seat belt usage campaigns, smoking cessation clinics, and stress reduction programs to encourage employees to establish home and work habits that will help them lead healthier, more fulfilling lives. The cost of these programs will be supported by the Company.

# ARTICLE XIII - COOPERATIVE EFFORTS

In addition to the above, a weight management program, approved by management, will be sponsored by the Company as follows. Upon completing a program with at least 75% attendance, the Company will reimburse the employee 50% of the program cost.

The continuance of these programs will be reviewed by an Advisory Committee consisting of two (2) representatives from the Local Union and two (2) representatives from the Company. The medical portion of the program will be administered by the plant Medical Director including the type and frequency of screening tests.

Active employees will be eligible to participate in the program. At the beginning of the program, eligible employees will be scheduled for an initial health screening examination. After the initial examination, employees will be scheduled for periodic examinations on or about their birthday anniversary. During the course of the 1998 negotiations, it was agreed that a prostate screen (PSA) be added to the Wellness program screening examination.

To the extent possible, the examinations will be scheduled in the plant dispensary during the regular dispensary hours. Employees will be scheduled for examination prior to their regular work shift; however, some employees may have to be scheduled at other times. Other local medical service resources may be utilized when necessary.

The results of the examination will be reviewed by the local plant physician. The participant will be informed of the results and the recommendations, if any, for further medical evaluation. A copy of the examination will be provided the participant if requested in writing by the participant.

On written request of the Local President, available statistical summaries of examination data, with identifiers removed, regarding health problems in the work force will be provided.

All examination results will be considered as privileged and confidential information and will not be released to anyone except on written authorization of the employee and, no information received by the Company pursuant to this program shall be used to discriminate or retaliate against any employee for any purpose.

Such information shall not be used in making employment-related decisions unless the health of the employee so requires. Individual test results, health history profiles, risk analysis profiles, and physical recommendations transmitted to the plant physician shall be treated as confidential medical records and filed only within the plant medical department.

The Company may use its health insurance carrier to implement the terms of this provision.

## Section 8—USW/Titan Tire Institute For Career Development

(1)     Establishment

# ARTICLE XIII - COOPERATIVE EFFORTS

Effective July 1, 2007 the Union and the Company hereby establish the USW/Titan Tire Institute for Career Development (the Institute) which, in conjunction with similar programs negotiated by the Union with various other employers, will be administered under the rules and procedures of the Institute for Career Development (ICD).

(2)    Purpose

The purpose of the Institute is to provide resources and support services for the education, training and personal development of the Employees of the Company, including upgrading their basic skills and educational levels.

(3)    Guiding Principles

The Institute and ICD shall be administered in a manner consistent with the following principles:

(a)    workers must play a significant role in the design and development of their jobs, their training and education and their working environment;

(b)    workers should be capable of reacting to change, challenge and opportunity and this requires ongoing training, education and growth; and

(c)    worker growth and development can only succeed in an atmosphere of voluntary participation in self-designed and self-directed training and education.

(4)    Financing

The Institute will be financed by a contribution of $.10 (ten cents) for each hour worked in the Freeport plant.

The parties will also seek and use funds from federal, state and local governmental agencies.

(5)    Administration

(a)    The Institute will be administered jointly by the Company and the Union in accordance with procedures, rules, regulations and policies agreed to by the parties.

(b)    Training is separately provided for in the Agreement.  The Company may, however, contract with the Institute to provide services and resources in support of such training.

# ARTICLE XIII - COOPERATIVE EFFORTS

(c)     The Company agrees to participate fully as a member of ICD in accordance with policies, rules and regulations established by the ICD. The Company's financial contributions to the Institute will continue to be separately tracked. ICD will continue to be under the joint supervision of the Union and participating employers with a Governing Board consisting of an equal number of Union and employer appointees.

(6)     Reporting, Auditing, Accountability and Oversight

The following minimum requirements shall govern reporting, auditing, accountability and oversight of the funds provided for in Paragraph 4.

(a)     Reporting

(1)     For each calendar year quarter, and within thirty (30) days of the close of such quarter, the Company shall account to the Institute, the ICD, the International Union President and the Chair of the Union Negotiating Committee for all changes in the financial condition of the Institute.  Such reports shall be on form(s) developed by the Institute broken down by plant and shall include at least the following information:

(a)     The Company's contribution, an explanation thereof and the cumulative balance; and

(b)     a detailed breakdown of actual expenditures related to approved program activities during said quarter.

(2)     The Union Co-Chairs of each of the Local Joint Committees shall receive a report with the same information for their plant or Local Union, as the case may be.

(b)     Auditing

The Company or the Union may, for good reason, request an audit of the Company reports described in Paragraph 6(a) above and of the underlying Institute activities made in accordance with the following: (1) the Company and the Union shall jointly select an independent outside auditor; (2) the reasonable fees and expenses of the auditor shall be paid from ICD funds and (3) the scope of audits may be Company-wide, plant-specific, or on any other reasonable basis.

(c)     Approval and Oversight

Each year, the Local Joint ICD Committees shall submit a proposed training/education plan to the Chairs of the Union and Company Negotiating Committees or their designees.  Upon their approval, said

# ARTICLE XIII - COOPERATIVE EFFORTS

plans shall be submitted to the Institute. The Institute must approve the plan before any expenditure in connection with any activities may be charged against the funds provided for in this Agreement. An expenditure shall not be charged against such funds until such expenditure is actually made.

(7)     Dispute Resolution Mechanism

Any dispute regarding the administration of the Institute at the Company or plant level shall be subject to expedited resolution by the Chairs of the Union and Company Negotiating Committees and the Executive Director of ICD who shall apply the policies, rules and regulations of the Governing Board and the provisions of this Section in ruling on any such dispute. Rulings of the Executive Director may be appealed to the Governing Board, but shall become and remain effective unless stayed or reversed by the Governing Board.

ARTICLE XIV - COST OF LIVING

ARTICLE XIV - COST OF LIVING

**Cost-Of-Living Allowance**

(1)     The Cost-of-Living Allowance, if any, will be determined in accordance with changes in the Consumer Price Index--United States City Average, for Urban Wage Earners and Clerical Workers (1967 = 100) Revised Series as amended for the month of January, 1987 and subsequent months published by the Bureau of Labor Statistics, hereinafter referred to as the CPI-W.

(2)     Cost-of-Living Allowances will be the average CPI-W for the months of March, April, and May 2005.

Cost-Of-Living Allowances will be made at the following times:

| | |
|---|---|
| January 1, 2006 | September, October, November 2005 |
| April 3, 2006 | December 2005, January, February 2006 |
| July 3, 2006 | March, April, May 2006 |

The April 3, 2006 adjustment will be increased $.23 for restoration of previously deferred COLA adjustments.

Effective January 1, 2006, current Cost-of-Living Allowance will be considered to have been rolled into the Job Grade wage rates detailed in Schedule B. The amount of the Cost of Living Allowance payable on each Effective Date of Adjustment will be determined by comparing the three-month average CPI-W for the adjustment period to the Base. $.01 per hour for each full .26 of a point change that the three-month average CPI-W for the adjustment period exceeds the Base will be added to Job Grade wage rates effective January 1, 2006.

(3)     In determining the Base and the three-month average of the CPI-W for a specified period, the computed average shall be rounded to the nearest 0.1 Index Point using the Engineering Method of Rounding.

(4)     In the event the Bureau of Labor Statistics does not issue the appropriate CPI-W on or before the Effective Date of Adjustment, the Cost-of-Living Allowance required by such appropriate Index shall be effective at the beginning of the first pay period after receipt of the Index and paid retroactively to the Effective Date of Adjustment.

(5)     No adjustment, retroactive or otherwise, shall be made in pay or benefits as a result of any revision which later may be made in the published figures for the Index for any month on the basis of which the cost-of-living calculation shall have been determined.

# ARTICLE XIV - COST OF LIVING

(6)     In no event will a decline in the CPI-W be cause to reduce any Cost-of-Living Allowances that have been made prior to such decline.

(7)     The Cost-of-Living Allowances are dependent upon the availability of the BLS CPI-W in its present form and calculated on the same basis as the Index for February 1991. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W or is unable or fails to make said CPI-W available, the parties shall negotiate on the adoption of an appropriate substitute CPI-W that most accurately reflects the spending habits of the affected employees.

In the event the BLS discontinues the publication of the CPI-W on the 1967 = 100 base, the parties shall change the Cost-of-Living Allowance (COLA) calculation set forth above to maintain the same cents-per-hour COLA payment as would result by using the 1967=100 base and $.01/.26 point formula.

Failing agreement in such negotiations, the parties shall submit the issue of what shall constitute an appropriate substitute CPI-W to final and binding arbitration.

This Cost-of-Living Allowance Agreement shall become effective under the same terms as those upon which the Collective Bargaining Agreement becomes effective as outlined in Article XV, Effective Date, Amendment and Termination.

The final Cost-of-Living allowance adjustment will be made July 3, 2006 and no further Cost-of-Living Allowance adjustments will be made. Thereafter, wages will be set as set forth in Schedule B and Letter 2 and will be posted annually by the Company.

**ARTICLE XV - EFFECTIVE DATE AND TERMINATION**

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

(1)   This Agreement shall become effective at the time the local Agreement is completed, by ratification of the Local Union and approval of the International Union.  Except as provided in the No Strike, No Lockout Provision, it shall continue in effect until and including November 19, 2010 at 11:00 P.M. Central Time and thereafter it shall renew itself for yearly periods unless written notice is given by either party not less than sixty (60) days, but not more than seventy-five (75) days prior to the expiration date, that it is desired to amend or terminate this agreement.  In the event notice of a desire to amend or terminate this agreement is given, the representatives of the Local Union and the representatives of the Company shall meet as soon as possible but in no event later than thirty days (30) prior to expiration to begin negotiations.  Such negotiations shall have duration of at least thirty (30) days, unless otherwise mutually agreed.  At the opening of such negotiations, both parties shall present to each other in writing their proposed changes in said Agreement.   If negotiations are not completed prior to the expiration date of this Agreement, said Agreement shall terminate unless extended by mutual agreement.

(2)   Amendments to this Agreement may be made by mutual consent.

(3)   The effective date of this Agreement is dependent on ratification by the Local Union and approval of the International Union.

(4)   In Witness Hereof, the duly chosen representatives of the parties hereto affix their hand this 1st day of January 2006.

### LOCAL UNION #745L, UNITED STEELWORKERS

(Sgd.) Steve Vanderheyden          _____

(Sgd.) Dan Kreeger                       _____

(Sgd.) Jim Jamison                        _____

(Sgd.) John Fuller                          _____

(Sgd.) Frank Wool                         _____

(Sgd.) Kevin Kirk                           _____

(Sgd.) Ed Bell (USW Staff Representative)   _____

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

**TITAN TIRE CORPORATION OF FREEPORT**

(Sgd.)  William Campbell, President    _____

# SCHEDULE A

## SCHEDULE A – JOB DEPARTMENTS, CLASSIFICATIONS AND GRADES

This schedule A identifies the job classifications and corresponding Pay Grades established during the contract negotiations between the parties for the 2006 Agreement. It is understood that the standard job evaluation practice referred to in Article VII, Section 1 (a) will apply to any changes in job content of any classification.

For a period of six months from the effective date of the Agreement, the Company will not change the job descriptions or combine jobs of any current job classification without agreement of the union.

(1)     Six months from the effective date, prior to making any changes in current job descriptions the parties will discuss the reason for the changes and proposals for implementing the change in job descriptions. If the parties do not agree on the change the Company may make the change only: (a) if it is the result of, and only to the extent necessary to implement a capital investment and/or process of improved automation directly affecting the involved classification, or (b) if it is the result of and only to the extent necessary to implement a process change necessary for manufacturing.

(2)     Six months from the effective date, any Company proposal to combine current job classifications will be discussed with the Union. The Company will discuss the reasons for the change and proposal for implementing the proposed change. Should the parties be unable to reach mutual agreement on the change and its implementation, the Company's sole remaining option will be to surplus the necessary members of the affected classifications and establish a new classification to be filled through the filling of vacancy procedures of article VIII, Section 6.

Minor changes of job duties that do not result in a change in the assessment of the job will not result in a change in job grade, even if the numeric total would ordinarily result in a different job grade.

This is not intended to restrict overtime distribution properly scheduled under the terms of Article XI, Section 14.

### Grade and Classification

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 119 | 359 | Tool Crib Attendant | 2 |
| 119 | 479 | Utility Person | 1 |
| 119 | 570 | Painter | 4 |
| 200 | 701 | Waste & Scrap Pickup | 1 |
| 200 | 723 | Trucker & Checker - Receiving | 2 |
| 210 | 402 | Store Attendant | 2 |
| 320 | 396 | Operate Pigment Blender | 2 |

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 320 | 459 | Lay Down Stock - Wig Wag | 1 |
| 320 | 512 | Clean machinery & Equipment | 1 |
| 320 | 553 | Clean Shakers & Misc Service | 1 |
| 320 | 559 | Resample & Process Control | 2 |
| 410 | 441 | Reroll & Repair Liners - Misc Service | 1 |
| 410 | 577 | Service Back End | 2 |
| 410 | 707 | Truck Stock & Place in Tire Room | 2 |
| 412 | 500 | Production Service | 2 |
| 412 | 569 | Roll Changer - 60" Gum Calender | 2 |
| 412 | 598 | Truck Stock - Misc Service | 2 |
| 420 | 555 | Wrap Beads and Service | 1 |
| 430 | 500 | Production Service | 2 |
| 430 | 508 | Cement Tread Ends - 10-10 tuber | 1 |
| 430 | 512 | Clean machinery & Equipment | 1 |
| 430 | 561 | Cushion Mill & Tread Check | 3 |
| 440 | 621 | Truck and Stock Farm Tires | 1 |
| 441 | 461 | Assemble, Prepare & Truck Orders | 1 |
| 441 | 607 | S&L Tube-In-Case, Truck & Load Farm Tires | 1 |
| 442 | 431 | Sort and label | 2 |
| 511 | 422 | Repair tires/stock & clean equip | 2 |
| 511 | 500 | Production Service | 2 |
| 514 | 512 | Clean Machinery & Equipment | 1 |
| 514 | 620 | Service, Spray and Truck Green Tires | 2 |
| 531 | 512 | Clean machinery & Equipment | 1 |
| 531 | 518 | Service - Helper | 2 |
| 534 | 500 | Production Service | 2 |
| 534 | 512 | Clean machinery & Equipment | 1 |
| 535 | 576 | Buff and Repair - Farm Tires | 3 |
| 535 | 622 | LRF Runout Inspection | 3 |
| 911 | 491 | Janitor | 1 |
| 021 | 421 | Section and Step Down tires | 3 |
| 330 | 397 | Operate Windup - 66" Calender | 3 |
| 330 | 575 | Operate Let-Off - 66" Calender | 3 |
| 410 | 451 | Roll changer - Plain Ply Units | 2 |
| 410 | 524 | Roll Changer - 4-Roll Calender | 2 |
| 420 | 550 | Flap, Apex and Service | 2 |
| 430 | 412 | Book Treads - 10-10 Tubers | 2 |
| 514 | 438 | Paint and Line Green Tires | 2 |
| 515 | 500 | Production Service | 2 |
| 119 | 548 | Oiler | 3 |
| 320 | 389 | Attend Banburys - Roller Die | 3 |
| 320 | 395 | Banbury Operator | 4 |
| 320 | 462 | Batch-Off Millman | 3 |
| 320 | 514 | Banbury Operator Helper - Batch builder | 3 |
| 320 | 544 | Truck Gondolas - Pellets | 3 |
| 330 | 386 | Millman - 66" & 4-Roll Calender | 3 |
| 410 | 386 | Millman - 66" and 4-Roll Calender | 3 |

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 410 | 394 | Banner Bias Oper - Splicer | 3 |
| 412 | 530 | Cut, Pick, Splice, Squeegee and Back End | 4 |
| 412 | 532 | Build Bands - RJS Unit | 4 |
| 412 | 666 | Low-Angle Bias Cutter Operator | 3 |
| 420 | 399 | Build and Wrap Beads | 3 |
| 430 | 388 | Millman - 10-10 Tuber | 3 |
| 511 | 734 | Build Tires - Passenger | 4 |
| 514 | 725 | Cure Tires - Service BOM Presses | 3 |
| 514 | 726 | Chg Molds & Bladders - Clean Molds | 3 |
| 515 | 406 | Inspect & Vent Tires - Trim Beads & Vents | 3 |
| 515 | 415 | Classify & Disposition Passenger Tires | 4 |
| 515 | 526 | Trim Tires - Attend Paint Machine | 3 |
| 530 | 519 | Laminator Operator | 3 |
| 531 | 464 | Build Tires - Farm | 4 |
| 534 | 471 | Inspect, Repair, Jam and Paint & Line | 3 |
| 534 | 509 | Tend Presses - Farm | 3 |
| 534 | 568 | Chg Molds & Bladders - Clean Molds | 3 |
| 535 | 571 | Trim and Final Inspect - Farm Tires | 3 |
| 535 | 578 | Farm Tire Press Operator/Inspector (A row) | 3 |
| 054 | 485 | Labor Trainer - RSP | 4 |
| 054 | 495 | Labor Trainer - RFS | 4 |
| 119 | 301 | Machinist | 5 |
| 119 | 307 | Pipefitter | 5 |
| 119 | 310 | Millwright | 5 |
| 119 | 345 | Heating, Vent and Air Cond Repair | 5 |
| 119 | 350 | Maintenance Labor Trainer | 5 |
| 119 | 588 | Truck Mechanic | 5 |
| 330 | 370 | Calender Operator - 66" Calender | 4 |
| 410 | 496 | Calender Operator - 4-Roll Calender | 4 |
| 412 | 521 | Calender Operator - 60" Gum Calender | 4 |
| 430 | 385 | Tuber Operator | 4 |
| 530 | 671 | Service & Operate FMSL | 4 |
| 532 | 669 | Service & Operate RFSL | 4 |
| 119 | 323 | Instrument Repairman | 5 |
| 053 | 534 | RSP Balance Production | 4 |
| 053 | 536 | RFS Balance Production | 4 |
| 053 | 546 | Warehouse Balance Production | 3 |
| 119 | 304 | Electrician | 5 |
| 160 | 330 | Powerhouse Operator | 5 |

**SCHEDULE B – PAY GRADES**

A.    Titan Tire Wage Scale

1.    Effective January 1, 2006, for those employees hired before January 1, 2006, Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $21.93 | $22.03 | $ 22.29 | $23.06 | $23.81 |

2.    Employees Hired after January 1, 2006, the Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $13.50 | $15.00 | $ 22.29 | $23.06 | $23.81 |

For employees in Grades 1 & 2, the new hire starting wage rates will be $1.50 below the above wage rate. Each employee in Grade 1 & 2 will get a $.50 increase at 12 months, 18 months and 30 months of employment.

For Employees in Grades 3 and Grade 4, their new hire starting wage rate will be 70% of the above wage rate. Increases shall based upon the following chart.

| | Start Rate | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|
| % of Pay Grade of Classification | 70% | 76% | 82% | 88% | 94% | 100% |

For maintenance employees in Grade 5 (except Electricians and Powerhouse Employees), their new hire starting wage rate will be 85% of the above wage rate. Increases shall be based upon the following chart.

| Date | Start Rate | 1st Year Anniversary | 2nd Year Anniversary | 3rd Year Anniversary |
|------|-----------|---------------------|---------------------|---------------------|
| % of Pay Grade of Classification | 85% | 90% | 95% | 100% |

The company may, on a non-discriminatory basis, move employees upward through the wage scale irrespective of service time based upon performance and company needs.

COLA adjustments made between January 2, 2006 and July 3, 2006 (inclusive) will be applied to all wage rates. Each year Titan will post the current wage rate and progressions.

Letter #1



January 1, 2006

Mr. Ron Hoover, Executive Vice-President (R/PIC)
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Hoover and Mr. Vanderheyden:

      This letter is to confirm our agreement that in the event of a default by Titan Tire of Freeport of its financial obligations under the 2006 Agreement between Titan Tire of Freeport and the USW on behalf of itself and its Local No. 745, Titan Tire Corporation will guarantee the financial obligations of said 2006 Agreement. If Titan Tire Corporation should default under its guarantee of financial obligations to the 2006 Agreement, then Titan International Inc. will guarantee the financial obligations of Titan Tire Corporation under the 2006 Agreement referenced above.

      The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to this letter.

Sincerely Yours,

Maurice M. Taylor<br/>Chairman and CEO, Titan International

_____
Steve Vanderheyden, President
USW Local 745L

_____
Ron Hoover, Executive Vice President

114

Letter #2



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

In accordance with the agreement between the parties, COLA increases will be added to the wage rate set forth in the Collective Bargaining Agreement through the COLA increase on July 3, 2006. After that date, with the end of future COLA adjustments, the following General Wage Increases will be added to the existing hourly wage rates.

For all employees hired on or before January 1, 2006:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 7/23/07 | $0.25 | $0.25 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.25 | $0.25 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.25 | $0.25 | $0.45 | $0.44 | $0.51 |
| 7/19/10 | $0.25 | $0.25 | $0.45 | $0.45 | $0.53 |

**For all employees hired after January 1, 2006:**

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 7/23/07 | $0.40 | $0.40 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.40 | $0.40 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.40 | $0.40 | $0.45 | $0.44 | $0.51 |

| 7/19/10 | $0.40 | $0.40 | $0.45 | $0.45 | $0.53 |
|---|---|---|---|---|---|

Annually, upon application of these wage increases, Titan will post the current wage for each pay grade as well as a chart showing starting wages for those employees on a progression.

Sincerely,


William Campbell, President
Titan Tire Corporation

Agreed:


_____
Steve Vanderheyden, President
USW Local 745L

116

Letter #3

# ☯TITAN™

January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

     RE:   Neutrality

Dear Mr. Hoover:

The following will confirm our understanding on the above captioned matter.

1.     Introduction

The Company and the Union are attempting to develop a constructive relationship built on trust, integrity and mutual respect and the parties place a high value on development of that relationship.

2.     Neutrality

     a.     To underscore the Company's commitment in this matter, it agrees to adopt a position of Neutrality regarding the unionization of its employees at any and all of its factories involved in producing or distributing tire or rubber products ("Covered Employees").

     b.     Neutrality means that, except as explicitly provided herein, the Company will not in any way, directly or indirectly, involve itself in any matter which involves the unionization of its Covered Employees, including but not limited to efforts by the Union to represent the Company's employees or efforts by its employees to investigate or pursue unionization.

117

      c.      The Company's commitment to remain neutral as defined above may only cease upon the Company demonstrating to the arbitrator under Paragraph 6 below that in connection with an Organizing Campaign (as defined in Paragraphs 3(a) through 3(c) below) the Union is: materially misrepresenting to the employees the facts surrounding their employment; is unfairly demeaning the integrity or character of the Company or its representatives; or is threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

3.      Organizing Procedures

      a.      Prior to the Union distributing authorization cards to non-represented employees, the Union shall provide the Company with written notification (Written Notification) that an organizing campaign (Organizing Campaign) will begin. The Written Notification will include a description of the proposed bargaining unit.

      b.      The Organizing Campaign shall begin immediately upon provision of Written Notification and continue until the earliest of: (1) the Union gaining recognition under Paragraph 3(d)(5) below; (2) written notification by the Union that it wishes to discontinue the Organizing Campaign; or (3) ninety (90) days from provision of Written Notification to the Company.

      c.      There shall be no more than one (1) Organizing Campaign in any particular factory in any twelve (12) month period.

      d.      Upon Written Notification the following shall occur:

(1)      Notice Posting

The Company shall post a notice on all bulletin boards of the facility where notices are customarily posted as soon as the Unit Determination Procedure in Paragraph 3(d)(3) below is completed. This notice shall read as follows:

"NOTICE TO EMPLOYEES

We have been formally advised that the United Steelworkers is conducting an organizing campaign among certain of our employees. This is to advise you that:

      1.      The Company does not oppose collective bargaining or the unionization of our employees.

      2.      The choice of whether or not to be represented by a union is yours alone to make.

3.     We will not interfere in any way with your exercise of that choice.

4.     The Union will conduct its organizing effort over the next ninety (90) days.

5.     In their conduct of the organizing effort, the Union and its representatives are prohibited from: misrepresenting the facts surrounding your employment; unfairly demeaning the integrity or character of the Company or its representatives; and threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

6.     If the Union secures a simple majority of individual authorization cards of the employees in [insert description of bargaining unit provided by the Union] the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

7.     Each authorization card must unambiguously state that the signing employee desires to designate the Union as his/her exclusive representative.

8.     Employee signatures on the authorization cards will be confidentially verified by a neutral third party chosen by the Company and the Union."

Following receipt of Written Notification, the Company may only communicate to its employees on subjects which directly or indirectly concern unionization on the issues covered in the Notice set forth above or raised by other terms of this Neutrality Section and consistent with this Section and its spirit and intent.

(2)     Employee Lists

Within five (5) days following Written Notification, the Company shall provide the Union with a complete list of all of its employees in the proposed bargaining unit who are eligible for Union representation. Such list shall include each employee's full name, home address, job title and work location. Upon the completion of the Unit Determination Procedure described in Paragraph 3(d)(3) below, an amended list will be provided if the proposed unit is changed as a result of such Unit Determination Procedure. Thereafter during the Organizing Campaign, the Company will provide the Union with updated lists monthly.

(3)    Determination of Appropriate Unit

As soon as practicable following Written Notification, the parties will meet to attempt to reach an agreement on the unit appropriate for bargaining. In the event that the parties are unable to agree on an appropriate unit, either party may refer the matter to the Dispute Resolution Procedure contained in Paragraph 6 below. In resolving any dispute over the scope of the unit, the arbitrator shall apply the principles used by the National Labor Relations Board.

(4)    Access to Company Facilities

During the Organizing Campaign the Company, upon written request, shall grant reasonable access to a well-traveled non-work location to the Union for the purpose of distributing literature and meeting with unrepresented Company employees. The exact times and location shall be determined in joint discussions between the parties. Distribution of Union literature shall not compromise safety or production or unreasonably disrupt ingress or egress or the normal business of the facility. Distribution of Union literature and meetings with employees shall be limited to non-work areas during non-work time.

(5)    Card Check/Union Recognition

    (a)    If, at any time during an Organizing Campaign which follows the existence of a substantial and representative complement of employees in any unit appropriate for collective bargaining, the Union demands recognition, the parties will request that a mutually acceptable neutral (or an arbitrator from the American Arbitration Association if no agreement on a mutually acceptable neutral can be reached) conduct a card check within five (5) days of the making of the request.

    (b)    The neutral shall confidentially compare the authorization cards submitted by the Union against original handwriting exemplars of the entire bargaining unit furnished by the Company. If the neutral determines that a simple majority of eligible employees has signed cards which unambiguously state that the signing employees desire to designate the Union as their exclusive representative for collective bargaining purposes, and that cards were signed and dated during the Organizing Campaign, then the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

    (c)    The list of eligible employees submitted to the neutral shall be jointly prepared by the Union and the Company.

4.    Hiring

    a.    Laid-off employees described in Article VIII of the Agreement may apply for employment at plants not covered by the Agreement. A laid-off employee must make written application for employment at a specific plant of interest. Upon such request, the laid-off employee will receive priority consideration in the plant's hiring selection process and will be required to satisfy the normal selection process requirements at the respective plant in order to attain status.

    b.    In determining whether to hire any applicant (whether or not such applicant is an Employee covered by the Agreement), the Company shall refrain from using any selection procedure which, directly or indirectly, evaluates applicants based on their attitudes or behavior toward unions or collective bargaining.

5.    Definitions and Scope of this Agreement

    a.    Rules with Respect to Affiliates

        (1)    For purposes of this Section, the Company includes (in addition to the Company) any entity which is an Affiliate of the Company.

        (2)    An Affiliate shall mean any business enterprise that Controls, is under the Control of, or is under common Control with Titan Tire.

            Control of a business enterprise shall mean possession, directly or indirectly, of either:

            (a)    fifty percent (50%) of the equity of the enterprise; or

            (b)    the power to direct the management and policies of said enterprise.

    b.    Rules With Respect to Existing Affiliates

        The Company agrees to cause all of its existing Affiliates to become a party to this Section and to achieve compliance with its provisions.

121

c.      Rules with Respect to New Affiliates

The Company agrees that it will not consummate a transaction which would result in the Company having or creating an Affiliate without ensuring that the New Affiliate agrees to and becomes bound by this Section.

6.      Dispute Resolution

a.      Any alleged violation or dispute involving the terms of this Section may be brought to a joint committee of one (1) representative each from the Company and the Union. If the alleged violation or dispute cannot be satisfactorily resolved by the parties, either party may submit such dispute to the arbitrator. A hearing shall be held within ten (10) days following such submission and the arbitrator shall issue a decision within five (5) days thereafter. Such decision shall be in writing and need only succinctly explain the basis for the findings. All decisions by the arbitrator pursuant to this article shall be based on the terms of this Section and the applicable provisions of the law. The arbitrator's remedial authority shall include the power to issue an order requiring the Company to recognize the Union where, in all the circumstances, such an order would be appropriate.

b.      The arbitrator's award shall be final and binding on the parties and all employees covered by this Section. Each party expressly waives the right to seek judicial review of said award; however, each party retains the right to seek judicial enforcement of said award.

c.      For any dispute under this Section and the interest arbitration procedure described in Paragraph 6 above, the parties shall choose the arbitrator from the list of arbitrators described in the grievance procedure of the Collective Bargaining Agreement, contacting them in the order listed, and retaining the first to indicate an ability to honor the time table set forth above for the hearing and the decision.

7.      Nothing in this Section shall be construed so as to include as "Covered Employees" Titan Wheel employees working at a plant that does not manufacture tires or rubber products, provided that the Company does not transfer work to Titan Wheel employees that is performed, as of the date of Titan's acquisition of Freeport, by either Des Moines or Freeport employees.

Sincerely yours,

122

Maurice M. Taylor, Jr.
Chairman and Chief Executive Officer
Titan Tire Corporation
Titan International, Inc.


Agreed:


_____
Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #4



January 1, 2006

Mr. Leo W. Gerard,
President United
Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Re: Job Security

Dear Mr. Gerard:

The following will confirm our understanding on the above-captioned matter.

1.    The Company agrees that the Freeport and Des Moines facilities shall be
      designated as Protected Facilities and that the commitments below shall apply to
      them.

2.    The Company agrees that no plant closure will occur at either of the Protected
      Facilities during the life of the 2006 Agreements.

3.    The Company agrees that the Freeport facility shall for two years following the
      Effective Date, maintain 100% of the regular full-time bargaining unit enrollment
      as of the effective date. It is understood that the 100% of the regular full-time
      bargaining unit enrollment as of the effective date shall mean the total Freeport
      active enrollment as of the effective date less the number of individuals who have
      taken the Goodyear "buyout." Thereafter, the company shall at all times
      maintain a minimum of 90% of the regular full-time bargaining unit enrollment
      and 95% of the total maintenance workforce, as of the effective date; it being
      understood that the base from which the 90% and 95% is measured may be
      adjusted to reflect efficiency improvements.

4.    In the event work provided to Goodyear is terminated or reduced, the Company
      will be permitted to reduce the obligation under #3 above accordingly, provided
      that Titan has made every effort to retain that work.

5.    The Company agrees that the Des Moines facility shall at all times maintain a
      minimum of 425 regular full-time bargaining unit jobs.

6.      The Company agrees that it shall not directly or indirectly produce, distribute, market, or sell any product, which currently is or historically was made at a Protected Facility unless that product is produced at a Protected Facility. For the Freeport facility, "historically" is limited to the past five years.

7.      The Company agrees to make the necessary capital expenditures required to maintain and improve the competitive status of the Protected Facilities.

8.      The Commitments set forth in this letter shall remain in effect for the life of the 2006 Agreements, unless compliance in part or in whole becomes no longer feasible due to an act of God. Otherwise, these provisions shall remain applicable regardless of any reported business loss by the Company or any division or subsidiary or plant thereof.

9.      For purposes of this letter of agreement and its accompanying clarification, "the Company" shall be understood to mean Titan Tire International and its present and future affiliates.

Upon request, the Company shall provide the Union with a report documenting its compliance with this job security agreement and shall, upon request, provide the Union with any information reasonably requested that allows the Union to monitor such compliance with this job security agreement. The requests will be made no more often than semi-annually. The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to the this letter.

Sincerely Yours,


Maurice M. Taylor
Chairman and CEO, Titan International



Agreed:


_____

Leo W. Gerard, President United Steelworkers

Letter #5



January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA  15222

      RE: Successorship

Dear Mr. Hoover:

1. The Company agrees that it will not sell, convey, assign or otherwise transfer (any of the foregoing, a Sale) any plant, operation or significant part thereof covered by a collective bargaining agreement between the Company and the United Steelworkers to any other party (Buyer) unless the following conditions have been satisfied prior to the closing date of the Sale:

    (a) the Buyer shall have entered into an agreement with the Union recognizing it as the bargaining representative for the employees within the existing bargaining unit.

    (b) the Buyer shall have entered into an agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date.

2. This provision is not intended to apply to any transactions solely between the Company and any of its Affiliates.

3. For the purpose of this agreement the Company shall be defined as it is in our agreement regarding Neutrality.

           Sincerely yours,

           /s/Maurice M. Taylor, Jr.
           Chairman and Chief Executive Officer
           Titan International

Agreed:

_____
Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #6



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

    During the course of negotiations for the 2006 Agreement the parties discussed the Lead Hands program in place. Because of Titan's uncertainty over use of Lead Hands, the parties have agreed to certain assurances from Titan regarding the Lead Hand program.

    Titan agrees that it will not change any position designated as a Lead Hand for six (6) months from the effective date of the Agreement without mutual agreement of the parties. After six (6) months, other than mutual agreement, Titan may reduce the number of process or scheduling Lead Hands if Titan can demonstrate that a decrease in the number is necessary in order to increase production efficiency and reduce overall costs, because an increase in supervision is deemed necessary to address a lack of management oversight in the area or because of an overall reduction in manning in the facility. Before any changes can be made in the number of process or scheduling Lead Hands, Management will sit down with the Lead Hand Driver Committee and express its concerns and permit the Committee a thirty (30) day period to address those concerns. Any work performed by Lead Hands where the position was eliminated, the work can be performed by supervisors.

    Further, after six (6) months if any General Lead Hand resigns as a Lead Hand or leaves the area for any reason, Titan will determine whether or not to replace the General Lead Hand. Should the decision be made that the General Lead Hand Position be eliminated, all Lead Hands of any type will be eliminated and the Administrative work of the Lead Hand will be performed by supervision.

Sincerely yours


William Campbell, President
Titan Tire Corporation

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

Letter #7



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032


Dear Mr. Vanderheyden:

    Titan will increase general wages by $.12 on November 1, 2010.

Sincerely yours



William Campbell, President<br>Titan Tire Corporation

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

Letter #8



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

For interpreting the provisions of the CBA, Benefits Agreement and SUB Agreement, the parties agree that wherever necessary and appropriate, the parties utilize the language of Article VIII, Section 1 for determination of length of service.

Sincerely yours


William Campbell, President
Titan Tire Corporation

Agreed:

_____

Steve Vanderheyden, President
USW Local 745L

Letter #9



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

During the bargaining for the 2006 Agreement, the parties discussed the fact that the vacation canvas would take place prior to the effective date of the Agreement and one change in the Agreement is the manner in which vacation is scheduled. Goodyear has announced that it will post a one-week shutdown around the July 4th Weekend. Titan will honor that commitment and will further commit that under the terms of the Agreement, it will also have a shutdown during Christmas.

Titan will honor the vacation requests made during the Goodyear Canvas in December of 2005 based upon the language in the 2003 Agreement. Further, in the event of individuals who have made plans for vacations, Titan will adhere to the language in Article IX, Section 3(b) and permit those affected employees to take vacations as planned.

Employees who have scheduled all of their eligible vacation will be asked to take two days from their scheduled vacation for use during the Christmas shutdown. For those who have not scheduled all of their eligible vacation, they will be asked to take two days from either their scheduled vacation or their vacation eligibility for use during the Christmas shutdown. Should employees take the days without pay, they will be covered by Article IX, Section 3(b).

Titan also understands that there will be weeks of vacation that will be "available" as people retire from the Freeport facility. Those weeks will be posted in accordance with Article IX, Section 3(f).

Finally, for purposes of the vacation payment set forth in Article IX, Section 2(a), Titan will recognize the pay at Goodyear for determining the basis of the payment.

Sincerely yours


William Campbell, President
Titan Tire Corporation

Agreed:


_____
Steve Vanderheyden, President
USW Local 745L

Letter #10



January 1, 2006

Mr Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

Titan will establish on its books a Special Account for accumulating contributions once the SUB Plan reaches the $1,000 funding level. The Special Account shall be operated as follows:

(a)     Once the SUB fund achieves a funding level of $1,000 (as calculated in a manner consistent with Article VI of the SUB plan) Titan shall accrue on its books and monthly transfer to a Special Bank Account during the term of the current Collective Bargaining Agreement between Titan and the USW $.05 for each hour worked. Said contributions to the Special Bank Account shall only continue when the SUB fund maintains a funding level of $1,000. Said Special Bank Account shall bear the same interest rate as the SUB plan with said interest inuring to the benefit of the employees.

(b)     As of the first pay period ending in November in any year during the term of the current Collective Bargaining Agreement there shall be determined an amount per Employee (and a pro rata share thereof for eligible Retirees) which shall be calculated by dividing the balance in the Special Bank Account at the end of such pay period by the total number of eligible Employees and the appropriate number of pro rata shares for eligible Retirees.

(c)     An eligible Employee is one who, during the pay period for which the calculation in paragraph (b) is made, has at least two years of seniority in the plant and the Employee is currently covered by the SUB Agreement, and who is actively at work or on sick leave or leave of absence which has not exceeded 90 days or leave of absence as an officer, representative or employee of the local union.

134

(d)    An eligible Retiree is one who was an Employee hereunder but who, prior to the pay period for which the calculation in paragraph (b) is made but after the pay period for the immediately preceding annual calculation, retires form the employ of the Company is eligible for a monthly Pension under the Steelworkers Pension Trust.  (For purposes of determining the pro rata share of the distribution to which an eligible Retiree shall be entitled, the Company shall divide the one year between annual calculations into 12 equal periods (approximately corresponding with calendar months) and shall award twelfths of a full distribution on the basis of the number of periods worked prior to retirement of the nearest full period).

(e)    If the per employee distribution for each eligible Employee determined for any year as provided in paragraph (b) is $25 or more, payment of such amount up to a maximum of $100 to the nearest lower dollar shall be paid to each eligible Employee and the appropriate pro rata share thereof to each eligible Retiree on the first pay day in December in that year or on the last pay before June 1 of the following year.

(f)    If the per employee amount determined as provided in paragraph (b) is less than $25, no distribution of the Special Account shall be made in the current year and the amount in the Special Bank Account shall be carried over and taken into account in determining the distribution, if any, to be made in the succeeding year or years.

(g)    Any amount in excess of $100 for each eligible Employee shall also be carried over and taken into account in determining the distribution, if any, to be made in the following year or years.

(h)    No distribution shall be made prior to receipt by Titan of:  (1) a ruling satisfactory to it from the Administrator, Wage and Hour and Public Contracts Division, Department of Labor, holding that the payments are not to be included in the regular rate of the Employee for purposes of the Fair Labor Standards Act of 1938, as Amended, and (2) a ruling satisfactory to Titan from the Internal Revenue Service that the payment shall constitute currently deductible expense to the Company under the Internal Revenue Code for the taxable year in which the distribution is made.

(i)    If such rulings are not obtained by December 31, 2007, other disposition of the balance in the Special Account shall be negotiated promptly.

(j)    In the event an employee or retiree entitled to a distribution (or pro rata share thereof) hereunder shall be deceased or cannot be located with reasonable ease by the Company, then the Company at its option may

make payment of such distribution or pro rata share thereof to the estate, spouse, surviving spouse, children or surviving children of such Employee or Retiree as the Company shall determine to be appropriate.  If, for any reason, payment of the distribution cannot be conveniently effected by the Company within 18 months following the date upon which the distribution was to be made, the net amount thereof remaining after appropriate deductions shall be added to the Special Bank Account by the Company and shall be taken into account in determining distributions for later years.

(k)     Grievances concerning these arrangements shall be subject to the grievance procedure of the Basic Labor Agreement.


Sincerely yours


William Campbell, President
Titan Tire Corporation


Agreed: _____
        (sgd)Steve Vanderheyden

136

Insert 2007 calendar

Insert 2008 Calendar

Insert 2009 calendar

Insert 2010 calendar



Unions at Titan Tire

BENEFITS AGREEMENT BETWEEN

**08 C 50072**

TITAN TIRE CORPORATION OF FREEPORT

AND

LOCAL NO. 745L

UNITED STEELWORKERS

AFL-CIO

EFFECTIVE January 1, 2006

EXHIBIT

2

# BENEFITS AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of January 2006, by and between TITAN TIRE CORPORATION OF FREEPORT, covering the Freeport, Illinois Plant, and UNITED STEELWORKERS, Local 745L.

Wherever used in this Agreement.

(a)   The term "Basic Agreement" means the present agreement dated January 1, 2006, between the parties hereto, or any new agreement, replacing such present agreement hereafter entered into between the parties hereto.

(b)   The terms "Company" and "Employer" each mean Titan Tire Corporation of Freeport;

(c)   The term "Employee" means any employee of the Employer who, during the term of this Agreement, shall be in a bargaining unit covered by the Basic Agreement;

(d)   The term "Union" means the United Steelworkers; and

(e)   The term "Local Union" means, as to each plant covered by this Agreement, the respective local union listed below which is the exclusive bargaining agency of the employees in certain bargaining units at such plant.

(f)   The term "Plant Closure" wherever used in this Agreement shall mean when operations at a plant covered by this Agreement shall be completely and permanently discontinued while this Agreement is in force

INSURANCE
Section A

Basic Life Insurance, Accidental Death and Dismemberment
Insurance, Optional Contributory Life Insurance, and Survivor
Income Benefits

Effective January 1, 2006, and for the duration of this Agreement thereafter, the Employer will
provide the following standard form basic life insurance, accidental death and dismemberment
insurance, optional life insurance, and survivor income benefits for regular full time Employees
beginning on the 31st day of employment:

1.      Basic Life Insurance and Accidental Death and Dismemberment Insurance.

      (a)      The amount of basic life insurance benefit for each Employee shall be $40,000
and the amount of accidental death and dismemberment insurance shall be
$40,000.

The amount of insurance payable in the event of the death of the Employee
will be payable to the named beneficiary in accordance with the terms
described in this Program.

      (b)      The full amount of basic life insurance benefits will be payable to the
beneficiary in the event of the death of the Employee from any cause, at any
place and at any time while insured under the Program.

      (c)      The full amount of the accidental death and dismemberment insurance benefit
shall be payable if an accident causes the loss of:

Life
Both hands
Both feet
One hand and one foot
One hand and sight of one eye
One foot and sight of one eye
Sight of both eyes

One-half of such amount shall be payable if an accident causes the loss of one
hand, one foot, or the sight of one eye; provided, however, that the full amount
will be paid only once to or on account of any Employee.

The amount of insurance, subject to due proof of claim loss, will be payable to
the Employee if living, otherwise to the beneficiary in accordance with the
terms described in this Program.

Accidental death and dismemberment insurance benefits will be payable upon

2

due proof that such loss resulted, directly and independently of all other causes, from bodily injuries caused by an accident occurring while the Employee was covered by this Program.

With respect to a hand or a foot, "Loss" means dismemberment by severance through or above the wrist or ankle joint. With respect to an eye, "Loss" means the entire and irrecoverable loss of the sight of such eye. With respect to losses involving partial loss of a bodily member or the partial loss of the sight of an eye, "Loss" shall also mean the loss of all functional use of the hand, foot or eye.

Accidental death and dismemberment insurance does not cover any loss caused directly or indirectly, wholly or partly, or contributed to substantially, by bodily or mental infirmity, or ptomaine's, or bacterial infections (except phylogenic infections which occur through an accidental cut or wound); or any other kind of disease; or medical or surgical treatment (except such as may result directly from surgical operations made necessary solely by injuries); or war, or any act of war; or suicide, sane or insane.

(d)     BENEFICIARY.

   (1)     The Employee may designate a beneficiary or beneficiaries or change the designation of such beneficiary or beneficiaries from time to time by written notice on form provided by the Employer. Such designation or change will take effect as of the date of execution of such request but without prejudice to the Employer on account of any payments made prior to receipt of such request.

   If any designated beneficiary predeceases the Employee, the share which such beneficiary would have received if surviving the Employee will be payable equally to the remaining designated beneficiary or beneficiaries, if any, who survive the Employee.

   If no designated beneficiary survives the Employee, or if no beneficiary has been designated, payment will be made to the Employee's spouse, if surviving the Employee; if not surviving the Employee, in equal shares to the Employee's children who survive the Employee; if none survives the Employee, to the Employee's parents, equally, or to the survivor; if neither survives the Employee, in equal shares to the Employee's brothers and sisters who survive the Employee; or, if none survives the Employee, to the Employee's executors or administrators.

   In any case, the Insurance Company may, on instructions from the Employer, deduct from the benefits payable an amount not to exceed $1,000 to cover expenses incurred for the Employee's burial.

3

(2)    Payment of death benefits will be made consistent with the administrative procedures of the carrier.

(e)    The insurance coverage described in Paragraph 1(a) of this Section A shall be likewise provided for any Employee absent on the Effective Date, under a leave of absence granted by his Employer, and the insurance coverages provided to any Employee in accordance herewith shall be continued in force during the period of any absence for which he is granted a leave of absence by his Employer, except in cases where such Employee is employed by a Local Union in other than an official or representative capacity, or is employed in any capacity by the International Union.

(f)    If an Employee for whom insurance coverage's are provided in accordance herewith shall be retired on a disability pension under the Goodyear Pension Plan, or the Steelworker Pension trust, the full amount of his basic life insurance (but not his accidental death and dismemberment insurance) shall be continued in force for the period of such disability (subject to the furnishing of due proof of its continuance) or until he attains age 65, whichever first occurs. In the event such disability continues after attainment of age 65, the amount of basic life insurance shall be reduced on the first day of the month following the month in which he attains age 65 and on the first day of each succeeding month thereafter by an amount equal to 1/30th of the difference between $3,000 and the amount of basic insurance in effect at the time of his retirement; provided, however, that such monthly reductions shall not operate to reduce the amount of basic insurance below a minimum amount of $3,000, which minimum amount shall then be continued in force during such Employee's remaining lifetime.

(g)    Except as provided herein, all insurance coverage's provided hereunder for any Employee, other than a laid-off Employee, shall cease on the date 31 days following any termination of such Employee's active employment; all insurance for a laid-off Employee shall cease on the date 90 days following termination of active employment; provided, however, that the basic life insurance (but not the accidental death and dismemberment insurance) benefit shall be continued in force for all Employees who retire and receive a monthly pension under the normal or early retirement provisions of Steelworkers Pension Trust. If an Employee returns to active employment within such time and under such circumstances that he is credited with previous service in accordance with the Basic Agreement, insurance shall be immediately provided for him in the amounts set forth in Paragraph 1(a) of this Section A.

A laid-off Employee may, within 90 days following layoff, arrange to continue the full amount of his basic life insurance coverage by payment in advance of the required premium to the carrier for the period equal to the maximum number of full weekly SUB benefits to which Employee's credit units as of last

4

day worked prior to lay-off would entitle him under the Supplemental
Unemployment Benefits Plan but not less than 24 months following the date of
layoff, provided, however, that upon acceptance of any benefit payable under
Article XIII of the Goodyear Pension Plan or the Steelworker Pension Trust,
the Employee shall be deemed to have terminated his employment with the
Company and shall be deemed to have forfeited any and all remaining
eligibility for coverage's under this sub-paragraph (g).

Accidental death and dismemberment insurance will continue for a laid-off
employee for 90 days following layoff. If the Employee elects to continue his
basic life insurance coverage after the 90 day period following layoff then
accidental death and dismemberment insurance will continue at no cost to the
Employee for the same period that basic life insurance coverage is continued.

(h)    Conversion Privilege.  In case of termination of insurance coverage for any
reason whatsoever, the Employee will be entitled to have a policy of life
insurance (but not accidental death and dismemberment insurance) issued by
the Insurance Company without further evidence of insurability according to
the administrative procedures of the carrier, provided:

(1)    the amount of the policy may not exceed the amount of the Employee's
life insurance under the Program at the time the coverage terminated,

(2)    the policy must be upon one of the non-participating forms then
customarily being issued by the Insurance Company, except Term
Insurance,

(3)    the policy will require payment of the premium applicable to the class
of risk to which the Employee then belongs and to the form and amount
of the policy at the Employee's then attained age,

(4)    written application for such a policy and payment of the first premium
must be made by the Employee within thirty-one days after termination
of such coverage and such policy will become effective at the end of
such thirty-one days.

If the Employee fails to exercise any conversion right from a reduction in the
amount of his insurance, the Employee will not, thereafter, be entitled to
convert the amount of any subsequent reduction in the amount of his insurance.

If the Employee dies during the thirty-one day period within which he is
entitled to have an individual policy issued to him under the conversion
privilege and before any such individual policy has become effective, the
amount of life insurance which the Employee is entitled to have issued to him
under such individual policy will be payable as a claim under the Program,
whether or not application for the individual policy or the payment of the first

5

premium therefore has been made.

(i)   It is the intent of this Paragraph 1 that Employees shall be provided, beginning January 1, 2006, without cost to them, with the basic life insurance and accidental death and dismemberment insurance benefits previously provided under existing group insurance plans underwritten by Minnesota Mutual Insurance Company, including the benefit increases provided in Paragraph 1(a) of this Section A.

(j)   Assignment - Claims of creditors.  Neither the Employee nor the beneficiary may assign the insurance or other benefits under this Program.

Except so far as may be contrary to the laws of any state having jurisdiction in the premises, the insurance and other benefits under the program shall be exempt from execution, attachment, garnishment, or other legal or equitable process, for the debts or liabilities of the Employee or his beneficiaries.

2.   Optional Contributory LifePlus Insurance.

(a)   Employees who are covered for Basic Life Insurance benefits will also be eligible to enroll for and be covered by Optional Contributory LifePlus Insurance. If the Employee enrolls for coverage, the spouse may enroll for a coverage amount limited to no more than 50% of the Employee's coverage amount.

(b)   Eligible Employees and their spouses must enroll and authorize deductions of contributions for Optional Contributory LifePlus Insurance based upon the following schedule:

LIFEPLUS RATES PER $1,000 OF INSURANCE
Employee, Retiree and Spouse

(Monthly Contributions will be based on current age)

|          | Per Month  |        |
|----------|------------|--------|
| Age      | Non-Smoker | Smoker |
| Under 25 | .049       | .074   |
| 25-29    | .049       | .098   |
| 30-34    | .066       | .132   |
| 35-39    | .074       | .148   |
| 40-44    | .082       | .164   |
| 45-49    | .123       | .246   |
| 50-54    | .189       | .378   |
| 55-59    | .353       | .706   |

6

| | | |
|---|---|---|
| 60-64 | .541 | 1.082 |
| 65-69 | .750 | 1.50 |
| 70-74 | .898 | 2.060 |
| 75-79 | 1.30 | 3.340 |
| 80-84 | 1.887 | 5.510 |
| 85-89 | 2.735 | 5.510 |
| 90-94 | 3.966 | 5.510 |

Child(ren) $.11 per $1,000 of insurance.

These monthly contribution rates are effective January 1, 2006 through December 31, 2008. These rates will be subject to change by the carrier on January 1, 2009.

    (1)    Employees hired after the Effective Date may enroll for up to 100% of the Basic Life Insurance amount and their spouse may enroll for up to $10,000 within 31 days of their hire date.

    (2)    For Employees hired after the Effective Date, coverage will become effective on the day the Life Insurance, pursuant to Paragraph 1 of this Section A, becomes effective, provided the Employee enrolled on or prior to that date.

(c)    A medical examination at the Employee's expense may be required to provide evidence of insurability satisfactory to the carrier:

    (1)    if the Employee or his spouse does not enroll during the enrollment period described in (i) of sub-paragraph (b)above;

    (2)    if the spouse of an employee who is currently enrolled elects an amount that is more than $10,000 above their current amount;

    (3)    if an Employee hired after the Effective Date does not enroll himself and his spouse within thirty-one (31) days following his hire date;

    (4)    If an Employee hired after the Effective Date enrolls himself within thirty-one (31) days following his hire date and elects an amount equal to 200%, 300% or 400% of Basic Life Insurance;

    (5)    If the spouse of an Employee hired after the Effective Date enrolls within thirty-one (31) days following the Employee's hire date and elects an amount greater than $10,000;

    (6)    if an Employee who elected an amount equal to 50%, 100%, 200% or 300% of Basic Life Insurance elects an increased amount;

    (7)    or if the Optional Contributory LifePlus Insurance previously terminated

because an Employee failed to provide for the payment of the required premiums through a payroll deduction authorization or direct payment to the carrier.

(d)     Employees enrolled for Optional Contributory Life Insurance may elect to be insured for an amount equal to 400%, 300%, 200%, 100% or 50% of their Basic LifePlus Insurance.

Employees enrolled for Optional Contributory LifePlus Insurance will be eligible to enroll for Dependent Life Insurance as follows:

Spouse Coverage

Spouse may enroll for coverage levels from $5,000 to $50,000 in $5,000 increments, limited to 50% of the employee's coverage amount, by paying the same rates as active employees and subject to the provisions of paragraph (c) above.

Child(ren) Coverage

Children may be covered for $9,000, $7,000, $5,000, $3,500 or $2,000, subject to state availability.

(1)     A "dependent" means the Employee's spouse or the Employee's unmarried child under nineteen years of age, however, any person who is in full-time military service shall not be considered a dependent.

(2)     A "child" means the Employee's own natural or legally adopted child or step child who lives with either parent and depends upon the Employee for support and maintenance.

The word "child" means in addition to the Employee's own children as defined above, such foster children or other children (all unmarried) who live with the Employee and depend upon him for support and maintenance.

(3)     The amount of insurance payable under the Dependent Life Insurance provision shall be payable to the Employee in the event of death of the Dependents from any cause.

(e)     Optional Contributory LifePlus Insurance is payable in event of death from any cause while an Employee is insured. The insurance will be paid to the beneficiary designated by the Employee under the Basic Life Insurance and Accidental Death and Dismemberment Insurance plan.

(f)     The Optional Contributory LifePlus Insurance coverage may be continued on

8

termination of an Employee's active employment, including any layoff or retirement, consistent with the administrative procedures of the carrier.

Employees who are covered for Basic Life Insurance, pursuant to Paragraph 1 of this Section A, at the time of layoff, leave of absence, or sick leave, may continue the Optional Contributory LifePlus Insurance coverage by making arrangements for the required monthly contributions to be paid directly to the carrier. Optional Contributory LifePlus Insurance coverage will also terminate if the Employee fails to make the required contributions within thirty-one (31) days following the end of the month in which no contributions were received by the carrier. A written notice of contributions due will be mailed to the last address on file with the carrier. Optional Contributory LifePlus Insurance may be continued by contacting the carrier.

(g)    Employees and their spouses may increase their coverage without providing evidence of insurability satisfactory to the carrier for certain life events which are marriage, divorce, birth, death(spouse), child placed for adoption and purchase of a home subject to the administrative procedures of the carrier and the following limitations:

(1)    The Employee may increase one level of coverage.

(2)    The spouse may increase coverage up to an additional $10,000.

(h)    Employees and/or their spouses who have not previously enrolled in Optional Contributory Life may enroll in Optional Contributory life insurance during the "Open Enrollment Period" each year providing they qualify under paragraph 2(c) above.

(i)    Employees and their spouses who are enrolled for Optional Contributory LifePlus Insurance are eligible to participate in a tax-deferred cash accumulation fund subject to the administrative procedures of the carrier. There are no fees for contributing to the cash accumulation fund, and there is access to the money in the fund through the loan and withdrawal features of the fund. The cash accumulation fund earns interest and may also be used to purchase paid up life insurance or continue existing life insurance when the Employee retires. If the insured dies, the death benefit, including the cash accumulation fund, is paid to beneficiary.

(j)    If the Employee or spouse is diagnosed as terminally ill with less than six months to live, they can receive up to 50% of the face amount of coverage subject to state availability and the administrative procedures of the carrier.

3.    Survivor Income Benefits

(a)    If an Employee dies on or after the Effective Date while covered for Survivor

9

Income Benefits, leaving one or more Survivors, as defined below, payment of not more than 24 monthly Survivor Income Benefits ("Transition Survivor Income Benefits") shall begin, provided at least one of such Survivors is living on the first day of the month following the Employee's death and then qualifies as his survivor. An Employee shall be covered for monthly Transition Survivor Benefits while he is on the payroll of the Employer, on sick leave (and accumulating seniority), on layoff or on authorized leave of absence for a period not to exceed 90 days, or on authorized leave of absence for service with a Local Union in an official representative capacity. An Employee on leave of absence extending beyond such 90 day period, other than on sick leave (and accumulating seniority) or authorized leave of absence for service with a Local Union in an official representative capacity, may arrange to continue his Survivor Income Benefit coverage by payment in advance of the current monthly group rate premium during the period of such leave of absence.

(b)     The amount of the monthly Transition Survivor Income Benefit shall be $500 for any month in which there is only one Survivor of the deceased Employee eligible to receive such Benefit.  The Transition Survivor Income Benefit payable hereunder shall be reduced by the amount of any Pre-Retirement Benefit payable under the Special 50% Joint and Survivor Option of the Goodyear Pension Plan and/or the Steelworker Pension Trust provided, however, such reduction will not reduce the Transition Survivor Income Benefit below three hundred and twenty-five dollars ($325.00).  For any month in which there are two or more Survivors of the deceased Employee eligible for a Transition Survivor Income Benefit, the amount of Benefit payable hereunder to each such Survivor for such month shall be a fraction of the Benefit that would be paid to him as a sole Survivor, the numerator of such fraction being 1 and the denominator of such fraction being a number equal to the total number of all Survivors who would be eligible for a Transition Survivor Income Benefit but for their eligibility for Federal Social Security Benefits.  No monthly Transition Survivor Income Benefit, however, shall be paid for any month to any Survivor who has attained an age equal to three (3) years prior to his attainment of full retirement age, as defined by the Social Security Administration, becomes eligible for and receives a Federal Social Security benefit for age or is eligible for disability, widows or widowers unreduced benefit under the Federal Social Security Act as then in effect.

(c)     The first such Benefit is payable on the first day of the month following the Employee's death.  Thereafter, a monthly Transition Survivor Income Benefit is payable on the first day in each of the next 23 months, but if on the first day of any month after the Employee's death no person then living qualifies as his Survivor, no such Benefit is payable for that month or any subsequent month.

(d)     Survivors are classified and defined as follows:

(1)     A "Class A Survivor" means the Employee's spouse, whether or not remarried, but only if married to the Employee for at least a year

10

immediately prior to the Employee's death, and only if spouse was wholly or partially dependent on the Employee at the time of the Employee's death.

(2)    A "Class B Survivor" means the Employee's child who at the Employee's death and at the time a Survivor Income Benefit first becomes payable to such child is both unmarried and either (i) under 21 years of age, or (ii) at least age 21 but under age 25, or (iii) totally and permanently disabled at any age over 21; provided, however, that a child under clause (ii) or (iii) must have been legally residing with and dependent upon the Employee at the time of his death. A child ceases to be a Class B Survivor upon marrying or, if not totally and permanently disabled, upon reaching his or her 25th birthday. To qualify as the Employee's child, the child must be one of the following:

(i)    the Employee's own child born prior to the first of the month following the Employee's death,

(ii)    the Employee's legally adopted child or a child with respect to whom he had initiated legal adoption proceedings which were terminated by his death,

(iii)    the Employee's step-child who resided with him at the time of his death.

(3)    A "Class C Survivor" means the Employee's parent for whom he had, during the calendar year immediately preceding his death, provided at least 50% of such parent's support, if such parent was

(i)    the Employee's father or mother by blood relationship, or

(ii)    the Employee's adopting parent.

(4)    The Survivors entitled to each monthly Transition Survivor Income Benefit that becomes payable under this Paragraph 3, Survivor Income Benefits, shall be determined as follows:

(i)    the Employee's Class A Survivor who is living on the first day of a month shall be entitled to the Benefit payable for such month;

(ii)    if the Employee's Class A Survivor is not living on the first day of a month, persons who qualify on that day as his Class B Survivors excluding any then deceased, shall be entitled to the Benefit payable for that month;

(iii)    if the Employee's Class A Survivor is not living on the first day of

11

a month and no living person qualifies on that day as the Employee's Class B Survivor, persons who qualify on that day as the Employee's Class C Survivors, excluding any then deceased, shall be entitled to the Benefit payable for that month.

(e)    A laid-off Employee may, within 90 days following layoff, arrange to continue the amount of his Survivor Income Benefit coverage by payment in advance of the current monthly group rate premium but not for longer than 24 months following the date of layoff.

(f)    An Employee may not assign his Survivor Income Benefits and his Survivors may not assign any monthly Survivor Income Benefit that becomes payable. To the extent permitted by applicable law, monthly Survivor Income Benefits shall not be subject to attachment or other encumbrance or subject to the debts or liability of any Survivor.

(g)    Survivor Income Benefits become payable only if due proof of the Employee's death is submitted to the Employer. Payment of each monthly Survivor Income Benefit is subject to the condition that the person claiming the Benefit submit to the Employer due proof of entitlement to such benefit.

(h)    If the Employee dies after attaining age 45 while covered for Transition Survivor Income Benefits and if such Employee is survived by a Class A Survivor, such Survivor shall become eligible for Bridge Survivor Income Benefit. The monthly amount of the Bridge Survivor Income Benefit shall be $500. The Bridge Survivor Income Benefit payable hereunder shall be reduced by the amount of any Pre-Retirement Benefit under any Pension Plan provided, however, such reduction will not reduce the Bridge Survivor Income Benefit below three hundred and twenty-five dollars ($325.00).

A Bridge Survivor Income Benefit shall be paid to an eligible Survivor on the first day of each month, beginning with the 25th calendar month following the death of the Employee and ending with the first day of the month in which such Survivor remarries, dies, attains an age equal to three (3) years prior his attainment of full retirement age, as defined by the Social Security Administration, or attains such lower age at which full widows or widowers Insurance Benefits become payable under the Federal Social Security Act as it may be amended; provided, however, that no monthly Bridge Survivor Income Benefit shall be payable for any month for which such Survivor receives a Mother's Insurance Benefits under such Act or becomes eligible for and receives a Federal Social Security benefit for age.

12

SECTION B -  Medical Benefits Program and Employee
             Savings Plan For Employees and Their
             Dependents

Effective January 1, 2006 and for the duration of this Agreement thereafter, the Employer will
provide a Medical Benefits Program and Employee Savings Plan as described in Exhibit B
attached hereto and made a part hereof by reference.  The Employer will also provide a Medical
Benefits Program For Retirees And Their Dependents through a VEBA as described in Exhibit E
attached hereto and made a part hereof by reference.

The foregoing shall not be construed to exclude Employees from coverage who are on vacation,
leave of absence for Union activities, working less than their standard shift, or not actively at
work because of a temporary disability.

CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT OF 1985 (COBRA)

Effective January 1, 1989, and consistent with the provisions of COBRA and any subsequent
amendments thereto, the Company will make available the options for continuation of health
care coverage prescribed by COBRA, to employees, spouses, former employees, former spouses
and former eligible dependents.  The medical benefit continuation options prescribed by COBRA
shall be concurrent with any continuation of benefits otherwise provided in this Section B and
Exhibit B-1.

13

SECTION C - ACCIDENT AND SICKNESS BENEFITS

Effective January 1, 2006, and for the duration of this Agreement thereafter, the Employer will provide the following plan of accident and sickness benefits for all Employees.

1.      Accident & Sickness Benefits for Employees

     (a)      General.

          Benefits will be paid because of a disabling accident, sickness, or pregnancy, while under the care of a doctor licensed to practice medicine.

          Benefits will be payable from:

          (1)      The first day of disability due to accident or occupational illness, or

          (2)      the eighth day of disability due to non-occupational sickness or pregnancy, or

               (i)      the first day of hospital confinement if occurring  prior to the eighth day, or

               (ii)      the first day on which an Employee undergoes a surgical procedure for which a benefit is payable under the Program, provided the Employee has not worked on the day of surgery, or

               (iii)      the day of Pre-Admission Testing (PAT) if occurring prior to the eighth day, provided surgery is performed not later than the fourth day following the day of PAT with respect to an Employee who is disabled on the day prior to PAT. Should the results of PAT indicate that surgery is not necessary or that surgery must be postponed beyond the fourth day following the day of PAT for medical reasons, benefits will be paid beginning with the day of PAT.

     Benefits will be paid for the duration of the disability not to exceed 52 weeks for each period of disability.

     Periods of disability due to the same cause will be considered the same period of disability unless separated by return to full-time work for at least two weeks. Periods of disability due to different causes will be considered different periods of disability if separated by return to full-time work.

The time limitations contained in this Paragraph 1 shall be applied, in the case of Employees previously covered under the accident and sickness benefit provision of the Agreement in effect prior to the Effective Date, by taking into account payments, and periods of disability, and other conditions, prior to the Effective Date.

(b)     Benefits.

The amount of weekly benefit will $410 effective January 1, 2006.

Restaurant Employees and part-time students whose regularly scheduled work shift or normal work week is less than the standard work shift or the normal workweek will receive reduced benefits based upon the proportion which their work shift or workweek bears to the regular work shift or the normal workweek.

The amount of weekly accident and sickness benefits otherwise payable will be reduced for each week in excess of 21 weeks of benefits during any one continuous period of disability by:

(1)     pensions for which the Employee is eligible under the Goodyear Pension Plan,

(2)     pensions for which the Employee is eligible under the Steelworker Pension Trust,

(3)     the amount of any primary disability benefits or unreduced primary old age benefits under the Federal Social Security Act which the Employee is entitled to receive, and

(4)     the amount of any reduced primary old age benefit which the Employee receives under the Federal Social Security Act, but only when actually paid to the Employee for the same week of benefits.

2.     Deduction for Workers' Compensation Benefits

In the event that an Employee receives weekly compensation under a Workers' Compensation Act for any period with respect to which he is also entitled to weekly benefits under Paragraph 1 of this Section C, the amount of such weekly compensation payable under such Act shall be deducted from the amount of the weekly benefit otherwise payable to such Employee under said Paragraph 1.

3.     Eligibility for Benefits

(a)     Active Employees on the Effective Date, will be covered by the provisions of this Section C on that date. Employees not actively at work on the Effective

Date, will be covered by the provisions of this Section C immediately upon their return to work.

The foregoing shall not be construed to exclude Employees from coverage who are on vacation, leave of absence for Union activities, working less than their standard shift, or not actively at work because of a temporary disability.

(b)  Employees hired after the Effective Date will become covered by the provisions of this Section C on the 31st day of employment.

4.  Layoff

(a)  In the event of layoff, coverage under this Section C will be continued for 90 days following layoff.

(b)  Employees re-employed with credit for prior service will have an immediate reinstatement of coverage under this Section C.

5.  Leave of Absence

The coverage provided under this Section C shall be continued in force during the period of any leave of absence granted by his Employer for service with a Local Union in an official or representative capacity or while representing such Local Union in a state, county, or city council of AFL-CIO-CLC.

6.  Injury or Sickness

Employees off work due to injury or sickness will continue to be covered, subject to the provisions of this Section C, during the period in which they accumulate seniority.

7.  Termination of Coverage

Except as provided in Paragraphs 4, 5 and 6 immediately above, all coverage will terminate when active employment with the Employer terminates.

8.  Modification

The provisions of this Section C may be appropriately modified where necessitated by federal or state statute or regulation.

9.  Miscellaneous Provisions

Employees who become disabled shall notify the Employer's Insurance Department of such disability, and shall give new notice thereof at intervals of no more than 30 days thereafter for the duration of such disability. If any such notice is not timely filed, no benefits will be paid for periods previous to such notice unless the delay shall be shown

to have been unavoidable and satisfactory evidence of physician's care and disability is furnished.

Section D - Supplemental Workers' Compensation Benefits

Effective January 1, 2006, and for the duration of this Agreement thereafter, the Employer will provide the following Supplemental Workers' Compensation Benefits:

1.     General

Subject to the conditions hereafter stated, an Employee who is absent from work due to temporary total disability (including an Employee awaiting placement at "light work" pending full recovery from his injury) caused by occupational injury or occupational illness resulting from employment with the Employer and who becomes eligible for weekly benefits under Workers' Compensation law for such absence will receive the amount of Supplemental Workers' Compensation Benefits specified in Paragraph 3 below.  No payment shall be made hereunder unless the absence continues long enough for weekly benefits to be paid therefore under the applicable Workers' Compensation Act, but when payments are made hereunder for an absence the amount of payment will be computed from the first day of such absence.

2.     Eligibility for Benefits

Active Employees on the Effective Date and Employees absent on that date because of occupational disability, will be covered by the provisions of this Section D on that date. Other Employees not actively at work on the Effective Date will be covered by the provisions of this Section D immediately upon their return to work.  Employees hired after the Effective Date, will become covered by the provisions of this Section D on the 31st day of employment.

3.     Amount of Benefit

The amount of weekly benefit will be 80% of the Employee's job wage level if on piecework, or his hourly rate if on day work, or his actual hourly earnings if higher, multiplied by the number of hours in the standard work week, but not to exceed 40 hours, in effect when his absence due to occupational injury or occupational illness began, minus the weekly benefit under the applicable Workers' Compensation Act and minus any weekly accident and sickness benefit under Section C of this Part V.  The benefits provided herein for any period in excess of 21 weeks will be further reduced by

(a)      pensions for which the Employee is eligible under the Goodyear Pension Plan,

(b)      pensions for which the Employee is eligible under the Steelworker Pension Trust,

(c)      the amount of any primary disability benefits or unreduced primary old age benefits under the Federal Social Security Act which the Employee is entitled to receive, and

18

(d)    the amount of any reduced primary old age benefit which the Employee receives under the Federal Social Security Act, but only when actually paid to the Employee for the same week of benefits. If the absence continues long enough for payments to be made under Workers' Compensation Act, for the first week of such absence, such payment will be applied as a credit against the amount due hereunder, or paid as reimbursement to the Employer. If the weekly benefit under the applicable Workers' Compensation Act has been protested by the Employer through the procedure provided therefore under the applicable Workers' Compensation Act, and the dispute is finally determined adversely to the Employee, the amount of the Supplemental Benefit paid to such Employee shall be paid as reimbursement to the Employer.

If an Employee returns to full time work for at least 90 days and subsequently leaves work for the same disability as the original injury, the amount of weekly benefit calculated above will be computed on the Employee's highest rate during the six-month period preceding the commencement of the subsequent period of disability. To determine the highest applicable rate, the Company will compare the Employee's rate at the commencement of this subsequent period of disability with the Employee's rate 180 days prior thereto, but not earlier than the commencement of the original period of disability, and the higher of the two will be used unless the Employee when applying for benefits shall designate an intervening third period for comparison. If so, the rate for such third period shall also be compared and shall be the rate applied if it is the highest of the three.

4.    Duration of Payments

Benefits will be paid for the duration of the disability not to exceed 52 weeks for each period of disability. Periods of disability due to the same cause will be considered the same period of disability unless separated by return to full-time work for at least 90 days. Periods of disability due to different causes will be considered different periods of disability if separated by return to full-time work.

5.    Conditions of Payment

Benefits pursuant to this Section D will be paid for any absence caused by occupational injury which is reported to the dispensary promptly after each injury occurs and for any absence caused by occupational illness which is reported to the dispensary promptly after the time the Employee becomes aware of the existence of such illness. No benefits will be paid on account of any period of absence other than the first week thereof as provided in Paragraph 1 hereof with respect to which the Employee fails for any reason to become or to continue eligible to receive weekly benefits under Workers' Compensation Law.

19

SECTION E - Dental Benefits for Employees and Dependents

Effective January 1, 2006 and for the duration of this Agreement thereafter, benefits will be payable for eligible charges which are incurred in connection with a non-occupational accident or illness of an Employee or eligible dependent for Endodontic, Periodontic and Oral Surgery procedures, performed by a Doctor of Dental Surgery (D.D.S.) or Doctor of Medicine (M.D.) acting within the scope of his license, which are described in the Schedule of Dental Procedures (made a part hereof by reference).

Benefits will also be paid for such eligible charges which are for treatment of a fractured jaw or of accidental injuries to natural teeth within 12 months of the accident (including replacement of such natural teeth within such period).

Whenever benefits are provided in accordance with the foregoing Paragraphs, the amount of any such benefit will be determined on the basis of a reasonable and customary fee for the services performed.

Coverage and eligibility for dental benefits under this Section E will be in accordance with the coverage and eligibility provisions contained in Exhibit B-1 but eligible charges as described in the first paragraph of this Section E will not be subject to the deductible and co-payment maximum provisions described in Paragraph 1 of Exhibit B-1.

Section F – Section 125 Plan – Cafeteria Benefits Plan for Bargaining Unit Employees

The Company shall establish and maintain a cafeteria plan, as defined under Section 125 of the Internal Revenue Code as from time to time amended, for the purpose of allowing Employees to make contributions for healthcare benefits on a pre-tax basis, to opt out of the healthcare benefits plan and establishes a Health Care Spending Account and a Dependent Day Care Spending Account to allow reimbursement of eligible expenses, as defined in Exhibit D, through pre-tax Employee contributions.

SECTION G - General Provisions For Part V, Sections A, C, D and E

1.    Medical Examination by Employer

   (a)    Disabilities giving rise to claims for any benefits under Section C of this Part V may be verified by the Employer by medical examination at any reasonable time. Benefits may be suspended if the claimant fails to have such examination made.

   (b)    If any dispute shall arise concerning the disability of any Employee, such difference shall be resolved as follows: The Employee shall be examined by a physician appointed for the purpose by the Employer. If the Employer's physician and the Employee's physician should disagree concerning the disability, that question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician after examination of the Employee and consultation with the other two physicians shall decide such question. A copy of the third physician's report will be provided to both the Employer's and the Employee's physician. The expenses of the third physician shall be borne jointly by the Employer and the Employee.

2.    Listing of Dependents

Each Employee shall furnish a list of his eligible dependents on an enrollment card supplied by the Employer for such purpose. This card must be kept up to date at all times.

3.    Definition of "Physician", etc.

The term "physician", or "doctor" or "doctor licensed to practice medicine", or "doctor licensed to practice dental surgery" as used in this Part V means only a Doctor of Medicine (M.D.) or a Doctor of Osteopathy (D.O.) or a Doctor of Dental Surgery (D.D.S.), except that with respect to surgical operations coming within the scope of the "Schedule of Surgical Operations - Chiropody" the term also means a Doctor of Surgical Chiropody (D.S.C.) (Podiatrist) and with respect to chiropractic treatments for neuromusculoskeletal conditions coming within the scope of his license, the term shall also mean a Chiropractor.

For the purposes of Section C the term "doctor licensed to practice medicine" means also a Doctor of Surgical Chiropody (D.S.C.) (Podiatrist) when the doctor is acting within the scope of his license. Further, for purposes of Section C the term "doctor licensed to practice medicine" means a Chiropractor acting within the scope of his license.

4.    Insurance Contracts

The Employer may, alone, or in conjunction with other corporations subsidiary to or

affiliated with the Company, enter into a contract or contracts with an insurance company or insurance companies to provide the benefits described in this Part V. No insurance company contract which may be entered into by the Employer for the purpose of providing any benefits described in this Part V shall alter, amend or detract from the provisions of this Agreement.

5.    Grievance Procedure

If any difference shall arise between the Employer and any Employee with respect to whether or not the Employer has provided the benefits under this Part V, and if agreement cannot be reached between the Employer and such Employee, such difference may be taken up as a grievance under the grievance procedure provided for under the Basic Agreement at the Manager of the Labor Department level. If any such grievance shall be taken before the impartial umpire in accordance with such procedure, then the impartial umpire shall have the authority only to decide the question pursuant to the provisions of this Part V applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions. The decision of the impartial umpire shall be binding on the Employer, such Employee, and all other interested parties. Termination of the Basic Agreement shall not invalidate the use of its grievance procedure for the purposes of this Part V.

6.    Benefits on Plant Closure

In the event of a Plant Closure at any plant covered by the Agreement, the coverage under this Paragraph 6 is provided in lieu of all other coverage under Part V, Section A of the Agreement and Exhibit B-1. However, upon termination of coverage under this Paragraph 6, the conversion privileges of Part V, Section A, Paragraph 1 of the Agreement as well as the termination provisions of Exhibit B-1 shall apply.

Coverage under Part V, Section A of the Agreement will be extended following such Plant Closure without cost to the Employee for an additional 27 months beyond Employer-furnished coverages provided in Paragraphs 1 and 3 of Section A. Coverage under Exhibit B-1 will be extended following such Plant Closure without cost to the Employee for an additional 12 months beyond Employer-furnished coverages provided in Exhibit B-1. However, in no event shall the coverage provided in Exhibit B-1 be less than 9 months. For any month in which Employer-furnished coverage is provided under Paragraph 1, Part V Section A of the Agreement, the Employee may continue to purchase coverage under Paragraph 2 of Section A.

In addition to the Employer-furnished coverage provided above, for any month in which the Employee has Credit Units remaining under the Titan Tire Supplemental Unemployment Benefits Plan, coverage under Exhibit B-1 may be continued up to an additional 12 months by payment in advance at the Group Rate if arranged for prior to the expiration of such Employer-furnished coverage. The maximum period of coverage under this Paragraph 6 shall be 30 consecutive months for coverage under Part V, Section A, Paragraphs 1 and 3 and 36 consecutive months for coverage under Exhibit B-1 following the month in which such Plant Closure occurred.

Coverage under this Paragraph 6 will not continue as provided above **while the Employee** is covered by any other Employer sponsored life insurance **or medical benefit program;** however, when he ceases to be covered by any such other **program,** he may then resume coverage hereunder for the remainder of the maximum **period of coverage** as defined above. In order to remain eligible for continued coverage **as provided above,** the Employee must maintain such coverage continuously except as **provided above in** this Paragraph 6.

PART VI
DURATION AND TERMINATION

1.      Subject to the conditions set forth in Part II hereof, this Agreement shall become effective as otherwise set forth in this Agreement, on January 1, 2006.

2.      This Agreement constitutes a settlement for the duration of this Agreement of all issues with respect to the subject matters covered hereby, and, while this Agreement continues in effect, the Employer shall have no obligation to negotiate or bargain with the International Union or any Local Union (except as noted in connection with grievance procedures) with respect to any subject matter covered hereby, nor shall there be any strike or work stoppage with respect to such matters. Any termination of the Basic Agreement in accordance with the provisions thereof shall not affect the duration of this Agreement nor shall such termination of the Basic Agreement be deemed to open for negotiation the subject matters covered by this Agreement. The fact that this Agreement continues in effect shall not prevent the parties from engaging in a strike or lockout with respect to any subject matter not covered by this Agreement, if such strike or lockout may be engaged in lawfully under the terms and provisions of the Basic Agreement.

3.      The International Union or the Employer may request renegotiation of the provisions of this Agreement and termination of the Basic Agreement and local supplements thereto by giving a written notice to the other party not more than 75 days nor less than 60 days prior to November 19, 2010, or any November 19 thereafter. In such event, if negotiations are not completed prior to the November 19 next following the giving of such written notice, this Agreement, together with the Basic Agreement and local supplements thereto shall terminate unless otherwise agreed upon.

4.      In the event at any time the Basic Agreement and the local supplements thereto shall have been terminated as a result of the termination of this Agreement as provided in the preceding Paragraph 3 and the parties shall subsequently settle the issues involved in this Agreement which resulted in the termination thereof, the Basic Agreement and the local supplements thereto shall be immediately reinstated in full force and effect.

5.      This Agreement may be amended by mutual agreement between the parties. If either party proposes amendments to this agreement during the life thereof, negotiations on such proposals shall begin within thirty (30) days. If no settlement is reached, the provisions of this Agreement shall continue in effect.

6.      In the event that right, title or possession to any or all of the plants covered by this Agreement shall pass to any subsequent owner by merger, acquisition, sale, or any other method of disposition or acquisition. The benefits provided in this Agreement shall be binding upon the Company and its successors and assigns.

7.      The parties acknowledge that Titan Tire of Freeport has no obligation to provide,

24

guarantee, pay for or in any manner be responsible for benefits provided by Goodyear. Employees who receive or accept benefits from the Goodyear have no right to claim that Titan Tire of Freeport is obligated in any manner to provide, guarantee, pay for or in any manner be responsible for benefits provided by the Goodyear.

IN WITNESS WHEREOF THE PARTIES HERETO HAVE HEREUNTO SET THEIR HANDS THIS 1st DAY OF January, 2006.

THE UNITED
STEELWORKERS,

## LOCAL UNION #745L, UNITED STEELWORKERS

(Sgd.) Steve Vanderheyden                    _____

(Sgd.) Dan Kreeger                              _____

(Sgd.) Jim Jamison                              _____

(Sgd.) John Fuller                              _____

(Sgd.) Frank Wool                            _____

(Sgd.) Kevin Kirk                            _____

(Sgd.) Ed Bell (USW Staff Representative)     _____

## TITAN TIRE CORPORATION OF FREEPORT

(Sgd.)  William Campbell, President        _____

EXHIBIT A

# STEELWORKERS PENSION TRUST
## INCORPORATION AGREEMENT

It is agreed by and between Titan Tire Corporation, hereinafter the "EMPLOYER", and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of Local No. 745, hereinafter the "UNION", that the Collective Bargaining Agreement between the parties dated January 1, 2006, is hereby amended by adding to it the clause entitled "STEELWORKERS PENSION TRUST" which is attached hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by its

officers and/or representatives.

TITAN TIRE CORPORATION

By _____
      President

Attest _____
       Secretary

          **UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC on behalf of Local No. 745**

          By _____
             International President

          By _____
             International Secretary/Treasurer

          By
          _____
             International Vice President (Administration)

          By
          _____
             International Vice President (Human Affairs)

          By
          _____

26

R/PIC Executive
Vice President

By _____
Staff Representative

Approved as to content

This _____ day of _____ , 2006,

By_____
Michael C. Felice, Jr., Chairman
Steelworkers Pension Trust

# STEELWORKERS PENSION TRUST
## PENSION INCORPORATION AGREEMENT

### SECTION 1 - BENEFIT PLAN

The parties to this Agreement desire that the benefits granted by the Trustees of the STEELWORKERS PENSION TRUST, hereinafter "TRUST", be provided to the Employees employed within the UNION'S Bargaining Unit.

### SECTION 2 - CONTRIBUTION RATE

The month for which the contribution is due is referred to as the "Benefit Month" and the month immediately preceding the Benefit Month as the "Wage Month". The EMPLOYER shall contribute to the TRUST, each and every Benefit Month, a sum of money equal to one dollar and eighty-five cents ($1.85) per hour for each Hour Worked by all Covered Employees during the Wage Month.

The parties understand that the first Benefit Month is April, 2006, and the first Wage Month is the three month period consisting of January, 2006, February, 2006, and March, 2006. For that Benefit Month the EMPLOYER is to contribute to the TRUST one dollar and eighty-five cents ($1.85) for each hour worked by all Covered Employees who worked for any length of time during the preceding Wage Month of January, 2006, through March, 2006.

### SECTION 3 - COVERED EMPLOYEES

Covered Employees are all employees employed within the UNION'S Bargaining Unit who were actively employed by the EMPLOYER for any length of time during the Wage Month and whose employment with the EMPLOYER is not terminated prior to April 1, 2006, under the

27

The EMPLOYER shall transmit to the TRUST with each contribution a Contribution Report on the form furnished by the TRUST on which the EMPLOYER shall report the *names, status, hire and termination dates as applicable,* as well as the *total number of hours paid* for each Covered Employee during the Wage Month. The EMPLOYER further agrees to supply to the TRUST such further information as may from time to time be requested by it in connection with the benefits provided by said TRUST to said Employees, and to permit audits of its books and records by the TRUST for the sole purpose of determining compliance with the terms and conditions of this Agreement.

## SECTION 9 - BENEFIT ACCRUAL RATE

A. The average age and other actuarial characteristics of the Employees covered by this Agreement is such that the Benefit Accrual Rate that applies to the Employees is that the monthly pension benefit of an Employee at age 65 years shall be an amount equal to twenty-six percent (26%) of total contributions paid to the TRUST on the service of such Employee divided by twelve (12). Effective with the Benefit Month August, 2006, based on Wage Month July, 2006, the Benefit Accrual Rate that applies to the Employees is that the monthly pension benefit of an Employee at age 65 years shall be an amount equal to twenty-five percent (25%) of total contributions paid to the TRUST on the service of such Employee divided by twelve (12). It is understood by all concerned that the foregoing Benefit Accrual rates may be modified by the Trustees at any time upon proper notice as required by law.

B. The EMPLOYER will make to the TRUST the following additional contributions:
   a) payable as of April 10, 2006, an amount equal to two thousand six hundred fifty dollars ($2650.00), subject to the clarification in Section 8 B c, below, times the number of Covered Employees employed by the EMPLOYER on the effective date of participation, excluding those Covered Employees who have signed an irrevocable agreement to terminate employment with the EMPLOYER prior to January 1, 2008, under the terms of the Goodyear Exit Incentive, a complete list of whom will be provided to the TRUST by the EMPLOYER on April 10, 2006.

   b) The EMPLOYER is to supply the TRUST with a list of the names, date of birth, social security number and seniority date of all employees who have service with a predecessor employer and are entitled to recall. If any of these employees are recalled to employment within the bargaining unit, then the EMPLOYER shall pay the following additional contributions to the TRUST two thousand six hundred fifty dollars ($2650.00), subject to the clarification in Section 8 B c, below.

   These additional contributions shall be paid to the TRUST by no later than the tenth day of the calendar month immediately succeeding the month of recall.

   c) The additional contribution of two thousand six hundred fifty dollars ($2650.00) was calculated by the TRUST actuary based on the demographic data provided by Goodyear the previous employer in 2004. The TRUST actuary will recalculate that amount based on the demographics of the employees who are Covered Employees on the

effective date who have not elected to terminate their employment with the EMPLOYER under the terms of the Goodyear Buyout. The EMPLOYER will pay any additional amount that may due based on the recalculation by the TRUST actuary no later than May 10, 2006.

C. Upon the timely payment in full of the additional contributions described in Section 8-B, above, past service with the employer and predecessor employers shall be credited for eligibility for "Rule of 85," vesting, and disability eligibility.

In consideration of the EMPLOYER'S aforesaid contributions to the TRUST as herein above provided and for so long *as* the EMPLOYER'S participation in the TRUST is accepted by the Trustees, the Trustees will, beginning with the date of receipt by the TRUST of the EMPLOYER'S first said contribution and continuing for such part of the duration of the Agreement as the EMPLOYER fully complies by this Agreement the pension benefits for which such Employees are eligible under the Declaration of Trust, as amended from time to time, which is by this reference incorporated herein and made a part thereof.

SECTION 10 -      TERMINATION

This Incorporation Agreement will terminate at the same time the Benefit Agreement between the parties terminates, which is the 17th day of February, 2011.

EXHIBIT B

MEDICAL BENEFITS PROGRAM
FOR EMPLOYEES AND THEIR DEPENDENTS AND
THE EMPLOYEE SAVINGS PLAN
FOR BARGAINING UNIT EMPLOYEES

EXHIBIT B-1

TITAN TIRE CORPORATION OF FREEPORT
MEDICAL BENEFITS PROGRAM
FOR EMPLOYEES AND THEIR DEPENDENTS

Effective January 1, 2006, and for the duration of this Agreement thereafter, the Employer will provide the following program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits for eligible employees and their dependents, with the exception that none of the aforesaid benefits shall be applicable in the event of accident or sickness covered by a Workers' Compensation Act or similar legislation nor shall there be any duplication of benefits under any Employer-sponsored Program.

1.    Benefits

   (a)    General.

         Benefits will be payable for eligible charges authorized by a doctor licensed to practice medicine which are reasonably necessary for the care and treatment of a non-occupational accident or illness of an Employee or eligible dependent.

   (b)    National PPO Plan For Employees And Their Dependents

         Benefits, with the exception of the benefits set forth in Paragraph 2 below, will be provided through the National PPO Plan For Employees And Their Dependents. The benefits are set forth in the National PPO Plan For Employees And Their Dependents Basic Benefit Services Plan Design which is incorporated herein by reference.

         Until January 1, 2008 on behalf of each Employee who elects coverage under this Exhibit B-1 the Company contribution will be 95% of the cost of the coverage as estimated in advance by the Company for the medical benefits provisions of the Agreement. Beginning January 1, 2008, 10% of any increase/decrease in premium cost will be borne/shared by/with employees. The increase/decrease for 2008 will be based upon the increase for 2008 over 2007. The increase/decrease

for 2009 will be based upon the increase in 2009 over 2008. The increase/decrease for 2010 will be based upon the increase in 2010 over 2009.

Failure on the part of the Employee (including their spouse or dependents) to pay their medical contribution will result in cancellation of coverage.

(c)    No Coverage Option

Each covered Employee may elect to not be covered under this Exhibit B-1.

An election not to be covered under this Exhibit B-1 may be revoked and a new election made if both the revocation and election are on account of and consistent with a Change in Family Status as defined in accordance with the Internal Revenue Service Regulations as they are from time to time amended or effective, which are incorporated herein by reference.

2.    Prescription Drug Benefits

(a)    General

Prescription drug payments will be made if an Employee or Dependent, as a result of an accident or sickness, incurs expenses for covered prescription drugs dispensed by any person or organization legally licensed to dispense drugs, upon the order of a physician licensed to practice medicine.

(b)    Benefits

(1)    Effective January 1, 2006, benefits will be provided through participating providers who have agreed to accept an assignment of the benefit claim hereunder by the Employee to the provider plus a co-payment by the Employee or Dependent of $10.00 for generic medication or $25.00 for preferred name brand drugs or $40.00 for non-preferred name brand drugs as full payment for the covered prescription drug. The co-payment amount herein is to be paid by the Employee or his Dependent and is applicable to each separate prescription order and to each refill thereof.

(2)    Effective January 1, 2006, maintenance drug requirements may be filled through the Mail-Order Prescription Service established by the Company in which case the co-payments will be $20.00 for generic medication or $50.00 for preferred name brand drugs or $80.00 for non-preferred name brand drugs. The co-payment amount herein is to be paid by the Employee or his Dependent and is applicable to each separate prescription order and to each refill thereof.

(3)    If a covered prescription drug is dispensed by a non-participating provider, the amount of the benefit for each separate prescription order and each refill thereof will be:

(1)    The dispensing fee for the covered prescription drug which would have been paid to a participating provider for dispensing similar drugs, plus

(2)    the amount that would have been paid to a participating provider, plus

(3)    any applicable state sales tax for the covered prescription drug, less

(4)    the applicable co-payment stated in paragraph 2(b)(1) above.

(5)    If a name brand drug is dispensed in lieu of a generic equivalent drug which has been approved for inclusion in the Maximum Allowable Cost (MAC) list by the Network Administrator, the reimbursement will be limited to the amount payable as if the generic drug had been dispensed.

(c)    Covered Prescription Drugs

The prescription drugs covered by this paragraph are:

(1)    Injectable insulin, or any Prescription Legend Drug for which a prescription is required;

(2)    A compound medication of which at least one ingredient is a Prescription Drug; and

(3)    Any other drug which under the applicable state law may be dispensed only upon the prescription of a physician:

Provided that a prescription drug shall not be covered under this Paragraph if (i) the cost thereof is included in the cost of other services or supplies provided to or prescribed for the Employee or his dependent or (ii) such drug is consumed at the time and place the prescription is ordered; except, however, a drug dispensed by a licensed pharmacy doing business with the public will be covered.

"Prescription Legend Drug" means for the purpose of this Paragraph, any medical substance, the label of which, under the Federal Food, Drug, and Cosmetic Act, as from time to time amended, is required to bear the legend: "Caution: Federal Law prohibits dispensing without a prescription".

33

(d)    Exclusions

(1)    No benefit shall be payable to an Employee or his Dependent if he is entitled to receive reimbursement under any Workers' Compensation Laws or is entitled to benefits from any municipal, state, federal or other governmental program of any sort.

(2)    No benefit shall be payable for any medication or device which is to be used for contraceptive purposes, or for any therapeutic device or appliance (e.g., hypodermic needles, syringes, support garments and other non-medicinal substances).

(3)    No benefit shall be payable for the administration of any medication.

(4)    When a prescription drug is dispensed, no benefit shall be payable for any medication for which the customary and usual charge is less than the co-payments stated in Paragraph 2(b)(1) and 2(b)(2) above.

(5)    No benefit shall be payable for more than a 90-day supply of any medication through the Mail-Order Prescription Service (30-day supply outside of the Mail-Order Prescription Service, except as noted in paragraph (7), for any refill in excess of the number specified by the physician, or for any refill dispensed after one year from the physician's order.

(6)    No benefit shall be payable for any drug defined in paragraph (c) above, the reimbursement for which is considered taxable income by the Internal Revenue Service.

(7)    Notwithstanding the above, benefits shall be payable for up to a 90-day supply of allergy serum medication dispensed outside of the Mail-Order Prescription Service.

(e)    In addition to the benefits otherwise provided, herein, the Company may make available to Employees a mail order option.

(f)    The eligible charges payable herein by the Employee will not be included for purposes of meeting the deductible nor will they apply towards the co-payment maximum.

3.    Eligibility for Benefits under Exhibit B-1

(a)    Active Employees who have elected the benefits provided under Exhibit B, will be covered by the provisions of this Exhibit B-1 on the Effective Date. Employees not actively at work on the Effective Date, will be covered by the

provisions of this Exhibit B-1 immediately upon their return to work, but until such return to work, will have such coverage for hospital expense, surgical, hospital-medical and prescription drug benefits, if any, and for such period of time as is provided for them in the plan in effect prior to the Effective Date.

The foregoing shall not be construed to exclude Employees from coverage who are on vacation, leave of absence for Union activities, working less than their standard shift, or not actively at work because of a temporary disability.

(b)    Employees hired after the Effective Date who elect the benefits provided under Exhibit B-1, will become covered by the provisions of this Exhibit B-1 on the 31st day of employment.

(c)    Coverage for an Employee's dependents will become effective on the same date as the Employee's coverage.

(d)    An Employee's dependents are:

(1)    The spouse, and unmarried children of the Employee under 19 years of age. A spouse becomes an Employee's dependent on the date of marriage to the Employee. An unmarried child becomes an Employee's dependent on the later of:

the child's date of birth, or

the date of the Employee's marriage, in the case of a child acquired by marriage, or

the date of adoption of the child, or, if earlier, the date the child is placed with the Employee for adoption and the Employee assumes and retains a legal obligation for total or partial support of the child in anticipation of adoption of the child.

Eligibility as a dependent for a child placed with the Employee for adoption terminates upon the termination of the legal obligation of the Employee for total or partial support of the child.

(2)    Unmarried children of the Employee who are eligible as dependents may continue to be deemed eligible dependents of the Employee beyond age 19 provided such children upon attainment of age 19 are both dependent upon the Employee, as determined by the Employer, and are either:

mentally or physically incapable of self-support, or

full-time students at an accredited high school, college or similar institution of higher education in a course of study leading to a

(b)    Thereafter, coverage will be continued for a period during which he is laid off for one of the reasons set forth in Article I, Section 4(a) of the Titan Supplemental Unemployment Benefits Plan maintained by the parties hereto under Agreement as of January 1, 2006 and with respect to which he receives no earnings for work performed for the Employer; but the maximum period of such continued coverage shall be determined in accordance with the following table:

| Maximum Number of Full Weekly SUB Benefits to which Employee's Credit Units as of Last Day Worked Prior to Layoff Would Entitle Him | Maximum Number of Months for which the Medical Benefits Program Coverage will be Continued |
|---|---|
| 16-19 | 1 |
| 20-23 | 2 |
| 24-27 | 3 |
| 28-31 | 4 |
| 32-35 | 5 |
| 36-39 | 6 |
| 40-43 | 7 |
| 44-47 | 8 |
| 48-52 | 9 |

(1)    In applying the above table, the "Maximum Number of Full Weekly SUB Benefits to which Employee's Credit Units as of Last Day Worked Prior to Layoff Would Entitle Him" shall be determined by dividing the number of the Employee's Credit Units under the Supplemental Unemployment Benefits Plan by the number of Credit Units to be cancelled for one SUB Benefit in accordance with the Credit Unit Cancellation table contained in Article III, Section 4 of such Supplemental Unemployment Benefits Plan, based on the Employee's seniority and the Trust Fund Position in effect as of the last day worked prior to layoff. The "Maximum Number of Months for Which the Medical Benefits Program Coverage will be Continued" shall commence with the 91st day of layoff.

(2)    With respect to any period of continuous layoff, changes in an Employee's Credit Units, Seniority or Trust Fund Position subsequent to the date layoff begins shall not change the number of months of continued coverage for which such Employee is eligible.

(3)    In the event that the aforesaid Titan Tire Supplemental Unemployment Benefits Plan shall be terminated in accordance with its terms prior to the termination of the Agreement, Subparagraph (b) of this Paragraph 4 shall

high school diploma, an Associate degree, a Bachelor's degree or a higher degree.

Extended eligibility as a dependent beyond age 19 will terminate when the Employee's child is:

no longer mentally or physically incapable of self-support as a result of the disability which gave rise to the original extension of coverage, or no longer a full-time student, or attains age 27, if earlier. In the case of a full-time student, the child who attains age 19 or ceases to be a full-time student, may again be deemed to be an eligible dependent as a full-time student if the child otherwise meets the requirements of this Paragraph (d) (ii) and, within 24 months following the date the child ceased to be a full-time student, requalifies as a full-time student.

Eligibility will also be extended to a child who was covered as a full-time student following the attainment of age 19 and while covered as a full-time student becomes disabled as herein defined. However, such eligibility will not be extended beyond the attainment of age 27.

(3)    The donor of an organ for transplant, when the recipient is covered for hospital, surgical, and medical benefits under this Exhibit B-1 shall also be covered for such benefits as though the donor were a covered dependent child of such recipient, but only with respect to charges in connection with the procedure in which such organ is removed from the donor.

The word "child" in addition to the Employee's own children includes such stepchildren, foster children or other children (all unmarried) who live with the Employee and depend upon him for support and maintenance.

If an Employee acquires a child dependent other than by birth, legal adoption, placement for adoption, or marriage, such dependent shall not become eligible until three months have elapsed from the date such child was added to the Employee's enrollment record.

The term "unmarried children" means children who have never been married. When a dependent child becomes married, even though the marriage may later be dissolved, such child ceases to be an eligible dependent, forever.

4.    Layoff

(a)    In the event of layoff, coverage under this Exhibit B-1 will be continued for 90 days following layoff.

36

thereupon cease to have any force or effect.

(4)     The foregoing provisions of this Subparagraph (b) shall be subject to the Employer obtaining and retaining from the Commissioner of Internal Revenue and from the United States Department of Labor the rulings relating to Supplemental Unemployment Benefits, and shall be effective with respect to layoffs commencing on or after the first day of the month following the month in which such rulings are received by the Employer. Pending receipt of said rulings, the foregoing provisions of this Subparagraph (b) will nevertheless be made operative as to any Employee for a period up to 90 days.

(c)     The maximum period of coverage under this Paragraph 4 shall be 24 consecutive months following the month in which the Employee was laid off. For any month in this period not covered by Employer-sponsored coverage, the Employee may continue the coverage by payment in advance at the Group Rate if arranged for prior to the expiration of such Employer-sponsored coverage.

(d)     An Employee on layoff may not continue coverage as provided in Subparagraphs (b) or (c) above while covered by any other employer-furnished hospital, medical and surgical benefit program; however, when the Employee ceases to be covered by any such other program, the Employee may then resume coverage hereunder for the remainder of the 24-month maximum period. In order to remain eligible for continued coverage as provided in Subparagraphs (b) and (c) above, the Employee must maintain such coverage continuously except as provided above in this Subparagraph (d).

(e)     Employees re-employed with credit for prior service will have an immediate reinstatement of coverage.

(f)     An Employee on layoff eligible for coverage under this Paragraph 4 upon acceptance of any benefit payable under Article XIII of the Goodyear Pension Plan or the Steelworker Pension Trust shall be deemed to have terminated his employment with the Company and shall be deemed to have forfeited any and all remaining eligibility for coverages under this Paragraph 4.

5.     Leave of Absence, Etc.

(a)     During authorized leave of absence, (Other than leaves for which coverage is provided in Subparagraphs (b), (c) and (d) below), coverage under this Exhibit B-1 will be continued for a period not to exceed 90 days. Employees on leave of absence extending beyond such 90-day period may, by application to the Employer during such period and advance payment of current group rate premium, continue such coverage during the period of such leave of absence. An Employee who leaves the employ of the Employer as the result of being elected or appointed to public office or to an office in a Local Union cooperative enterprise

38

serving Company employees may, by application to the Employer prior to leaving his employment with the Employer and upon advance payment of the current group rate premium, continue such coverage during the period of his service in such office.

(b)    During an authorized leave of absence for active duty in the Armed Forces for a period of less than six months, an Employee (and his eligible dependents) shall continue to be eligible for the benefits provided in this Exhibit B-1 to the extent that such benefits are not provided by the Military Service or the Federal or State Government.

(c)    During an authorized leave of absence for pregnancy, Employees (and their eligible dependents) will continue to be covered subject to the provisions of this Exhibit B-1, during the period in which they accumulate seniority.

**08 C 50072**

(d)    Notwithstanding the foregoing, coverage shall be continued during the period of an Employee's authorized leave of absence granted by his Employer for service with a local Union in an official or representative capacity or while representing such local Union in a State, County, or City council of AFL-CIO-CLC.

6.    Injury or Sickness

Employees off work due to injury or sickness will continue to be covered subject to the provisions of this Exhibit B-1, during the period in which they accumulate seniority.

7.    Termination of Coverage Under Exhibit B-1.

Except as described in Paragraphs 4, 5 and 6 immediately above, all coverage will terminate when active employment with the Employer terminates except as follows:

(a)    The hospital, surgical, hospital-medical and prescription drug benefits for an Employee or dependent will be extended for three months following termination of coverage to cover a hospital confinement, an operation or obstetrical procedure resulting from a continuous total disability which began while the coverage was in force.

(b)    Coverage will be extended for six months for the spouse and dependent children of an Employee who dies while on the payroll of the Employer, while on sick leave (and accumulating seniority), while on layoff with Exhibit B-1 coverage provided continuously under Paragraph 4 of this Exhibit B-1, during authorized leave of absence for a period not to exceed 90 days, or while on authorized leave of absence for service with a Local Union in an official or representative capacity.

The surviving spouse of a deceased Employee who is not eligible for continued coverage under Paragraph 9 (b) of this Exhibit B-1 may elect, within such six months, to extend such coverage for up to an additional 18 months by payment in

advance of the current group rate premium.  Such spouse may **make arrangements** for the premium to be paid (i) in a lump sum amount equal to **14 monthly** payments which may be deducted from any benefits the spouse is entitled to receive under Section A, Life Insurance or (ii) in quarterly installments paid directly to the Company.

(c)    Coverage for an unmarried full-time student will be extended for 90 days following termination of status as full-time student provided no other group medical coverage of any kind is in effect on such student.

8.    Miscellaneous Provisions

(a)    Any payment for any benefit under this Exhibit B-1 which is payable to a hospital shall be paid directly to the hospital entitled thereto.  If an Employee pays directly to the hospital any of the charges upon which the claim is based and furnishes the Employer or insurance carrier satisfactory evidence of such payment, such Employee shall be paid the benefit payment in accordance with the provisions hereof.

(b)    In enrolling an individual as an Employee or eligible dependent or in determining or making any payments for benefits of an individual as an Employee or eligible dependent, the fact that the individual is eligible for or is provided medical assistance under a State plan for medical assistance approved under title XIX of the Social Security Act will not be taken into account.

(c)    Any payment for any benefit with respect to an Employee or eligible dependent under this Exhibit B-1 will be made in accordance with any assignment of rights made by or on behalf of such Employee or dependent as required by a State plan for medical assistance approved under title XIX of the Social Security Act pursuant to Section 1912 (a) (1) (A) of the Social Security Act as in effect on August 10, 1993.

(d)    To the extent that payment has been made under a State plan for medical assistance approved under title XIX of the Social Security Act in any case in which this Exhibit B-1 has a legal liability to make payment for items or services constituting such assistance, payment for benefits under this Exhibit B-1 will be made in accordance with any State law which provides that the State has acquired the rights with respect to an Employee, spouse of an Employee, or dependent of an Employee to such payment for such items or services.

9.    Special Medicare Benefit

(a)    Eligibility for Benefit

An Employee, spouse and their eligible dependents, who are eligible for benefits

under this Exhibit B-1 will be eligible for a Special Medicare Benefit when first eligible to enroll in Part B of Medicare with Medicare as primary coverage, provided the individual enrolls and continues to be enrolled in Part B of Medicare.

(b)    Amount of Benefit

The amount of the Special Medicare Benefit will be equal to the lesser of the standard monthly premium for Part B of Medicare or $50.00 that is paid by persons who enroll when first eligible for primary Medicare coverage but shall not include any additional premiums such as those charged for delinquent enrollment.

Notwithstanding the above, the Special Medicare Benefit for any person who enrolls and continues to be enrolled in a Medicare Risk HMO under the provisions of Exhibit B-1, Paragraph 10 will be equal to the standard monthly premium for Part B of Medicare.

(c)    Payment of Benefit

The Special Medicare Benefit will be paid to the Employee. Payment of the Special Medicare Benefit will commence the first day of the month following the month for which such individual is eligible to enroll in Part B of Medicare with Medicare as primary coverage, provided the individual enrolls in Part B of Medicare.

Payment of the Special Medicare Benefit shall continue so long as the Employee, spouse and the eligible dependents continue to be covered for benefits under this Exhibit B-1 and continue to be enrolled for coverage under Part B of Medicare.

The Special Medicare Benefit will not be paid for any eligible dependent who is also eligible for this Special Medicare Benefit as an Employee or when such dependent is reimbursed by another employer for the Medicare Part B premium. When a dependent child is covered by this Paragraph under more than one Employee, the Special Medicare Benefit will be paid only to the male Employee.

10.    Alternative (Group Practice) Plans

(a)    The Company will make arrangements to afford individual Employees the option to subscribe to Group Practice Plans when they become available in their area, if such plans are approved by the Company, in lieu of all the coverages provided in Exhibit B-1, subject to the limitation on Company contributions contained in Subparagraph (b) below.

Subsequent opportunities to exercise or revoke the exercise of such option shall be provided as may be mutually agreed upon by the Company and the Local Union but not more frequently than once in any 12-month period.

(b)     On behalf of each Employee subscribing to a Group Practice Plan under
        Subparagraph (a) above, the Company will make monthly contributions to such
        plan.
        Until January 1, 2008 on behalf of each Employee who elects coverage
        under this Exhibit B-1 the Company contribution will be 95% of the cost as
        estimated annually in advance by the Company. Beginning January 1,
        2008, 10% of any increase/decrease in premium cost will be borne/shared
        by/with employees. The increase/decrease for 2008 will be based upon the
        increase for 2008 over 2007. The increase/decrease for 2009 will be based
        upon the increase in 2009 over 2008. The increase/decrease for 2010 will
        be based upon the increase in 2010 over 2009.

        Failure on the part of the Employee (including their spouse or dependents) to pay
        their medical contribution will result in cancellation of coverage.

11.  Non-Duplication of Benefits Under Exhibit B-1

    (a)     If an Employee, the spouse of an Employee, or the dependent of an Employee is
            covered or is eligible to be covered except in those cases where contributions for
            coverage are required (except as provided in subparagraph (b) and (h) below) by
            another employer-sponsored group hospital, surgical, medical, dental or
            prescription drug program, the payment allowable under Exhibit B-1 will be
            coordinated with the payments payable under such other group program whether
            or not such person has actually enrolled for coverage.

            For purposes of employer-sponsored flexible benefits programs, an individual will
            be considered "eligible to be covered" as mentioned above and subparagraph (b)
            below, whenever hospital-surgical-medical coverages were available and such
            coverage was not elected.

    (b)     When the spouse of an Employee or the dependent of an Employee is eligible to
            be covered by another employer-sponsored group hospital, surgical, medical, or
            prescription drug program, and the Employee is eligible for coverage under this
            Exhibit B-1, the Company will reimburse, on a quarterly basis, 50% of the
            spouse's or dependent's contribution for "single only" coverage from an
            employer-sponsored plan for the most comparable coverage as available under
            Exhibit B-1. The maximum contribution amount for such coverage by the spouse
            or dependent that will be considered for the 50% reimbursement is limited to
            $200 per month. For spousal or dependent contributions in excess of $200 per
            month, at its discretion, the Company will make a determination whether to
            reimburse the excess contribution over the maximum. If the Company's
            determination is to limit the reimbursement to $100 per month, the spouse or
            dependent will not be required to take that coverage. This reimbursement will not
            be made to an Employee if the other employer sponsored group hospital, surgical,

42

medical, or prescription drug program is provided by the Employer or any of its affiliated companies.

The spouse of the Employee or the dependent of the Employee will be considered to be covered under such other employer-sponsored group hospital, surgical, medical, or prescription drug program (except as noted in the previous paragraph) whether or not they are actually enrolled and the payment allowable under this Exhibit B-1 will be coordinated with the payments that would have been payable under such other group program.

(c)    When such other group program has been determined to be primary (as defined in subparagraph (d) below), the payment allowable under Exhibit B-1 will be equal to the amount which would have been payable for such services, treatments, supplies or prescription drugs under Exhibit B-1 had there been no such other group program less the amount payable by such primary group program for such services, treatments, supplies or prescription drugs.

(d)    Such other group program will be considered as primary:

(1)    When the spouse or a dependent of an Employee is covered as an employee by such other group program, or

(2)    when an Employee, whose credited service is less with the Employer than with the employer sponsoring such other group program, is covered by such other group program as an employee, or

(3)    in any case, when such group program does not contain a non-duplication or coordination of benefits provision.

(e)    In those cases where both husband and wife are covered as Employees and or Retirees under Exhibit B-1, either Employee will be considered eligible for benefits as a dependent of the spouse, but the total benefit payment under Exhibit B-1 and Exhibit E shall not exceed the amount which will be normally paid under Exhibit B-1 and Exhibit E.

(f)    In those cases where both husband and wife are employed, the program of the parent whose birth date (month and day only) falls earlier in the calendar year will be considered as primary with respect to that parent and dependent children of the husband and wife and the parent whose birth date (month and day only) falls later in the calendar year will be considered as primary for that parent and secondary with respect to the dependent children of the husband and wife. If the husband and wife have the same birth date (month and day only), the program covering the parent longer is primary with respect to the dependent children and the program covering the other parent for the shorter time is secondary with respect to the dependent children.

When the program of the Employee's spouse does not determine primary coverage for dependent children based on birth date, the program covering the husband as an Employee will be considered as primary with respect to the husband and his dependent children. The program covering the wife as an Employee will be considered as primary with respect to the wife.

In the case when parents are separated or divorced and the parent with custody of dependent children has not remarried, the dependent coverage of the parent with custody of the children will be primary to the dependent coverage of the parent without custody.

In the case when parents are divorced and the parent with custody of dependent children has remarried, the dependent coverage of the parent with custody of the children will be primary to the dependent coverage of the stepparent. The dependent coverage of the stepparent will be primary to the dependent coverage of the parent without custody.

In the event there is a court decree which would otherwise establish financial responsibility for the medical care expenses with respect to dependent children, the dependent coverage of the parent with such financial responsibility will be primary.

The Company shall establish reasonable procedures to determine the status of medical child support orders and to administer the payment of benefits under medical child support orders which are deemed to be qualified orders. Such procedures shall be in writing and shall comply with the provisions of Section 609 of the Employee Retirement Income Security Act of 1974, as amended.

(g)    When the patient is an Employee covered under Exhibit B-1, this Program will be the primary program regardless of whether or not the other group program contains a coordination of benefits provision, except in the case of duplicate employment when the Employee has more credited service with the employer sponsoring such other group program and except as provided in subparagraph (b) and (h) of this paragraph.

(h)    Medicare Parts A and B and any other Federal, State or government-sponsored hospital, surgical, medical, dental or prescription drug program (including payments made under any "No Fault" liability insurance program) will be considered as though such government-sponsored program were another employer-sponsored group program and will be considered as primary, except as otherwise prohibited by law.

For purposes of this paragraph, an Employee and their eligible dependents, who are eligible to receive the Special Medicare Benefit provided under this Program, shall be considered covered under Part B of Medicare whether or not such person has actually enrolled for coverage under Part B of Medicare. An employee who

works beyond age 65 shall have this Program as primary and Medicare as secondary during the period the Employee continues actively working after age 65.

(i)    Charges incurred for services, treatments and supplies in connection with an illness of a covered individual, to the extent to which such services, treatments and supplies, or payment of such charges, or any benefit for or in connection with such charges, services, treatments or supplies, is provided for the covered individual under or by any law or plan of any government or political sub-division, including Medicare, or any other plan which you participate by virtue of your employment with the Employer.

If, after benefits have been paid on account of services, treatments and supplies given to the Employee or eligible dependent in connection with an illness of such person, it is determined that any such services, treatments or supplies have been provided from any source referred to above, the Employer will be entitled to a refund from the Employee of the amount paid by it in connection with such illness which is in excess of the benefits which would have been payable based on the actual eligible charges incurred.

12.   Subrogation

(a)    In the event an Employee or a dependent of an Employee is legally entitled to or does recover all or a portion of the cost of a service or prescription drug covered by this Program from any third party, the Employer will, upon making payment under such Program succeed to any rights of and claims to recovery the Employee or dependent may have or acquire (with respect to such service or prescription drug) against such third party except insurers of individual hospital, surgical, or medical policies issued to the Employee or Dependent, and except as described under Paragraph 11(g) of this Exhibit B-1.

If an Employee or dependent recovers any money, directly or indirectly, the Employer has first priority for repayment of the full amount of the service or prescription drug it provided under this Program and the Employer will pay a portion of the reasonable legal fees and expenses incurred by the Employee or dependent in obtaining such recovery from the third party. If money is recovered from more than one party, the same principle shall apply to the amount recovered from each party.

Further, if the Employee and/or dependent is not made whole for all harm suffered as a result of an injury or illness caused by a third party, the Employer shall agree to a reasonable fair sharing of recoveries.

Notwithstanding the above, the Employer reserves the right to examine the facts of each case to determine a reasonable fair sharing of all recoveries from all parties involved.

45

(b)     Employees by acceptance of such benefit payments agree to furnish such information and assistance, and execute such assignments and other instruments as the Employer may reasonably request to facilitate enforcement of its successor rights and claims. Employees and their dependents shall take no action prejudicing such rights and claims of the Employer (including, but not limited to, settlement of pending or potential lawsuits against any third party without prior notice to the Employer).

(c)     An Employee who is required to appear and defend against a civil action involving this Subrogation provision shall be compensated for time lost from his regular scheduled shift. The person will be paid consistent with Article VI, Section 3 (a) of the Collective Bargaining Agreement.

13.    Listing of Dependents

Each Employee shall furnish a list of his eligible dependents on an enrollment form supplied by the Employer for such purpose. This form must be kept up to date at all times.

14.    Definitions

(a)     "Plan" or "program" as used herein means the Medical Benefits Program For Employees And their Dependents as from time to time in effect.

(b)     The term "benefit year" means the period commencing on January 1 of any calendar year and terminating at the expiration of December 31 of such calendar year.

(c)     The term "covered individual" means an Employee or eligible dependent who is covered for medical benefits.

(d)     The term "physician", or "doctor", or "doctor licensed to practice medicine", as used in this Program means only Doctor of Medicine (M.D.) or a Doctor of Osteopathy (D.O.). The term also means Doctor of Surgical Chiropody (D.S.C.) (Podiatrist) and with respect to chiropractic treatments for neuromusculoskeletal conditions coming within the scope of his license, the term also means a Chiropractor.

15.    Insurance Contracts

The Employer may, alone, or in conjunction with other corporations subsidiary to or affiliated with the Company, enter into a contract or contracts with an insurance company or insurance companies to provide the benefits described in this Exhibit B-1. No insurance company contract which may be entered into by the Employer for the purpose of providing any benefit described in this Exhibit B-1 shall alter, amend or detract from

the provisions of this Agreement.

16.    Grievance Procedure

If any difference shall arise between the Employer and any Employee with respect to whether or not the Employer has provided the benefits under this Exhibit B-1, and if agreement cannot be reached between the Employer and such Employee, such difference may be taken up as a grievance under the grievance procedure provided for under the Basic Agreement at the Manager of the Labor Department level.  If any such grievance shall be taken before the impartial arbitrator in accordance with such procedure, then the impartial arbitrator shall have the authority only to decide the question pursuant to the provisions of this Exhibit B-1 applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions. The decision of the impartial arbitrator shall be binding on the Employer, such Employee, and all other interested parties.  Termination of the Basic Agreement shall not invalidate the use of its grievance procedure for the purposes of this Exhibit B-1.

17.    Benefits on Plant Closure

In the event of a Plant Closure at any plant covered by the Agreement, the coverage under this Paragraph 17 is provided in lieu of all other coverage under Part V Section A of the Agreement and this Exhibit B-1. However, upon termination of coverage under this Paragraph 17, the conversion privileges of Part V Section A, Paragraph 1 of the Agreement and the termination provisions of Exhibit B-1, Paragraph 7 shall apply.

Coverage under Part V Section A of the Agreement will be extended following such Plant Closure for an additional 27 months beyond Employer-furnished coverages provided in Paragraphs 1 and 3 of Section A.  Coverage under Exhibit B-1 will be extended following such Plant Closure for an additional 12 months beyond Employer-sponsored coverage's provided in Paragraph 4 of Exhibit B-1.  However, in no event shall the coverage provided in Paragraph 4(b) of Exhibit B-1 be less than 9 months.  For any month in which Employer-furnished coverage is provided under Paragraph 1 Part V, Section A of the Agreement, the Employee may continue to purchase coverage under Paragraph 2 of Section A.

In addition to the Employer- sponsored coverage provided above, for any month in which the Employee has Credit Units remaining under the Titan Tire Supplemental Unemployment Benefits Plan, coverage under Exhibit B-1 may be continued up to an additional 12 months by payment in advance at the Group Rate if arranged for prior to the expiration of such Employer-sponsored coverage.  The maximum period of coverage under this Paragraph 17 shall be 30 consecutive months for coverage under Part V, Section A, Paragraphs 1 and 3 of the Agreement, and 36 consecutive months for coverage under Exhibit B-1 following the month in which such Plant Closure occurred.

Coverage under this Paragraph 17 will not continue as provided above while the Employee is covered by any other employer-sponsored life insurance or medical benefit

program; however, when he ceases to be covered by any such other program, he may then resume coverage hereunder for the remainder of the maximum period of coverage as defined above. In order to remain eligible for continued coverage as provided above, the Employee must maintain such coverage continuously except as provided above in this Paragraph 17.

EXHIBIT B-2

THE TITAN TIRE OF FREEPORT
EMPLOYEE SAVINGS PLAN
FOR
BARGAINING UNIT EMPLOYEES

**INSERT TITAN TIRE 401K Plan**

visual acuity.

9.  "Optician" shall mean any person who is legally qualified and licensed to supply eyeglasses prescribed by an Ophthalmologist or Optometrist to improve visual acuity, to grind or mold the lenses or have them ground or molded according to prescription, to fit them into a frame and to adjust the frames to fit the face.

10.  "Participating Provider" shall mean a Provider who has agreed to render procedures in accordance with terms and conditions established by the Carrier.

11.  "Non-Participating Provider" shall mean a Provider who has not entered into an agreement with the Carrier.

ARTICLE II
ELIGIBILITY FOR BENEFITS

1.  Active Employees will be covered by the provisions of this Plan on January 1, 2006.

    Employees not actively at work on the Effective Date, will be covered by the provisions of this Plan if they are covered by Section B of the Benefits Agreement effective January 1, 2006, on a non-contributory basis except as may be hereinafter provided.

2.  Employees hired after the Effective Date, will become covered by the provisions of this Plan on the 31st day of employment.

3.  Coverage for an Employee's dependents will become effective on the same date as the Employee's coverage.

4.  Layoff.  In the event of layoff, coverage under this Plan will be continued for Employees (and their eligible Dependents) for 90 days following date of layoff.

5.  Leave of Absence.  During authorized leave of absence, (other than leaves for which coverage is provided in subparagraphs below) coverage for Employees (and their eligible Dependents) under this Plan will be continued for a period not to exceed 90 days.

    During an authorized leave of absence for active duty in Armed Forces for a period of less than six months, Employees (and their eligible Dependents) will continue to be eligible for the benefits provided in this Plan to the extent that such benefits are not provided by the Military Service or the Federal or State Government.

    During an authorized leave of absence for pregnancy, Employees (and their eligible Dependents) will continue to be covered subject to the provisions of this Plan, during the period in which they accumulate seniority.

    Notwithstanding the foregoing, coverage for Employees (and their eligible Dependents)

will be continued during the period of an Employee's authorized leave of absence granted by his Employer for service with a local Union in an official or representative capacity or while representing such local Union in a State, County, or City council of AFL-CIO-CLC.

6.    Injury or Sickness.  Employees (and their eligible Dependents) off work due to injury or sickness will continue to be covered subject to the provisions of this Plan during the period in which they accumulate seniority.

ARTICLE III
BENEFITS PROVIDED, LIMITATIONS AND EXCLUSIONS

1.    Benefit Provision

If the Employee or Dependent receives any of the Covered Vision Services, as set forth in the schedule below, while the Vision Care Benefits are in force on account of such person, benefits shall be paid to the Ophthalmologist, Optometrist or Optician rendering the service, after receipt of due proof of claim and subject to the following limitations and exclusions, in an amount equal to the fee charged for such service, provided that the amount of such payment shall in no event exceed the maximum payment specified for such service in the schedule below.

If at the time proof of claim is submitted, or prior thereto, evidence is furnished that charges, in whole or in part, for the services of an Ophthalmologist, Optometrist or Optician have been paid by the Employee, benefits on account of such service shall be paid to the Employee to the extent of such payment.

For the purposes of the Vision Care Benefit Plan described herein, an expense shall be deemed to have been incurred on the date the service for which the charge is made shall have been received or rendered.

O u 7 –

Schedule of Covered Vision Benefits
Effective January 2006

| Services | Maximum Payment |
|---|---|
| Complete Vision Examination | $ 50.00 |
| Lens or Lenses for Eyeglasses: | |
| Single Vision Prescription | |
| One Lens | 40.00 |
| Set of Lenses | 80.00 |
| Bifocal Prescription | |
| One Lens | 45.00 |
| Set of Lenses | 90.00 |
| Trifocal Prescription | |
| One Lens | 50.00 |
| Set of Lenses | 100.00 |
| Lenticular Prescription | |
| One Lens | 55.00 |
| Set of Lenses | 110.00 |
| Contact Prescription | |
| One Lens | 45.00 |
| Set of Lenses | 90.00 |
| One Supply of Disposable Lenses | 90.00 |
| One Frame for Eyeglasses | 55.00 |

2.    Limitations

Payment for Covered Vision Benefits shall be subject to the following limitations:

(a)    Vision Examination.  Benefits shall be payable for a vision examination only
when performed by an Ophthalmologist or Optometrist.  Payment of such
benefits shall be limited to one such vision examination for each Employee or
Dependent in any period of 24 consecutive months, except that if a subsequent
vision examination is performed within such 24 month period for which
benefits are payable for a lens or set of lenses by reason of the exception to the
limitation of benefits for a lens or lenses as provided in sub-paragraph (b)
below, then such vision examination shall be considered a Covered Vision

Benefit.

(b) Lens, Lenses. Benefits shall be payable for lenses only when prescribed by an Ophthalmologist or Optometrist. Payment of such benefits shall be limited to one such lens, set of lenses, or one supply of disposable prescription contact lenses, for each Employee or Dependent in any period of 24 consecutive months, except that if a subsequent lens, set of lenses or supply of disposable prescription contact lenses are received during such 24 month period by reason of a prescription change and the new lens, set of lenses or supply of disposable prescription contact lenses differ from the most recent one by an axis change of 20 degrees or .50 diopter sphere or cylinder change and improve visual acuity by at least one line on the standard chart, such new lens, set of lenses or supply of disposable prescription contact lenses shall be considered a Covered Vision Benefit.

(c) Frame. Benefits shall be payable for a frame only when such frame is for use with a lens or set of lenses which are prescribed by an Ophthalmologist or Optometrist. Payment of such benefits shall be limited to one such frame for each Employee or Dependent in any period of 24 consecutive months.

(d) The 24 consecutive month eligibility period referred to in sub-paragraphs (a), (b) and (c) above shall begin on the first day of any calendar year which ends in an even number and will continue during the ensuing 24 consecutive month period.

3. Exclusions

No benefits are payable for the following services (including supplies):

(a) Services rendered to the Employee or Dependent prior to the effective date of the Vision Care Benefit Plan on account of such person;

(b) Sunglass lenses, except that tinted lenses with Tints 1 or 2 shall not be considered to be sunglasses for the purposes of this exclusion;

(c) Photosensitive or anti-reflective lenses to the extent that the charges for such lenses exceed the Maximum Payment for regular lenses as specified in the Schedule of Covered Vision Benefits;

(d) Services in connection with medical or surgical treatment of the eye;

(e) Drugs or medications (other than those required for a vision examination);

(f) Special services and procedures such as orthoptics, vision training, subnormal vision aid, aniseikonic lenses and tomography.

(g)     Services or supplies which are experimental in nature;

(h)     Replacement of a lost or broken lens or lenses and/or a frame unless at the time of such replacement such lenses or frame would otherwise be considered Covered Vision Benefits;

(i)     Services not prescribed as necessary by an ophthalmologist or optometrist;

(j)     Services or supplies for which the Employee or Dependent is entitled to benefits under any other provision of the Benefits Agreement or which are provided under a plant safety glass program;

(k)     Services received because of sickness or injury arising out of or in the course of employment and entitling the Employee or Dependent to benefits under any Worker's Compensation, occupational disease or similar law or laws.

(l)     Services (or payments for or because of such services) to the extent that such services (or payments for or because of such services) are reasonably available under any plan or program established pursuant to the laws or regulations of any government or under any plan or program in which any government participates other than as an employer.  In the case of any person who is not enrolled for all coverage for which such person has become eligible under any such plan or program, services and payments available shall nevertheless include all benefits to which such person would be entitled if such person were enrolled for all such coverage.  The term "any government" includes the federal, state, provincial or local government or any political subdivision thereof of the United States or any other country.  This provision is subject to any provision or regulation of such plan or program which requires that insurance benefits be utilized before benefits are available thereunder.

(m)     Services for which the individual is not required to make payment or for which no charge would be made in the absence of the insurance evidenced herein.

(n)     Vision examination performed and lenses and frames ordered after the termination of the individual's coverage.

ARTICLE IV
TERMINATION OF COVERAGE

Except as described in Paragraphs 4, 5, and 6 of Article II all coverage will terminate when active employment with the Employer terminates except that coverage will be extended for three months for the spouse and dependent children of an Employee who dies while on the payroll of the Employer, while on sick leave (and accumulating seniority), while on layoff with Plan coverage provided continuously under Paragraph 4 of Article II, while on an authorized leave of absence for a period not to exceed 90 days, or while on an authorized leave of absence for service with a local Union in an official or representative capacity or while representing such

local Union in a State, County, or City council of AFL-CIO-CLC.

## ARTICLE V

1. In consideration of waiving physical examination of Employees and Dependents and, as a condition precedent to the approval of claims hereunder, the Carrier shall be entitled to receive from Ophthalmologist, Optometrists, Opticians, hospitals or other providers of covered procedures and supplies such information and records relating to attendance, examination or treatment with respect to an Employee or Dependent as may be required in the administration of this Plan.

2. The Carrier shall have the right to resolve any questions concerning vision care which may arise hereunder and any such determination shall be held to be conclusive upon the Employee or Dependent unless, within sixty (60) days following receipt of notice of such decision, the Employee or Dependent shall appeal such decision to the Carrier. In the event of such appeal, the dispute shall be referred to a Peer Review council or committee of the appropriate vision care society for determination. Any such determination shall be final.

3. The Plan shall not be obligated to pay for vision care for which the claim has been submitted more than twelve (12) months after the date of rendition of such procedures. Failure to submit such claim within the stated twelve (12) months shall not invalidate or reduce any claim if, in the opinion of the Carrier, the delay was unavoidable and the claim was presented within a reasonable period of time, considering the circumstances.

## ARTICLE VI
## NON-DUPLICATION OF BENEFITS

1. If an Employee, the spouse of an Employee, or the dependent of an Employee is covered, except as provided in Paragraph 7 below, by another employer-sponsored vision care program (except a Group Practice Plan or Health Maintenance Organization Plan), the payment allowable under this Plan will be coordinated with the payments payable under such other group program.

2. When such other group program has been determined to be primary (as defined in Paragraph 3 below), the payment allowable under this Plan for any service covered by this Plan will be equal to the smaller of:

   (a) 100% of the charge for such service (but not more than the usual, customary and reasonable charge for such service covered under this Plan) less the amount payable by such primary group program for such service, and

   (b) the amount which would have been payable for the service under this Plan had there been no such other group program.

3. Such other group program will be considered as primary:

(a)     when the spouse or a dependent of an Employee is covered by such other group program, or

(b)     when an Employee, whose credited service is less with the Employer than with the employer sponsoring such other group program, is covered by such other group program as an employee, or

(c)     in any case, when such other group program does not contain a non-duplication of coordination of benefits provision.

4.     In those cases where both husband and wife are covered as Employees under this Plan, either Employee will be considered eligible for benefits as a dependent of the spouse, but the total payment under the Plan shall not exceed the usual, customary and reasonable charge for each covered expense.

5.     In those cases where both husband and wife are employed, the program of the parent whose birth date (month and day only) falls earlier in the calendar year will be considered as primary with respect to that parent and dependent children of the husband and wife and the parent whose birth date (month and day only) falls later in the calendar year will be considered as primary for that parent and secondary with respect to the dependent children of the husband and wife. If the husband and wife have the same birth date (month and day only), the program covering the parent longer is primary with respect to the dependent children and the program covering the other parent for the shorter time is secondary with respect to the dependent children.

When the program of the Employee's spouse does not determine primary coverage for dependent children based on birth date, the program covering the husband as an Employee will be considered as primary with respect to the husband and his dependent children. The program covering the wife as an Employee will be considered as primary with respect to the wife.

In the case when parents are separated or divorced and the parent with custody of the dependent children has not remarried, the dependent coverage of the parent with custody of the children will be primary to the dependent coverage of the parent without custody.

In the case when parents are divorced and the parent with custody of dependent children has remarried, the dependent coverage of the parent with custody of the children will be primary to the dependent coverage of the stepparent. The dependent coverage of the stepparent will be primary to the dependent coverage of the parent without custody.

In the event there is a court decree which would otherwise establish financial responsibility for the medical care expenses with respect to dependent children, the dependent coverage of the parent with such financial responsibility will be primary.

6.   When the patient is an Employee covered under this Plan, this Plan will be the primary program regardless of whether or not the other group program contains a non-duplication of benefits provision, except in the case of duplicate employment when the Employee has more credited service with the employer sponsoring such other group program and except as provided in Paragraph 7.

7.   Any Federal, State or Government-sponsored vision care program (including payments made under any "No Fault" liability insurance program) will be considered as though such government-sponsored program were another employer-sponsored group program and will be considered as primary.

8.   When an Employee, the spouse of an Employee, or the dependent of an Employee elects coverage under a Group Practice Plan or a Health Maintenance Organization Plan, benefits otherwise payable under this Plan will not be paid and coordination of benefits provisions described in Paragraphs 1 through 7 of this Article VI will not be applicable.

## ARTICLE VII
## CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT OF 1985 (COBRA)

Effective with this Agreement, and consistent with the provisions of COBRA and any subsequent amendments thereto, the Company will make available the options for continuation of health care coverage prescribed by COBRA, to employees, spouses, former employees, former spouses and former eligible dependents. The medical benefit continuation options prescribed by COBRA shall be concurrent with any continuation of benefits otherwise provided in this Exhibit C.

EXHIBIT D

THE TITAN TIRE CORPORATION OF FREEPORT
CAFETERIA BENEFITS PLAN FOR BARGAINING UNIT EMPLOYEES
AND THE TITAN TIRE CORPORATION OF FREEPORT DEPENDENT DAY CARE
ASSISTANCE PLAN FOR BARGAINING UNIT EMPLOYEES

EXHIBIT D-1

CAFETERIA BENEFITS PLAN FOR BARGAINING UNIT EMPLOYEES

Titan Tire Corporation of Freeport hereby adopts, effective as of January 2006, this Cafeteria Benefits Plan for Bargaining Unit Employees for the purpose of furnishing employees who are covered by the Plan with the choice of receiving certain tax-free benefits provided by the Company in lieu of taxable compensation in accordance with the terms of the Plan. It is the intention of the Company that the Plan qualify as a "cafeteria plan" within the meaning of Section 125(d) of the Code.

Article I
DEFINITIONS

For Plan purposes, each of the following words and phrases shall have the meaning set forth in this Article I unless different meaning is clearly required by the context.

1.  The "Plan" shall mean the Benefits Plans as set forth herein, together with all amendments thereto, which Plan shall be called "Cafeteria Benefits Plan for Bargaining Unit Employees".

2.  The "Company" shall mean Titan Tire Corporation of Freeport, its corporate successors and any company or companies with which it may be merged or consolidated, and a "subsidiary of the Company" shall mean a subsidiary of the Company or any of its subsidiaries which sponsor the Plan.

3.  An "Employee" shall mean a person employed by the Company as an Hourly Employee who is employed at a designated location, and is represented by a collective bargaining representative with whom his Company has in effect a contract that specifically provides for coverage by the Plan.

4.  A "Covered Employee" shall mean an Employee who meets the eligibility requirements of Article II and who is covered by the Plan.

5.  An "Entry Date" shall mean January 1 of each Plan Year, except that, for an Employee not eligible to enroll on January 1 of the Plan Year, "Entry Date" shall mean the day an Employee becomes eligible for benefits after meeting the service requirements in Article II.

6.    A "Benefit Plan" means the specific terms and conditions regarding a Benefit.

7.    which may be purchased under the Plan, including the terms and conditions of any separate plan document, trust agreement, or contract regarding such Benefit, the terms of which are incorporated herein by reference.

8.    "Wage Reduction Dollars" shall mean the amount by which a Covered Employee elects to reduce his compensation to purchase Benefits under the Plan, as more fully described in Article III.

9.    A "Benefit" shall mean any of the benefits which may be purchased under the Plan pursuant to Article III of the Plan.

10.    A "Plan Year" shall mean the twelve-month period commencing January 1 and ending on December 31.

11.    "Default Benefits" shall mean the Benefits a Covered Employee who fails to make a proper election under the Plan shall be deemed to have made an election to purchase as more fully described in Paragraph 6 of Article V.

12.    The "Effective Date" shall mean the effective date of the Plan in the respective Benefits agreement between the Company and the collective bargaining representative.

13.    The "Code" shall mean the Internal Revenue Code of 1986, as amended. Reference to a section of the Code shall include such section, any comparable section or sections of any future legislation that amends, supplements, or supersedes such section.

14.    The "Enrollment Period" shall mean the period of time designated by the Company prior to each Plan Year during which Covered Employees may elect Benefits under the Plan, or the period of time designated by the Company prior to each Entry Date other than January 1 during which Employees who become Covered Employees during the Plan Year may elect Benefits under the Plan.

The masculine pronoun whenever used herein shall include the feminine in any case so requiring, and singular references shall include the plural and plural references shall include the singular, unless the context clearly requires otherwise.

## Article II
## ELIGIBILITY FOR COVERAGE

1.    Active Employees. Each Employee shall be eligible to be covered by the Plan under the same terms and conditions specified in the eligibility provisions of the applicable plan in the respective Benefits agreement between the Company and the collective bargaining representative and/or Summary Plan Description.

Article IV
ELECTIVE BENEFITS UNDER THE PLAN

1.    In General.  Subject to the requirements of Article V of the Plan regarding elections, each Covered Employee may elect to purchase any of the Benefits set forth in this Article IV at the cost or costs as provided for by the Company for each enrollment period, and consistent with the terms of the Benefits agreement covering the Employee. The provisions of this Article IV regarding Benefit Plans covered by a separate document are intended only as a descriptive summary, and in the case of any conflict between the Plan and a separately documented Benefit Plan, the latter shall control.

2.    Medical Benefit Plan.  Each Covered Employee may elect coverage under the Medical Benefit Plan for (a) the Covered Employee only, or (b) the Covered Employee and family, including spouse and eligible children.  The Covered Employee may elect coverage by choosing between the option(s) communicated by the Company during the Enrollment Period and outlined in the respective Benefits agreement and/or Summary Plan Description.  Specific coverage and exclusions can be found in the most current Benefits agreement and/or Summary Plan Description for the option elected, and are incorporated herein by reference.  The cost for the Medical Benefit Plan option varies depending on family status category.  The cost of the benefits under this Plan will be determined annually in advance of the employee enrollment period provided for in this Plan.  Covered Employees will be notified of the cost of the option for a Plan Year before or during the Enrollment Period for the Plan Year.

3.    Contributory Dental Benefits Plan.  Each Covered Employee, at a location designated by the Company, may elect coverage under the Contributory Dental Benefits Plan for (a) the Covered Employee only, or (b) the Covered Employee and his spouse, or (c) the Covered Employee and his eligible children, or (d) the Covered Employee and family, including spouse and eligible children.  The Covered Employee may elect coverage by choosing between the option(s) communicated by the Company during the Enrollment Period and outlined in the respective Benefits agreement and/or Summary Plan Description.  Specific coverage and exclusions can be found in the most current Benefits agreement and/or Summary Plan Description for the option elected, and are incorporated herein by reference.  The cost of the Contributory Dental Benefits Plan option varies depending on family status category.  The cost of the benefits under this Plan will be determined annually in advance of the employee enrollment period provided for in this Plan. Covered Employees will be notified of the cost of the option for a Plan Year before or during the Enrollment Period for the Plan Year.

4.    No Coverage Option.  Each Covered Employee may elect to not be covered under the Medical Benefit Plan.  Each Covered Employee may elect not to be covered under the Contributory Dental Benefits Plan.

5. Health Care Spending Account.  The Health Care Spending Account will provide reimbursements to each Covered Employee for qualifying medical expenses, defined to mean expenses incurred solely for "medical care" (as defined in Section 213(d)(1) of the Code, but not including premium payments for other health coverage) of the Covered Employee, and/or his spouse or dependents, if applicable, which are not covered by the Medical Benefits Program for Employees and Their Dependents, the Contributory Dental Benefits Plan for Employees and Their Dependents, Vision Care Benefit Plan, or by any other type of health care insurance.  A covered Employee may elect to have no coverage or may elect any dollar amount of coverage up to $96.15 per week ($5,000 per year) under the Health Care Spending Account for a Plan Year.  The cost for the Health Care Spending Account is equal to the dollar amount of coverage the Covered Employee elects for the Plan Year.  Each Covered Employee may elect to be reimbursed from his Health Care Spending Account for qualifying medical expenses incurred during the Plan Year for which the Health Care Spending Account is established.  Applications for such reimbursements must be made during the period the Health Care Spending Account for such Plan Year is open, but no later than three months after the close of the Plan Year, and must be filed in accordance with the procedures established by the Company.  A qualifying medical expense is considered to have been incurred during a Plan Year only if services giving rise to the expense are performed during the Plan Year.  The amount of any reimbursement paid to the Covered Employee hereunder shall be charged against the Health Care Spending Account as of the date on which it is paid.  The full amount of Wage Reduction Dollars elected by a Covered Employee to be applied for a Plan Year to the Health Care Spending Account, reduced by the amount of prior reimbursements from the Health Care Spending Account for the Plan Year, shall be available to the Covered Employee at all time during the Plan Year.  Reimbursements under the Health Care Spending Account shall be made from Wage Reduction Dollars credited to the Account.  A Covered Employee's Health Care Spending Account for each Plan Year shall be closed at the earlier of the time when all amounts in the Health Care Spending Account have been paid or distributed or when all reimbursements from the Health Care Spending Account requested within three months after the close of the Plan Year have been made.  Any remaining balance in the Covered Employee's Health Care Spending Account at the time it is closed shall be forfeited.  All forfeitures will remain in the Company's general assets.

6. Dependent Day Care Spending Account.  The Dependent Day Care Spending Account provides reimbursement under THE TITAN TIRE CORPORATION OF FREEPORT DEPENDENT DAY CARE ASSISTANCE PLAN for certain services rendered for the care of a Participant's dependents eligible for such services under the Code.  A Participant may elect to have no coverage or may elect annually any dollar amount of coverage up to $96.15 per week ($5,000.00 per year) under the Dependent Day Care Spending Account for a Plan Year, but in no event more than an amount permitted by the Code.  The cost for the Dependent Day Care Spending Account is equal to the dollar amount of coverage the Participant elects for the Plan Year.  Each Participant may elect to be reimbursed from his Dependent Day Care Spending Account for qualifying dependent care expenses incurred during the Plan Year for which the Dependent Day Care Spending Account is established.  Applications for reimbursements must be made

during the period the Dependent Day Care Spending Account for such Plan Year is open, but no later than three months after the close of the Plan Year, and must be filed in accordance with the procedures established by the Company. A qualifying dependent day care expense is considered to have been incurred during a Plan Year only if services giving rise the expense are performed during the Plan Year. The amount of any reimbursement paid to the Participant hereunder shall be charged against the Dependent Day Care Spending Account as of the date on which it is paid. A Participant can be reimbursed only up to the balance in his Dependent Day Care Spending Account at the time the request for reimbursement is made. Reimbursements under the Dependent Day Care Spending Account shall be made from Wage Reduction Dollars credited to the Account. A Covered Employee's Dependent Day Care Spending Account shall be closed at the earlier of the time when all amounts in the Dependent Day Care Spending Account have been paid or distributed or when all reimbursements from the Dependent Day Care Spending Account requested within three months after the close of the Plan Year have been made. Any remaining balance in the Covered Employee's Dependent Day Care Spending Account at the time it is closed shall be forfeited. All forfeitures will remain in the Company's general assets. The terms and conditions summarized herein and additional terms and conditions regarding the Dependent Care Assistance Plan are set forth in THE TITAN TIRE OF FREEPORT DEPENDENT DAY CARE ASSISTANCE PLAN FOR BARGAINING UNIT EMPLOYEES which is incorporated herein by reference.

Article V

ELECTION PROCEDURES AND DEFAULT BENEFITS

a.   In General. Each Covered Employee shall make an election under the Plan during the Enrollment Period as specified in the respective Summary Plan Description. The Enrollment Period dates will be determined and announced by the Company. Each Covered Employee described in Paragraph 1 of Article II shall make an irrevocable advance election for the first Plan Year of coverage or the remainder thereof during the Enrollment Period prior to the Entry Date on which the Employee becomes a Covered Employee. A Covered Employee who fails to make a proper election under the Plan shall automatically be deemed to have made an election of the Default Benefits set out in Paragraph 6 of Article V.

b.   Forms and Procedures. The Company shall prescribe the manner and methods as communicated by the Company in the most recent enrollment materials that Covered Employees will be required to use in making their elections, and may prescribe deadlines and other procedures for filing the elections.

c.   Acceptance of Elections. An election filed by a Covered Employee in the manner prescribed by the Company and communicated by the Company in the most recent enrollment materials is subject to acceptance, modification, or rejection by the Company. The Company may modify or reject an application in order to satisfy legal requirements. An election form not modified or rejected by the Company within 30 days after the end of the relevant Enrollment Period shall be deemed to be accepted. Rejection of an

election for any particular Benefit or for all Benefits for a Plan Year shall be deemed to result in an election of Default Benefits for that particular Benefit or for all Benefits for the Plan Year, unless effective as of the beginning of the Plan Year, the Company, in its discretion, permits the Covered Employee to file a new election.

d.    Revocation of Elections.  Once an election has been finally accepted by the Company, a Covered Employee may not revoke or modify his elections for the Plan Year except as provided in Paragraph 5 of this Article V.

e.    Change in Status Events.  An election may be revoked and a new election made after the beginning of a Plan Year for the balance of the Plan Year if both the revocation and election are on account of and consistent with a Change in Status Event as defined and in accordance with the Internal Revenue Service Regulations as they are from time to time amended or effective, which are incorporated herein by reference.

f.    Default Benefits.  Any Covered Employee who fails to make a proper election under this Plan for a Plan Year in conformance with the procedures set forth in this Article V or prescribed by the Company shall be deemed automatically to have made an election to purchase the Default Benefits.  Such Default Benefits shall consist of the same Benefits elected by the Covered Employee for the Plan Year immediately preceding the Plan Year for which the Covered Employee failed to make a proper election of Benefits, except that no deposits shall be made to a Health Care Spending Account or Dependent Day Care Spending Account for the Plan Year.  If the Covered Employee did not elect or was not deemed to elect Benefits for the prior Plan Year, however, the Default Benefits shall consist of medical coverage for himself and his family under the plan designated in the respective Benefits agreement, however, no coverage for any other benefits that may be offered under this Plan.

g.    Changes by Company.  If the Company determines, before or during any Plan Year, that the Plan may fail to satisfy for such Plan Year any nondiscrimination requirement imposed by the Code or any limitation on benefits provided to specified Employees under the Code, the Company may take such action as it deems appropriate, after consultation with the respective collective bargaining representatives, under rules uniformly applicable to similarly situated Employees, to assure compliance with such requirement or limitation. Such action may include, without limitation, modification of elections by Covered Employees, with or without their consent.

Article VI
ADMINISTRATION

The Company shall be the "Administrator" of this Plan for purposes of the Employee Retirement Income Security Act of 1974, as amended, and shall be the "Plan Administrator" for purposes of the Code.

The Plan Administrator shall have the sole and absolute discretionary authority and power to interpret plan provisions and make factual determinations in administering and carrying out the provisions of the Plan, including, but not limited to, the authority and power (a) to determine all

65

questions relating to eligibility for the amount of any benefit to be paid under the Plan, (b) to determine all questions pertaining to claims for benefits and procedures for claim review, (c) to resolve all other questions arising under the Plan, including any questions of construction, and (d) to take such further action as the Plan Administrator shall deem advisable in the administration of the Plan. The actions taken and the decisions made by the Plan Administrator hereunder shall be final and binding on all interested parties. The Company may delegate to a third party administrator in whole or in any part any of this authority.

If any difference shall arise between the Company and any Employee with respect to whether or not the Company has provided the benefits under this Exhibit D-1, and if agreement cannot be reached between the Company and such Employee, such difference may be taken up as a grievance under the grievance procedure provided for under the Basic Agreement at the Manager of the Labor Department level. If any such grievance shall be taken before the impartial umpire in accordance with such procedure, then the impartial umpire shall have the authority only to decide the question pursuant to the provisions of this Exhibit D-1 applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions. The decision of the impartial umpire shall be binding on the Company, such Employee, and all other interested parties. Termination of the Basic Agreement shall not invalidate the use of its grievance procedure for the purposes of this Exhibit D-1.

Article VII
FUNDING

1.    No Obligation to Insure or Fund Benefits. The Company shall have no obligation, but shall have the right, to insure any Benefits under this Plan or to establish any fund or trust for the payment of Benefits under this Plan except as mandated by law or by the Benefits agreement.

2.    Insured Benefits. In the case of any Benefit which is insured with an insurance company, any Benefits accruing shall be paid solely by such insurance company, and the Company's only responsibility will be the payment of such Benefits.

3.    Non-Insured Benefits. Payment of all non-insured Benefits under this Plan shall be made first from any trust established for the holding of Employee contributions pursuant to this Plan, and if needed, out of the general assets of the Company.

4.    No Interest Obligation. The Company shall have no obligation to pay interest on any Covered Employee's Account.

Article VIII
AMENDMENT AND TERMINATION

The Company reserves the right to amend the Plan, after consultation with the collective bargaining representative, at any time by written instrument signed by a duly authorized officer of the Company, or terminate the Plan at any time by action of its Board of Directors; provided, however, that no such action shall adversely affect any Covered Employee with respect to

EXHIBIT D-2

## TITAN TIRE OF FREEPORT
## DEPENDENT DAY CARE ASSISTANCE PLAN FOR BARGAINING UNIT EMPLOYEES

The Titan Tire Corporation of Freeport hereby adopts, effective as of January 1, 2006 Dependent Day Care Assistance Plan for Bargaining Unit Employees. The Plan is intended to provide Participants with reimbursements for Qualifying Dependent Care Expenses for which a dependent care tax credit is not taken under Section 21 of the Code. It is the intention of the Company that the Plan qualify as a "dependent care assistance program" within the meaning of Section 129(d) of the Code and that expenses which are reimbursed to a Participant will be eligible for exclusion from income under Section 129(a) of the Code. Accordingly, the Plan shall be construed consistently with Section 129 of the Code and any regulations thereunder.

### Article I
### DEFINITIONS

•    For Plan purposes, each of the following words and phrases shall have the meaning set forth in this Article I unless a different meaning is clearly required by the context.

1.    The "Code" shall mean the Internal Revenue Code of 1986, as amended. Reference to a section of the Code shall include such section, any comparable section or sections of any future legislation that amends, supplements, or supersedes such section.

2.    The "Company" shall mean Titan Tire Corporation of Freeport, its corporate successors and any company or companies with which it may be merged or consolidated, and a "subsidiary of the Company" shall mean a subsidiary of the Company or any of its subsidiaries which sponsor the Plan.

3.    "Dependent Care Expense" shall have the meaning given to it by Paragraph 4 of Article IV of the Plan.

4.    "Earned Income" shall mean wages, salaries, tips, and other employee compensation, plus the amount of the individual's net earnings from self-employment (within the meaning of Section 1402(a) of the code, but determined with regard to the deduction allowed by Section 164(f) of the Code for one-half of self-employment taxes), computed without regard to any community property laws, without taking into account any amount received as a pension or annuity, without taking into account any amount to which Section 871(a) of the Code applies, and without taking into account any amounts paid under the Plan or under a dependent care reimbursement plan of any other employer.

5.    "Educational Institution" shall mean a school maintaining a regular faculty and established curriculum and having an organized body of students in attendance.

6. "Cafeteria Benefits Plan" shall mean Titan Tire Corporation of Freeport Cafeteria Benefits Plan For Bargaining Unit Employees.

7. A "Participant" shall mean a Covered Employee under the Cafeteria Benefits Plan who elects coverage under the Plan.

8. The "Plan" shall mean the Dependent Day Care Assistance Plan For Bargaining Unit Employees as set forth herein, together with all amendments thereto, which Plan shall be called "The Titan Tire Corporation of Freeport Dependent Day Care Assistance Plan For Bargaining Unit Employees."

9. "Qualifying Dependent Care Expense" shall mean Dependent Care Expense incurred by a Participant which is paid to a person who is not (a) a dependent of the Participant within the meaning of Section 152(a) of the Code, or (b) a child of the Participant under the age of 19.

10. A "Qualifying Individual" shall mean (a) an individual with respect to whom the Participant is entitled to a deduction under Section 151(c)(1)(B) of the Code who is under the age of 13, (b) the spouse of the Participant if the spouse is physically or mentally incapable of caring for himself, (c) a dependent of the Participant if such dependent is physically or mentally incapable of caring for himself and the Participant is entitled to a deduction with respect to such dependent under Section 151(c)(1)(A) of the Code, or (d) a child of the Participant who is under the age of 13 with respect to whom the Participant is not entitled to a deduction under Section 151(c)(1)(B) of the Code only because of a written declaration or decree of divorce, provided that the child receives over half of his support from and is in the custody of one or both of his parents for more than one-half of the calendar year.

11. "Student" shall mean an individual who is enrolled at and attends an Educational Institution during each of five calendar months during a Plan Year for the number of course hours which is considered to be a full-time course of study.

12. All other capitalized but undefined terms used in the Plan shall have the meaning given to them in the Cafeteria Benefits Plan.

The masculine pronoun whenever used herein shall include the feminine in any case so requiring, and singular references shall include the plural and plural references shall include the singular, unless the context clearly requires otherwise.

## Article II
## ELIGIBILITY FOR PARTICIPATION

1. In General.  Each Covered Employee under the Cafeteria Benefits Plan shall be eligible to participate in the Plan.  In order for a Covered Employee to participate in the Plan, the Covered Employee must elect coverage under the Plan in accordance with the election procedures of the Cafeteria Benefits Plan, prior to the commencement of the Plan Year, or as otherwise permitted under the provisions of the Cafeteria Benefits Plan relating to the revocation and change of elections.

2. Termination of Participation.  A Participant's eligibility to participate in the Plan and his coverage under the Plan shall terminate when he retires, dies, or otherwise terminates his employment with the Company.

## Article III
## COVERAGE OPTIONS

A Covered Employee may elect and have credited to his Dependent Day Care Spending Account, on an annual basis for each Plan Year in accordance with the election procedures under the Cafeteria Benefits Plan, any dollar amount of coverage under the Plan equal to or less than $96.15 per week ($5,000.00 per year) for all Qualifying Individuals and $48.07 per week ($2,500.00 per year) in the case of a Covered Employee who is married and separate returns are filed); provided, however, that each Participant's coverage under the Plan shall be limited to the lesser of (a) the Participant's Earned Income for the Plan Year, and (b) the Earned Income of the Participant's spouse for the Plan Year.  In the case of a spouse who is a Student or who is physically or mentally incapable of caring for himself, for these purposes, the spouse shall be deemed under Section 21(d)(2) of the Code, for each month during which such spouse is a full-time Student at an Educational Institution or incapable of caring for himself, to be gainfully employed and to have Earned Income of not less than $250 for one Qualifying Individual or $500 for two or more Qualifying Individuals.  The Company reserves the right to accept, modify, or reject any election by a Covered Employee under the Plan pursuant to the terms of the Cafeteria Benefits Plan.

Article IV
BENEFITS UNDER THE PLAN

1.    In General. Each Participant will be entitled to receive for each Plan Year reimbursement of Qualifying Dependent Care Expenses that are incurred during the Plan Year, or during the Participant's period of employment with the Company within the Plan Year, if shorter, for which a dependent care tax credit is not taken on the Participant's federal income tax return pursuant to Section 21 of the Code, in the aggregate up to the dollar amount of coverage elected by the Participant for that Plan Year. Reimbursements made during a Plan Year (and during the first three months following the Plan Year as provided in Paragraph 3 of this Article IV) to a Participant will not exceed the dollar amount of coverage elected by the Participant for the Plan Year prorated for the period of time the Participant has actually participated in the Plan during the Plan Year, and can never exceed the amount credited to the Participant's Dependent Day Care Spending Account under the Cafeteria Benefits Plan at the time of the reimbursement.

2.    Forfeiture. A Covered Employee's Dependent Day Care Spending Account for each Plan Year shall be closed at the earlier of the time when all amounts in the Dependent Day Care Spending Account have been paid or distributed or when all reimbursements from the Dependent Day Care Spending Account requested within three months after the close of the Plan Year have been made. Any balance remaining in the Covered Employee's Dependent Day Care Spending Account at the time it is closed shall be forfeited. All forfeitures will remain in the Company's general assets.

3.    Limitation to Expenses Incurred During Plan Year. The amount of coverage elected for the Plan Year is only available to reimburse Qualifying Dependent Care Expenses that are incurred during the Plan Year, or during the Participant's period of participation in the Plan during the Plan Year, if shorter. Coverage is limited to expenses incurred during the portion of a Plan Year in which there is a Qualifying Individual. During the first three months after each Plan Year, Participants may submit claims for reimbursement of, and receive reimbursements with respect to, Qualifying Dependent Care Expenses incurred during the Plan Year. In the event of a Covered Employee's termination of employment with the Company prior to the end of a Plan Year, the Participant may not receive reimbursements under the Plan for any expenses incurred after the date of his termination of employment, although the Participant may submit during the three-month period following the end of the Plan Year a request for reimbursement of a Qualifying Dependent Care Expense incurred during his employment with the Company. An expense is incurred during a Plan Year if the services giving rise to the expense are performed during the Plan Year. An expense shall not be deemed to be incurred during a Plan Year merely because a Participant receives a bill for the expense during the Plan Year or pays the bill for the expense during the Plan Year.

4.    Dependent Care Expenses. Dependent Care Expenses shall include only expenses that constitute "employment-related expenses" within the meaning of Section 21(b)(2) of the Code. Specifically, Dependent Care Expenses must be incurred for the care of a Qualifying Individual or for household services that enable the Participant to be gainfully

72

employed.  Dependent Care Expenses shall be limited to (a) amounts paid for services rendered in the Participant's home, and (b) amounts paid for services rendered elsewhere with respect to a Qualifying Individual defined in Paragraph 8(a) of Article I of the Plan or a Qualifying Individual defined in Paragraph 8(b) or Paragraph 8(c) of Article I of the Plan who regularly spends at least eight hours each day in the Participant's household, provided that services rendered in a Dependent Care Center, as defined in Section 21(b)(2)(D) of the Code, must satisfy the requirements of Section 21(b)(2)(C) of the Code and regulations or other published interpretations thereunder.  Specifically, a Dependent Care Center that provides care for more than six individuals (other than individuals who reside at the facility) and receives a fee, payment, or grant for providing services for any of the individuals to whom it provides services (regardless of whether the facility is operated for profit) must comply with all applicable laws and regulations of the State and unit of local government in which it is located.

5.   Limitations on Benefits.  In accordance with Section 129(d) of the Code, not more than 25% of the amounts paid or incurred by the Company for dependent care assistance during a year may be provided for principal (5%) owners of the Company, and the average benefits provided to Participants who are not highly compensated employees shall be at least 55% of the average benefits provided to highly compensated employees under all the Company's plans.  For purposes of this Paragraph 5, employees whose compensation is less than $25,000, who are under age 21, or who have less than one year of service, and employees covered by a collective bargaining agreement between the Company and employee representatives, if there is evidence that dependent care benefits were the subject of good-faith bargaining, may be disregarded for purposes of the average benefits test.

## Article V
## ADMINISTRATION AND CLAIMS PROCEDURE

1.   The Company shall be the "Administrator" of this Plan for purposes of the Employee Retirement Income Security Act of 1974, as amended, and shall be the "Plan Administrator" for purposes of the Code.

The Plan Administrator shall have the sole and absolute discretionary authority and power to interpret plan provisions and make factual determinations in administering and carrying out the provisions of the Plan, including, but not limited to, the authority and power (a) to determine all questions relating to eligibility for the amount of any benefit to be paid under the Plan, (b) to determine all questions pertaining to claims for benefits and procedures for claim review, (c) to resolve all other questions arising under the Plan, including any questions of construction, and (d) to take such further action as the Plan Administrator shall deem advisable in the administration of the Plan.  The actions taken and the decisions made by the Plan Administrator hereunder shall be final and binding on all interested parties.  The Company may delegate to a third party administrator in whole or in any part any of this authority.

If any difference shall arise between the Company and any Employee with respect to

whether or not the Company has provided the benefits under this **Exhibit D-1, and if** agreement cannot be reached between the Company and such Employee, such difference may be taken up as a grievance under the grievance procedure provided for under the Basic Agreement at the Manager of the Labor Department level. If any such grievance shall be taken before the impartial umpire in accordance with such procedure, then the impartial umpire shall have the authority only to decide the question pursuant to the provisions of this Exhibit D-1 applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions. The decision of the impartial umpire shall be binding on the Company, such Employee, and all other interested parties. Termination of the Basic Agreement shall not invalidate the use of its grievance procedure for the purposes of this Exhibit D-1.

2.    Claims for Reimbursement. Participants shall make claims for reimbursements under the Plan in writing following such procedures, including deadlines and documentation requirements, and using such forms as are prescribed by the Company.

Article VI
FUNDING

1.    No Obligation to Insure or Fund. All reimbursements paid under the Plan shall be payable solely out of the general assets of the Company. The Company shall have no obligation to establish a trust or fund for the payment of reimbursements under the Plan nor to insure any reimbursements under the Plan.

2.    No Interest Obligation. The Company shall have no obligation to pay interest on any amount of a Participant's coverage under the Plan.

Article VII
AMENDMENT AND TERMINATION

The Company reserves the right to amend the Plan, after consultation with the collective bargaining representative, at any time by written instrument signed by a duly authorized officer of the Company, or terminate the Plan at any time by action of its Board of Directors; provided, however, that no such action shall adversely affect any Covered Employee with respect to contributions that have been made for the Plan Year in which such action is taken.

Article VIII
MISCELLANEOUS

1.    Claims of Other Persons. The provisions of the Plan shall in no event be construed as giving any person, firm, or corporation any legal or equitable right as against any Company, its officers, employees or directors, except any such rights as are specifically provided for in the Plan or are hereafter created in accordance with the terms and provisions of the Plan.

2.    Absence of Liability.  No member of the Board of Directors of any **Company** nor any officer of any Company shall be liable for any act or action hereunder, whether of commission or omission, taken by any other member, or by **an officer, agent** or employee, or, except in circumstances involving his bad faith, for **anything done** or omitted to be done by himself.

3.    Severability.  The invalidity or unenforceability of any particular provision of the Plan shall not affect any other provision hereof, and the Plan shall be construed in all respects as if such invalid or unenforceable provision were omitted herefrom.

4.    Governing Law.  The provisions of the Plan shall be governed by and construed in accordance with the laws of the State of Illinois.

EXHIBIT E

TITAN TIRE OF FREEPORT
MEDICAL BENEFITS PROGRAM
FOR RETIREES AND THEIR DEPENDENTS



January 1, 2006

Steve Vanderheyden, President
United Steel Workers Local 745L
2496 East Maize Road
Freeport, IL  61032

Dear Mr. Vanderheyden

Titan will establish one Voluntary Employee Benefits Agreement ("VEBA") for Des Moines future retirees as outlined below. The VEBA will vary from this only to the extent necessary to comply with ERISA and to maintain a plan that will not establish any obligation beyond the financial obligations set forth in this letter. Further, the parties agree that the VEBA will create no obligation on the part of Titan Tire to pay benefits in the event the VEBA has no assets. Further, the parties agree that there will be future changes in the VEBA in the event the law changes so as to maintain the provision that there will be no additional liabilities for Titan and so that Titan will not be required to pay benefits.

1.    Contractual obligation will run simultaneously with the term of the collective bargaining agreement.

2.    Titan will establish a single VEBA to cover both Freeport and Des Moines, though VEBA trustees will have the discretion to account for income/benefits by location or on any other basis.

3.    The VEBA must receive a favorable determination from the IRS with respect to its tax-exempt status under Code §501(c)(9).

4.    Employer's obligation will be limited to the payment of negotiated contributions during the term of the collective bargaining agreement. Those contributions are:

| | |
|---|---|
| 1/1/2006 | $3,010,000 |
| 8/1/07 | $3,010,000 |
| 8/1/08 | $3,010,000 |
| 8/1/09 | $3,010,000 |
| 8/1/10 | $3,010,000 |

Each contribution is conditioned on its current deductibility under the Internal Revenue Code. In no event shall Titan be liable for any plan benefit or expense attributable to the VEBA other than the negotiated contributions provided under a collective bargaining agreement with the Union.

     5.     The VEBA will be administered by a joint board of trustees, consisting of two representatives appointed by the employer and two by the union. Any deadlocks will be subject to arbitration under the Taft-Hartley Act.

     6.     Subject to the restrictions in section 4, the trustees may create a benefit plan to provide benefits to eligible retirees, their spouses, surviving spouses and their dependents funded solely from the assets of the VEBA, as may, but need not be, supplemented by retiree contributions.   Any expenses of providing benefits and administering the VEBA shall be borne solely by the VEBA. The Trustees shall have the discretion to determine the benefits to be provided to the various groups of eligible retirees, their spouses, surviving spouses and their dependents. The Trustees shall not create any benefit that creates any obligation for payment of benefits by Titan Tire. Only benefits permitted under Code § 501(c)(9) may be provided.

     7.     Eligible retirees include only bargaining unit employees who retire after the effective date of this agreement directly from active service with the Employer, and who are not eligible for retiree medical benefits from Goodyear.  Any other eligibility rules shall be set by the Trustees.

Sincerely yours,

/s/ William Campbell, President
Titan Tire Corporation

In re Arbitration between

United Steelworkers of America
Local No 745

<span style="color:red; font-weight:bold">08 C 50072</span>

and

Titan Tire Corporation of
Freeport, Illinois

Case 97-10

Issue: Denial of Medical Benefits

Heard: December 13 2007


For the Union
Steve Vanderheyden, President
   Presenting

For the Company
Gene LaSuer, Esq, Presenting


Introduction and Statement of the Case

    Effective January 1, 2006, the Goodyear tire production plant at Freeport
Illinois was acquired by Titan Tire Corporation The now Titan Tire Corporation
of Freeport and Local 745 (bargaining unit for Freeport production and
maintenance employees) negotiated a collective bargaining agreement including
an incorporated Benefits Agreement, effective January 1, 2006.

    As with prior owner Goodyear, Titan is a self insured entity, utilizing a third
party administrator (TPA) to administer its health plan but with ultimate decisions
as to plan coverage made by Company officials. The TPA enforces or pays out
claim benefits according to a lengthy and detailed Plan Document created under



1

the Company's supervision and direction. A separate shorter but still detailed booklet containing much of the same information as to coverage and exclusions is to be distributed to employees. However, at the time of the events in question, no plan booklet had been distributed to employees.

Key facts of this unfortunate event are not at issue. Titan employee Kip Kuhlemeier along with a colleague\business partner had for some years operated a side electrical repair business ("IMR Technology.") Their small business had no other employees, and no connection to Mr. Kuhlemeier's full time employment (since 1996) as an electrician at Titan's Freeport Plant. The two men billed their outside jobs by the hour, and divided up the net profits of their business at the end of the year ("Subchapter S").

Under State of Illinois workers' compensation law, such a partnership *qualifies* to acquire workers' compensation insurance covering injuries experienced by them in the course of performing their private contracting work, but its owners are not *required* to obtain it. The Grievant and his partner had purchased other insurance but had decided not to purchase workers' compensation coverage.

On August 28 2007 the grievant on his own time was trouble shooting a machine for a local customer (CSI). He was seriously injured, ultimately having his left leg amputated above his knee. During his hospital stay he was informed by Titan benefits administrators that he would not receive health care benefits for which he was enrolled in a Titan program. Titan plant management held firm to the determination that these facts met one of the listed exclusions ("general limitations") from such coverage.

A grievance was timely filed (9/5/2007) protesting the company "not paying medical on Kip for outside injury." The grievance invokes "Benefits Agreement, Exhibit B-1." The Company in denying this grievance cited the introductory language in Exhibit B-1 It has subsequently relied greatly upon other language found in the Benefits Agreement and in its Plan document, as discussed below.

As discussed at hearing, the primary issue for resolution is

Did the Company violate the Collective Bargaining Agreement (including the incorporated negotiated Benefits Agreement) under the circumstances of this case when it denied medical benefits coverage to Kip Kuhlemeier? If so, what is the appropriate remedy?

The Employer notes that "the question before the arbitrator is whether the language Titan relied upon was part of the agreement between the parties. The Company believes the testimony at the hearing established unequivocally that the Company was reasonable in relying on the language in question. "The Company core position is that the Benefits Agreement incorporates the language of the Summary Plan Description. The language in question if applicable, voids Titan health care coverage not only when workers compensation is actually carried by the outside employer, but when that employer (the self employed employee or a third party secondary employer) **had had the choice or opportunity to purchase such insurance and had failed to or voluntarily elected not to take it.**

Arguments presented by the parties will be addressed as necessary.

<u>Cited or Relevant Documents and Contract Language</u>

The (master) Collective Bargaining Agreement itself has a short reference to medical coverage and exclusions, in Article XI:

Section 7 Effect of Agreement

The parties have entered into this Collective Bargaining Agreement, a Benefits Agreement and a Supplemental Unemployment Benefits Plan ("Agreements"). Those Agreements shall constitute the sole and entire Agreement between the parties and supersede all prior Agreements. The language of these Agreements will prevail over any oral agreements, unless specifically adopted by the Company in writing after the effective date of these Agreements.

The negotiated Benefits Agreement is 134 pages. The non negotiated "Plan Document Titan International Health Care Plan 503" \ "Freeport natl PPO." is a

3

59 page document. I am authorized to interpret the negotiated Benefits Agreement vis a vis the Plan Document solely to resolve the question of whether the denial of benefits to Kip Kuhlemeier violated his contract rights, meaning his rights as stated in the Benefits Agreement. Does the Benefits Agreement incorporate the Summary Plan\Plan "General Limitation" as the employer argues, and were employees on notice of the Plan elements negating their coverage?[1]

Introductory Statement to Exhibit B-1

Effective January 1, 2006 and for the duration of this Agreement thereafter, the Employer will provide the following program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits for eligible employees and their dependents, **with the exception that none of the aforesaid benefits shall be applicable in the event of accident or sickness <u>covered by a Workers' Compensation Act</u>** or similar legislation nor shall there be any duplication of benefits under any Employer-sponsored Program

Following the introductory paragraph there are several pages describing the benefits, which are

...provided through the National PPO Plan for Employees and Their Dependents. The benefits are set forth in the National PPO Plan for Employees and their Dependents Basic Benefit Service Plan Design which is incorporated herein by reference."[2]

---

[1] I use the terms " Plan Document" and "Summary Plan" and 'Plan" interchangeably. There was confusion at hearing as to what was reviewed with the Union. The Summary Plan is a shortened version of the full "Plan" which SISCO uses for administration. When "Benefits" is used here, it refers to the negotiated labor agreement addendum document. The "Summary Plan"exclusion lists are identical in each document so the confusion is not significant.

[2] The only Plan Document submitted as the Freeport Plant Plan is entitled 'Plan Document, Titan International Inc, Plan 503" and at the bottom "Freeport PPO." This has never been distributed to employees; a final draft had been given to the Union.. The employee booklet "Freeport Bargaining Unit PPO Health Care Plan" was distributed three months after Mr Kuhlemeier's accident.

4

Benefits Agreement  Exhibit B-1 contains  only a few  references to Workers
Compensation. There is the  introduction quoted above. Then, under "prescription
drugs"  is the label "Exclusions"

> ...no benefits shall be payable to an Employee or his Dependent if he is
> **entitled to receive** reimbursement under any Workers' Compensation Laws
> or is entitled to benefits from any....governmental program of any sort. (all
> emphasis\bolding is by this writer.)

Later within B-1 is found

12.  Subrogation

(a) In the event an Employee or a dependent of an Employee is **legally
entitled to or does recover** all or a portion of the cost of a service or
prescription drug covered by this Program from any third party, the
Employer will, upon making payment under such Program succeed to any
rights of and claims to recovery the Employee or dependent may have or
acquire (with respect to such service or prescription drug) against such third
party except insurers of individual hospital, surgical, or medical policies
issued to the Employee or Dependent , and except as described under
Paragraph 11 (g) of this exhibit.[3]

If an Employee or dependent recovers any money, directly or indirectly, the
Employer has first priority for repayment of the full amount of the service or
prescription drug it provided under this Program and the Employer will pay
a portion of the reasonable legal fees and expenses incurred by the
Employee or dependent in obtaining such recovery......

Finally, still within B-1 is stated

15. Insurance Contracts

The employer  may, alone or in conjunction with other corporations

---

[3]Paragraph 11 g refers to coordination of benefits with other group programs.

subsidary to or affiliated with the Company, enter into a contract or contracts with an insurance company or insurance companies to provide the benefits described in this exhibit B-1. **No insurance company contract which may be entered into by the Employer for the purpose of providing any benefits described in this Part V shall alter, amend or detract from provisions of this Agreement.**

The Benefits Agreement is poorly organized. The first part consists of "Sections" and the second part of listed "exhibits." Exhibit B\B-1 is the "Titan Tire Corporation of Freeport Medical Benefits Program for Employees and their Dependents....." Exhibit D\D-1 is a" Titan Tire Corporation of Freeport Cafeteria Benefits Plan....for the purpose of furnishing employees who are covered by the Plan with the choice of receiving certain tax-free benefits..in lieu of taxable compensation." Titan relies greatly on the language underlined below, which is found only within Exhibit D (joint ex 2). Exhibit D-1,Article IV Elective Benefits Under the Plan states

1. In General. Subject to the requirements of Article V of the Plan regarding elections, each covered employee may elect to purchase any of the Benefits set forth in this Article IV.....consistent with the terms of the Benefits agreement covering the Employee. The provisions of this Article IV regarding Benefit Plans covered by a separate document are intended only as a descriptive summary, **and in the case of any conflict between the Plan and a separately documented Benefit Plan, the latter shall control.**[4]

---

[4] "Benefit Plan" may refer to "Benefit Agreement" a term used earlier in the same paragraph. Also, the "article V" does not exist (printed) but the parties inform me that it refers to sections A- F of their negotiated Benefits Agreement.(joint ex 2). The "Section" titles of that negotiated agreement are A Insurance, Section B Medical Benefits Program an Employee Savings Plan, Section C Accident and Sickness Benefits, Section D Supplemental Workers Compensation Benefits, Section E Dental Benefits, Section F "Section 125 Plan Cafeteria Benefits Plan," and Section G "general Provisions for Part V Section A, C, D AND E." Under The exhibits are " Exhibit B\B-1 "Titan Tire Corporation of Freeport Medical Benefits program for employees and their dependents;" Exhibit B-2 "Employee Savings Plan; Exhibit C a Vision Care Plan; Exhibit D\D-1 the "Titan Tire Corporation of Freeport Cafeteria Benefits Plan for Titan Bargaining Unit Employees and..... Dependent day Care Assistance Plan."

2. Medical Benefit Plan. Each Covered Employee may elect coverage under the Medical Benefit Plan......by choosing between the options communicated by the Company during the Enrollment Period and outlined in the respective Benefits agreement and/or Summary Plan Description. **Specific coverage and exclusions can be found in the most current benefits agreement and/or Summary Plan Description for the option elected and are incorporated herein by reference....**(P. 59-60 joint ex 2, reference Article IV of Exhibit D).[56]

_____

[5] Exhibit D of the Medical Benefits Agreement between the parties, the "cafeteria benefits plan" lists those plans that an employee may enroll in, including "Medical Benefits Plan." The language in paragraph 2 of Article IV ("Elective Benefits") of Section D is greatly relied upon by the Company, while the Union argues that the Medical Benefits referenced under Article IV of D are not the same benefits as are provided by B-1. My full reading of paragraph 2 leads me to conclude that the reference is to all offered plans (n.b. it is page 60 of Joint 2, not p. 62 of joint 1, as the company asserts in its brief.)

[6]Article VI  Administration (of Exhibit D only)

The Company shall be the "administrator" of this Plan for purposes of the Employee Retirement Income Security Act of 10074 as amended, and shall be the "Plan Administrator" for purposes of the Code

The Plan Administrator shall have the sole and absolute discretionary authority and power to interpret plan provisions and make factual determinations in administering and carrying out the provisions of the Plan, including, but not limited to, the authority and power (a) to determine all questions relating to eligibility for the amount of any benefit to be paid under the Plan, (b) to determine all questions pertaining to claims for benefits and procedures for claim reviews, (c) to resolve all other questions arising under the Plan, including any questions of construction, and (d) to take such further action as the Plan Administrator shall deem advisable in the administration of the Plan. The actions taken and the decisions made by the Plan Administrator hereunder shall be final and binding on all interested parties. The Company may delegate to a third party administrator in whole or in any part any of this authority.

If any difference shall arise between the Company and any Employee with respect to whether or not the Company has provided the benefits under this Exhibit D-1, and if agreement cannot be reached between the Company and such Employee, such difference may be taken up as a grievance under the grievance procedure provided for under the Benefits Agreement.....the impartial umpire shall have the authority only to decide the question pursuant to the provisions of this Exhibit D-1 applicable to the question, but he shall have no authority in any way to alter, add to, or subtract from any such provisions.

It is the Company position that this Exhibit D (Article IV ) language within the Benefits Agreement incorporates the limitations stated only in its "Plan Document," which is utilized by its third party administrator. That Plan document is the foundation for the booklet ultimately given to employees so they may understand their coverage.

The Titan Freeport Plan document was created largely by staff of SISCO in consultation with Titan risk management personnel.[7] The Plan Document (not the Benefits Agreement) contains 56 exclusions from coverage in its four page "General Limitations." The Company denial of coverage to Mr. Kuhlemeier was reached because he **could have**, but voluntarily chose not to obtain workers' compensation insurance for his side business, which brings him under General Limitations "Exclusion #3" ( See pp 18-22, co ex 1, and 20-24, co ex 4)

3.  No benefits or expenses will be paid or reimbursed to or for any Covered individual for any injury,, illness, occupational disease, or other loss which arises out of and in the course of employment, or for which the Covered Individual is reimbursed or *entitled to reimbursement* under any federal or state law, including a workers' compensation law or similar law.

    This exclusion applies to each Covered Individual: 1) who is actively engaged in a business, occupation, or profession and **who may elect coverage under a workers' compensation law or similar law, but either fails to secure such coverage or voluntarily elects not to *secure such***

---

The decision of the impartial umpire shall be binding....

[7]"Titan International" ("Employer") and "Self Insured Services Company ("SISCO") on August 1, 2002 were already parties to a service agreement by which SISCO would provide claims administration for set fees; enumerated SISCO services would include among others not cited here "payment of claims in accordance with the plan document, ...make claim payment decisions, except when specifically directed by the Employer... maintain employee benefit records for determination of plan benefits and satisfaction of deductibles......instigate the filing of Subrogation claims... On January 1, 2006 (the date Titan acquired the Freeport plant), SISCO and Titan signed an addendum to their existing agreement, essentially a new fee schedule. (Union ex 11). Only 22 plus months later was a Summary Plan Booklet distributed to individual employees. See Holley testimony.

8

*coverage;* or 2) whose employer may elect coverage under workers' compensation law or similar law, but either fails to secure such coverage or voluntarily elects not to secure workers' compensation coverage.[8]


<u>Background and Findings</u>

   Grievant Kuhlemeier and his business partner had conducted their (city-) licensed electrical contractor business for about six years. On August 28 2007 he was duly enrolled and paid up in his Titan medical benefits plan when---while at his outside work--- he suffered the serious injury which ultimately caused the loss of his leg He has not been able to work since. He does receive Titan Accident and Sickness benefits, and has an application pending for company plan dismemberment benefits.

   The grievant and his partner knew that they could purchase state of Illinois workers' compensation insurance to cover themselves during their side business, but they had decided to not do so.   Nor did Mr Kuhlemeier have any other medical benefits coverage than that with Titan. He was not an employee of the customer where he was injured  trouble shooting a piece of equipment. There is no indication that the grievant knew or should have known of the new language of the exclusion upon which the company relies. The Union argues that it had an entirely different understanding of what that language meant.

   Union officer Daniel Kreeger has been on the Grievance Negotiating Committee (GNC) since 1984. Per his  hearing testimony,  when the Union local's long time benefits representative (Reddington.) retired, one Tony Balsamo took over, and Mr. Kreeger became "benefits back up representative" to Mr. Balsamo--who did not attend this arbitration hearing. Mr. Kreeger recalled three instances during Goodyear ownership when employees at the Freeport plant injured themselves while doing outside  work and were paid their Goodyear Plan medical benefits. One such Goodyear  employee hurt his back at a side job in construction, a second employee  was working (for a third party) as a race car driver and was in a wreck, and a third employee working as a tree trimmer  hurt his back. No further details were provided about those cases, which were, of course, under a prior

---

[8] Hereafter referred to as "limitation" or "exclusion" item #3"

owner.

After take over by the new owners of the Freeport facility, Mr. Kreeger, Tony Balsamo and Local Union president Steve Vanderheyden requested to see the Titan Plan Description from Renee Holley, Titan's Corporate Risk Manager. Ms Holley herself had obtained the former owner Goodyear Plan. The Plans were quite different. The Titan plan language was primarily based on its other Plans, and had been authored by Self Insured Service Company (SISCO), Titan's existing TPA, for use in Titan facilities. According to Mr. Kreeger, Ms Holley "merged their plan with Goodyear's." Ms Holley would e-mail clean copy to the Union team which would review and compare what Ms Holley had sent them with the Goodyear plan. He and Tony "highlighted the areas that were different from the Goodyear version and took it back to Renee," who--- according to Mr. Kreeger—" said that SISCO wanted to use standard language."

The Union team was involved in perhaps three discussions with Ms. Holley. The Union was able to obtain some changes in the Titan Plan Document and not others. This was not a formal "negotiation" and the parties did not have to reach agreement on the Plan contents. To protect itself, the Union made sure to obtain a statement in the document. As witness Kreeger explained, while Risk Manager Holley and the Union team "reached compromises on most points, in areas where we did not reach consensus (we) got past those differences" by getting agreement from management to insert in the Plan Document the statement that "Language in the Collective Bargaining Agreement supersedes the Provisions of this Plan" (the Collective Bargaining Agreement including the Benefits Agreement.)

Mr. Kreeger acknowledged that there had been some discussion of the two paragraph General Limitations Item #3. Both the union officers and Company risk Manager Holley recognized that the Titan wording was very different from Goodyear on the subject of the effect of workers' compensation coverage on receipt of Titan medical care benefits. Exclusion item #3 had been given to the Union team and per Union officer Kreeger, had been discussed with Renee Holley " a couple of different times.... we pointed out that it was a change in words." In response Ms Holley had reiterated that "`it was a standard exception" to exclude workers' compensation coverage. "Renee spent a lot of time explaining that it was a standard exception. " As for the key second paragraphs of Plan General Limitation #3:

...I recall she said over and over that (Titan) was not intending a change from Goodyear and that it was stated more clearly.....she explained as to paragraph 2 that it applied to the other covered employee (spouse or dependent). Me and Tony accepted that as an explanation and that it was consistent with Goodyear.

It "never occurred" to these Union officers that the second paragraph of that section applied to Titan employees. The team did not request Ms Holley to take out or revise exclusion #3 "because she explained that it was no change" from Goodyear. And the team knew that Goodyear had paid out in such situations. Mr. Kreeger asserts that it was a "complete shock" to him when Titan later declined benefits payment to the seriously injured Kip Kuhlemeier.

Ron Hoover was a hearing witness via speaker phone from the Union's national office where he is a Vice President of the Rubber and Plastic Worker's conference within the Steelworkers. Mr Hoover has not worked at the Freeport Plant but he participated in pre-sale negotiations over the Titan purchase of Goodyear's Freeport plant. Mr. Hoover cavalierly stated that as for Plan documents, "frankly I don't pay attention to those because I know what we negotiated" referring to the (formerly entitled) "Pension and Insurance Service Agreement" between Goodyear and the Union.

Mr Hoover recalled that Goodyear, after "questioning the matter," had decided to pay benefits to the employee injured while acting as a race car driver "when it turned out that that driver had no other insurance." He knew of no refusals to pay for outside injuries by Goodyear. He asserted that the subrogation language had been placed in the Goodyear contract so that Goodyear would pay medical costs up front, and "then had the right to recover." He acknowledged that such right only has value if there is a third party to pursue. Mr. Hoover was not involved in the local team discussions with Renee Holley concerning the (eventually) forthcoming Titan Plan Document for Freeport.

Company witness and Corporate Risk Manager Holley is not based in Freeport. She testified that when Titan was preparing to acquire the Freeport plant she became involved with the Freeport facility "at the tail end of negotiations" and she communicated directly with Goodyear to obtain their Plan document. The Goodyear Plan document (82 pages, CO ex 5) is "more expansive." In September

11

2006 Ms Holley met with Steve Vanderheyden, Dan Kreeger and Tony Balsamo, as the part of the local executive committee dealing with benefits language. She had provided to them in advance of this meeting three SISCO documents. The Union informed her that with "so many changes" (from the Goodyear plan), it wanted to meet with her. They did so.

Ms Holley took the Union proposed changes back to SISCO, which "updated them" and she sent the revisions back to the Union. First she testified that she gave the Union the general limitations language (the two paragraph exclusion item #3) and that she recalled no discussion about it. The Company showed that there had been discussion with the Union at least as to a wording change for an item #6 found on the page in question.

Company official Holley explained that limitation item #3 was written by "some one at SISCO" but she did not know if it is found in other Titan plan documents. Ms. Holley further explained that she believed this language acted to "clarify what we believed Goodyear had. We highlighted (the proposed Titan SISCO language) to show how it was (now to be) stated." She later testified that "the sole purpose was to get the plan documents and Summary Plan Document correct the first time. We did take the Goodyear document and use it as a place to start but we put it in Titan format...." Per Ms Holley, Titan's third party administrator, SISCO, would not dictate to Titan what should go into the document "SISCO advised us, but did not tell us."

It was, per Ms Holley, during the last meeting (November? December?) over the Plan with the Union when the page of general limitations containing Exclusion #3 was discussed. She did not recall any January 2007 meeting where the Union team purportedly requested to continue the process of making corrections. In December 2006 the Proposed Plan Document final version was sent to the Union electronically. The Union did not respond, yet months passed before Ms Holley sent the document to print in August of 2007 (the same month as Kip Kuhlemeier's injury) Ms Holley confirmed that she participated in the decision to deny benefits, which she based on limitation item 3

I take into account that Union officers were on notice that the Plan document was more or less completed by December 2006 and that after the final discussion, the Union went silent. It did not warn its employees about any new risk

they faced of lost medical benefits if injured during self employment (or side employment) where the member (or their secondary  employer) "could have" applied for workers' compensation. The Union has made a case for not grasping what the change meant although–as the employer points out-- the second paragraph is quite clear. Ms Holley confirms that she did not view the Titan language as changing the Goodyear Plan terms; therefore it is indeed possible that the Union did not understand that paragraph 2 of exclusion 3 did apply to its members. Notably, management also went silent for ten more months; it neither sent out a notice to employees or to the Union, or published the "PPO Health Care Plan "booklet. No claim is made of any  cover letter when the "final version" was sent to the Union (electronically? As paper?)

Discussion and Analysis:


    When Mr Kuhlemeier was injured, the Plan Document had not been distributed. Its exclusion #3 language contradicts and narrows the coverage as stated  in the negotiated (and controlling) Benefits Agreement.  The Union had accepted a management claim that nothing was changed by the new language. I find it hard to credit that the Union would let its members take outside jobs unaware of a new and broader risk of having no injury medical coverage. The Union failed to convey this. Yet the new risk requires that employees seeking second jobs examine the (legal) right of their part time employer to obtain workers compensation, as well as the decision of that employer to have it or not have it. Essentially, they must knowingly decide whether to take the second job "bare."

    The Benefits Agreement is a collectively bargained document.   The Summary Plan\ Plan is not bargained, and has no Collectively Bargained impact unless it is found to be incorporated into the Benefits Agreement.What is clear is that  at no time **before** this accident had the  grievant or any other Freeport plant bargaining unit member (other than the union benefits team)  been provided **any** version of the "Plan Document."  I find no record evidence in support of the (post-hearing brief) assertion by management that the Master Plan document between SISCO and Titan was " available in human resources for anyone who wanted to know what it included."  This is simply unproven; it was  not addressed. No notice had  been  sent to employees or the Union that the "final draft" or any Plan  was

available for viewing.[9] If such notice had been sent, it would surely have been an exhibit.

The Company contends that the fact that the Plan description "was not available to the total membership until after the date the grievant was injured..should not be a factor in the arbitrator's decision" because in December 2006 the Union had "been presented a copy of the Summary Plan." I cannot agree. The summary Plans were Company controlled documents. They defined the scope of medical expense coverage. Employees were giving automatic payroll deduction of their contribution. The Union may indeed have been sitting on a final draft, but it was not the responsible party for promulgating the 60 page company- created document to its members[10]. If the Union understood the new risk now taken by its members when working second jobs, its conduct gives no hint of this. But the Union had been told there was "no change from Goodyear" and Goodyear had paid medical costs on outside employment injuries not otherwise covered. While the failure on the part of both parties to promulgate the vast details of this vital benefit is regrettable, it is only the employer who had the obligation and means to finalize and distribute the summary document informing employees of limits of their health coverage. It was nearly two years after the plant had been acquired by Titan before the booklet was provided.[11]

---

[9] The Company offers in its brief the information that the grievant's wife worked in Human Resources and "would have had access to the document." But the document is a contract between the Company and Sisco, and there had been no response from the Union, and no dissemination of it to the Union as "in force."

[10] The Union in its brief asserts that "between January and October 2007 there were several attempts to reconcile the differences in documents but when it never occurred the Union relied on the parties agreement to include the earlier mentioned term in the Plan Documents, the SPD booklet and the pre-existing provision in Section G." I find nothing in my notes of testimony to support this assertion.

[11] As of August 28. 2007 (accident date) no Freeport bargaining unit employee had received any document setting out their elected Plan coverage.. On October 12, 2007 the Company issued a "notice to Freeport Bargaining Employees, subject Health Care Plan Description Booklets," informing them that company HR had "received the health care plan booklets from Sisco" and that "the booklets will be available to employees over the next couple weeks" in the HR department.( Union ex 2) Thus, the employee booklet was ultimately distributed about 22 months after ownership change.

This decision is only in part based upon the failure of notice to employees of the new severe limits to their health coverage when injured at other jobs, although that is a serious omission. This decision comes from resolution of the question of whether the full Plan document is part of the Benefits Agreement by virtue of the language of Exhibit D-1 of the Benefits Agreement. The next question to resolve is whether General Limitation item #3 conflicts with what is promised by the Benefits Agreement, or is merely a clarification of an existing limit. It conflicts.

Titan contends that

The benefits agreement clearly and unequivocally provides that the exclusions from the medical coverage can be found in either the Benefit Agreement or the Summary Plan Description. The language describing the medical benefits available to employees must not be ignored, that language that provides "Specific coverage and exclusions can be found in the most current Benefits Agreement and/or Summary Plan Description for the option elected, and are incorporated herein by reference...(brief p 11)

and that

.....the Company did not attempt to alter the benefit to be provided through any insurance contract... the Company simply used the Summary Plan Description to clarify the exclusions from the medical coverage. The Company was given that right in the negotiated Benefits Agreement. "Specific coverage and exclusions can be found in the most current Benefits agreement and/or Summary Plan Description for the option elected and are incorporated herein by reference..."

....Titan is not attempting to alter the Benefits Agreement with the Summary Plan Description; rather it is simply asking that the arbitrator enforce the plain language of the Benefits Agreement that denies coverage in this case (brief p. 16).

The Company position is grounded in Article IV of Exhibit D ("Cafeteria Plan") of the negotiated Benefits Plan:

1. Subject to the requirements of Article V of the Plan regarding elections, each covered employee may elect to purchase any of the Benefits set forth in this Article IV.....consistent with the terms of the Benefits agreement covering the Employee. **The provisions of this Article IV regarding Benefit Plans covered by a separate document are intended only as a descriptive summary, and in the case of any conflict between the Plan and a separately documented Benefit Plan, the latter shall control.**

2. Medical Benefit Plan. Each Covered Employee may elect coverage under the Medical Benefit Plan......by choosing between the options communicated by the Company during the Enrollment Period and outlined in the respective Benefits agreement and/or Summary Plan Description. **Specific coverage and exclusions can be found in the most current benefits agreement and/or Summary Plan Description for the option elected and are incorporated herein by reference.....**(P. 59-60 joint ex 2, reference Article IV of Exhibit D

This language does not provide authority for management to decrease or eliminate negotiated benefits by "incorporating by reference" a Plan-stated exclusion that contradicts what is promised in the negotiated Benefits Agreement where they are not consistent. As noted, there was not, as of the date of this injury any "current" Benefits Agreement other than the one containing the statement. No Summary Plan description had been given to employees.. A Plan cannot negate negotiated language. Thus as to Titan's argument that its language does not change the exclusion already existing under Goodyear. I cannot agree. As to its argument that the Plan is incorporated in the Benefits agreement, I also cannot agree. Where there is conflict, as here, the Plan cannot expand an exclusion.

There is scant evidence to resolve Titan's view that Article IV of Exhibit D-1 of the Benefits Agreement, while pertaining to a " Cafeteria Plan," was negotiated with an understanding that all Benefits created throughout the document would be as limited by Plans. This is a big leap to take from "alternative choice" language. The wording "and\or" and the lack of any yet promulgated Summary Plan Document means that employees could not know of the new and broader loss of benefits if injured at outside work at the time of this event.

However, I take as established, for analysis\ argument purposes, that the D-1 language serves to incorporate Plan documents terms and conditions applying to the rest of the Agreement. (The cafeteria plan choices appear to include the Freeport PPO as an option). I leave unresolved the problem wording.[12] I return to the central question. The parties concur that the Benefits Agreement does prevail over the Summary Plan description were they to conflict. The employer position is that they do not conflict. I cannot agree. The differences between negotiated Benefits Agreement and Summary Plan Description cannot be reconciled.

The Benefits Agreement B-1 Introduction states

Effective January 1, 2006 and for the duration of this Agreement thereafter, the Employer will provide the following program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits for eligible employees and their dependents, **with the exception that none of the aforesaid benefits shall be applicable in the event of accident or sickness <u>covered by a Workers' Compensation Act</u>** or similar legislation nor shall there be any duplication of benefits under any Employer-sponsored Program

Exhibit B-1 states in item 12, Subrogation:

a) In the event an Employee or a dependent of an Employee is *legally entitled to* or does recover all or a portion of the cost of a service or prescription drug covered by this Program from any third party, the Employer will, upon making payment under such Program succeed to any rights of and claims to recovery the Employee or dependent may have or acquire (with respect to such service or prescription drug) against such third party except insurers of individual hospital, surgical, or medical policies issued to the Employee or Dependent [13]

---

[12]Exhibit D-1, in Article V "Election Procedures" states that where an employee has failed to make proper election of benefits, "Default Benefits will be set out in Paragraph 6 of Article V " Article V has no paragraph 6.  However, paragraph (f) of Article V explains default benefits.

[13]A right of subrogation is not of great help to an employer in the absence of a third party payer against which to seek recourse.  The employer notes that if its employees "make the

This grievant was not "covered" by workers compensation when injured.  He also was not "legally entitled" to coverage, because his own business did not have to purchase it, and did not have to supply it to him. Being (discretionarily) entitled to purchase it under State law does not equate to "entitlement" where the discretionary option is not taken up. Where the law requires that such insurance exists, there is a "legal entitlement." That is not the case here. Mr Kuhlemeier's situation is governed by the Benefits Agreement and he was not "covered" by or "legally entitled to" workers' compensation.

The applicable new language in the  SISCO\Titan  Plan Document and Summary Plan document (identical) states

This exclusion applies to each Covered Individual: 1) who is actively engaged in a business, occupation, or profession and who **may elect** coverage under a workers' compensation law or similar law, but either **fails** to secure such coverage *or voluntarily elects not to secure such coverage;* or 2) whose employer may elect coverage under workers' compensation law or similar law, but either fails to secure such coverage or voluntarily elects not to secure workers' compensation coverage.

This definition is not compatible with the Benefit Agreement. It creates a great expansion of loss of coverage.  Here, it is no longer a question of whether workers compensation "covered" the accident. This Titan Plan language  removes benefits from  an employee working for himself  who "may elect" and did not, and from employee working for a  third party employer who in turn "may elect" but had failed or chosen  not to obtain workers' compensation insurance. This is not merely a "clearer" definition of what Goodyear language stated. It is not compatible with the Benefits Agreement; it reduces the benefit. The significance of this change  is huge  for all Titan employees who operate their own business on the side, **or** who take  an outside part time job with an "employer" who "may elect" but "fails to secure " or "voluntarily elects" not to secure workers compensation coverage.

---

decision to work without insurance or work for a company that has no insurance Titan would be left with the medical expenses and no ability to recover....."  That is indeed the case and seeking to limit such use of  its self insured funds is a fully appropriate management goal. But such goal must be consistent with the labor contract.

The Union stresses the testimony of Ms Holley that the SISCO plan document was not intended to be a change from the Goodyear version. The employer also argues that there is no change from what Goodyear documents stated. The Goodyear ownership Plan reads that the company "...does not provide benefits for services or supplies....

> ....
> For any condition, disease, defect, ailment, or injury arising out of and in the course of employment if benefits are **available** under a Worker's Compensation Act or other similar law. **This exclusion applies if you receive the benefits in whole or in part.** This exclusion **also applies whether or not you claim the benefits or compensation.** It also applies whether or not you recover from any third party (emphasis added.)

The concept of "available" means "in place,"accessible at the time of the accident. It is different than "could have been available" if applied for (the Titan concept). The Titan Plan language is clear, but it does not have the same meaning as Goodyear's language. Under Titan's plan, the injured employee (or his outside employer) need only have been legally qualified to purchase such insurance to be excluded from his medical benefits with Titan. The Goodyear plan language as interpreted in at least three cases did **not** set that test. If there was no insurance, Goodyear paid its benefits.

To be stressed is that I am not restoring a "past practice" in contravention of the parties current criteria for such item. The relevance of how Goodyear interpreted its own workers compensation exclusion is that Titan's risk manager assured the Union team (and may have herself perceived) that this was no change from what it had under Goodyear, only a "clarification." This is not the case, not an accurate representation, even if made in good faith. And if the Union relied on these assurances to its members' detriment, the members nonetheless had nothing to examine or review by themselves.

Titan's position is that the Goodyear language is irrelevant, but that in any respect it is "substantially similar" although the "Titan language is much clearer and more precise than the vague language included in the Goodyear Plan Document." (brief p. 14) Ms Holley made such assertion to the Union team as per all testimony. But the Goodyear language does not exclude coverage unless an employee "receives" compensation benefits elsewhere. The Titan language

excludes coverage if the employee or his other employer "could have applied" to receive such benefits. This is not "substantially similar" language.

The Union has stressed that the law did not require the grievant to buy his own workers' compensation insurance, and that the fact of a subrogation right in the Company should there be such insurance does not mandate having the insurance. In opening remarks it pointed out that there

> ...has been no notice to employees of this type of contract interpretation. Nothing has changed to interrupt the expectation of employees that the negotiated group medical benefits will continue to apply to them unless other coverage is applicable. It appears to the Union that Titan management would prefer to use this case as the notice to all employees of a change in policy."

The Union seeks as relief that the Grievant receive all benefits that would have been due him since his injury had his eligibility not been challenged. It seeks reimbursement to him for qualifying expenses that he has paid, and for fees or penalties due and it asks that I retain jurisdiction for 12 months

Summary

My response to the issues is that

1. The Benefits Agreement does not incorporate language from the Plan document because that document (limitation item #3) narrows or reduces ("alters or detracts from") what is provided for in the Benefits Agreement.

2. The language of the Summary Plan changes the meaning of the Benefits Agreement, violates it, and is not applicable to the grievant.

3. The clear right of the Company to subrogation where there are funds due to an employee from third parties is not the basis to deny benefits which could have been covered by discretionary workers' compensation, particularly in the absence of any warning and notice..

4. No past practice has been applied.

<u>Award</u>

The Union has established that the denial of medical benefits to Grievant Kuhlemeier violated his rights under the Collective Bargaining Agreement\Benefits Agreement. He is to be reimbursed or his qualified medical expenses paid and calculated by SISCO under its usual claims processing and applicable Plan conditions. The Company has full right of subrogation from any proceeds obtained by the grievant from any source, including litigation against any party resulting from his accident.

The parties are free to negotiate the company desired interpretation of workers compensation "coverage" but it is beyond my authority to impose it. I retain jurisdiction through June 30 2008 to resolve any questions as to the intent and scope of this decision, and for no other purpose.

Ellen J. Alexander

January 24 2008

21

**08 C 50072**

PLAN DOCUMENT

TITAN INTERNATIONAL, INC.

HEALTH CARE PLAN

Plan:  503



Titan International, Inc. hereby establishes a program of benefits constituting an "Employee Welfare Benefit Plan" under the Employee Retirement Income Security Act of 1974 (ERISA), as amended.  By signing below, Titan International, Inc. agrees to be bound by the terms of the plan.

TITAN INTERNATIONAL, INC.

By: _____
            Authorized Representative

Witnessed:

Date: _____/_____/_____            By: _____

## DISCLAIMER OF CLAIMS PROCESSOR

We have prepared these documents for your review and consideration, but we are not legal counsel, nor are we in the business of practicing law.  As your plan's fiduciaries and/or trustees, you are fully responsible for all legal issues which concern the plan.  If you are not an expert in this area, you may wish to consult an attorney to assist you in reviewing this plan.

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| PLAN DESCRIPTION | 1 |
| PLAN SUMMARY | 4 |
| MANAGED CARE | 10 |
| Review Organization | 10 |
| Utilization Review | 10 |
| Penalty for Non-Certification | 10 |
| COMPREHENSIVE MEDICAL EXPENSE BENEFITS | 11 |
| The Deductible | 11 |
| Family Deductible Feature | 11 |
| Medical Eligible Expenses | 11 |
| GENERAL LIMITATIONS | 20 |
| CREDITABLE COVERAGE | 25 |
| ELIGIBILITY FOR COVERAGE | 27 |
| Employee Eligibility and Effective Date | 27 |
| Dependent Eligibility and Effective Date | 28 |
| LATE ENROLLMENT | 29 |
| Special Enrollment | 29 |
| TERMINATION OF COVERAGE | 31 |
| Employee Termination | 31 |
| Dependent Termination | 31 |
| EXTENSION OF BENEFITS | 32 |
| Family and Medical Leave Act Provision | 32 |
| Uniformed Services Employment And Reemployment Rights Act (USERRA) | 32 |
| COBRA Extension of Benefits | 32 |
| COORDINATION OF BENEFITS | 33 |
| SUBROGATION | 36 |
| RIGHTS UNDER ERISA | 38 |
| GENERAL PROVISIONS | 40 |
| DEFINITIONS | 45 |

# PLAN DESCRIPTION

**Purpose**

The Plan Document details the benefits, rights, and privileges of Covered Individuals (as later defined), in a fund established by Titan International, Inc. (the "Company") and referred to as the "Plan." The Plan Document explains the times when the Plan will pay or reimburse all or a portion of Eligible Expenses.

| | |
|---|---|
| **Effective Date** | January 1, 2006 |
| **Name Of Plan** | Titan International, Inc. Health Care Plan |
| **Name And Address Of Plan Sponsor** | Titan International, Inc.<br>2701 Spruce Street<br>Quincy, IL  62301 |
| **Name And Address Of Claims Processor** | Self Insured Services Company (SISCO)<br>P.O. Box 389<br>Dubuque, Iowa  52004-0389<br>(800) 457-4726 |
| **Name And Address Of Review Organization** | HealthCorp<br>P.O. Box 1475<br>Dubuque, Iowa  52004-1475<br>(800) 457.4726 |
| **Employer I.D. Number** | 36-3228472 |
| **Plan Number** | 503 |
| **Type Of Plan** | A self-funded group health plan providing medical expense coverage |
| **Agent For Legal Service** | Titan International, Inc. |
| **Funding Of The Plan** | Titan International, Inc. and Employee Contributions |
| **Medium For Providing Benefits** | The benefits are administered in accordance with the Plan Document by the Claims Processor. |
| **Fiscal Year Of The Plan** | Beginning January 1st and ends December 31st |

1

### Named Fiduciary And Plan Administrator

The Named Fiduciary and Plan Administrator is Titan International, Inc., who has the authority to control and manage the operation and administration of the Plan. The Plan Administrator or its delegate has the sole authority and discretion to interpret and construe the terms of the Plan and to determine any and all questions in relation to the administration, interpretation or operation of the Plan, including, but not limited to, eligibility under the Plan, payment of benefits or claims under the Plan and any and all other matters arising under the Plan.

### Contributions To The Plan

The amount of contributions to the Plan are to be made on the following basis:

The Company will from time to time evaluate the costs of the Plan and determine the amount to be contributed by the Company and the amount to be contributed (if any) by each covered Employee. Notwithstanding any other provision of the Plan, the Company's obligation to pay claims otherwise allowable under the terms of the Plan will be limited to its obligation to make contributions to the Plan as set forth in the preceding sentence. Payment of said claims in accordance with these procedures will discharge completely the Company's obligation with respect to such payments. In the event that the Company terminates the Plan, then as of the effective date of termination, the Company and Covered Individuals will have no further obligation to make additional contributions to the Plan.

### Plan Modification And Amendments

Subject to any negotiated agreements, the Company may modify, amend, or discontinue the Plan without the consent of or notice to Covered Individuals. Any changes made shall be binding on each Employee and on any other Covered Individuals. This right to make amendments shall extend to amending the coverage (if any) granted to retirees covered under the Plan, including the right to terminate such coverage (if any) entirely.

### Termination Of Plan

The Company reserves the right at any time to terminate the Plan by a written instrument to that effect. All previous contributions by the Company will continue to be issued for the purpose of paying benefits under the provisions of this Plan with respect to claims arising before such termination, or will be used for the purpose of providing similar health benefits to Covered Individuals, until all contributions are exhausted.

### Plan Is Not A Contract

The Plan Document constitutes the entire Plan. The Plan will not be deemed to constitute a contract of employment or give any Employee of the Company the right to be retained in the service of the Company or to interfere with the right of the Company to discharge or otherwise terminate the employment of any Employee.

## Claim Procedure

In accordance with Section 503 of ERISA, the Company will provide adequate notice in writing to any Covered Individuals whose claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial and written in a manner calculated to be understood by the Covered Individuals. Further, the Company will afford a reasonable opportunity to any Covered Individuals, whose claim for benefits has been denied, for a full and fair review of the decision denying the claim by the person designated by the Company for that purpose.

## Protection Against Creditors

No benefit payment under this Plan will be subject in any way to alienation, sale, transfer, pledge, attachment, garnishment, execution, or encumbrance of any kind, and any attempt to accomplish the same will be void. If the Company finds that such an attempt has been made with respect to any payment due or to become due to any Covered Individual, the Company in its sole discretion may terminate the interest of such Covered Individual or former Covered Individual in such payment, and in such case will apply the amount of such payment to or for the benefit of such Covered Individual or former Covered Individual, his spouse, parent, adult child, guardian of a minor child, brother or sister, or other relative of a Dependent of such Covered Individual or former Covered Individual, as the Company may determine, and any such application will be a complete discharge of all liability with respect to such benefit payment. This Provision does not prohibit a Covered Individual from assigning his benefits to an Eligible Provider.

## Indemnification Of Employees

Except as otherwise provided in ERISA, no director, officer, or Employee of the Company or of the Claims Processor will incur any personal liability for the breach of any responsibility, obligation, or duty in connection with any act done or omitted to be done in good faith in the administration or management of the Plan and will be indemnified and held harmless by the Company from and against any such personal liability, including all expenses reasonably incurred in his defense if the Company fails to provide such defense. The Company and the Plan may each purchase fiduciary liability insurance consistent with applicable law.

3

PLAN SUMMARY

FOR

TITAN INTERNATIONAL, INC.

**Language in the Collective Bargaining Agreement supersedes the Provisions of this Plan.**

Eligibility Provisions

| | |
|---|---|
| **EFFECTIVE DATE OF PLAN** | January 1, 2006 |
| **ELIGIBLE CLASS** | All individuals who meet the eligibility requirements established in the current bargaining agreement of the Company. |
| **REQUIRED PERIOD OF SERVICE** | An individual will be eligible following thirty (30) days of continuous Active Work. |
| **CONTRIBUTION** | The Plan may be evaluated from time to time to determine the amount of Employee contribution (if any) required. |

**Managed Care**

**Hospital Pre-Admission Certification**

The Plan requires that all non-emergency inpatient hospitalizations be pre-certified by the Review Organization prior to the hospitalization; all emergency inpatient hospitalizations must be reported within two (2) business days of admission. If the patient is unconscious or unable to provide information, the call should be made as soon as possible. If an individual fails to pre-certify an in-Hospital stay with the Review Organization, Eligible Expenses related to the hospitalization will be subject to a penalty of $300. (The penalty does not apply to the Annual Deductible or Out-of-Pocket Maximum.)

In regard to maternity or Newborn infant admissions, the health Plan may not restrict benefits for any Hospital length of stay in connection with childbirth for the mother or Newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section, or require that a provider obtain authorization from the Plan for prescribing a length of stay not in excess of the above periods. However, Federal law generally does not prohibit the mother's or Newborn's attending provider, after consulting with the mother, from discharging the mother or her Newborn earlier than 48 hours (or 96 hours as applicable).

A maternity or Newborn admission in excess of the 48/96 hour time frame requires calling the Review Organization for pre-certification of the additional stay.

**Continued Stay Review**

If the Review Organization determines at any time during an inpatient hospitalization that Inpatient Care is no longer Medically Necessary, there will be no coverage for expenses incurred thereafter because the Covered Individual elects to remain hospitalized.

**Case Management**

When a catastrophic condition, such as a spinal cord Injury, cancer or a premature birth occurs, a person may require long-term, perhaps lifetime care.  After the person's condition is diagnosed, he might need extensive services or might be able to be moved into another type of care setting – even to his home.

Case management is a program whereby a case manager monitors a patient and explores, discusses and recommends coordinated and/or alternate types of appropriate Medically Necessary Care.  The case manager consults with the patient, the family and the attending Physician in order to develop a plan of care for approval by the patient's attending Physician and the patient.

## Comprehensive Medical Expense Benefits

*Your Plan utilizes a Preferred Provider Organization (PPO) which, through negotiation, offers discounts for using the preferred providers for your medical care.  If you utilize the PPO providers for eligible services, you will receive the In-Network benefit listed below.*

*\* All services under the PPO Plan must be provided by participating providers to be covered at the In-Network benefit level.  Services received elsewhere will be paid at the Out-of-Network level of benefits.  However, if any of the following circumstances apply, benefits will be payable at the In-Network level of benefits:*

- *The service is not available through the PPO.*
- *Emergency care when an In-Network provider is not available.*
- *Services for Covered Individuals traveling out of area for reason other than medical care (such as vacation).*
- *Ancillary services when the primary service is rendered by a PPO provider.*
- *Services for Dependents who, because of a divorce or separation, live Out-of-Network.*
- *Services for college students who live Out-of-Network.*

### National PPO Plan

| | |
|---|---|
| **\*Annual Individual Deductible** | In-Network:  $100<br><br>Out-of-Network:  $200 |
| **\*Annual Family Deductible (All Family members combined)** | In-Network:  $200<br><br>Out-of-Network:  $400 |
| **\*Annual Out-of-Pocket Maximum Including the Deductible and Co-pays (Does not include the benefit reduction for failure to comply with the Managed Care measures of the Plan, ineligible charges, or any amount over the Usual, Customary and Reasonable procedure rate.)** | In-Network:<br>    Individual:  $1,000<br>    Family:  $2,000 (All Family members combined)<br><br>Out-of-Network:<br>    Individual:  $2,000<br>    Family:  $4,000 (All Family members combined) |
| **Benefit Percentage for Physician's Office Services (includes all services performed in a Physician's office unless specifically listed)** | In-Network:  100% after a $15 co-pay<br><br>Out-of-Network:  70% after the Annual Deductible |
| **Benefit Percentage for Lab/x-ray billed by a Physician's Office or Independent Lab** | In-Network:  100%<br><br>Out-of-Network:  70% after the Annual Deductible |
| **Benefit Percentage for Allergy Injections Received in a Physician's Office** | In-Network:  100% no deductible required<br><br>Out-of-Network:  70% after the Annual Deductible |
| **Benefit Percentage for Chiropractic Services** | In-Network:  100% after a $15 co-pay<br><br>Out-of-Network:  70% after the Annual Deductible |

| | |
|---|---|
| **Benefit Percentage for Ambulance Services** | 100%, no deductible required |
| **Benefit Percentage for Emergency Room Services (non-emergency use of the emergency room is not covered)** | Facility:  100% after a $50 co-pay (co-pay waived if admitted)<br>Physician:  100% |
| **Benefit Percentage for Urgent Care Facility Services** | Facility:  100% after a $35 co-pay<br>Physician:  100% |
| **Benefit Percentage for Well-Child Care (Up to Age Nineteen [19])** | In-Network:  100% after a $15 co-pay<br>Out-of-Network:  Not Covered |
| **Benefit Percentage for Adult Well Care (Age Nineteen [19] and Older)** | In-Network:  100% after a $15 co-pay<br>Out-of-Network:  Not Covered |
| **Benefit Percentage for Hospice Services** | 100% no deductible required |
| **Benefit Percentage for Outpatient Physical, Occupational and Speech Therapy** | In-Network:  100% after a $15 co-pay<br>Out-of-Network:  70% after the Annual Deductible |
| **Benefit Percentage for Supplies, Durable Medical Equipment and Appliances (if obtained other than in a Physician's office)** | In-Network:  90% after the Annual Deductible<br>Out-of-Network:  90% after the Annual Deductible |
| **Benefit Percentage for Inpatient Mental Health Expenses** | In-Network:  90% after the Annual Deductible<br>Out-of-Network:  Not Covered |
| **Benefit Percentage for Transplants** | In-Network:  Pays as any In-Network service depending on where service is performed<br>Out-of-Network:  Not Covered<br>Travel, lodging and meals, as described in the Plan, pay 100% |
| **Benefit Percentage for All Other Eligible Medical Expenses, Not Specifically Listed in This Schedule** | In-Network:  90% after the Annual Deductible<br>Out-of-Network:  70% after the Annual Deductible |

*The In-Network and Out-of-Network Deductibles, Co-payments and Out-of-Pocket maximum are separate and do not accumulate to one another.

## Plan Limitations & Maximums

| | |
|---|---|
| **UCR** | All charges are subject to the Usual, Customary and Reasonable (UCR) fee for the area in which the service or supply is received. |
| **Hospital Room & Board Limitation** | Semi-private rate; if a facility has only private rooms, the average semi-private rate of the area will be allowed.  If a private room is medically necessary, the private room rate will be allowed. |
| **Intensive Care Unit Limitation** | Actual ICU rate |
| **Skilled Nursing Facility Room & Board Limitation** | Semi-private rate |
| **Maximum Lifetime Benefit for All Medical Expenses (Includes all other lifetime maximums except transplants other than cornea and kidney).** | $2,000,000 per Covered Individual |
| **Maximum Lifetime Benefit for Transplants (does not include cornea and kidney transplants which are part of Lifetime Medical Expense maximum)** | $1,000,000 per transplant |
| **Maximum Annual Benefit for Home Health Care** | In-Network:  Unlimited<br>Out-of-Network:  30 visits |
| **Maximum Annual Benefit for Outpatient Mental Health Services** | In-Network:  30 visits per Calendar Year<br>Out-of-Network:  10 visits per Calendar Year |
| **Maximum Annual Benefit for Inpatient Mental Health Services** | 30 days per Calendar Year |
| **Maximum Annual Benefit for Outpatient Occupational and Physical Therapy Combined** | 60 visits per Calendar Year |
| **Maximum Annual Benefit for Outpatient Speech Therapy** | 20 visits per Calendar Year |
| **Maximum Annual Benefit for Chiropractic Care** | 30 visits per Calendar Year; diagnostic x-rays limited to $100 per Calendar Year |

## MANAGED CARE

### Review Organization

The Review Organization for this Plan is:

> HealthCorp
> P.O. Box 1475
> Dubuque, Iowa 52004-1475
> 1-800-457-4726

### Utilization Review

This Plan has a mandatory utilization review requirement called "pre-certification". Pre-certification is required prior to all scheduled Hospital admissions. For emergency admissions to the Hospital, the covered individual must notify the Review Organization within two (2) business days of the admission. If the patient is unconscious or unable to provide information, the call should be made as soon as possible. Pre-certification determines that services received are Medically Necessary. **Pre-certification does not guarantee that proposed Hospital admissions are covered under the Plan as Eligible Expenses.**

The Covered Individual must inform the provider that he participates in a program which has pre-certification requirements. In order to obtain pre-certification:

1. Notify the appropriate Review Organization of the upcoming Hospital stay no later than twenty-four (24) hours prior to the admission to the Hospital. Emergency admissions to the hospital must be reported to the Review Organization within two (2) business days of the admission. If the patient is unconscious or unable to provide information, the call should be made as soon as possible.

2. Notice can be given by: (a) the Hospital; (b) admitting Physician; (c) Covered Individual; or (d) a Family member of the Covered Individual, but **it is ultimately the responsibility of the Covered Individual to make sure a Hospital admission has been pre-certified.**

3. The Review Organization must be provided with information necessary to make a decision as to the Medical Necessity of the admission.

When the Review Organization provides pre-certification to the Covered Individual, the Review Organization will assign a certain number of inpatient Hospital days for the stay. If any days are not Medically Necessary, and the Covered Individual remains beyond the Medically Necessary length of stay, the Covered Individual shall be liable for all Hospital charges beyond the Medically Necessary length of stay.

### Penalty for Non-Certification

**If pre-certification is not obtained in connection with an inpatient hospitalization, the Eligible Expenses will be subject to a penalty of $300. The additional penalty will be figured before the Annual Deductible and coinsurance are applied. The penalty is not considered an Eligible Expense.**

## COMPREHENSIVE MEDICAL EXPENSE BENEFITS

Upon receipt of proof of loss, the Plan will pay the Benefit Percentage listed in the Plan Summary for Medically Necessary Eligible Expenses incurred in each Benefit Period. The amount payable in no event shall exceed the Maximum Lifetime Benefit stated in the Plan Summary.

### The Deductible

The Deductible is the amount of Eligible Expenses which must be paid each Calendar Year before Comprehensive Medical Expense Benefits are payable. The amount of the Deductible is shown in the Plan Summary. Each Family member is subject to the Deductible up to the Family maximum as shown in the Plan Summary.

### Family Deductible Feature

If the Family Deductible limit, as shown in the Plan Summary, is incurred by covered Family members during the Calendar Year, no further Deductibles will be required on any Family members for the rest of the Calendar Year.

### Co-payment

Co-payment is the fixed dollar amount you pay each time you receive certain covered services. The co-payment does not apply toward the Annual Deductible. The co-payment applies to the Annual out-of-pocket maximum and ceases to be taken after the out-of-pocket maximum is met.

### Allocation And Apportionment Of Benefits

The Company reserves the right to allocate the Deductible amount to any Eligible Expenses and to apportion the benefits to the Covered Individual and any assignees. Such allocation and apportionment shall be conclusive and shall be binding upon the Covered Individual and all assignees.

### Medical Eligible Expenses

Medical Eligible Expenses are the following Medically Necessary expenses that are incurred while Plan coverage is in force for the Covered Individual. The Plan does not provide coverage for services if medical evidence shows that treatment is not expected to resolve, improve, or stabilize the Covered Individual's condition, or that a plateau has been reached in terms of improvement from such services. If any of the listed expenses are excluded from coverage because of a reason described in the General Limitations section or any other Plan section, those expenses will not be considered medical Eligible Expenses.

The Plan will make payment for medical Eligible Expenses subject to the Benefit Percentage and maximum amounts shown in the Plan Summary.

### Hospital Expenses

Hospital expenses are the charges made by a Hospital on its own behalf. Such charges include:

1. Semi-Private Room and Board. If a facility has only private rooms, the average semi-private rate of the area will be allowed. If a private room is Medically Necessary due to the diagnosed condition, the private-room rate will be allowable.

2. Necessary Hospital services other than Room and Board as furnished by the Hospital.

3.  Special care units, including burn care units, cardiac care units, delivery rooms, Intensive Care Units, isolation rooms, operating rooms and recovery rooms.

4.  Outpatient charges to include observation up to twenty-three (23) hours. Observation in excess of twenty-three (23) hours will be allowed based on the inpatient benefit of the Plan.

## Skilled Nursing Facility/Extended Care Facility Expenses

Eligible Skilled Nursing Facility/Extended Care Facility expenses under this benefit will be limited to the maximums listed in the Plan Summary and will include:

1.  Room and Board, including any charges made by the facility as a condition of occupancy or on a regular daily or weekly basis, such as general nursing services. The daily Room and Board charges allowed will not exceed the average semi-private rate.

2.  Medical services customarily provided by the Skilled Nursing Facility or Extended Care Facility, with the exception of private-duty or special nursing services and Physician fees.

3.  Drugs, biologicals, solutions, dressings and casts furnished for use during the convalescent period, and other Medically Necessary supplies.

## Hospice Expenses

A Hospice program provides care for patients who are terminally ill. The following services and supplies provided by a Hospice are covered:

1.  Nursing care by a Registered Nurse (R.N.), or by a Licensed Practical Nurse (L.P.N.), a vocational nurse, or a public health nurse who is under the direct supervision of a Registered Nurse.

2.  Physical therapy, occupational therapy and speech therapy, when rendered by a licensed therapist.

3.  Medical supplies, including drugs and biologicals, and the use of medical appliances.

4.  Physicians' services.

5.  Services, supplies, and treatments (including Inpatient Hospice care) deemed Medically Necessary and ordered by a licensed Physician.

6.  Respite Care offers rest and relief help for the Family caring for a terminally ill patient. Eligible inpatient respite care can take place in a Hospital, Skilled Nursing Facility/Extended Care Facility or nursing home.

## Home Health Care Expenses

Home health care expenses are the charges made by a Home Health Care Agency for the following services and supplies which are ordered by a Physician and furnished to a Family member in his home in accordance with a Home Health Care Plan.

1.  Part-time or intermittent nursing care provided by a Registered Nurse (R.N.), or by a Licensed Practical Nurse (L.P.N.), a vocational nurse, or a public health nurse who is under the direct supervision of a Registered Nurse.

2.  Part-time or intermittent home health aide services which consist primarily of caring for the patient, and are under the supervision of an R.N. or L.P.N.

3. Medical supplies, drugs, and medicines prescribed by a Physician, and laboratory services provided by or on behalf of a licensed medical provider, but only to the extent that such charges would have been covered if the Family member had remained in the Hospital or a Skilled Nursing Facility/Extended Care Facility.

4. Charges for physical, speech or occupational therapy.

5. Charges for parenteral or enteral nutrition.

6. Charges for inhalation therapy

7. Medical social services.

Home health care expenses will not be covered if they are:

1. For services or supplies not specified in the Home Health Care Plan.

2. For services by a Close Relative or member of the household.

3. For services for a period during which an Employee or Dependent is not under the continuing care of a Physician.

4. For transportation services.

Each visit by a Registered Nurse (R.N.) or Licensed Practical Nurse (L.P.N.) to provide nursing care, by a therapist to provide physical, occupational or speech therapy, and each visit by a home health aide shall be considered as one home health care visit.

**Organ/Tissue Transplant Expenses**

Benefits are available to a Covered Individual who is a recipient or donor for Medically Necessary covered services relating to bone marrow, liver, heart, lung (single and double), combination heart/lung, pancreas, pancreas/kidney, kidney, cornea and any other non-Experimental transplant. Eligible Expenses include, but are not limited to: testing to determine transplant feasibility and donor compatibility; charges related to the transplant itself, as well as follow-up care to include: diagnostic x-ray and lab; procedures to determine rejection or success of transplant, to include: Physician, lab, x-ray or Hospital charges, and anti-rejection drugs.

Transportation, meals and lodging will also be Eligible Expenses in connection with a covered transplant procedure, if you obtain prior approval from the Plan Administrator. If you are required to travel more than seventy-five (75) miles from your residence to reach a Network Transplant facility, the Plan will cover expenses for transportation to and from the Network provider facility. Such Eligible Expenses include lodging and meals for the patient and one (1) companion. If the Covered Individual receiving the transplant is a minor, then reasonable and necessary expenses for transportation, lodging and meals may be allowed for two (2) companions. You must submit itemized receipts for transportation, meals and lodging expenses in a form satisfactory to the Plan Administrator. Contact the Plan Administrator for detailed information.

Organ transplant expenses are those charges for services and supplies in connection with non-Experimental, human to human, transplant procedures, subject to the following criteria:

1. There must be a reasonable expectation of survival if the Covered Individual were to receive the transplant.

2. Charges incurred by the donor are only payable if the donor has no other health coverage available, i.e. group health plan, a government program, or a research program. If only

the donor is on this Plan, payment by this Plan will be secondary to coverage offered by the health plan of the recipient.

3.  Pre-approval is required.

The following will not be eligible for coverage under this benefit:

1. Expenses associated with the purchase of any organ.

2. Charges in connection with mechanical or non-human organs or a transplant involving a mechanical organ; except charges in relation to mechanical organs which may be necessary on a temporary short-term basis until a suitable donor organ is available will be Eligible Expenses under the Plan.

3. Services or supplies furnished in connection with the transportation of a living donor.

## Physician Services

The Plan will allow Physician charges according to Usual, Customary, and Reasonable (UCR) guidelines for medical care and/or surgical treatments, including office or home visits, Hospital Inpatient care or Outpatient care, clinic care, ambulatory surgery care, and Medically Necessary care provided at a licensed outpatient facility. Payment for multiple Surgical Procedures (not including the primary Surgical Procedure) performed at the same time may be reduced based on standard billing protocol. If the multiple Surgical Procedure is determined incidental, benefits will be denied.

## Eligible Expenses In or Out of the Hospital

1. Fees for private-duty nursing when such services are: 1) provided by Registered Nurses (RNs) or Licensed Practical Nurses (LPNs) in the Covered Individual's home; 2) prescribed by a Physician for the treatment of an Illness or Injury when the Covered Individual is homebound; and 3) not more costly than alternative services that would be effective for diagnosis and treatment of the Covered Individual's condition.

2. Treatment or services rendered by a licensed Physical Therapist in a home setting or at a facility or institution which has the primary purpose of providing medical care for an Illness or Injury. Charges for restorative or rehabilitative physical therapy due to an Illness or Injury, or due to surgery performed because of an Illness or Injury will be eligible.

3. Charges for Medically Necessary local air or ground ambulance service to and from the nearest, local adequate Hospital or Skilled Nursing Facility/Extended Care Facility where Medical Emergency care or treatment is rendered, or to the nearest facility equipped to furnish necessary medical treatment if not available at a local Hospital. This Plan will only cover ambulance transportation when: 1) no other method of transportation is appropriate; 2) the services necessary to treat the Illness or Injury are not available in the Hospital or Skilled Nursing Facility/Extended Care Facility where the Covered Individual is an inpatient; and/or 3) the Hospital or Skilled Nursing Facility/Extended Care Facility where the ambulance takes the Covered Individual is the nearest with adequate facilities.

4. Charges for x-rays, diagnostic tests, and laboratory tests.

5. Charges for radiation therapy or treatment, and chemotherapy.

6. Charges for the processing and administration of blood or blood components, including charges for the processing and storage of autologous blood.

7. Charges for oxygen and other gases, and their administration.

8. Charges for electrocardiograms, electroencephalograms, pneumoencephalogram, basal metabolism tests, allergy tests, or similar well-established diagnostic tests generally approved by Physicians throughout the United States.

15

9.  Charges for the cost and administration of anesthetic in conjunction with a covered surgical or medical procedure.

10. Charges for dressings, sutures, casts, splints, crutches, braces, diabetic supplies, ostomy supplies, custom-made arch supports/orthotics, or other necessary medical supplies, with the exception of dental braces, orthopedic shoes (except as an integral part of a brace), elastic stockings, trusses, lumbar braces, garter belts and similar items which can be purchased without a prescription.

11. Charges for the rental, up to the purchase price, of a wheelchair, Hospital bed, iron lung, or other Durable Medical Equipment required for Medically Necessary temporary therapeutic use, or the purchase of this equipment if economically justified, whichever is less.

12. Charges for prosthetic appliances used to replace a missing natural body part, and charges for repairs of such an appliance. Replacement of a prosthetic appliance will be covered when due to a pathological change, or if it has been more than five (5) years since the last placement of such an item, unless replacement is needed as a result of unintentional damage of the appliance, and it cannot be made serviceable by repairs. Pre-authorization of a replacement is recommended.

13. Charges made by an Ambulatory Surgical Facility or minor emergency medical clinic when treatment has been rendered.

14. Charges for dialysis as an inpatient or at a Medicare-approved Outpatient dialysis center.

15. Charges for allergens and allergy injections.

16. Charges for injectable drugs whether self-administered or administered by a physician.

17. Outpatient cardiac rehabilitation programs to provide supervised monitored exercise sessions following heart surgery or a heart attack.

18. Charges for restorative or rehabilitative speech therapy by a licensed Speech Therapist due to an Illness or Injury, or due to surgery performed because of an Illness or Injury.

19. Charges for restorative or rehabilitative occupational therapy by a licensed Occupational Therapist due to an Illness or Injury, or due to surgery performed because of an Illness or Injury.

20. Eligible Pregnancy related expenses for an Employee or a Dependent spouse, including Medically Necessary amniocentesis tests. These expenses are considered the same as any other medical condition under the Plan. The health Plan may not restrict benefits for any Hospital length of stay in connection with childbirth for the mother or Newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section, or require that a provider obtain authorization from the Plan for prescribing a length of stay not in excess of the above periods.

21. Charges in relation to elective sterilization, but only for the initial surgery. Benefits do not include the reversal of such procedure.

22. Charges for routine child Well-Care up to age nineteen (19). Eligible Expenses include those for physical exams, developmental assessments, laboratory services, routine hearing and vision exams, annual medical diabetes eye exams, and immunizations, except mass immunizations or those required for travel.

23. Exam and laboratory charges in relation to a routine annual pap test.

24. Charges for routine mammograms shall be covered according to the following guidelines:

   a.   Ages 35 to 40--one baseline mammogram;

   b.   Age 40 and over--annual mammogram.

25. Annual PSA (prostate specific antigen) test at age fifty (50) and over.

26. One (1) colorectal cancer examination and related lab tests per Calendar Year as determined appropriate for your age and sex. Such services will be covered more often as recommended by the American Cancer Society guidelines or by your Physician.

27. Charges for routine adult physicals, for individuals age nineteen (19) and older. Eligible Expenses will include those for the office exam, any routine diagnostic services normally associated with a routine exam, routine hearing and vision exams, annual medical diabetes eye exams, tobacco abuse counseling, and immunizations, except mass immunizations or those required for travel.

28. Charges for dental services provided by a Dentist when Medically Necessary, and limited to services provided for the repair of damage to the jaw or sound natural teeth as the direct result of an Accidental Injury. Injury as a result of chewing or biting will not be considered an Accidental Injury. This will not in any event be deemed to include charges for treatment for the repair or replacement of a denture.

29. Charges for the following oral surgery whether performed by a Dentist or Physician will be considered as Medical Eligible Expenses:

   a.   Correction of cleft palate/lip.

   b.   Reduction or manipulation of fractures of facial bones.

   c.   Excision of lesions of the mandible, mouth, lips or tongue.

   d.   Incision of the accessory sinuses, mouth, salivary glands or ducts.

   e.   Manipulation of dislocations of the jaw.

30. Charges for services and supplies in relation to diabetes self-management programs.

31. Charges for services in connection with surgical treatment of morbid obesity will be considered Eligible Expenses, if the Covered Individual is at least 100 pounds over ideal weight, subject to the following conditions:

   a.   A second concurring surgical opinion is required prior to the Surgical Procedure;

   b.   Pre-authorization with the Claims Processor (SISCO) is required; and

   c.   Pre-certification with the Review Organization is required.

32. Charges in relation to individual and group Psychiatric Care (treatment of a psychiatric condition, alcoholism, substance abuse or drug addiction). A psychiatric condition includes but is not limited to anorexia nervosa and bulimia, schizophrenia, and depressive disorders including but not limited to manic depression.

33. Hospital and Physician charges in relation to the routine care of a Newborn.

34. Charges for home infusion therapy, including the administration of nutrients, antibiotics, and other drugs and fluids intravenously or through a feeding tube.

35. Charges for testing related to infertility.

36. Charges for Medically Necessary mammoplasty following a Medically Necessary mastectomy. Services include reconstruction of the breast on which the mastectomy has been performed and reconstruction of the other breast to produce symmetrical appearance. Breast prostheses, surgical brassieres (2 per Calendar Year), and physical complications of all stages of mastectomy, including lymphedemas, are also eligible under the Plan. Reduction mammoplasty will be covered if medical necessity is established and upon prior approval of the Utilization Review Agent

37. Charges for TMJ (temporomandibular joint disorder). Dental treatment related to TMJ is not an Eligible Expense.

38. Charges related to elective abortion.

39. Charges for cochlear implants.

40. Charges for scheduled childbirth at home if under the supervision of an Eligible Provider.

## GENERAL LIMITATIONS

The following exclusions and limitations apply to expenses incurred by all Covered Individuals:

1. Expenses incurred prior to the effective date of coverage under the Plan or after coverage is terminated, unless Extension of Benefits applies.

2. Charges as a result of active participation in war or any act of war, whether declared or undeclared, or caused during service in the armed forces of any country.

3. No benefits or expenses will be paid or reimbursed to or for any Covered Individual for any injury, illness, occupational disease, or other loss which arises out of and in the course of employment, or for which the Covered Individual is reimbursed or entitled to reimbursement under any federal or state law, including a workers' compensation law or similar law.

   This exclusion applies to each Covered Individual: 1) who is actively engaged in a business, occupation, or profession and who may elect coverage under a workers' compensation law or similar law, but either fails to secure such coverage or voluntarily elects not to secure such coverage; or 2) whose employer may elect coverage under workers' compensation law or similar law, but either fails to secure such coverage or voluntarily elects not to secure workers' compensation coverage.

4. Charges while confined in a Hospital owned or operated by the United States government or any agency thereof, or charges for services, treatments or supplies furnished by the United States government or any agency thereof, unless such benefits are mandated under federal law and/or regulation.

5. Charges for which the Covered Individual is not (in the absence of this Plan coverage) legally obligated to pay, or for which a charge would not ordinarily be made in the absence of this Plan coverage.

6. Charges incurred due to an Illness or Injury resulting from the Covered Individual's voluntary participation in a criminal act, participation in a riot or civil disturbance, or while the Covered Individual is engaged in an illegal occupation.

7. Charges for services or supplies which constitute personal comfort or beautification items; for television or telephone use; for nutritional supplements; or in connection with Custodial Care, education or training, or expenses actually incurred by other persons.

8. Charges in connection with the care or treatment of or surgery performed for a Cosmetic Procedure. This exclusion will not apply when such treatment is rendered to correct a condition resulting from an Accidental Injury or disfiguring disease (does not include scarring due to acne or chicken pox), or when rendered to correct a congenital anomaly (i.e., a birth defect) of a Covered Dependent child. **Pre-authorization is recommended.**

9. Charges incurred in connection with services and supplies which are not Medically Necessary for treatment of the Injury or Illness, or are in excess of Usual, Customary and Reasonable charges, or are not recommended and approved by a Physician, or are not recognized by the American Medical Association as generally accepted and Medically Necessary for the diagnosis and/or treatment of an active Illness or Injury; or charges for procedures, surgical or otherwise, which are specifically listed by the American Medical Association as having no medical value.

10. Charges incurred for routine medical examinations or care, or immunizations related to employment, insurance or travel.

11. Charges related to or in connection with the reversal of a sterilization procedure.

12. Charges incurred in connection with the purchase or fitting of eyeglasses, contact lenses, or such similar aid devices except the initial prosthetic lenses or sclera shells following intra-ocular surgery, or for soft contact lenses due to a medical condition.

13. Charges in connection with external hearing aids, or examinations for the prescription or fitting of hearing aids.

14. Charges for orthopedic shoes (unless an integral part of a brace), or any such similar device, or for the prescription or fitting thereof.

15. Charges for splints or braces for non-medical purposes (i.e., supports worn primarily during participation in sports or similar physical activities).

16. Charges for dental services not specifically included in benefits described in this Plan; or for Hospital charges in relation to dental care, except those services which are certified by a Physician to be Medically Necessary to safeguard the life and health of the Covered Individual due to the existence of a non-dental physical condition. **Pre-authorization is recommended.**

17. Charges for inpatient concurrent services of Physicians, unless there is a clinical necessity for supplemental skills and two or more Physicians attend the Covered Individual for separate conditions during the same Hospital admission.

18. Charges for services rendered by a Physician, nurse, or licensed therapist if such Physician, nurse, or licensed therapist is a Close Relative of the Covered Individual, or resides in the same household of the Covered Individual. Durable medical equipment or drugs ordered by such individual will also not be eligible.

19. If a Covered Individual receives medical treatment outside of the United States or its territories, benefits shall be provided for those charges to the extent that the services rendered are included as Eligible Expenses in the Plan, and provided the Covered Individual did not travel to such a location for the sole purpose of obtaining medical services, drugs, or supplies. Prescription Drugs purchased outside of the United States are only covered if the Covered Individual is traveling outside the United States for reason other than medical care.

   Additionally, charges for such treatment may not exceed the limits specified herein as Usual, Customary and Reasonable in the area of residence of the Covered Individual in the United States. Fees and charges exceeding Usual, Customary and Reasonable shall be disallowed as ineligible charges. Charges equal to or less than Usual, Customary and Reasonable shall be considered. In no event shall benefit payment exceed the actual amount charged.

20. Charges for hospitalization when such confinement occurs primarily for physiotherapy, hydrotherapy, convalescent or rest care, or any routine physical examinations or tests not connected with the actual Illness or Injury.

21. Charges for professional nursing services if rendered by other than a Registered Nurse (R.N.) or Licensed Practical Nurse (L.P.N.), unless such care was vital as a safeguard of the Covered Individual's life, and unless such care is specifically listed as an Eligible Expense elsewhere in the Plan. In addition, the Plan will not cover certified Registered Nurses in independent practice (other than an anesthetist). This exclusion does not apply to private duty nurses as addressed elsewhere in this Plan.

22. Charges for Experimental procedures, drugs, or research studies, or for any services or supplies not considered legal in the United States or not recognized by the American Medical Association or the American College of Surgeons and/or the United States Food & Drug Administration. Experimental services include:

   a. Care, procedures, treatment protocol or technology which:

      i. is not widely accepted as safe, effective and appropriate for the Injury or Illness throughout the recognized medical profession and established medical societies in the United States; or

      ii. is Experimental, in the research or investigational stage or conducted as part of research protocol, or has not been proved by statistically significant randomized clinical trials to establish increased survival or improvement in the quality of life over other conventional therapies.

   b. Drugs, tests, and technology which:

      i. the FDA has not approved for general use;

      ii. are considered Experimental;

      iii. are for investigational use; or

      iv. are approved for a specific medical condition but are applied to another condition. Medications that are FDA approved for one diagnosis, but used in an off label manner may be covered under the Plan if approved by the Medical Director of HealthCorp as being medically appropriate and necessary for the Covered Individual's condition, which will be based upon current literature and studies

   The Plan will rely on the Data project of the American Medical Association, the National Institute of Health, the U.S. Food and Drug Administration, The National Cancer Institute, Office of Health Technology Assessment, the Centers for Medicare and Medicaid Services of the U.S. Department of Health and Human Services, and Congressional Office of Technology Assessment in determining Experimental services.

23. Charges related to counseling for persons suffering from gender identification problems, or services or supplies related to the performance of gender transformation procedures.

24. Charges for services or supplies for recreational or educational therapy or forms of non-medical self-help or self-cure.

25. Charges for maintenance therapies.

26. Charges for services or supplies furnished for weight reduction or in connection with morbid obesity; except as specifically shown as an Eligible Expense elsewhere in the Plan. This includes dietary supplements, foods, equipment, laboratory testing, exams and Prescription drugs, regardless of whether or not weight reduction is medically appropriate.

27. Charges for services or supplies for marital counseling.

28. Charges for hypnotherapy, biofeedback, or sleep therapy.

29. Charges for the purchase or rental of air conditioners, humidifiers, dehumidifiers, air purifiers, exercise equipment and other such equipment.

30. Charges for travel or lodging costs, except as specifically listed in relation to a covered transplant procedure.

31. Charges for acupuncture.

32. Charges for penile prosthesis/implants and any charges relating thereto.

33. Charges in relation to chelation therapy except in the treatment of heavy metal poisoning.

34. Charges for routine foot care, such as removal of corns, calluses, or trimming of toenails; except the services necessary in the treatment of a peripheral-vascular disease when recommended by a medical doctor or doctor of osteopathy.

35. Charges in relation to radial keratotomy, corneal modulation, refractive keratoplasty or any similar procedure.

36. Charges in relation to self-inflicted Injury or self-induced Illness, unless the result of a medical condition whether mental or physical.

37. Charges for contraceptives used for contraceptive purposes; subcutaneous implants such as Norplant; nutritional supplements; and drugs or supplies associated with smoking cessation.

38. Charges for a surrogate mother or her newborn child.

39. Charges in relation to complications of a non-covered procedure.

40. Charges for wigs and artificial hair pieces, except the initial purchase of a wig/hairpiece will be covered following chemotherapy.

41. Charges for phone consultations or failing to keep an appointment.

42. Charges related to the testing and treatment of communication delay, motor development delays, and growth development delays including growth hormones. Charges for hearing therapy, therapy for learning disability, communication delay, perceptual disorders, sensory deficit, mental retardation, autistic disease, hyperkinetic syndromes, and related conditions.

43. Charges dental services related to TMJ (temporomandibular joint disorder).

44. Charges for vocational rehabilitation.

45. Charges for massage therapy.

46. Charges for infertility treatment.

47. Charges for genetic testing and counseling.

48. Charges for services or supplies received while incarcerated in a penal institution or in legal custody.

49. Charges for appliances, or medical or surgical treatment for correction of malocclusion or protrusion or recession of the mandible, maxillary hyperplasia, or maxillary hypoplasia.

50. Charges related to congenitally missing, malpositioned or super numerary teeth, even if part of a congenital anomaly.

51. Charges for Prescription drugs or mail order service drugs.

52. Charges related to the pregnancy of a dependent child.

53. Charges related to erectile dysfunction.

54. Stand-by charges of a Physician.

55. Charges for alternative or complementary medicine including, but not limited to: holistic medicine, homeopathy, hypnosis, aroma therapy, reike therapy, herbal, vitamin or dietary products or therapies, naturopathy, thermograph, orthomolecular therapy, contact reflex analysis, bioenergial synchronization technique (BEST) and iridology-study of the iris.

56. Charges for any new FDA approved drug product or technology (including but not limited to medications, medical supplies, or devices) available in the marketplace for dispensing by the appropriate source for the product or technology, including but not limited to Pharmacies, for the first six (6) months after the product or technology received FDA new drug approval or other applicable FDA approval. The Plan may at its sole discretion, waive this exclusion in whole or in part for a specific new FDA approved drug product or technology.

## CREDITABLE COVERAGE

**Acceptance of Certificates**

Any Pre-existing Condition limitation period is reduced by the period of other Creditable Coverage unless there has been a lapse in coverage of 63 days or more, termed a Break in Coverage. Waiting periods and HMO affiliation periods are not considered a lapse in coverage. Days of Creditable Coverage that occur before a Break in Coverage shall not be counted by the Plan in reducing the Pre-existing Condition limitation.

Creditable Coverage includes coverage under most individual and group health insurance plans (including Medicare, Medicaid, governmental and church plans) whether or not a fully insured plan or a self-insured plan. Creditable coverage does not include liability, dental, vision, specified diseases and./or other supplemental type plans which are defined as excepted benefits by HIPAA.

To reduce a Pre-existing Condition limitation period by creditable coverage, proof of prior creditable coverage must be submitted. A Participant may request a Certificate of Coverage from his prior plan. The Employer will assist any Participant in obtaining a Certificate of Coverage from a prior plan.

Within a reasonable time following the receipt of a Certificate of Creditable Coverage or other evidence of Creditable Coverage, the Plan shall make a determination regarding the length, if any, of the Pre-existing Condition limitation that shall apply to the Participant and provide notice to the Participant of said determination. The Plan shall have the right to reconsider and modify its initial determination if it is later determined that the claimed Creditable Coverage did not exist.

The Plan shall determine the total days of creditable coverage for each Participant by counting all the days during which the Participant had one or more types of Creditable Coverage. This determination will be made regardless of the specific benefits included in the coverage.

If, after creditable coverage has been taken into account, there will be a Pre-existing Condition limitation imposed on a Participant, that Participant will be notified.

**Provision of Certificates**

The Plan shall issue a Certificate of Creditable Coverage, automatically and without charge, under the following circumstances:

1. For an individual who is a Qualified Beneficiary entitled to elect COBRA coverage; the Certificate of Creditable Coverage shall be issued after the Qualifying Event.

2. For an individual who loses coverage under the Plan, but is not entitled to COBRA coverage, the Certificate of Creditable Coverage shall be issued as soon as reasonably possible after coverage ceases.

3. For an individual who is a Qualified Beneficiary and has elected COBRA coverage, the Certificate of Creditable Coverage shall be issued within a reasonable time after the cessation of COBRA coverage or, if applicable, after the expiration of any grace period for the payment of COBRA premiums.

25

The Plan shall also issue a Certificate of Creditable Coverage at any time within twenty-four (24) months after coverage ceases, provided that the Plan receives a written request for the Certificate of Creditable Coverage by the former Plan Participant (or by another person authorized by the former Plan Participant).

The Certificate of Creditable Coverage shall be in the form required by HIPAA.

Also upon written request, the Plan shall provide a copy of the Plan Document and other information as outlined in the model form established by HIPAA to provide additional information on categories of benefits for plans that use the Alternative Method of counting Creditable Coverage.

# ELIGIBILITY FOR COVERAGE

**Employee Eligibility and Effective Date**

An Employee is eligible for coverage under the Plan when the Employee:

1. Is employed by the Company on a regular, Full-Time Work basis as specified in the Plan Summary;

2. Is Actively at Work;

3. Has satisfied the Required Period of Service as specified in the Plan Summary; and

4. Is within the classification (if any) shown in the Plan Summary.

If the Employee has met the above eligibility requirements on or before the effective date of this Plan, the date of eligibility shall be the effective date of the Plan.

If the Employee meets the above eligibility requirements after the effective date of the Plan, the date of eligibility shall be the day he first meets those eligibility requirements.

Employee Coverage under the Plan shall become effective on the date of the Employee's eligibility, provided he has made written application for such coverage on or before such date. If an Employee applies for coverage within thirty-one (31) days after his date of eligibility, his coverage shall be retroactive to the initial date of eligibility.

All Employee Coverage under the Plan shall commence at 12:01 A.M. Standard Time, on the date such coverage is effective, provided such Employee is able to be actively at work at such time. If the Employee is not Actively at Work on the date this Employee Coverage would otherwise take effect, but would have been able to be Actively at Work at 12:01 A.M. Standard Time had such work commenced at that time, such Employee shall be eligible for coverage on that date. If an eligible Employee is not able to be Actively at Work on the date this Employee Coverage would otherwise become effective, his coverage shall become effective on the day he returns to Active Work except as required by HIPAA.

An Employee who chooses not to keep his coverage in effect during a period of an approved leave of absence which qualifies under the Family and Medical Leave Act will be eligible to enroll for the same type of coverage (single or Family) which was in effect at the time of the leave of absence immediately upon return to Full-Time Work.

Each Employee will become eligible for Dependent Coverage on the latest of the following:

1. The date he becomes eligible for Employee coverage.

2. The date on which he first acquires a Dependent.

3. The date he first comes within the classification (if any) for Dependent Coverage, as stated in the Plan Summary.

If both the husband and wife are employed by the Company and both are eligible for Dependent Coverage, either the husband or wife, but not both, may elect Dependent Coverage for their eligible dependents.

**Dependent Eligibility and Effective Date**

A Dependent will be considered eligible for coverage on the date the Employee becomes eligible for Dependent Coverage, subject to all limitations and requirements of this Plan. Each Employee who makes such written request for Dependent Coverage on a form approved by the Company, shall, subject to the further provisions of this section, become covered for Dependent Coverage as follows:

1. If the Employee makes such written request on or before the date he becomes eligible for Dependent Coverage, or within the time frame listed in "Employee Eligibility" to enroll, he shall become covered, with respect to those persons who are then his dependents, on the date he becomes covered for Employee Coverage.

2. A Newborn child of an Employee will be covered from the moment of birth for up to thirty-one (31) days. Proper enrollment must be completed within that thirty-one (31) day period for coverage to continue beyond that time.

3. An adoptive child of an Employee or a child placed with the Employee for adoption will be covered from the date the child is placed in the physical custody of the Employee and the Employee is legally responsible for medical expenses incurred by said child if proper enrollment is completed within thirty-one (31) days of the placement.

4. If a Dependent is acquired other than at the time of his birth due to a court order, decree, or marriage, coverage for this new Dependent will be effective on the date of such court order, decree, or marriage if Dependent Coverage is in effect under the Plan at that time and proper enrollment is completed within thirty-one (31) days of the event. If the Employee does not have Dependent Coverage in effect under the Plan at the time of the court order, decree, or marriage and requests such coverage and properly enrolls this new Dependent within the thirty-one (31) day period immediately following the date of the court order, decree, or marriage, Dependent Coverage will be retroactive to the date of the court order, decree, or marriage.

5. A newly eligible Dependent who meets the definition of a Full-Time Student will be covered from the date of eligibility providing Dependent Coverage is in effect at that time and providing written request for coverage is made within the thirty-one (31) day period immediately following the first day of eligibility of the Dependent. If Dependent Coverage is not in effect at that time, the Employee has thirty-one (31) days from the date of the Dependent's eligibility to make such written request and coverage will be retroactive to the date the Dependent became a Full-Time Student.

**Annual Change Period**

During the Annual change period established by the Company, a Covered Individual may switch from one Company sponsored health plan to another. A Covered Individual will only be able to switch plans during this time frame.

# LATE ENROLLMENT

Enrollment for coverage is required within thirty-one (31) days of the date an individual would otherwise be eligible. If enrollment is not completed within that time, or if a covered Employee's and/or Dependent's coverage terminates because of failure to make a contribution when due, such person will be considered a late enrollee. Some late enrollments may be made under the following Special Enrollment provisions, however, if the Special Enrollment provisions do not apply, a late enrollee will be eligible to enroll in the Plan during the Annual enrollment period established by the Company.

## Special Enrollment

Special enrollment rights may be triggered upon the occurrence of two types of events – upon the loss of other health coverage and upon the addition of a new dependent. When a triggering event occurs, an eligible individual who does not enroll in the Plan within the thirty-one (31) day deadlines explained below, will lose special enrollment rights for that event.

1.  **First Type of Event**

    a)  **Loss of Other Health Coverage.** Eligible Employees and their Dependents who, at the time they were offered coverage under the Plan were eligible for the coverage and declined it because of other health coverage, are entitled to enroll in the plan when the other coverage ends.

    b)  **Other Coverage is COBRA Coverage.** If the other coverage is COBRA coverage, the eligible Employee or Dependent must exhaust COBRA coverage to be eligible for special enrollment in the Plan. Exhaustion of COBRA coverage means that COBRA coverage ends for any reason other than failure to pay contributions on time or for cause.

    c)  **Other Coverage is Not COBRA Coverage.** If the other coverage is not COBRA coverage, the Employee or Dependent must lose the other coverage as a result of loss of eligibility for the coverage, termination of employment, or employer contribution toward the other coverage terminates. If an individual loses coverage due to ceasing to make required premium payments when due, he will not qualify as a special enrollee.

    d)  **Deadline for Special Enrollment Period.** The eligible Employee is required to request special enrollment in the Plan not later than thirty-one (31) days after the loss of the other coverage or the termination of employer contributions toward that other coverage. If the Plan Administrator does not receive the eligible Employee's completed request for enrollment within this deadline, the eligible Employee and/or Dependent lose special enrollment rights for that event.

    e)  **Effective Date of Enrollment.** Enrollment in the Plan under the Special Enrollment provision will be effective not later than the first day of the first calendar month beginning after the date the Plan Administrator receives your completed request for enrollment.

2. **Second Type of Event**

    a) **Addition of a Dependent.** An eligible Employee's marriage, or the birth, adoption or placement for adoption of his or her child, triggers special enrollment rights. This type of event also triggers an opportunity for an Employee who is enrolled in a Company sponsored Plan to switch to another Company sponsored Plan, if the Company has multiple Plans available.

    b) **Non-Participating Employee May Also Enroll.** The addition of a new Dependent triggers enrollment rights for an eligible Employee even if he or she does not participate in the Plan at the time of the event. For example, upon the birth of an eligible Employee's child, the eligible Employee (assuming that he or she did not previously enroll), his or her spouse, and his or her Newborn child may all enroll because of the child's birth. The same rule applies to the eligible Employee's marriage or adoption of a child or a child's placement for adoption if the eligible Employee had not previously enrolled in the Plan.

    c) **Deadline for Special Enrollment Period.** An eligible Employee must request special enrollment within thirty-one (31) days of marriage, or birth, adoption or placement for adoption of his or her child. If the Plan Administrator does not receive the eligible Employee's completed request for enrollment within this deadline, he or his Dependents lose special enrollment rights for that event.

    d) **Effective Date of Enrollment.** The date of enrollment for coverage will be the date of the event in the case of birth, adoption or placement for adoption and no later than the first of the calendar month after the Plan Administrator receives the enrollment form for marriage.

# TERMINATION OF COVERAGE

## Employee Termination

Employee Coverage will automatically terminate immediately upon the earliest of the following dates, except as provided in any Extension of Benefits provision:

1. The date the Employee terminates employment.

2. The date the Employee ceases to be in a class of participants eligible for coverage.

3. The date ending the period for which the last contribution is made if the Employee fails to make any required contributions when due.

4. The date the Plan is terminated; or with respect to any participant benefit of the Plan, the date of termination of such benefit.

5. The date the Employee enters military duty.

6. The date of the Employee's death.

## Dependent Termination

Dependent Coverage will automatically terminate immediately upon the earliest of the following dates, except as provided in any Extension of Benefits provision:

1. The date the Dependent ceases to be an eligible Dependent as defined in the Plan. If a Dependent child fails to meet the definition of "Dependent", coverage shall end three (3) months after the date he fails to meet the definition.

2. The date of termination of the Employee's coverage under the Plan.

3. The date the Employee ceases to be in a class of participants eligible for Dependent Coverage.

4. The date for which the last contribution is made if the Employee fails to make any required contributions when due.

5. The date the Plan is terminated; or with respect to any Dependent's benefit of the Plan, the date of termination of such benefit.

6. The date the Dependent enters military duty.

7. The date the Dependent becomes covered under this Plan as an individual participant.

8. The date the Employee's death occurs.

31

## EXTENSION OF BENEFITS

**Family and Medical Leave Act Provision**

All provisions under the Plan are intended to be in compliance with the Family and Medical Leave Act of 1993 (FMLA). To the extent the FMLA applies to the Company, Plan benefits may be maintained during certain leaves of absence at the level and under the conditions that would have been present as if employment had not been interrupted. Employee eligibility requirements, the obligations of the Company and Employee concerning conditions of leave, and notification and reporting requirements are specified in the FMLA. Any Plan provisions which conflict with the FMLA are superseded by the FMLA to the extent such provisions conflict with the FMLA. An Employee with questions concerning any rights and/or obligations should contact the Company.

**Uniformed Services Employment And Reemployment Rights Act (USERRA)**

It is the intent of the Plan to adhere to the continuation of coverage provisions of The Uniformed Services Employment and Reemployment Rights Act (USERRA) effective October 14, 1994. Any Plan provisions which conflict with USERRA are superceded by USERRA. An individual who would like complete information regarding his rights under USERRA should contact the Plan Administrator.

**COBRA Extension of Benefits**

It is the intent of the Plan to adhere to the continuation of coverage provision of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), its interpretations, and as amended from time to time.

## COORDINATION OF BENEFITS

The Coordination of Benefits provision is intended to prevent the payment of benefits which exceed Allowable Expenses. It applies when the Employee or any eligible Dependent who is covered by this Plan is also covered by any other plan or plans. When more than one coverage exists, one plan normally pays its benefits in full and the other plans pay a reduced benefit. This Plan will always pay either its benefits in full, or a reduced amount which, when added to the benefits payable by the other plan or plans, will not exceed this Plans' normal liability. Only the amount paid by the Plan will be charged against the Plan maximums.

The Coordination of Benefits provision applies whether or not a claim is filed under the other plan or plans. If needed, authorization must be given this Plan to obtain information as to benefits or services available from the other plan or plans, or to recover overpayment.

All benefits contained in the Plan are subject to this provision.

### Definitions

The term "plan" as used herein will mean any plan providing benefits or services for or by reason of medical, vision, or dental treatment, and such benefits or services are provided by:

1. Group insurance or any other arrangement for coverage for Covered Individuals in a group whether on an insured or uninsured basis, including but not limited to:

    a. Hospital indemnity benefits.

    b. Hospital reimbursement-type plans which permit the Covered Individual to elect indemnity at the time of claims.

2. Hospital or medical service organizations on a group basis, group practice, and other group pre-payment plans.

3. Hospital or medical service organizations on an individual basis having a provision similar in effect to this provision.

4. A licensed Health Maintenance Organization (HMO).

5. Any coverage for students which is sponsored by or provided through a school or other educational institution.

6. Any coverage under a governmental program, and any coverage required or provided by any statute.

7. Group automobile insurance.

8. Individual automobile insurance coverage on an automobile leased or owned by the Company.

9. Individual automobile insurance coverage based upon the principles of "No-Fault" coverage.

The term "plan" will be construed separately with respect to each policy, contract, or other arrangement for benefits or services, and separately with respect to that portion of any such policy, contract, or other arrangement which reserves the right to take the benefits or services of other plans into consideration in determining its benefits and that portion which does not.

The term "Claim Determination Period" means a Calendar Year or that portion of a Calendar Year during which the Covered Individual for whom claim is made has been covered under this Plan.

## Coordination Procedures

Notwithstanding the other provisions of this Plan, benefits that would be payable under this Plan will be reduced so that the sum of benefits and all benefits payable under all other plans will not exceed this Plan's normal liability. Benefits will be coordinated on a service by service basis for claims incurred during any Claim Determination Period with respect to a Covered Individual eligible for:

1. Benefits either as an insured person or participant or as a Dependent under any other plan which has no provision similar in effect to this provision, or

2. Dependent benefits under this Plan for a Covered Individual who is also eligible for benefits:

   a. As an insured person or participant under any other plan, or

   b. As a dependent covered under another group plan.

3. Employee benefits under this Plan for an Employee who is also eligible for benefits as an insured person or participant under any other plan and has been covered continuously for a longer period of time under such other plan.

4. If an individual has an HMO as an employee of another employer, this Plan will only pay benefits for co-pays and deductibles and services that the HMO excludes. If a service is not covered because the individual failed to use an HMO provider, the services will not be eligible under this Plan.

## Order Of Benefit Determination

Each plan makes its claim payment according to where it falls in this order, if Medicare is not involved:

1. If a plan contains no provision for coordination of benefits, then it pays before all other plans.

2. The plan which covers the claimant as an employee or named insured pays as though no other plan existed; remaining recognized charges are paid under a plan which covers the claimant as a dependent.

3. If the claimant is a dependent child, the plan of the parent whose birthday occurs first in the Calendar Year shall pay first. If the parents have the same birthday, the plan that covered the parent longer will pay first and the other plan will pay second. This rule also applies to unmarried parents who are living together. However, if the parents are divorced, or unmarried and not living together, then:

   a. The plan of the parent who by court order or decree is financially responsible for the children's medical costs is primary.

   b. If no decree exists, the plan of the parent who has custody pays first;

   c. The plan of any stepparent with whom the child lives pays second;

   d. The plan of the parent without custody pays third.

   If the specific terms of a court decree state that the parents have joint custody, without stating that one of the parents is responsible for the health care expenses of the child, the plans covering the child shall follow the order of benefit determination rules outlined above for dependent children of parents not separated or divorced.

   For parents who were never married to each other, the plans covering the child shall follow the order of benefit determination rules outlined above for dependent children of parents not separated or divorced.

34

4. The benefits of a plan which covers a person as an employee who is neither laid off nor retired are determined before those of a plan which covers that person as a laid off or retired employee. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule will not apply.

5. If the order set out above does not apply in a particular case, then the plan which has covered the claimant for the longest period of time will pay first.

The Company has the right:

1. To obtain or share information with an insurance company or other organization regarding Coordination of Benefits without the claimant's consent.

2. To require that the claimant provide the Company with information on such other plans so that this provision may be implemented.

3. To pay the amount due under this Plan to an insurer or other organization if this is necessary, in the Company's opinion, to satisfy the terms of this provision.

**Facility Of Payment**

Whenever payments which should have been made under this Plan in accordance with this provision have been made under any other plan or plans, the Company will have the right, exercisable alone and in its sole discretion, to pay to any insurance company or other organization or person making such other payments any amounts it will determine in order to satisfy the intent of this provision, and amounts so paid will be deemed to be benefits paid under this Plan and to the extent of such payments, the Company will be fully discharged from liability under this Plan.

The benefits that are payable will be charged against any applicable maximum payment or benefit of this Plan rather than the amount payable in the absence of this provision.

**Right To Receive And Release Necessary Information**

For the purposes of determining the applicability of and implementing the terms of this provision of the Plan or any similar provision of any other plans, the Company may, without the consent of or notice to any person, release to or obtain from any insurance company or other organization or person any information, with respect to any person, which the Company deems to be necessary for such purposes. Any person claiming benefits under this Plan shall furnish to the Company such information as may be necessary to implement this provision.

**Effect Of Medicare**

It is the intent of the Plan to adhere to the laws of DEFRA, TEFRA, and COBRA as currently constituted and as amended from time to time. Any Employee or Dependent eligible for Medicare should contact the Claims Processor for current rulings.

If any Covered Individual eligible for Medicare fails to enroll therefore, benefits will be paid by the Plan as though he had enrolled.

## SUBROGATION

**Time of Payment of Benefits**

The Plan may withhold payment of benefits until such time that liability is determined.

**Reduction of Benefits by Other Coverage**

The Plan's liability is reduced by any benefits recoverable under non-group medical payments (including auto) or medical expense type coverage and any no-fault or similar insurance.

**Conditions of Payment – Recovery of Benefits**

The Plan provides benefits only on the following conditions:

1.  The Plan and any representatives of the Plan are entitled to cooperation from Recipients. "Recipient" includes the Covered Individual and his dependents, any other representative, person or entity who received benefits from the Plan on their behalf, and the estate, assignee or other successor of any of the foregoing. Cooperation includes completing such forms, giving such information and executing such releases and authorizations for disclosure of information as the Plan or its representatives deem necessary to investigate the incident, the basis of the claim, and any potential claims against and payments made by or on behalf of any third party who is or may be legally or contractually liable because of the injury, illness, or related expenses. Recipient shall have a continuing duty to supplement information when the information previously supplied is inadequate or outdated.

2.  The Plan shall have the following cumulative rights and remedies to the full extent of all benefits paid by the Plan in the event that one or more third parties, or one or more insurance companies, workers' compensation or other sources or programs designed or intended to compensate in whole or in part for or to provide benefits because of injuries, illnesses or related expenses, are or may arguably be liable under law or contract to pay damages, compensation or benefits to any Recipient because of an injury or illness in respect to which benefits have been paid by the Plan:

    a.  The Plan shall be subrogated to the claim of any Recipient. The Recipient shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

    b.  The Recipient shall report any judgment, award, settlement, covenant, release or other payment in whole or in part upon such claim promptly to the Plan. The Plan shall have the following rights in and to the proceeds of any such judgment, award, settlement, covenant, release or other payment received by or on behalf of a Recipient:

        i.  The Recipient, as trustee, agrees to hold the proceeds received by him and his legal representative in trust for the Plan, as beneficiary, and to pay or to direct payment of the same promptly over to the Plan.

        ii. The Recipient grants to the Plan a first lien on the proceeds having priority over the rights of the Recipient and of any third party. The Recipient agrees to take whatever steps are necessary to assist the Plan Administrator to secure that remedy.

c.  The Plan's rights under paragraphs "a" and "b" shall be without reduction, allocation or apportionment because of any expenses, court costs or attorney's fees incurred by the Recipient, fault, or any other reason.  No consent or agreement of the Plan to reduce its recovery for any reason shall be implied either in fact or in law by any doctrine or rule of law to the contrary, including but not limited to any "Fund Doctrine," "Common Fund Doctrine," or "Attorney's Fund Doctrine."  Except as otherwise agreed by the Plan in writing, the proceeds shall be applied first to the Plan's recovery, whether or not any Covered Individual, Dependent or other Recipient is or would be fully compensated, notwithstanding any "Made-Whole Doctrine," "Rimes Doctrine," or any other law which would otherwise require a Covered Individual, Dependent or other Recipient to be compensated before reimbursement of a subrogee.

d.  The Recipient shall not do anything which may have the effect of prejudicing any of the foregoing rights, including but not limited to:  excluding or omitting any part of the claim, demand or action, including but not limited to exclusion or omission of medical expenses; making any assignment of a claim in whole or in part without the prior express written consent of the Plan; arranging for others to receive proceeds of any judgment, award, settlement, covenant, release or other payment; or releasing any claim in whole or in part without reasonable compensation therefore.

e.  Amounts due the Plan shall accrue interest at the rate of five percent (5%) per annum commencing thirty (30) days after a third party's payment of proceeds of the judgment, award, settlement, covenant or release or other payment, until paid.

f.  The Plan or its representative on behalf of the Plan shall be entitled to recover its reasonable attorney's fees, litigation expense and costs incurred in any action or suit the Plan litigates against a Recipient in order to secure any right or remedy under these conditions of payment.

g.  The Plan may, in its discretion, withhold future benefits for the Covered Individual and his dependents, as a dollar for dollar satisfaction of amounts due the Plan hereunder.

## RIGHTS UNDER ERISA

### Your Rights

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all plan participants shall be entitled to:

### Receive Information About Your Plan and Benefits

Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites, all documents governing the plan, including insurance contracts, and a copy of the latest annual report (Form 5500 series), if any, filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, on written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report, if any is required by ERISA to be prepared. The Plan Administrator is required by law to furnish each participant with a copy of the summary annual report.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.

### Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report (if any) from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If it should happen that plan fiduciaries misuse the plans money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA or HIPAA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, DC 20210.  You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## GENERAL PROVISIONS

### Notice Of Claim

Written notice of claim should be submitted to the Claims Processor within ninety (90) days after the occurrence.  All claims must be filed within one (1) year and forty-five (45) days of the event on which claim is based or payment will be denied.  Written notice of claim given by or on behalf of the Covered Individual to the Claims Processor, with information sufficient to identify the Covered Individual, will be considered notice.

Failure to furnish proof within the time provided in the Plan will not invalidate or reduce any claim if it will be shown not to have been reasonably possible to furnish such proof and that such proof was furnished as soon as reasonably possible.

### Claim Procedure

Following is a description of how the Plan processes claims for benefits.  A claim is defined as any request for a Plan benefit, made by a claimant or by a representative of a claimant, that complies with the Plan's reasonable procedure for making benefit claims.  The times listed are maximum times only.  A period of time begins at the time the claim is filed.  Decisions will be made within a reasonable period of time appropriate to the circumstances. "Days" means calendar days.

There are different types of claims and each one has a specific timetable for either approval, payment, request for further information, or denial of the claim. If you have any questions regarding the procedure, please contact the Claims Processor.

There are three types of health claims: urgent care claims, pre-service claims, and post-service claims.  Most claims are post-service claims which means a claim for a Plan benefit that is a request for payment under the Plan for covered medical services already received by the claimant.  An urgent care claim is one for medical care or treatment where an untimely determination may jeopardize the life or health of the claimant.  A pre-service claim means any claim for a benefit under this Plan where the Plan requires advance approval for obtaining medical care.

In the case of a post-service claim, the Claims Processor will process your claims no later than thirty (30) days after receiving it.  An additional fifteen (15) days will be allowed in circumstances beyond the Plan's control, such as the need for additional information.  You will be notified during the first thirty (30) days of the need for additional information.  You will have forty-five (45) days from receipt of the request to supply the information needed to complete the claim.  Upon receipt of the requested information, the Plan will again review the claim and notify you within fifteen (15) days of the claim determination.

If your post-service claim is denied (in whole or in part), you will receive a written explanation of the denial.  Should your claim be denied (in whole or in part), or if there is a reduction of benefits or charge amount, you (or your provider) may have your claim reviewed.  To do so, a review must be requested within 180 days of the denial by writing to:

> Patient Advocate
> Self Insured Services Company
> P.O. Box 389
> Dubuque, IA 52004-0389

You should supply any additional pertinent documentation to support the appeal of the claim.  Within sixty (60) days after receipt of your request for review, you will receive a determination from the Claims Processor.

For an urgent care claim, notification of benefit determination will be given within seventy-two (72) hours after the Claims Processor receives the claim. If there is insufficient information to make a determination, a request will be made for the additional information within twenty-four (24) hours of receiving the claim. This request may be in writing or orally. The claimant will then have forty-eight (48) hours to provide the missing information. After receiving the information or when forty-eight (48) hours has passed, the Claims Processor will respond orally or in writing as to the benefit determination. If an urgent care claim is denied, an appeal may be filed with the Plan Administrator within 180 days of the denial. This appeal may be orally or in writing. Upon receipt of the appeal, a claim determination must be made within seventy-two (72) hours. All necessary information, including the Plan's benefit determination on review, may be transmitted between the Plan and the claimant by telephone, facsimile, or other similarly expeditious method.

You will receive notice of benefit determination for a pre-service care claim within fifteen (15) days of the Claims Processor's receipt of the claim. An additional fifteen (15) days will be allowed in circumstances beyond the Plan's control, such as the need for additional information, and you will be notified within five (5) days of receipt of the claim as to the need for additional information. You will have forty-five (45) days from receipt of the request to supply the information needed to complete the claim. Upon receipt of the requested information, the Plan will again review the claim and notify you within fifteen (15) days of the claim determination. If your pre-service care claim is denied, you may file a written appeal within 180 days of the denial. Upon receipt of the appeal, the Claims Processor will have thirty (30) days to make a benefit determination.

If the Plan has previously approved an ongoing course of treatment for a participant to be conducted over a period of time, any reduction or termination of that course of treatment will be deemed to be an adverse benefit determination. The Plan Administrator must then notify the claimant a sufficient time in advance of the reduction or termination to give the claimant time to obtain a review on appeal of the adverse termination before the benefit is reduced or terminated.

## Proof Of Loss

The Plan Administrator will have the right and opportunity to have examined any individual whose Injury or Illness is the basis of a claim hereunder when and as often as it may reasonably require during the pendency of a claim, and also the right and opportunity to make an autopsy in case of death (where such autopsy is not forbidden by law).

## Free Choice Of Physician

The Covered Individual will have free choice of any legally qualified Physician or surgeon, and the Physician-patient relationship will be maintained.

## Payment of Claims

All Plan benefits are payable to the provider of service, or subject to any written direction of the Employee. All or a portion of any payments provided by the Plan on account of Hospital, nursing, medical or surgical services may, at the Employee's option and unless the Employee requests otherwise in writing not later than the time of filing proof of such loss, be paid directly to the Hospital or person rendering such services; however, if any such benefit remains unpaid at the death of the Employee or if the participant is a minor or is, in the opinion of the Plan Administrator, legally incapable of giving a valid receipt and discharge for any payment, the Plan Administrator may, at its option, pay such benefits to any one or more of the following relatives of the Employee: wife, husband, mother, father, child or children, brother or brothers, sister or sisters. Any payment so made will constitute a complete discharge of the Plan's obligation to the extent of such payment, and the Plan will not be required to see the application of the money so paid.

## Assignment

Benefits may not be assigned except by consent of the Company, other than to Eligible Providers and according to the provisions set forth in the Plan Document.

## Rights Of Recovery

Whenever payments have been made by the Company with respect to allowable expenses in excess of the maximum amount of payment necessary to satisfy the intent of this Plan, the Company will have the right, exercisable alone and in its sole discretion, to recover such excess payments or to withhold payment of any future benefits to offset for such excess payments. The Plan has the right to recover these amounts through any legal or equitable remedy, including imposition of a constructive trust.

## Workers' Compensation Not Affected

This Plan is not in lieu of and does not affect any requirement for coverage by workers' compensation insurance.

## Legal Proceedings

No action at law or in equity will be brought to recover on the Plan until you have followed the Plan's claims procedures and exhausted the opportunities described under the Plan's claims procedures, nor will such action be brought at all unless brought within three (3) years of receiving the final review notice under the Plan's claims procedures.

## Conformity With Governing Law

If any provision of this Plan is contrary to any law to which it is subject, such provision is hereby amended to conform thereto.

## Permitted and Required Uses of Protected Health Information

Protected Health Information (PHI) is individually identifiable health information that is transmitted by electronic media, maintained in electronic media or transmitted or maintained in any other form or medium. PHI will only be released only to the following individual at the Company: Benefits Assistant and the Corporate Risk Manager.

Your health Plan will only provide Protected Health Information to the Plan Sponsor upon receipt of certification that the Plan Sponsor will agree to:

1. Not use or disclose the PHI other than as permitted or required by the Plan Document or as required by law;

2. Ensure that agents and subcontractors to whom the Plan Sponsor provides PHI agree to the same restrictions and conditions as the Plan Sponsor;

3. Not use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Plan Sponsor;

4. Report to the group health Plan any PHI use or disclosure, of which it becomes aware, that violates the permitted uses or disclosures under HIPAA;

5. Make PHI available in accordance with HIPAA privacy regulation, 45 CFR 164.524;

6. Make PHI available for amendment and incorporate those amendments as required by HIPAA privacy regulation, 45 CFR 164.526;

7.  Make information available to provide an accounting of disclosures as provided in HIPAA privacy regulation, 45 CFR 1464.528;

8.  Make its internal practices, books and records relating to the use and disclosure of PHI received from the group health plan available to the Secretary of the Department of Health and Human Services;

9.  If feasible, at termination of the relationship, return or destroy all PHI received from the group health plan, but if return or destruction is not feasible, limit further uses or disclosures to those purposes that make return or destruction of the information infeasible; and

10. Ensure adequate separation between employees who are authorized to use PHI and those who are not.

Any information supplied to the Plan Sponsor in order to process claims and claim payment will be kept confidential by all individuals within the Company who use this information in the normal course of business. These individuals will restrict access to and use of PHI by individuals other than for plan administration functions that the Plan Sponsor performs for the group health plan. Misuse or improper disclosure of PHI by any individual in the Company will result in disciplinary sanctions, which may include dismissal. The Company shall provide a mechanism for resolving issues of noncompliance. PHI will not be disclosed to a Plan Sponsor for employment-related activities or decisions or in connection with any other benefit plan of the Plan Sponsor.

## HIPAA Security Provision

Where electronic Protected Health Information (PHI) will be created, received, maintained, or transmitted to or by the Plan Sponsor on behalf of the Plan, the Plan Sponsor shall reasonably safeguard the electronic Protected Health Information as follows:

1.  Plan Sponsor shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that Plan Sponsor creates, receives, maintains, or transmits on behalf of the Plan;

2.  Plan Sponsor shall ensure that the adequate separation that is required by 45 C.F.R. sect. 164.504(f)(2)(iii) of the HIPAA Privacy Rule is supported by reasonable and appropriate security measures;

3.  Plan Sponsor shall ensure that any agent, including a subcontractor, to whom it provides electronic PHI agrees to implement reasonable and appropriate security measures to protect such information; and

4.  Plan Sponsor shall report to the Plan any "Security Incidents" of which it becomes aware as described below ("Security Incidents" has the meaning set forth in 45 C.F.R. sect. 164.304, as amended from time to time, and generally means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operations in an information system):

    a)  Plan Sponsor shall report to the Plan within a reasonable time after Plan Sponsor becomes aware, any "Security Incident" that results in unauthorized access, use, disclosure, modification, or destruction of the Plan's electronic Protected Health Information; and

    b)  Plan Sponsor shall report to the Plan any other "Security Incident" on an aggregate basis every quarter, or more frequently upon the Plan's request.

## Time Limitation

If any time limitation of the Plan with respect to giving notice of claim or furnishing proof of loss, or the bringing of an action at law or in equity is less than that permitted under the guidelines of ERISA and/or any federally mandated law, such limitation is hereby extended to agree with the minimum period permitted by such law.

## Statements

All statements made by the Company or by a Covered Individual will, in the absence of fraud, be considered representations and not warranties, and no statements made for the purpose of obtaining benefits under this Plan will be used in any contest to avoid or reduce the benefits provided by the Plan unless contained in a written application for benefits and a copy of the instrument containing such representation is or has been furnished to the Covered Individual.

Any Covered Individual who knowingly and with intent to defraud the Plan, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent act. The Covered Individual may be subject to prosecution by the United States Department of Labor. Fraudulently claiming benefits may be punishable by a substantial fine, imprisonment, or both.

## Miscellaneous

Section titles are for convenience of reference only, and are not to be considered in interpreting the Plan.

Pronouns used in this Plan Document shall include both masculine and feminine gender unless the context indicates otherwise. Likewise, words used shall be construed as though they were in the plural or singular number, according to the context.

No failure to enforce any provision of this Plan will affect the Company's right thereafter to enforce such provision, nor will such failure affect the Company's right to enforce any other provision of this Plan.

If an inadvertent error should occur due to interpretation of mandated benefits, relevant laws and regulations before the final regulations are issued, the Plan, Plan Administrator, Agent for the Service of Legal Process, Trustee, Claims Processor, and Company will be held harmless for such an error; and in no way will such an error be construed as a precedent-setting event.

Payment for expenses in relation to services which are generally accepted as cost-containment measures in large claim management cases that are not normally covered under this Plan will be reimbursable upon recommendation of the Claims Processor and written approval by the Plan Administrator.

## DEFINITIONS

### ACCIDENTAL INJURY

A condition which is the result of bodily Injury caused by an external force; or a condition caused as the result of an incident which is precipitated by an act of unusual circumstances likely to result in unexpected consequences; this incident must be of a sufficient departure from the claimant's normal and ordinary lifestyle or routine; the condition must be an instantaneous one, rather than one which continues, progresses or develops.

### ACTIVE WORK/ACTIVELY AT WORK

An Employee is considered to be at active work or actively at work when performing, in the customary manner, all of the regular duties of his occupation with the Company. An Employee shall be deemed at active work or actively at work on each day of a regular paid vacation; or on a regular non-working day, provided he was Actively at Work on the last preceding regular working day. A Covered Individual will be considered to be Actively at Work if he is absent solely due to a health reason.

### ALLOWABLE EXPENSES

Any Medically Necessary, Usual, Customary and Reasonable expense, incurred while you are eligible for benefits under this Plan.

### AMBULATORY SURGICAL CENTER

An institution or facility, either free-standing or as part of a Hospital, with permanent facilities, equipped and operated for the primary purpose of performing Surgical Procedures and to which a patient is admitted to and discharged from within a twenty-four (24) hour period. An office maintained by a Physician for the practice of medicine or dentistry or for the primary purpose of performing terminations of pregnancy shall not be considered to be an ambulatory surgical center.

### AMENDMENT

A formal document that changes the provisions of the Plan Document, duly signed by the authorized person or persons as designated by the Plan Administrator

### ANNUAL

Periodic, based on a Calendar Year.

### BENEFIT PERCENTAGE

That portion of Eligible Expenses to be paid by the Plan in accordance with the coverage provisions as stated in the Plan. It is the basis used to determine any out-of-pocket expenses in excess of the annual Deductible which are to be paid by the Employee.

**BENEFIT PERIOD**

A time period of one Calendar Year. Such benefit period will terminate on the earliest of the following dates:

1. The last day of the one-year period so established;
2. The day the Maximum Lifetime Benefit applicable to the Covered Individual becomes payable.

**CALENDAR YEAR**

A period of time commencing on January 1 and ending on December 31 of the same given year.

**CERTIFIED COUNSELOR**

An individual qualified by education, training, and experience to provide counseling in relation to emotional disorders, psychiatric conditions, or substance abuse.

**CHIROPRACTIC CARE**

Services performed by a person trained and licensed to practice chiropractic medicine, provided those services are for the remedy of diseases or conditions which the chiropractor is licensed to treat.

**CLAIM DETERMINATION PERIOD**

A Calendar Year or that portion of a Calendar Year during which the individual for whom claim is made has been covered under this Plan.

**CLAIMS PROCESSOR**

The person or firm employed by the Company to provide consulting services to the Company in connection with the operation of the Plan and any other functions, including the processing and payment of claims.

**CLOSE RELATIVE**

The spouse, parent, brother, sister, child, or spouse's parent of the Covered Individual.

**COBRA**

The Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**COINSURANCE**

That figure shown as a percentage in the Plan Summary used to compute the amount of benefit payable when the Plan states that a percentage is payable.

**COMPANY**

Titan International, Inc.

## CONFINEMENT

A continuous stay in the Hospital(s) or Skilled Nursing Facility/Extended Care Facility or combination thereof, due to an Illness or Injury diagnosed by a Physician.

## CO-PAYMENT

Co-payment is the fixed dollar amount you pay each time you receive certain covered services. The co-payment does not apply toward the Annual Deductible or out-of-pocket maximum and continues to be taken after the out-of-pocket maximum is met.

## COSMETIC PROCEDURE

A procedure performed to:

- change the texture or appearance of the skin; or

- change the relative size or position of any part of the body;

when such surgery is performed primarily for psychological purposes or for improvement of appearance rather than for restoration or improvement of a bodily function.

## COVERED INDIVIDUAL

Any Employee or Dependent of an Employee meeting the eligibility requirements for coverage as specified in this Plan, and properly enrolled in the Plan.

## CUSTODIAL CARE

That type of care or service, wherever furnished and by whatever name called, which is designed primarily to assist a Covered Individual, whether or not totally disabled, in the activities of daily living. Such activities include, but are not limited to: bathing, dressing, feeding, preparation of special diets, assistance in walking or in getting in and out of bed, and supervision over medication which can normally be self-administered.

## DEDUCTIBLE

A specified dollar amount of Eligible Expenses which must be incurred during a Benefit Period before any other Eligible Expenses can be considered for payment according to the applicable Benefit Percentage.

## DEFRA

The Deficit Reduction Act of 1984, as amended.

## DENTIST

An individual who is duly licensed to practice dentistry or perform oral surgery in the state where the dental service is performed and who is operating within the scope of his license. For the purpose of this definition, a Physician will be considered to be a Dentist when he performs any of the dental services described herein and is operating within the scope of his license.

**DEPENDENT**

The term "Dependent" means:

A.  The Employee's legal spouse, including a common law spouse, who is a member of the opposite sex and a resident of the same country in which the Employee resides. Such spouse must have met all requirements of a valid marriage contract of the State in which the marriage of such parties was performed. For the purposes of this definition, "spouse" shall not include a domestic partner.

B.  The Employee's child who meets all the following:

1.  Requirements

    a.  Is a resident of the same country in which the Employee resides.

    b.  Is unmarried.

    c.  Is a natural child, stepchild, legally adopted child, a child placed in the Employee's physical custody whom the Employee intends to adopt, a child for whom the Employee and/or the Employee's spouse has been named legal guardian, or a child for whom the Employee is legally financially responsible.

    d.  The child must be dependent upon the Employee for financial support.

    e.  Is less than nineteen (19) years of age, or less than twenty-seven (27) years of age and is a regular Full-Time Student at an accredited Educational Institution.

2.  Waivers

    a.  Requirements 1d., custody, and 1e., support, may be waived in the event the Employee/Employee's spouse is required to provide coverage due to a Qualified Medical Child Support Order (QMCSO), National Medical Support Order, court order or divorce decree.

    b.  Requirements 1d., custody, and 1e., financial support will be waived for those Dependents who satisfy the definition of dependent in every other way and who were covered under the health plan provided through the Company on the day immediately preceding the effective date of this Plan

    c.  Requirement 1e., dependent age limit, may be waived if the child is mentally or physically handicapped, provided that the child is incapable of self-sustaining employment and is allowed as a federal tax exemption by the Employee and/or the Employee's spouse. The child must have become handicapped before the end of the period they would become ineligible for benefits. Proof of incapacity must be furnished within 120 day after the Dependent would normally become ineligible, and may be requested from time to time.

Those situations specifically excluded from the definition of a Dependent are:

1.  Any person who is not a resident of the United States of America.

2.  A spouse who is legally separated or divorced from the Employee.

3.  A child who is married.

4.  Any person on active military duty.

5.  Any Dependent covered under this Plan as an individual Employee.

6.  Any person who is covered as a Dependent by another Employee of the Company.

48

## DEPENDENT COVERAGE

Eligibility under the terms of the Plan for benefits payable or Eligible Expenses of a Dependent.

## DURABLE MEDICAL EQUIPMENT

Equipment prescribed by the attending Physician which meets all of the following requirements: 1) it is Medically Necessary; 2) it can withstand repeated use; 3) it is not disposable; 4) it is not useful in the absence of an Illness or Injury; 5) it would have been covered if provided in a Hospital; and 6) it is appropriate for use in the home.

## EDUCATIONAL INSTITUTION

An institution accredited in the current publication of accredited institutions of higher education including vocational technical schools.

## ELIGIBLE EXPENSE

Any Medically Necessary treatment, services, or supplies that are not specifically excluded from coverage elsewhere in this Plan.

## ELIGIBLE PROVIDER

Eligible Providers shall include the following legally licensed or duly certified health care providers to the extent that same, within the scope of their license, are permitted to perform services which are considered Eligible Expenses under the Plan:

- Ambulatory Surgical Center
- Audiologist (MS)
- Birthing Center
- Certified Counselor
- Certified Registered Nurse Anesthetist
- Chiropractor
- Clinic
- Dentist
- Dialysis Center
- Home Health Agency
- Hospice
- Hospital
- Laboratory
- Licensed Practical Nurse
- Medical Supply Purveyor
- Midwife
- Nurse Practitioner
- Occupational Therapist
- Ophthalmologist
- Optometrist
- Oral Surgeon
 -Osteopath
- Outpatient Psychiatric Treatment Facility
- Outpatient Substance Abuse Treatment Facility
- Pharmacy/Pharmacist
- Physical Therapist
- Physician (M.D.)
- Physician's Assistant
- Podiatrist
- Professional ambulance service
- Psychiatrist
- Psychologist
- Registered Dietitian
- Registered Nurse
- Skilled Nursing Facility
- Social Worker
- Speech Therapist

"Eligible Provider" shall not include the Covered Individual or any close relative of the Covered Individual.

**EMERGENCY**

An accidental traumatic bodily injury or other medical condition that arises suddenly and unexpectedly and manifests itself by acute symptoms of such severity, including severe pain, that the absence of immediate medical attention could reasonably be expected by a prudent lay person who possesses an average knowledge of health and medicine to: 1) place an individual's health in serious jeopardy; 2) result in serious impairment to the individual's bodily functions; or 3) result in serious dysfunction of a bodily organ or part of the individual.

**EMPLOYEE**

An active Employee of the Company receiving compensation from the Company for services rendered to the Company. Employee means a person who is in an Employer-Employee relationship with the Company and who is classified by the Company as a regular Employee. The term "Employee" shall not include any individual classified by the Company as an independent contractor, a consultant, an individual performing services for the Company who has entered into an independent contractor or consultant agreement with the Company (even if a court, the Internal Revenue Service, or any other entity determines that such individual is a common-law employee) or a leased employee as defined in Section 414(n) of the Code. The term Employee does not include any employee covered by a collective bargaining agreement that does not provide for coverage under the Plan, provided that health care benefits were the subject of good faith bargaining between the employee's bargaining representative and the Company. The term Employee does not include an employee classified by the Company as a temporary employee.

**EMPLOYEE COVERAGE**

Eligibility under the terms of the Plan for benefits payable for Eligible Expenses of an Employee.

**ERISA**

The Employee Retirement Income Security Act of 1974, as amended.

**EXPENSES INCURRED**

The day supplies or services are rendered.

**EXPERIMENTAL**

Any medical procedure, equipment, treatment, or course of treatment, or drug or medicine that is limited to research, not proven in an objective manner to have therapeutic value or benefit, restricted to use at medical facilities capable of carrying out scientific studies, or is of questionable medical effectiveness. To determine whether a procedure is experimental the Company will consider, among other things, commissioned studies, opinions, and references to or by the American Medical Association, the Federal Drug Administration, the Department of Health and Human Services, the National Institute of Health, the Council of Medical Specialty Societies and any other association or federal program or agency that has the authority to approve medical testing or treatment.

**FAMILY**

A Covered Employee and his eligible Dependents.

**FULL-TIME STUDENT**

An Employee's Dependent child who is enrolled in and regularly attending an accredited educational institution for the minimum number of credit hours required by that institution in order to maintain full-time student status.

**FULL-TIME WORK**

A basis whereby an Employee works for the Company on a regular basis, for the hourly requirement provided in the union contract. Such work may occur either at the usual place of business of the Company or at a location to which the business of the Company requires the Employee to travel and for which he receives regular earnings from the Company.

**HOME HEALTH CARE AGENCY**

A Medicare-approved public or private agency or organization that specializes in providing medical care and treatment in the home. Such a provider must be primarily engaged in and duly licensed by the appropriate licensing authority (if such licensing is required) to provide skilled nursing services and other therapeutic services. It must have policies established by a professional group associated with the agency or organization including at least one Physician and at least one Registered Nurse (R.N.) to govern the services provided, and it must provide for full-time supervision of such services by a Physician or Registered Nurse. Its staff must maintain a complete medical record on each individual and it must have a full-time administrator.

**HOME HEALTH CARE PLAN**

A program for continued care and treatment of the Covered Individual, established and approved in writing by the Covered Individual's attending Physician. The attending Physician must certify that the proper treatment of the Illness or Injury would require continued Confinement as a resident inpatient in a Hospital or Skilled Nursing Facility in the absence of the services and supplies provided as part of the Home Health Care Plan.

**HOSPICE**

A health care program providing a coordinated set of services rendered at home, in Outpatient settings, or in institutional settings for Covered Individuals suffering from a condition that has a terminal prognosis. A Hospice must have an interdisciplinary group of personnel which includes at least one Physician and one Registered Nurse, and its staff must maintain central clinical records on all patients. A Hospice must meet the standards of the National Hospice Organization (NHO) and applicable state licensing.

**HOSPITAL**

An institution which meets all of the following conditions:

1. It is engaged primarily in providing medical care and treatment to an ill or injured person on an inpatient basis at the patient's expense.

2. It is constituted, licensed, and operated in accordance with the laws of jurisdiction in which it is located which pertain to hospitals.

3. It maintains on its premises all the facilities necessary to provide for the diagnosis and medical and surgical treatment of an Illness or an Injury.

51

4. Such treatment is provided for compensation by or under the supervision of Physicians, with continuous twenty-four (24) hour nursing services by Registered Nurses (R.N.'s).

5. It is a provider of services under Medicare.

6. It is not, other than incidentally, a place for rest, a place for the aged, or a nursing home.

The definition of "Hospital" will also include an institution qualified for the treatment of psychiatric problems, substance abuse, or tuberculosis that does not have surgical facilities and/or is not approved by Medicare, provided that such institution satisfies the definition of Hospital in all other respects.

## HOSPITAL MISCELLANEOUS EXPENSES

The actual charges made by a Hospital in its own behalf for services and supplies rendered to the Covered Individual which are Medically Necessary for the treatment of such Covered Individual. Hospital miscellaneous expenses do not include charges for room and board or for professional services (including intensive nursing care by whatever name called), regardless of whether the services are rendered under the direction of the Hospital or otherwise.

## ILLNESS

A bodily disorder, disease, physical Sickness, mental infirmity, or functional nervous disorder of a Covered Individual. Illness shall include pregnancy and any complications of pregnancy.

## IN-NETWORK BENEFIT

The benefit percentage paid if a Covered Individual utilizes the services of a Network Provider.

## INJURY

The term "Injury" shall mean only accidental bodily Injury caused by an external force. All injuries to one person from one accident shall be considered an "Injury."

## INPATIENT CARE

Hospital Room and Board and general nursing care for a person confined in a Hospital or Skilled Nursing Facility/Extended Care Facility as a bed patient. Observation care that extends beyond twenty-three (23) hours will be considered inpatient and allowed at the rate of inpatient care.

## INTENSIVE CARE UNIT (ICU)

An area within a Hospital which is reserved, equipped, and staffed by the Hospital for the treatment and care of critically ill patients who require extraordinary, continuous, and intensive nursing care for the preservation of life.

## LICENSED PRACTICAL NURSE (L.P.N.)

An individual who has received specialized nursing training and practical nursing experience, and is duly licensed to perform such nursing services by the state or regulatory agency responsible for such licensing in the state in which that individual performs such services.

## LIFETIME

The term "lifetime," which is used in connection with benefit maximums and limitations, means the period during which the person is covered under the Company Health Plan, whether or not coverage is continuous. Under no circumstances does "lifetime" mean during the lifetime of the Covered Individual.

## MEDICALLY NECESSARY

The service a patient receives which is recommended by a Physician and is required to treat the symptoms of a certain Illness or Injury. Although the service may be prescribed by a Physician, it does not mean the service is Medically Necessary. The care or treatment 1) must be consistent with the diagnosis and prescribed course of treatment for the Covered Individual's condition; 2) must be required for reasons other than the convenience of the Covered Individual or the attending Physician; 3) is generally accepted as an appropriate form of care for the condition being treated; and 4) is likely to result in physical improvement of the patient's condition which is unlikely to ever occur if the treatment is not administered.

## MEDICARE

The medical care benefits provided under Title XVIII of the Social Security Act of 1965, as subsequently amended.

## NAMED FIDUCIARY

Titan International, Inc., which has the authority to control and manage the operation and administration of the Plan.

## NEWBORN

An infant from the date of birth until the mother is discharged from the Hospital.

## OCCUPATIONAL THERAPIST

A licensed practitioner who treats, primarily, the loss of motor function of skeletal muscles by educating the patient to use other muscles and/or artificial devices to enable them to perform acceptably in any particular occupation or the ordinary tasks of daily living.

## OUT-OF-NETWORK BENEFIT

The benefit percentage paid if a Covered Individual receives services from a provider who is not contracted with the Preferred Provider Organization.

## OUTPATIENT

The classification of a Covered Individual when that Covered Individual received medical care, treatment, services, or supplies at a clinic, a Physician's office, a Hospital if not a registered bed patient at that Hospital, an Outpatient Psychiatric Treatment Facility, or an Outpatient Substance Abuse Treatment Facility.

## OUTPATIENT PSYCHIATRIC TREATMENT FACILITY

An administratively distinct governmental, public, private or independent unit or part of such unit that provides Outpatient mental health services and which provides for a psychiatrist who has regularly scheduled hours in the facility, and who assumes the overall responsibility for coordinating the care of all patients.

## OUTPATIENT SUBSTANCE ABUSE TREATMENT FACILITY

An institution which provides a program for diagnosis, evaluation, and effective treatment of alcoholism and/or substance abuse; provides detoxification services needed with its effective treatment program; provides infirmary-level medical services that may be required; is at all times supervised by a staff of Physicians; prepares and maintains a written plan of treatment for each patient, based on the patient's medical, psychological, and social needs and supervised by a Physician; and meets licensing standards.

## OUTPATIENT SURGERY

Outpatient surgery includes, *but is not limited to*, the following types of procedures performed in a hospital or surgi-center:

1. Operative or cutting procedures for the treatment of an illness or injury;

2. The treatment of fractures and dislocations; or

3. Endoscopic or diagnostic procedures such as biopsies, cystoscopy, bronchoscopy, and angiocardiography.

## PHYSICAL THERAPIST

A licensed practitioner who treats patients by means of electro-, hydro-, aero-, and mechano-therapy, massage and therapeutic exercises. Where there is no licensure law, the physical therapist must be certified by the appropriate professional body.

## PHYSICIAN

A legally licensed medical or dental doctor or surgeon, osteopath, podiatrist, optometrist, chiropractor or registered clinical psychologist to the extent that same, within the scope of his license, is permitted to perform services provided in this Plan. A Physician shall not include the Covered Individual or any Close Relative of the Covered Individual.

## PLAN

The term "Plan" means without qualification the Plan outlined herein.

## PLAN ADMINISTRATOR

The Company, which is responsible for the management of the Plan. The Plan Administrator may employ persons or firms to process claims and perform other Plan-connected services.

## PLAN SPONSOR

Titan International, Inc.

**PPO**

Preferred Provider Organization

## PRE-AUTHORIZATION

Pre-Authorization determines whether a proposed treatment is covered by the Health Plan. An Eligible Provider or a Covered Individual may submit information to the Claims Processor regarding a proposed service to determine if and at what level the service is covered by the Plan.

## PREFERRED PROVIDER ORGANIZATION

An Organization that has contracted with the Plan Sponsor to provide services to Covered Individuals at specific rates.

## PREGNANCY

That physical state which results in childbirth, abortion, or miscarriage, and any medical complications arising out of or resulting from such state.

## PRESCRIPTION

All drugs that are required under Federal law to bear the label, "Caution: Federal law prohibits dispensing without prescription," or any substitute required label, and injectable insulin (whether or not by prescription), as long as the drug was prescribed by a licensed Physician.

## PRIMARY PLAN

A plan whose allowable benefits are not reduced by those of another plan.

## PRONOUNS

Any references to "You, Yours, or Yourself" means the eligible Employee and Covered Dependents. "He, His, Him" refers to either sex; not to be discriminatory, but to avoid "he/she" type wording.

## PSYCHIATRIC CARE

The term "psychiatric care," also known as psychoanalytic care, means treatment for a mental Illness or disorder, a functional nervous disorder, alcoholism, or drug addiction. A psychiatric condition includes but is not limited to anorexia nervosa and bulimia, schizophrenia, and depressive disorders including but not limited to manic depression.

## PSYCHOLOGIST

A registered clinical psychologist. A provider who has a doctorate degree in psychology with two (2) years clinical experience and who meets the standards of a national register.

## QUALIFIED MEDICAL CHILD SUPPORT ORDER (QMCSO)

In order to meet the definition of a Qualified Medical Child Support Order (QMCSO), a court order or divorce decree must contain <u>all</u> of the following information:

1. The Employee's name and last known address.

2. The Dependent's full name and address.

3. A reasonable description of the coverage to be provided or the manner in which coverage will be established, i.e. through the employer.

4. The period for which coverage must be provided.

A National Medical Support notice, issued pursuant to ERISA section 609(a)(5)(C) and applicable regulations, will also meet the definition of a QMCSO.

## REGISTERED NURSE (R.N.)

An individual who has received specialized nursing training and is authorized to use the designation of "R.N.," and who is duly licensed by the state or regulatory agency responsible for such licensing in the state in which the individual performs such nursing services.

## REVIEW ORGANIZATION

The organization contracting with the Company to perform cost containment services.

## ROOM AND BOARD

All charges, by whatever name called, which are made by a Hospital, Hospice, or Skilled Nursing Facility/Extended Care Facility as a condition of occupancy. Such charges do not include the professional services of Physicians nor intensive nursing care (by whatever name called).

## SEMI-PRIVATE

A class of accommodations in a Hospital or Skilled Nursing Facility/Extended Care Facility in which at least two patient beds are available per room.

## SKILLED NURSING FACILITY or EXTENDED CARE FACILITY

An institution, or distinct part thereof, operated pursuant to law, and one which meets all of the following conditions:

1. It is licensed to provide and is engaged in providing, on an inpatient basis for persons convalescing from Injury or Illness, professional nursing services rendered by a Registered Nurse (R.N.) or by a Licensed Practical Nurse (L.P.N.) under the direction of a Registered Nurse and physical restoration services to assist patients to reach a degree of body functioning to permit self-care in essential daily living activities.

2. Its services are provided for compensation from its patients and under the full-time supervision of a Physician or Registered Nurse.

3. It provides twenty-four (24)-hour per day nursing services by licensed nurses, under the direction of a full-time Registered Nurse.

4. Its staff maintains a complete medical record on each patient.

5. It has an effective utilization review plan.

6.  It is not, other than incidentally, a place for rest, the aged, drug addicts, alcoholics, mentally handicapped, custodial or educational care, or care of mental disorders.

7.  It is approved and licensed by Medicare

This term shall apply to expenses incurred in an institution referring to itself as a Skilled Nursing Facility, Extended Care Facility, or any such other similar facility.

## SOCIAL WORKER

An individual who is qualified through education, training, and experience to provide services in relation to the treatment of emotional disorders, psychiatric conditions, or substance abuse.

## SPEECH THERAPIST

An individual who is skilled in the treatment of communication and swallowing disorders due to Illness, Injury or birth defect, who is a member of the American Speech and Hearing Association and has a Certificate of Clinical Competence and who is licensed in the state in which services are provided.

## SURGICAL PROCEDURES

Cutting, suturing, treatment of burns, correction of fractures, reduction of dislocation, manipulation of joints under general anesthesia, electrocauterization, tapping (paracentesis), application of plaster casts, administration of pneumothorax, endoscopy, or injection of sclerosing solution by a licensed Physician.

## TEFRA

The Tax Equity and Fiscal Responsibility Act of 1982, as amended from time to time.

## THERAPY SERVICES

Services or supplies used for the treatment of an Illness or Injury to promote the recovery of a Covered Individual.  Therapy services are covered to the extent specified in the Plan and may include:

1.  Chemotherapy - the treatment of malignant disease by chemical or biological antineoplastic agents.

2.  Dialysis Treatments - the treatment of acute or chronic kidney disease which may include the supportive use of an artificial kidney machine.

3.  Occupational Therapy - treatment of a physically disabled person by means of constructive activities designed and adapted to promote the restoration of the person's ability to satisfactorily accomplish the ordinary tasks of daily living and those required by the person's particular occupational role.

4.  Physical Therapy - the treatment by physical means, electrotherapy, hydrotherapy, heat, or similar modalities, physical agents, bio-mechanical and neuro-physiological principles, and devices to relieve pain, restore maximum function, and prevent disability following disease, Injury, or loss of body part.

5.  Radiation Therapy - the treatment of disease by X-ray, radium, or radioactive isotopes.

6.  Respiration Therapy - introduction of dry or moist gases into the lungs for treatment purposes.

7.  Speech Therapy - treatment of communication and swallowing disorders due to an Illness, Injury or birth defect.

**TMJ**

"TMJ" means temporomandibular joint syndrome and all related complications or conditions.

**TOTAL DISABILITY (TOTALLY DISABLED)**

A physical state of a Covered Individual resulting from an Illness or Injury which wholly prevents:

1.  An Employee from engaging in his regular or customary occupation and from performing any and all work for compensation or profit.

2.  A Dependent from performing the normal activities of a person of like age and sex and in good health.

**USUAL, CUSTOMARY AND REASONABLE  (UCR)**

The term "usual, customary, and reasonable" refers to the designation of a charge as being the usual charge made by a Physician or other provider of services, supplies, medications, or equipment that does not exceed the general level of charges made by other providers rendering or furnishing such care or treatment within the same area.  The term "area" in this definition means a county or such other area as is necessary to obtain a representative cross section of such charges.  Due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances which require additional time, skill, or expertise.

**WELL-CARE**

The term "well-care" means medical treatment, services, or supplies rendered solely for the purpose of health maintenance and *not* for the treatment of an Illness or Injury.